THE LAW OFFICES OF GARY W. GORSKI
Gary W. Gorski - SBN: 166526
1207 Front St., Suite 15
Sacramento, CA  95814
Tel. (916) 965-6800
Fax (916) 965-6801
usrugby@gmail.com

Attorney for Plaintiff

THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THERESE MARIE PIZZO, | ) | Case No. 09-CV-04493-CW |
| Plaintiff, | ) | |
| vs. | ) | **PLAINTIFF'S JOINDER TO SAN** |
| CITY AND COUNTY OF SAN FRANCISCO | ) | **FRANCISCO DEFENDANTS'** |
| MAYOR GAVIN NEWSOM, in both his | ) | **OPPOSITION TO MOTION FOR** |
| individual and official capacities; FORMER | ) | **AMICUS CURIAE STATUS BY** |
| SAN FRANCISCO POLICE DEPARTMENT; | ) | **NATIONAL RIFLE ASSOCIATION;** |
| CHIEF OF POLICE HEATHER FONG, in both | ) | **DECLARATION OF GARY W. GORSKI** |
| her individual and official capacities; SAN | ) | |
| FRANCISCO POLICE DEPARTMENT CHIEF | ) | **Hearing Date: May 5, 2011** |
| OF POLICE GEORGE GASCON, in his official | ) | **Time: 2:00 p.m.** |
| capacity; SAN FRANCISCO SHERIFF | ) | **Place: Courtroom 2, 4th Floor** |
| MICHAEL HENNESSEY, in both his | ) | |
| individual and official capacities; CITY AND | ) | |
| COUNTY OF SAN FRANCISCO; and STATE | ) | |
| OF CALIFORNIA ATTORNEY GENERAL | ) | |
| EDMUND G. BROWN, in his official capacity, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S JOINDER TO SAN FRANCISCO DEFENDANTS' OPPOSITION TO
MOTION FOR AMICUS CURIAE STATUS BY NATIONAL RIFLE ASSOCIATION**

Plaintiff hereby <u>joins</u> SAN FRANCISCO DEFENDANTS' OPPOSITION TO MOTION

FOR AMICUS CURIAE STATUS BY NATIONAL RIFLE ASSOCIATION, and concurrently files

the attached Declaration of Gary W. Gorski in <u>support</u> of SAN FRANCISCO DEFENDANTS.

For the reasons stated in SAN FRANCISCO DEFENDANTS' OPPOSITION TO MOTION

**- 1 -**

1   FOR AMICUS CURIAE STATUS BY NATIONAL RIFLE ASSOCIATION and the attached

2   supporting declaration of Gary W. Gorski, The National Rifle Association's motion should be

3   denied.

4
                                                    Respectfully submitted,
5                                                   LAW OFFICES OF GARY W. GORSKI
    Date:    April 19, 2011                         /S/ Gary W. Gorski
6                                                   GARY W. GORSKI
                                                    Attorney for Plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF GARY W. GORSKI

I, Gary W. Gorski, declare under the penalty of perjury as follows:

1. The facts contained herein are of my own personal knowledge, and if called upon to testify, I can state them based upon my own personal knowledge.

2. I was the lead attorney in the case of *Silveira v. Lockyer*, 312 F.3d 1062 (9th Cir. 2002) reh'g en banc denied, 328 F.3d 567, cert. denied, 124 S. Ct. 803 (2003).

3. In *Silveira v. Lockyer*, 312 F.3d 1052, 1087-8 (9th Cir. 2002), the 9th Circuit acknowledged that if the Second Amendment conferred a fundamental right, then strict scrutiny would apply. See also *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008) and *McDonald v. Chicago*, 561 U.S. ___ (2010).

4. More importantly, in *Silveira v. Lockyer*, at 1090, with regard to the statutorily granted privilege of exempting retired cops from California's restrictive gun laws, the Ninth Circuit held that "... the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs", and thereby struck down that portion of the statute that was challenged in *Silveira* by my clients.

5. In other words, my clients obtained a partial victory. However, not being content with the ruling, I petitioned the Ninth Circuit for en banc consideration. The following facts followed that petition.

6. Sometime prior to January 8, 2003, I was contacted by Steven Holbrook and Chuck Michel, both NRA attorneys, and in this phone conversation they asked me to dismiss my *Silveira* case because it would interfere with other projects the NRA was working on "behind the scenes." I declined their invitation as it was not my case, but my clients case, and my clients have the right to pursue the case all the way.

7. Thereafter, and again prior to January 8, 2003, I received another phone call from Mr. Chuck Michelle (NRA's attorney) requesting two things: 1) an electronic copy of my brief, and 2) permission for an amicus brief to be filed on behalf of the California Rifle Pistol Association. Mr. Michelle was very specific that the amicus brief to be filed would actually support my clients.

8.     Based upon the specific representations of Mr. Michelle, I agreed to email him a copy of my brief and he agreed to email me a copy of his at the time of filing.  In addition, I agreed to consent to his amicus filing on his representation that it would support my clients – and not adversely affect them.

9.     On January 8 or 9th, 2003, Mr. Michelle filed the attached amicus brief marked as Exhibit "A".  (Attached hereto as Exhibit "A" is a true and correct copy of the AMICUS CURIAE BRIEF OF THE CALIFORNIA RIFLE &PISTOL ASSOCIATION, INC., IN SUPPORT OF NEITHER PARTY, IN SUPPORT OF THE PETITION FOR REHEARING EN BANC, AND IN SUPPORT OF AFFIRMANCE ON OTHER GROUNDS.)

10.    On January 9, 2003, Thursday evening, I received a phone call from a male identifying himself from the NRA.  He verified my NRA membership information (I am no longer a member nor have I been for many years.), such as my address, and asked a few questions as to whether I was aware that the 9th Circuit said that I do not have a right to own a gun.

11.    He then proceeded to play a taped message from Charlton Heston speaking in generalizations about the decision. After the taped message, the telephone solicitor asked me to extend my NRA membership by paying three years in advance to help fight the Ninth Circuit on the case. Curious, I asked who the attorneys were working on the case, and he said the NRA has a whole legion of attorneys "fighting the case" all the way to the Supreme Court.

12.    I asked him the name of the case, and he said *Silveira v. Lockyer*. I then asked him specifically what the NRA's attorneys were doing on the case, and he said that "they were going to take the case to the Supreme Court" to get the decision overturned.

13.    I asked where he was calling from, and he said the NRA in Virginia (The NRA's legal counsel is in VA - 11250 Waples Mill Road, Fairfax, Va. 22030.)

14.    I then told him who I was and that I was the attorney on the case he is asking me to support; he appeared dumfounded. He said it was a pleasure talking to me, and thanked me for all my hard work. I asked to speak to a manager, and he hung up the phone.

15.    The following MEDIA RELEASE was sent out via email by the California Rifle & Pistol Association, Inc. and Chuck Michel on January 15, 2003, as well as it being posted on it

**- 4 -**

1    website:

2    California Rifle & Pistol Association, Inc.
     271 East Imperial Highway
3    Fullerton, California 92835
     www.crpa.org
4    For Immediate Release: January 15, 2003
     For Additional Information Contact: Chuck Michel (310) 548-3703

5

6    CRPA FILES AMICUS BRIEF IN NINTH CIRCUIT COURT ON SECOND
     AMENDMENT CASE

7    Recently, in Silveira vs. Lockyer, the Ninth Circuit Court of Appeal ruled that the
     Second Amendment does not create an individual right. The ill-advised three judge
8    panel decision was written by Justice Reinhardt, perhaps the most liberal judge on the
     court. On December 15, 2002 plaintiffs petitioned the en banc 9th Circuit court to
9    review the case, asking the entire court to overrule the panel's decision.

10   On January 9th, the California Rifle and Pistol Association (CRPA) filed a
     friend-of-the-court "amicus" brief in the case, urging the en banc Ninth Circuit to
11   reverse Judge Reinhardt's decision on procedural grounds. The amicus brief, which
     was filed independently on behalf of neither party, urges the court to reverse
12   Reinhardt's decision and dismiss the case because the plaintiffs lacked legal
     "standing." If the court adopts CRPA's position, Reinhardt's decision would be
13   invalidated and have no legal value as precedent.

14   "While the lawyers that brought this suit are well-intentioned, this suit was
     strategically ill-advised from its inception," said CRPA attorney and spokesman,
15   Chuck Michel. "The case raises too many issues for a court to digest in one lawsuit,
     and the court records make it apparent that it was not given the resources required to
16   properly litigate any of the issues involved. The decision was as predictable as it was
     avoidable. The case played right into Justice Reinhardt's biased hands."

17
     The suit was brought in response to the passage of Senate Bill 23, the 1999
18   amendments to the 1989
     "assault weapon" control act. CRPA's brief points out that, among other problems, it
19   appears that none of the plaintiffs could sufficiently allege an interest in the issues
     presented to even have legitimate legal standing to bring the case in the first place.
20   According to a San Francisco Chronicle interview with the lead lawyer on the case,
     not all of the plaintiffs own guns, and those who do don't necessarily own guns SB23
21   designated as "assault weapons.

22   On October 16, 2001, while the Silveira case was pending, the U.S. Fifth Circuit
     Court of Appeals ruled that the Second Amendment does create an individual right in
23   U. S. v. Emerson (10/16/01). Emerson is a tremendous victory for all who believe in
     the fundamental right to keep and bear arms, and in the Second Amendment of the
24   United States Constitution. Had the Ninth Circuit's decision been issued before the
     Emerson opinion came out, it would almost certainly have been another short
25   reiteration of the three previous short anti-Second Amendment decisions from the
     Ninth Circuit.

26
     "The Emerson decision makes choosing our next steps all the more critical," Michel
27   said. "Ultimately, pro-self-defense civil rights attorneys look forward to steering an
     appropriate Second Amendment case to the United States Supreme Court. But it
28   cannot be just any case. The issues must be carefully selected, and then

                                        - 5 -

comprehensively and competently presented. In 100 or 1000 years, when our children or children's children look back, they will not care if the Supreme Court rules in 2003 or 2013.

The Silveira case does not meet basic justiciability standards."  CRPA and other self defense civil rights associations are supportive of efforts to get an appropriate case to the Supreme Court. A challenge to the Washington, D.C. handgun ban being prepared by the CATO Institute would be a much more appropriate vehicle to advance the issues.

Although CRPA is the official state association of the National Rifle Association, CRPA is a stand alone California non profit corporation, independently controlled by its own Board of Directors. After reviewing the Silveira case history, CRPA's Legislative and Litigation Committees decided that filing the amicus brief was appropriate. CRPA's 70,000 members include law enforcement officers, prosecutors, professionals, firearm experts, the general public, and loving parents. CRPA instructors have been teaching safe and responsible firearms ownership to those who choose to own a gun for sport or self defense for over 125 years.

16.   In sum, Mr. Michelle and the organizations he represents actually funded and filed an amicus brief in *Silveira* that argued that my clients did not have standing.

17.   However, <u>after</u> I filed a Cert Petition in *Silveira*, and it looked like the U.S. Supreme Court could actually grant cert, NRA attorneys filed an Amicus brief before the Supreme Court arguing the complete opposite of Mr. Michelle – that the Plaintiffs in Silveira did have standing!  (Attached hereto as Exhibit "B" is a true and correct copy of the BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION IN SUPPORT OF PETITIONERS)

18.   In sum, and based upon my own personal experience, it is my opinion that Mr. Micelle, the National Rifle Association and the California Rifle & Pistol Association, Inc. are officious meddlers and any involvement in this case would not be in the best interest of any party or the court.

I declare under the penalty of perjury that the above facts are true and correct and of my own personal knowledge.  Executed in Sacramento, CA on Tuesday, April 19, 2011.

Date:   Tuesday, April 19, 2011             /S/ Gary W. Gorski_____
                                           GARY W. GORSKI, Declarant

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

01-15098

_____

SEAN SILVEIRA, *et al.*,
Appellants

v.

BILL LOCKYER, *et al.*,
Appellees

_____

**AMICUS CURIAE BRIEF OF THE CALIFORNIA RIFLE &PISTOL
ASSOCIATION, INC., IN SUPPORT OF NEITHER PARTY,
IN SUPPORT OF THE PETITION FOR REHEARING EN BANC,
AND IN SUPPORT OF AFFIRMANCE ON OTHER GROUNDS**

_____

Appeal from the U.S. District Court
for the Eastern District of California
D.C. No.  CIV S 00 411 WBS/JFM

C.D. Michel – S.B.N. 144258
TRUTANICH MICHEL, LLP
Port of Los Angeles
407 North Harbor Boulevard
San Pedro, California 90731
(310) 548-0410
Counsel for Amicus Curiae

Exhibit "A"

## CORPORATE DISCLOSURE STATEMENT

The California Rifle & Pistol Association, Inc., has no parent corporations.

Since it has no stock, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT   . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

IDENTITY OF THE AMICUS CURIAE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT:  THE PANEL RENDERED AN ADVISORY OPINION
 NOT ARISING OUT OF A CONCRETE "CASE OR CONTROVERSY"
 UNDER ARTICLE III  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

# TABLE OF AUTHORITIES

**CASES** **Page**

*Citizens for a Safer Community v. Rochester*, 627 N.Y.S.2d 193 (Sup. 1994) . . 11

*Coalition of New Jersey Sportsmen v. Whitman*, 44 F. Supp.2d 666
(D. N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001), *cert. denied*,
122 S. Ct. 613 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Doe v. San Francisco*, 136 Cal. App. 3d 509, 186 Cal. Rptr. 380 (1982) . . . . . . 11

*Emerson v. United States*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*,
122 S. Ct. 2362 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

*Fresno Rifle & Pistol Club v. Van de Kamp*, 965 F.2d 723 (9th Cir. 1992) . 11, 12

*Griswold v. Connecticut*, 381 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Harrott v. County of Kings*, 25 Cal. 4th 1138, 108 Cal. Rptr. 2d 445,
25 P.3d 649 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hickman v. Block*, 81 F.3d 98 (9th Cir. 1996), *cert. denied*, 519 U.S. 912
(1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . 8

*Miller v. Texas*, 153 U.S. 535 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Muscarello v. United States*, 524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . 13

*National Rifle Association v. City of South Miami*, 812 So. 2d 504 (2002) . . . . . 11

*Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522
(6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) . . . . . . . 12

*San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121
(9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 9

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) . . . . . . . . . . . . . . . . 12, 14, 15

*United States v. Gomez*, 92 F.3d 770 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 13

iii

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## CONSTITUTION

U.S. Const., Art. I, § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const., Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7, 8, 9

U.S. Const., Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const., Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amendment IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const., Amendment X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const., Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

## STATUTES

Firearms Owners' Protection Act, §1(b), P.L. 99-308, 100 Stat. 449 (1986) . . . 15

Freedmen's Bureau Act, §14, 14 Stat. 176 (1866) . . . . . . . . . . . . . . . . . . . . . 12, 15

Property Requisition Act, P.L. 274, 55 Stat. 742 (1941) . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 2106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Roberti-Roos Assault Weapons Control Act of 1989 . . . . . . . . . . . . . . . . . . . 3, 11

Cal. Penal Code § 12280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Cal. Penal Code § 12276 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Penal Code § 12276.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Penal Code § 12276.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## RULES

F.R.Civ.P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

F.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**OTHER AUTHORITIES**

"A Lonely Fight for Gun Rights," *San Francisco Chronicle*,
 Dec. 23, 2002, A1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Documentary History of the Ratification of the Constitution* (2000) . . . . . . . . . . 13

## IDENTITY OF THE AMICUS CURIAE

The California Rifle and Pistol Association, Inc. ("CRPA") is a California not-for-profit corporation founded in 1875. The CRPA, which has almost 70,000 members, is dedicated to representing the interests of all sportsmen, sportswomen, and firearm owners in California. The CRPA sponsors legislation on behalf of its members to guarantee the right of law-abiding persons to have and use firearms for sporting purposes, hunting, collecting, and lawful self defense. It conducts outreach programs and provides educational material to the public regarding the safe and proper use of firearms, wildlife preservation and management, and the Second Amendment right of the people to keep and bear arms. The CRPA actively promotes the shooting sports, providing education, training, and organized competition in adult and junior venues. It also sponsors local and state adult and junior shooting teams which compete in national competitions each year.

CRPA's interest in this case stems from the fact that its membership resides in California and are subject to the stringent legal requirements of the laws in question, are adversely affected by the panel opinion at issue, and will be affected by any other decision of this Court concerning the nature of the Second Amendment.

Appellants object to the filing of this amicus curiae brief. Appellees consent to the filing of this amicus curiae brief.

### ARGUMENT: THE PANEL RENDERED AN ADVISORY OPINION NOT ARISING OUT OF A CONCRETE "CASE OR CONTROVERSY" UNDER ARTICLE III

Amicus Curiae CRPA suggests that the petition for rehearing be granted by the

panel or, alternatively, that the petition for rehearing en banc be granted;  that the panel opinion be vacated; and that the judgment of dismissal be affirmed based on the failure of the complaint to allege sufficient injury to plaintiffs and the consequent lack of standing and ripeness to decide this case.[1]

The panel decision is an advisory opinion that was not the result of a concrete "case or controversy" under Article III of the U.S. Constitution between parties with a genuine dispute.  The complaint in this case fails to allege with particularly that specific plaintiffs possess specific firearms that are subject to the laws at issue and that they are individually injured by the enforcement thereof.  The panel decision conflicts with the general principles of standing and ripeness set forth in  *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), and consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions.  The panel decision conflicts with the authoritative decision of another United States court of appeals that addressed the issue, *Emerson v. United States*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 2362 (2002), but this conflict should not be resolved in this case in that it fails to present a genuine case or controversy under Article III.

---

[1] 28 U.S.C. § 2106 provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

The panel unnecessarily decided a complex constitutional issue and expanded this Circuit's precedents on the Second Amendment based on an action in which plaintiffs suffered no injury, did not have ordinary Article III standing, and which was never ripe for decision.

The complaint woefully fails the minimal tests for standing and ripeness. The only specificity alleged about the plaintiffs is that each one is a resident of California, has an identified background and employment, and that seven of the nine plaintiffs are identified as a "model citizen." First Amended Complaint ¶s 33-41. No allegation exists that any specific plaintiff possesses a specific firearm subject to the Act and how the Act and defendants' enforcement thereof is the proximate cause of harm to such specific plaintiff.[2]

Instead, the complaint makes the single, vague allegation that: "Plaintiffs *own, or would like to own*, semi-automatic rifles and/or pistols subject to the terms of the statute which prohibits and/or restricts possession, use, transfer and/or sale of semi-automatic rifles and/or pistols." ¶ 31 (emphasis added). This equivocates on whether any plaintiffs actually and presently "own" such items or whether they would merely "like to own" them in some indefinite future.[3] Saying that one would "like to own"

---

[2] The "Act" as used herein refers to California's Roberti-Roos Assault Weapons Control Act of 1989, as amended in 1991 (S.B. 263) and 1999 (S.B. 23). Its core provision is P.C. § 12280, which provides criminal penalties for the transfer, possession, and other activities with "assault weapons." However, the complaint also refers to various other provisions of California law.

[3] Plaintiffs' counsel in this case "filed the challenge on behalf of nine plaintiffs -- most of them rugby buddies. . . . Marcus Davis, one of the rugby-playing plaintiffs . . . said he owns a few deer rifles and shotguns but has no assault weapons himself.

3

something is a far cry from saying that such person would expeditiously obtain such item but for the existence of some barrier (such as the law), and that the person is injured by not being allowed to obtain it.

Moreover, the Act does not regulate "ownership" of specified firearms – instead, it regulates unregistered possession, transportation, and other acts.  P.C. § 12280.  Plaintiffs are free to "own" such firearms – ownership means legal title and knows no State boundaries – it is the possession and use thereof in California which are restricted.

And what do plaintiffs wish to "own"?  As noted, firearms "subject to the terms of the statute."  Since no specific firearm is identified, it is unclear that any firearm any plaintiff wishes to own is even subject to the Act, or that such plaintiff even knows the difference.[4]  Is it that plaintiffs would like to own firearms "subject to the

---

Most of the other plaintiffs also own guns, but some don't, Gorski said."  "A Lonely Fight for Gun Rights," *San Francisco Chronicle*, Dec. 23, 2002, A1 (attached herewith).

[4] For instance, P.C. § 12276 defines "assault weapon" by model name, but does not include firearms which may be functionally indistinguishable.  Left unregulated, and requiring legal action by the Attorney General and the courts to become regulated, is "another model by the same manufacturer" of a weapon listed in § 12276 "which is identical to one of the assault weapons listed in those subdivisions except for slight modifications or enhancements."  § 12276.5.  For all one knows from the complaint, the plaintiffs wish to own one of the latter, unregulated firearms.  *See Harrott v. County of Kings*, 25 Cal.4th 1138, 108 Cal. Rptr.2d 445, 449, 25 P.3d 649 (2001) (unlisted firearm may be regulated only after judicial action and publication).

Moreover, § 12276.1 defines "assault weapon" to include generic features such as "a flash suppressor" or "a forward pistol grip."  The complaint fails to allege that the firearms plaintiffs wish to own have any of these features – they might well wish to own firearms with similar (but unregulated) features or no such features at all.

terms of the statute," but would not like to own the very same firearms if they are *not* "subject to the terms of the statute"?  This vague allegation was obviously inserted to make a superficial showing of standing, but instead it suggests lack of any injury.

As to injury, the complaint alleges: "Plaintiffs have been harmed according to proof."  ¶ 32.  Perhaps it is too much to ask what the "proof" consists of, as the complaint fails to allege any concrete, relevant harm about any particular plaintiff.

Although the complaint contains nothing pertinent about the specific plaintiffs or what specifically they would like to own, it is filled with political arguments.  The opening paragraph is an alleged quotation from "Adolph [*sic*] Hitler" (lacking any citation to a source and of questionable authenticity), followed by several more paragraphs of quotations from historical American figures.[5]  ¶s 1-5.  There follows three pages labeled "The Underlying Facts" but consisting of policy arguments based on mortality statistics from a variety of causes.  (Pages 3-6)  Devoid of facts showing personal standing, injury, and ripeness, the complaint has all the earmarks of an action seeking an advisory opinion.

The petition for rehearing concerns only the First Cause of Action, which relates to the Second Amendment but which is inadequate on its face in that it fails to allege any facts that would establish standing or ripeness.  It alleges: "Plaintiffs are now prohibited from arming themselves with standard firearms under California law." ¶ 66.  It alleges that defendants are "enforcing numerous statutes which infringe upon

---

[5] Similarly, the Petition for Rehearing (p. 2) includes a quotation attributed to "James Maddison" [*sic*] and other quotations without citing references.

Plaintiffs' rights," "requiring Plaintiffs to register firearms," and "regulating and controlling firearms . . . in a way which obviously infringes upon Plaintiffs' rights . . . ." ¶ 76.  The allegations fail to articulate with particularity how the specific Act here (not "numerous statutes") concretely harms their current possession (not future "arming themselves") of specific firearms subject to the Act (not "standard firearms").

There is not a single allegation that a specific plaintiff possesses a specific firearm subject to the Act and that such plaintiff faces the threat of either prosecution or compliance which entails economic loss or other injury.

It is the view of CRPA and its members that the Act does indeed violate the Second and Fourteenth Amendments to the U.S. Constitution.   It is also their view that advisory opinions on this weighty issue should not be issued based on ill-prepared actions brought by plaintiffs who fail elementary standing and ripeness requirements.

The complaint in this case should have been dismissed based on the traditional standing and ripeness concerns such as those set forth in *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996),[6] which is not even cited in the panel opinion.  In that case, the plaintiffs challenged the federal assault weapon ban but failed to allege that they even possessed such items.  Thus, "plaintiffs allege that they 'wish and intend' to engage in unspecified conduct prohibited by the Act."[7]  *Id.*

---

[6] To be sure, that decision itself transforms the substantive Second Amendment issue into a standing issue, but its broader holding regarding personal standing and ripeness represents the view that actions brought by parties without concrete injury should not give rise to decisions on the merits of weighty constitutional issues.

[7] Like the "wish to obtain" allegation here, in that case:

6

at 1124.  Indeed, "plaintiffs' counsel represented that none of the plaintiffs are under any threat of prosecution."  *Id*. at 1127.  Of course, threat of prosecution is not the only form of injury.  "Economic injury is clearly a sufficient basis for standing." *Id*. at 1130.

To demonstrate standing under Article III of the Constitution, three elements must be found:

> First, plaintiffs must have suffered an "injury-in-fact" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between their injury and the conduct complained of.  Third, it must be "likely" – not merely "speculative" – that their injury will be "redressed by a favorable decision."

*Id*. at 1126, citing *Lujan*, 504 U.S. at 560-61.

The lack of specificity in the complaint in *San Diego County Gun Rights* also sufficed to dismiss the action for lack of ripeness.  First, "a concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate without running afoul of the Commerce Clause. . . . As we have previously observed, 'the District Court should not be forced to decide . . . constitutional questions in a vacuum.'" *Id*. at 1132 (citation omitted).  "With regard to the second prong of the ripeness test, we have previously considered a threat of

---

> The complaint does not specify any particular time or date on which plaintiffs intend to violate the Act. As the Supreme Court has observed, "such 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require."

*Id*. at 1127, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

7

criminal penalty to be hardship. . . . Nor do plaintiffs face a credible threat of prosecution." *Id.*

This Court's conclusion in *San Diego County Gun Rights* is particularly applicable here:

> Plaintiffs have not met their burden of establishing a "concrete and particularized" and "actual or imminent" injury caused by the Crime Control Act. . . . Indeed, it would be difficult to imagine a circumstance under which plaintiffs could have made a more feeble showing of injury-in-fact. To grant plaintiffs standing to challenge the constitutionality of the Crime Control Act in the circumstances of this case would eviscerate the core standing requirements of Article III and throw all prudential caution to the wind. Likewise, to hold that their claims are ripe for adjudication in the absence of any factual context would essentially transform district courts into the general repository of citizen complaints against every legislative action.

*Id*. at 1133.

This traditional standing and ripeness analysis was applied in the above decision in regard to constitutional challenges other than the Second Amendment.  On the Second Amendment issue, the Court applied a lack of standing for lack of cause of action analysis such as the panel applied here.[8]  *Id*. at 1125.  But as the case at bar highlights, that puts the cart before the horse.  A complex decision like that rendered here should arise from a real case or controversy brought by parties with a personal stake and injury, not by litigants who merely disagree with a law that they have not

---

[8] Ordinary Article III standing relates to whether the action is brought by a person with an actual stake in a controversy and over whose action the court thereby has jurisdiction.  A person without such a stake and whose case is not ripe cannot survive a motion to dismiss for want of jurisdiction under F.R.Civ.P. 12(b)(1).  What could be called "'cause of action' standing" is in reality a question not of standing but of whether a recognizable claim has been brought which can withstand dismissal for failure to state a claim under F.R.Civ.P. 12(b)(6).

shown adversely affects them.

By contrast, *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 528 (6th Cir. 1998), held that plaintiffs demonstrated standing and ripeness where they "face a clear Hobson's choice. They can either possess their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they can store their weapons outside the City, depriving themselves of the use and possession of the weapons." *Id*. at 529. The plaintiffs described with specificity the nature of the firearms possessed and how the law and its enforcement injured them. The court concluded:

> [T]his matter presents a justiciable controversy under Article III. Plaintiffs Smolak and Walker have shown the significant possibility of future harm which is necessary to establish standing in a declaratory judgment action . . . . In addition, the matter is currently ripe for judicial review. Plaintiffs Smolak and Walker have demonstrated the requisite hardship they and other similarly situated members of P.R.O. will suffer if judicial review is denied at the pre-enforcement stage, the likelihood that the harm alleged will come to pass, and the fitness of the issues raised for judicial review.

*Id*. at 530-31. No comparable allegations appear in the complaint here.

Standing and ripeness are routinely found or assumed in other meritorious actions brought by persons subject to various firearms laws, and the courts should be open to such claims.[9] But absent the requisite standing and ripeness, allowing cases to go forward by parties with an insufficient stake to litigate the issues can only result

---

[9] *E.g.*, *Doe v. San Francisco*, 136 Cal. App.3d 509, 186 Cal. Rptr. 380 (1982); *National Rifle Ass'n v. City of South Miami*, 812 So. 2d 504 (2002); *Coalition of New Jersey Sportsmen v. Whitman*, 44 F. Supp.2d 666, 673 n.10 (D. N.J. 1999), *aff'd* 263 F.3d 157 (3d Cir. 2001), *cert. denied*, 122 S. Ct. 613 (2001); *Citizens for a Safer Community v. Rochester*, 627 N.Y.S.2d 193, 203-04, 206 (Sup. 1994).

in advisory opinions.

The panel decision is the end result of more than one advisory opinion, none of which were necessary based on the precedent of *Fresno Rifle & Pistol Club v. Van de Kamp*, 965 F.2d 723 (9th Cir. 1992).  A challenge to the Roberti-Roos Act, *Fresno Rifle* held that the Second Amendment is not incorporated into the Fourteenth Amendment so as to protect the right to keep and bear arms from State infringement. That conclusion was flawed in two respects.  First, while the Bill of Rights does not *directly* apply to the States, the Supreme Court left open the question whether the Fourteenth Amendment incorporates the Second Amendment.[10]  Second, it ignores the fact that over two-thirds of the same Congress that passed the Fourteenth Amendment declared that the rights to "personal liberty" and "personal security" include "the constitutional right to bear arms."[11]

Even so, given that *Fresno Rifle* was binding circuit precedent, it was unnecessary to determine, as did *Hickman v. Block*, 81 F.3d 98 (9th Cir. 1996), *cert.*

───────────────

[10] *Miller v. Texas*, 153 U.S. 535, 538-39 (1894) ("if the Fourteenth Amendment limited the power of the States as to such rights [the rights to bear arms and against warrantless searches] as pertaining to citizens of the United States, we think it was fatal to this claim that it was not set up in the trial court").  Contrary to *Fresno Rifle*, 965 F.2d at 730, that issue was not resolved in earlier decisions, which in any event predate the incorporation of Bill of Rights guarantees through the due process clause of the Fourteenth Amendment.  *See Emerson*, 270 F.3d at 221 n.13; *accord*, *Silveira*, 312 F.3d at 1067 n.17.

[11] Freedmen's Bureau Act, §14, 14 Stat. 176 (1866).  *See Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 397-98 (1978) (opinion of Marshall, J.) (Freedmen's Bureau Act dispositive of Congress' intent in Amend. XIV); *Griswold v. Connecticut*, 381 U.S. 479, 485 n. (1965) (Amend. XIV protects "indefeasible right of personal security, personal liberty and private property").  *Fresno Rifle*, 965 F.2d at 730, rejected reliance on the Framers' intent.

*denied*, 519 U.S. 912 (1996), whether a Second Amendment challenge existed to another State law.  But the *Hickman* holding was limited to the right to "bear" arms, and did not consider the status of the right to "keep" arms.  Officials had "denied Hickman a concealed weapons permit. He complains . . . that the appellees' permit issuance policy violated his Second Amendment right to bear arms."  81 F.3d at 99.

*Hickman* avers that "the Second Amendment guarantees the right of the states to maintain armed militia . . . ."[12]  *Id*. at 102.  *Hickman* then endorses the entirely different view that the Second Amendment "guarantee[s] the right to bear arms as a member of a militia."[13]  *Id*. at 103 (citation omitted).  The argument that the right to "bear arms" refers only to militia service, does not apply to the right to "keep" (or possess) arms.[14]  In any event, *Hickman*'s actual holding is limited to the meaning of the right to bear arms, and is not precedent on the right to keep arms.[15]  The panel

---

[12] To the contrary, governments have "powers" and only "the people" have "rights."  *Compare* U.S. Const. Amends. I, II, IV ("the right of the people" to assemble, have arms, and be free from unreasonable searches) *with* Art. I, § 8 ("Congress shall have power . . . to provide for organizing . . . the militia, . . . reserving to the states respectively, the appointment of the officers") & Amend. X ("the powers not delegated to the United States . . . are reserved to the states").

[13] *But see Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) ("Surely a most familiar meaning [of carrying a firearm] is [in] the Constitution's Second Amendment ('keep and *bear* Arms')").  Moreover, no there is no "right" to bear arms in a militia, the composition of which is based on professional military judgment.  *Hickman*, 81 F.3d at 103 (citation omitted).

[14] Samuel Adams proposed a bill of rights provision that the Constitution could not be construed "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."  *Documentary History of the Ratification of the Constitution* (2000), vol. 6, at 1453.

[15] "The Second Amendment embodies the right to defend oneself and one's home against physical attack."  *United States v. Gomez*, 92 F.3d 770, 774 n.7 (9ᵗʰ Cir.

decision unnecessarily pushes beyond *Hickman* in deciding that the right to "keep" arms is not infringed by a prohibition on mere possession of a firearm.

The panel gives several reasons as to why it must issue a far-reaching, comprehensive analysis of the Second Amendment, but these reasons relate to other parties and other cases, not this one:

> In light of the United States government's recent change in position on the meaning of the amendment, the resultant flood of Second Amendment challenges in the district courts, the Fifth Circuit's extensive study and analysis of the amendment and its conclusion that *Miller* does not mean what we and other courts have assumed it to mean,[16] the proliferation of gun control statutes both state and federal, and the active scholarly debate that is being waged across this nation, we believe it prudent to explore Appellants' Second Amendment arguments in some depth, and to address the merits of the issue . . . .

312 F.3d at 1066.

This "flood of litigation" is taking place in criminal prosecutions in actual cases and controversies involving parties with genuine stakes – defendants alleged to possess specific restricted firearms and facing substantial prison sentences, not civil litigants who may "wish to obtain" at some indefinite time a firearm, but only if it is a restricted firearm so that the Act may be challenged. The panel states that this

---

1996). *See id.* at 779 ("an interesting and difficult question I would leave for another day") (Hawkins, J., concurring); *id.* at 778 (arguing conflict with *Hickman*) (Hall, J., concurring). The two cases may be reconciled with the conclusion that *Hickman* is limited to the bearing of arms, but that *Gomez* is limited to the keeping of arms.

[16] *United States v. Miller*, 307 U.S. 174, 178 (1939), held that the Second Amendment protects an arm that "is any part of the ordinary military equipment or that its use could contribute to the common defense." It did not question defendant's standing but remanded the case for the taking of evidence because "it is not within judicial notice" that a short-barreled shotgun was a militia arm. *Id.*

12

litigation flood resulted from the government's "recent change in position,"[17] but neither the United States nor those it is prosecuting are parties in this litigation which the panel asserts gives rise to the compelling need to resolve definitively the meaning of the Second Amendment.

The panel explains that its definitive opinion on the Second Amendment was more appropriate in the present civil challenge than in criminal cases brought before the circuit in part because the Second Amendment's scope "has been thoroughly briefed and argued by the parties." 312 F.3d at 1065 n.12. Yet the docket sheet reveals that the *appellants failed even to file a reply brief* before the panel, buttressing the fact that they do not have a sufficient stake in this controversy.

## CONCLUSION

This Court should grant the petition for rehearing or alternatively the petition for rehearing en banc, vacate the panel opinion, and affirm the judgment of dismissal based on the failure of the plaintiffs to allege sufficient concrete injury to themselves to establish standing and ripeness.

---

[17] The Justice Department's recent acknowledgment that the Second Amendment protects individual rights is the long-standing position of the United States. *See* Firearms Owners' Protection Act, §1(b), P.L. 99-308, 100 Stat. 449 (1986) ("the rights of citizens – (A) to keep and bear arms under the second amendment to the United States Constitution"); Property Requisition Act, P.L. 274, 55 Stat. 742 (1941) (may not construe law "to impair or infringe in any manner the right of any individual to keep and bear arms"); Freedmen's Bureau Act, §14, 14 Stat. 176 (1866) ("personal liberty, personal security, and . . . estate, . . . including the constitutional right to bear arms").

Dated:  January 8, 2003              Respectfully Submitted,

Trutanich • Michel, LLP:

_____
C.D. Michel – S.B.N. 144258
TRUTANICH MICHEL, LLP
Port of Los Angeles
407 North Harbor Boulevard
San Pedro, California 90731
(310) 548-0410
Counsel for Amicus Curiae

14

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached amicus curiae brief is proportionately spaced, has a typeface of 14 points and contains 4117 words.

Respectfully Submitted,

California Rifle & Pistol Association, Inc.,
Amicus Curiae

By Counsel

_____
C.D. Michel – S.B.N. 144258
TRUTANICH MICHEL, LLP
Port of Los Angeles
407 North Harbor Boulevard
San Pedro, California 90731
(310) 548-0410
Counsel for Amicus Curiae

CERTIFICATE OF SERVICE

I hereby certify that I caused two copies of the foregoing to be mailed first

class, postage prepaid on this 8th day of January, 2003, to:

GARY W. GORSKI
5033 Blanchard Court
Fair Oaks, CA  95628

DAN KARALASH
1329 H Street
Sacramento, CA 95814

JOHN D. BROPHY
P.O Box 245036
Sacramento, CA 95824-5036

TIM RIEGER
SPECIAL ASSISTANT ATTORNEY GENERAL,
STATE OF CALIFORNIA
1300 I STREET
SACRAMENTO, CA 94244-2550


_____
            C. D. MICHEL

No. 03-51

In The
## Supreme Court of the United States

———— ♦ ————

SILVEIRA, et al.,

*Petitioners,*

v.

LOCKYER, et al.,

*Respondents.*

———— ♦ ————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

———— ♦ ————

**BRIEF OF *AMICUS CURIAE* NATIONAL RIFLE
ASSOCIATION IN SUPPORT OF PETITIONERS**

———— ♦ ————

CHARLES J. COOPER
*Counsel of Record*
DAVID H. THOMPSON
GORDON D. TODD
ELISEBETH B. COLLINS
COOPER & KIRK, PLLC
1500 K Street, NW, Ste. 200
Washington, D.C. 20005
(202) 220-9600

August 7, 2003          *Counsel for Amicus Curiae*

COCKLE LAW BRIEF PRINTING CO. (800) 225-6964
OR CALL COLLECT (402) 342-2831

Exhibit "B"

i

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................ i

TABLE OF AUTHORITIES ........................................ ii

INTEREST OF THE *AMICUS CURIAE* ..................... 1

SUMMARY OF ARGUMENT ..................................... 1

REASONS FOR GRANTING THE WRIT ................. 2

   I.  Petitioners Have Article III Standing To
Challenge The Assault Weapons Control Act.... 2

  II.  The Second Amendment's Guarantee Of An
Individual Right To Keep And Bear Arms Ap-
plies To State Action ........................................... 3

 III.  The Second Amendment Guarantees An
Individual Liberty Both To "Keep" and to
"Bear" Arms ........................................................ 9

CONCLUSION............................................................ 20

TABLE OF AUTHORITIES

Page

CASES

*Byars v. United States*, 273 U.S. 28 (1927) ....................... 18

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999)............................... 3

*Duncan v. Louisiana*, 391 U.S. 145 (1968)..................... 4, 5

*Eldred v. Ashcroft*, 123 S. Ct. 769 (2003) ............. 15, 16, 17

*Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............................................................... 16

*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999)........................................................... 3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........... 3

*Marbury v. Madison*, 1 Cranch (5 U.S.) 137 (1803).......... 12

*Mazer v. Stein*, 347 U.S. 201 (1954) .................................. 16

*McPherson v. Blacker*, 146 U.S. 1 (1892) .......................... 10

*Miller v. Texas*, 153 U.S. 535 (1894) .................................... 4

*Muscarello v. United States*, 524 U.S. 125 (1998)............. 12

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997)........................................................... 3

*Nordyke v. King*, 319 F.3d 1185 (9th Cir.), *petition for rehearing en banc filed* (9th Cir. Apr. 1, 2003) (No. 99-17551)............................................. 9, 19

*Palko v. Connecticut*, 302 U.S. 319 (1937).......................... 4

*Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895) ............................................................... 10

*Presser v. Illinois*, 116 U.S. 252 (1886)................................ 4

*Printz v. United States*, 521 U.S. 898 (1997).............. 10, 17

TABLE OF AUTHORITIES – Continued

Page

*Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974) ........................................... 3

*Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69 (1946) ............................... 12

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ...........................................9, 11

*Robertson v. Baldwin*, 165 U.S. 275 (1897)........................ 5

*Saenz v. Roe*, 526 U.S. 489 (1999) ...................................... 9

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000)................................... 3

*United States v. Bean*, 123 S. Ct. 584 (2002) ................... 14

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ...........................................................11

*United States v. Cruikshank*, 2 Otto (92 U.S.) 542 (1876) ........................................................ 1, 4

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002)................*passim*

*United States v. Miller*, 307 U.S. 174 (1939)....5, 14, 15, 16, 17

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .................................................... 10, 18

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................ 1, 3


CONSTITUTIONS

U.S. CONST. amend. I ....................................................... 10

U.S. CONST. amend. II................................................*passim*

U.S. CONST. amend. IV.....................................................11

U.S. CONST. amend. VI.....................................................11

TABLE OF AUTHORITIES – Continued

Page

U.S. CONST. amend. IX.......................................................... 10

U.S. CONST. amend. XIV ........................................ 5, 6, 9, 10

U.S. CONST. art. I, § 8............................................. 15, 17, 19

U.S. CONST. art. I, § 10......................................................... 17

WIS. CONST. art. I, § 25 ......................................................... 7


STATUTES AND REGULATIONS

Freedmen's Bureau Act of 1866..................................... 6, 19

Militia Act, 1 Stat. 271 (1792)................................. 6, 17, 19

Violent Crime Control and Law Enforcement Act of
    1994................................................................................... 4


OTHER AUTHORITIES

CONG. GLOBE, 39th Cong., 1st Sess. 2459 (1866)................ 6

CONG. GLOBE, 39th Cong., 1st Sess. 2765 (1866)................ 6


MISCELLANEOUS

1 W. & M. 2 (1689) ................................................................. 5

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE
    LAWS OF ENGLAND *143 (1765).................................... 5, 7

2 THE DOCUMENTARY HISTORY OF THE RATIFICATION
    OF THE CONSTITUTION 623 (Merrill Jensen, ed.
    1976)................................................................................... 5

2 THE PAPERS OF THOMAS JEFFERSON 443 (J.P. Boyd
    ed., 1950)......................................................................... 13

TABLE OF AUTHORITIES – Continued

Page

Akhil Reed Amar, *The Second Amendment: A Case Study In Constitutional Interpretation*, 2001 UTAH L. REV. 889 (2001) ............................................... 4, 9

*Brutus IX*, NEW YORK JOURNAL (Jan. 17, 1788) ............... 19

*Brutus X*, NEW YORK JOURNAL (Jan. 24, 1788) ................ 19

Don B. Kates, *The Second Amendment and the Ideology of Self-Protection,* 9 CONST. COMMENTARY 87 (1992) .................................................................... 7

Donald S. Lutz, *The States and the U.S. Bill of Rights*, 16 S. ILL. U. L.J. 251, tbl. III (1992) .................. 6

Eugene Volokh, *The Amazing Vanishing Second Amendment*, 73 N.Y.U. L. REV. 831 (1998) .................... 5

Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793 (1998) ........................ 15, 16

Janice Baker, *The Next Step in Second Amendment Analysis: Incorporating the Right to Bear Arms Into the Fourteenth Amendment*, 28 U. DAYTON L. REV. 35 (2002) ............................................................ 6, 7

JOSEPH STORY, A FAMILIAR EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES § 450 (1840) ............................................................................ 8

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1890 (1833) ........................................................ 20

LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW (3d ed. 2000) .................................................................... 10

Nelson Lund, *The Past & Future of the Individual's Right to Arms*, 31 GA. L. REV. 1 (1996) ....... 5, 6, 7, 14, 18

NOAH WEBSTER'S 1828 DICTIONARY .............................. 11, 12

TABLE OF AUTHORITIES – Continued

Page

*Patrick Henry's Objections to a National Army, Speech at the Virginia Ratifying Convention* (June 16, 1788) (*reprinted in* 2 DEBATE ON THE CONSTITUTION 695 (Lib. of Am. 1993))........................... 19

*Ratifications and Resolutions of Seven State Conventions* (Sept. 1788) (*reprinted in* 2 DEBATE ON THE CONSTITUTION 561 (Lib. of Am. 1993)).................... 17

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration,* 80 GEO. L.J. 309 (1991)....................... 7

Robert Dowlut, *Federal and State Constitutional Guarantees to Arms,* 15 U. DAYTON L. REV. 59 (1989) .......................................................................... 7

SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1770)..................................................11

Sayoko Blodgett-Ford*, Do Battered Women Have a Right to Bear Arms?,* 11 YALE L. & POL'Y REV. 509 (1993) ......................................................... 7

*The Address & Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents,* Pennsylvania Packet (Dec. 18, 1787) (reprinted in 1 DEBATE ON THE CONSTITUTION 526 (Lib. of Am. 1993))............................................ 16

THOMAS COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES 281 (2d ed. 1891)................................................................ 18

TABLE OF AUTHORITIES – Continued

Page

William Plouffle, *A Federal Court Holds the Second Amendment Is An Individual Right*: *Jeffersonian Utopia or Apocalypse Now?*, 30 U. MEM. L. REV. 56 (1999) ...................................................... 5, 7

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION (1829) ........................................................... 19

## INTEREST OF THE *AMICUS CURIAE*[1]

The National Rifle Association (the "NRA") is a nonprofit voluntary membership corporation. Its 4 million members are bound together by a common desire to ensure the preservation of the Second Amendment right of individual citizens to keep and bear arms. More than 250,000 of the NRA's members reside in California and thus are subject to the Assault Weapons Control Act ("AWCA"), which forbids the purchase of many so-called "assault weapons" and requires registration of grandfathered guns. The Ninth Circuit upheld the AWCA based on its conclusion that the Second Amendment does not guarantee any individual the right to keep and bear arms. Thus, the NRA's most vital interest is directly implicated by the Ninth Circuit's decision, which effectively writes the Second Amendment out of the Constitution.

## SUMMARY OF ARGUMENT

1.  Petitioners have standing under Article III to challenge the AWCA. The Ninth Circuit reasoned that the Second Amendment provides only a "collective right" to the States and thus that individuals have no standing to challenge laws prohibiting gun ownership. In so holding, the court conflated the standing and merits inquiries in contravention of this Court's settled precedent that plaintiffs' legal theories are assumed to be valid for purposes of determining standing. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).

2.  The Second Amendment applies to the States. Although the Ninth Circuit neglected to analyze this threshold question, this Court should clarify that *United States v. Cruikshank*, 2 Otto (92 U.S.) 542, 553 (1876),

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for *amicus curiae* represents that it authored this brief and that no entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this *amicus* brief.

which held that the Second Amendment was not incorporated against the States, is no longer good law. The debate surrounding the adoption of the Fourteenth Amendment makes plain that its Framers fully intended to ensure that States could not transgress an individual's right to keep and bear arms.

3. The Second Amendment secures individual liberties, as does each provision of the Bill of Rights. We know this from the text of the Second Amendment, which guarantees "the *right of the people* to keep and bear arms." We know this from the historical record, which reveals that at the time of the founding citizens had the right, and indeed the duty, to possess and have at the ready a firearm. And we know this from the very purposes of the Amendment – the preservation of the rights of self-defense and resistance to government oppression – purposes which depend upon individual ownership of firearms.

### REASONS FOR GRANTING THE WRIT

The decision below addresses a question of paramount national importance: the meaning of the Second Amendment, a core provision of the Bill of Rights. As Circuit Judge Kleinfeld noted, the decision below effectively strips 20 percent of the American people of their constitutional right to keep and bear arms. Appendix to Petition for a Writ of Certiorari ("Pet. App.") 49. This Court should grant certiorari to resolve the sharp split in authority between the Ninth Circuit's decision below and the Fifth Circuit's decision in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002), which conclusively demonstrated that individuals have a constitutional right to keep and bear arms.

### I.   Petitioners Have Article III Standing To Challenge the Assault Weapons Control Act.

The Ninth Circuit held that petitioners had no standing to challenge the provisions of the AWCA as a violation of the Second Amendment, because that Amendment

confers a collective, rather than an individual, right. Under the Ninth Circuit's approach, then, any party whose claim rests on an erroneous legal premise loses not on the merits, but lacks standing. As the Seventh Circuit correctly recognized, that is not the law. *See Gillespie v. City of Indianapolis*, 185 F.3d 693, 711 & n.12 (7th Cir. 1999). For purposes of standing, a federal court must accept a plaintiff's legal argument as correct. *See Warth*, 422 U.S. at 501.

Petitioners clearly have Article III standing. They are individuals who either own firearms subject to the registration requirements of the AWCA or would like to own weapons that may not be purchased now. Petitioners have suffered an injury-in-fact, caused by the challenged provisions, which would be redressed by a decision holding that the challenged provisions are unconstitutional. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).[2]

## II. The Second Amendment's Guarantee Of An Individual Right To Keep And Bear Arms Applies To State Action.

Although the Ninth Circuit engaged in a detailed discussion of the meaning of the Second Amendment in its "standing" analysis, the panel failed to consider the threshold question of whether the Amendment even applies to the States. *See* Pet. App. 94 ("Because we decide

---

[2] To be sure, the D.C. Circuit found that plaintiffs lacked standing to challenge the Violent Crime Control and Law Enforcement Act of 1994, where they had failed to demonstrate that the "threat of prosecution [for violating the law]" was "genuine" and "imminent." *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (a plaintiff must face a "genuine threat of imminent prosecution" to obtain standing) (citation omitted). But this Court has never required individuals to risk criminal prosecution in order to vindicate their constitutional rights. *Cf. Regional Rail Reorganization Act Cases*, 419 U.S. 102, 144 (1974); *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 332 (1999).

this case on the threshold issue of standing, however, we need not consider the question whether the Second Amendment presently enjoins any action on the part of the states."). Even though the court below did not address the incorporation issue, this Court should grant certiorari to resolve this important question. Over a century ago, this Court held that the Second Amendment was not incorporated against the States. *See Cruikshank*, 92 U.S. at 553.[3] *Cruikshank* and its progeny were decided, however, before the Court incorporated virtually every provision of the Bill of Rights against the States. *See Duncan v. Louisiana*, 391 U.S. 145, 148 (1968). Thus, there is now widespread agreement that *Cruikshank* is not good law. *See* Pet. App. 94 ("One point about which we are in agreement with the Fifth Circuit is that *Cruikshank* and *Presser* rest on a principle that is now thoroughly discredited.").[4]

In determining which provisions of the Bill of Rights are incorporated, the Court has assessed whether the right is "so rooted in the tradition and conscience of our people to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (citation omitted). In *Duncan*, the Court identified four factors that guide this inquiry: (1) the history of the right; (2) historical recognition of the right by the States; (3) recent trends, including current recognition by States, with respect to the right; and (4) the purposes behind the right. *Duncan*, 391 U.S. at 151-56. As demonstrated below, each of these factors supports

---

[3] *See also Presser v. Illinois*, 116 U.S. 252, 264-65 (1886) (noting in *dicta* that the Second Amendment "is a limitation only upon the power of Congress and the National government, and not upon that of the States"); *Miller v. Texas*, 153 U.S. 535, 538 (1894) ("[I]t is well settled that the restrictions of these amendments operate only upon the Federal power, and have no reference whatever to proceedings in state courts.").

[4] Recent scholarship addressing this issue has concluded that the Second Amendment is incorporated against the States. *See, e.g.*, Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation*, 2001 UTAH L. REV. 889, 898-901 (2001).

incorporating the right to keep and bear arms through the Due Process Clause of the Fourteenth Amendment.

1.   The right of individuals to keep and bear arms is a bedrock feature of the Anglo-American legal tradition and was firmly established in the British Bill of Rights. *See* 1 W. & M. 2, ch. 2, 7 (1689); Eugene Volokh, *The Amazing Vanishing Second Amendment*, 73 N.Y.U. L. REV. 831, 832 (1998); *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897). In the English tradition, that right was understood to serve at least two purposes: an individual's rights to self-preservation, and to resist oppression. 1 WILLIAM BLACK-STONE, COMMENTARIES ON THE LAWS OF ENGLAND *143-*144 (1765). Thus, "'the preservation [of this right] as a protection against arbitrary rule [was] among the major objectives of the revolutionary settlement which was expressed in the Declaration and Bill of Rights of 1689.'" Nelson Lund, *The Past & Future of the Individual's Right to Arms*, 31 GA. L. REV. 1, 54 (1996) (hereinafter "Lund") (quoting *Duncan*). As the Court in *United States v. Miller*, 307 U.S. 174, 179 (1939), recognized, the colonies mandated the exercise of this right by imposing a "'general obligation [on] all adult male inhabitants to possess arms. . . . '" *Id*. (quoting 1 OSGOOD, THE AMERICAN COLO-NIES IN THE 17TH CENTURY*)*.

The right to keep and bear arms played a significant role in the process of ratifying the Constitution. At the Pennsylvania Convention, for example, the Anti-Federalists made clear that the omission of an individual right to bear arms was a primary reason for rejecting ratification. 2 THE DOCUMENTARY HISTORY OF THE RATIFI-CATION OF THE CONSTITUTION 623-24 (Merrill Jensen ed., 1976). "Objections to the Constitution because of the absence of a bill of rights were met by the immediate submission and adoption of the Bill of Rights," *Duncan*, 391 U.S. at 153, and the right to bear arms was "the most frequently appearing proposed amendment." William Plouffle, *A Federal Court Holds the Second Amendment Is An Individual Right*: *Jeffersonian Utopia or Apocalypse Now?*, 30 U. MEM. L. REV. 56, 80 (1999) (hereinafter "Plouffle"). Immediately after the adoption of the Second

Amendment, the Second Congress passed the Militia Act *requiring* every male citizen between the age of 18 and 45 to own a firearm and ammunition. 1 Stat. 271 (1792).

Most importantly, the historical evidence surrounding the adoption of the Fourteenth Amendment confirms that it was intended to prevent the States from abridging "the personal right guaranteed and secured by the first eight amendments of the Constitution, such as . . . the right to keep and bear arms." Cong. Globe, 39th Cong., 1st Sess. 2765 (1866) (Senator Howard). Thaddeus Stevens confirmed that "the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect." Cong. Globe, 39th Cong., 1st Sess. 2459 (1866). And there can be no doubt that the Second Amendment was included among the provisions that Congress sought to apply to the States. During the same year as the Fourteenth Amendment was debated, Congress passed legislation aimed at reversing the southern States' efforts to disarm the newly freed black citizens. Specifically, in the Freedmen's Bureau Bill of 1866, Congress made clear that "in every State [lately in rebellion] the right . . . to have full and equal benefit of all laws . . . including *the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens* of such State . . . without respect to race or color, or previous condition of slavery." Freedmen's Bureau Act of 1866, 14 Stat. 173, 176-77 (1866) (emphasis added).

2. From the founding of the Republic, the States have recognized the right to keep and bear arms. When the Second Amendment was adopted, almost half of the States with bills of rights included provisions recognizing that right, and many States affirmatively protected the right.[5] Recognizing the value of a well-armed populace,

---

[5] *See* Lund, at 54; Donald S. Lutz, *The States and the U.S. Bill of Rights*, 16 S. Ill. U. L.J. 251, 259, tbl. III (1992); Janice Baker, *The Next Step in Second Amendment Analysis: Incorporating the Right to*
(Continued on following page)

many States went farther, requiring the ownership of guns. Plouffle, at 64.

3. Forty-four States continue to maintain constitutional provisions protecting the right to keep and bear arms. Robert Dowlut, *Federal and State Constitutional Guarantees to Arms*, 15 U. DAYTON L. REV. 59 (1989), Appendix (collecting provisions); WIS. CONST. art. I, § 25. Since 1970, fifteen States "have enacted new state constitutional rights to bear arms or strengthened old ones." Janice Baker, *The Next Step in Second Amendment Analysis: Incorporating the Right to Bear Arms Into the Fourteenth Amendment*, 28 U. DAYTON L. REV. 35, 48-49 (2002) (internal quotation omitted). State laws also reflect the modern consensus as to the importance of the right to bear arms. Currently, thirty-five States allow large classes of individuals to carry concealed firearms. *See id.*

4. The Second Amendment was intended, in part, to promote the right of self-defense. *See*, *e.g.*, Don B. Kates, *The Second Amendment and the Ideology of Self-Protection*, 9 CONST. COMMENTARY 87 (1992); Lund, at 12 (citing WILLIAM BLACKSTONE, COMMENTARIES at 136, 139). Given the level of criminal activity that pervades our society, the right of individuals to protect themselves and their property with a firearm is as important as ever. Put simply, "our modern governments have proved no more able . . . to protect law-abiding citizens from criminal predators than their predecessors were." *Id.* at 55. "More important, the police do not and cannot protect law-abiding citizens from criminal violence." *Id.* at 61-62. *See also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991); Sayoko Blodgett-Ford, *Do Battered Women Have a Right to Bear Arms?*, 11 YALE L. & POL'Y REV. 509 (1993). In today's society, the Second

---

*Bear Arms Into the Fourteenth Amendment*, 28 U. DAYTON L. REV. 35, 41 (2002) (citing authorities).

Amendment remains an essential bulwark against the predations of violent criminals.

The Second Amendment right to keep and bear arms also empowers the citizenry to protect against state-sponsored or private oppression. Justice Story captured this basic truth:

> One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia. The friends of a free government cannot be too watchful, to overcome the dangerous tendency of the public mind to sacrifice, for the sake of mere private convenience, this powerful check upon the designs of ambitious men.

JOSEPH STORY, A FAMILIAR EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES § 450, at 264 (1840). This historical leitmotif is reflected in this Nation's foundation. The British attempted just such tactics on the eve of the American Revolution. The Militia Acts of 1757 and 1763 authorized British officials to "seize and remove the arms" of colonists, and it was just such an effort by General Gage that led to the Battles of Lexington and Concord. *See* Pet. App. 62.

The historical experience that led to the ratification of the Second Amendment remains as vital at the end of the Twentieth Century as at any time. As Judge Kozinski eloquently wrote, dissenting from denial of rehearing *en banc* in the court below:

> All too many of the other great tragedies of history – Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few – were perpetrated by armed troops against unarmed populations. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the *Militia Act* [of 1792] required here. If a few hundred Jewish fighters in the Warsaw Ghetto could hold

off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.

. . . However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

Pet. App. 46.

The Framers of the Fourteenth Amendment understood as much, and they ensured that the States could not infringe upon an individual's right to keep and bear arms.[6]

## III.  The Second Amendment Guarantees An Individual Liberty Both To "Keep" And To "Bear" Arms.

The Bill of Rights guarantees rights to individuals. *E.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). This is no less true of the Second Amendment than it is of the other amendments in the Bill of Rights. The Second Amendment's very text, the history surrounding its adoption, and the purposes it was intended to serve make clear that individuals have a right to keep and bear arms. The Fifth Circuit's decision in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002), and the dissenting opinions in this case make clear that the textual and historical evidence overwhelmingly

---

[6] Although the court below did not address this issue, incorporation of the Second Amendment also presents an opportunity for this Court to revisit the original understanding of the Privileges or Immunities Clause of the Fourteenth Amendment. *See, e.g.*, *Nordyke v. King*, 319 F.3d 1185, 1193 n.4 (9th Cir.) (Gould, J., specially concurring), *petition for rehearing en banc filed* (9th Cir. Apr. 1, 2003) (No. 99-17551); *see also Saenz v. Roe*, 526 U.S. 489, 521-23 (1999) (Thomas, J., joined by Rehnquist, C.J., dissenting) (suggesting that the *Slaughterhouse Cases* misinterpreted the Privileges or Immunities Clause); Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation*, 2001 UTAH L. REV. 889, 898-901 (2001).

supports such an interpretation. *See also Printz v. United States*, 521 U.S. 898, 939 n.2 (1997) (Thomas, J., concurring) ("Marshaling an impressive array of historical evidence, a growing body of scholarly commentary indicates that 'the right to keep and bear arms' is, as the Amendment's text suggests, a personal right.") (citations omitted); Laurence Tribe, American Constitutional Law (3d ed. 2000) (The Second Amendment includes "a right (admittedly of uncertain scope) on the part of individuals."). Due to space constraints, we can only touch upon the most salient evidence discussed in these opinions.

1. "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This Court has long emphasized the importance of the textual commands of the Constitution: "'The enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said.'" *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 618-19 (1895) (quoting *Gibbons v. Ogden*, 9 Wheat. (22 U.S.) 1, 188 (1824)); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("The framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged."). As we demonstrate below, both the operative clause and the preface of the Second Amendment secure an individual right.

*The People.* Throughout the Constitution, *"the people"* has a uniform meaning, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), and consistently refers to individuals. In addition to securing "the right of *the people* to keep and bear arms," the Bill of Rights also protects "the right of *the people* peaceably to assemble" and to "petition the Government for a redress of grievances," affirms the "right of *the people* to be secure in their persons, houses, papers, and effects," and safeguards the rights "retained by *the people.*" U.S. Const. amends. I, IV & IX.

All of these rights belong to each individual. *See*, *e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (Fourth Amendment); *Roberts*, 468 U.S. at 618-19 (First Amendment). These precedents confirm the obvious: every individual has a constitutional right to be free from unreasonable searches and seizures and to assemble and petition the government. The exercise of these rights is not contingent upon collective action. The Second Amendment is no different. "The people" are individuals, and to them the Second Amendment belongs.

*Right.* The term "Right" mandates the same conclusion. The Constitution both protects "rights" and confers "powers." Throughout the Constitution, rights are vested *exclusively* in individuals: for instance, the rights to a speedy and public trial by jury, and to be secure in the home against unreasonable searches and seizures. U.S. CONST. amends. IV & VI. In securing a "right" to "the people," the operative clause of the Second Amendment clearly protects an individual liberty to "keep and bear arms."

*Keep Arms.* To "keep" arms and to "bear" them, have separate meanings, each of which supports the conclusion that the Second Amendment secures an individual liberty. The common usage of the term "keep" establishes an individual right. Noah Webster's 1828 dictionary defined the term as:

> **1.** To hold; to retain in one's power or possession; not to lose or part with; as, to keep a house or a farm; to keep any thing in the memory, mind or heart; **2.** To have in custody for security or preservation.

*See also* SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1770) (defining "keep" as "1. To retain; not to lose. 2. To have in custody. . . . "). Thus, "to keep" suggests a personal act of possession. Since it is impossible to give any other coherent meaning to this term, the Ninth Circuit simply chose to give no effect at all to this portion of the Second Amendment. *See* Pet. App. 105 ("The reason why [keep] was included in the amendment is not

clear. . . . [I]t seems unlikely that the drafters intended the term 'keep' to be broader in scope than the term 'bear.'"). Such a cavalier approach to the Constitution's text is squarely foreclosed by this Court's precedents. *See Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 77-78 (1946) ("'In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added.'") (quoting *Holmes v. Jennison*, 14 Pet. (39 U.S.) 540, 570-71 (1840)); *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 174 (1803).[7] Thus, the Amendment's designation of a right to "keep" arms alone makes clear that individuals have the right to possess firearms.

*Bear Arms.* Commonly understood, to "bear" means "to carry." Webster's 1828 dictionary provided these definitions of "to bear":

> **1.** To support; to sustain; as, to bear a weight or burden; **2.** To carry; to convey; to support and remove from place to place; as, "they bear him upon the shoulder"; "the eagle beareth them on her wings;" **3.** To wear; to bear as a mark of authority or distinction; as, to bear a sword, a badge, a name; to bear arms in a coat.

By the plain meaning of "to bear," the Second Amendment means that the right of the people to carry, convey, wear on their person, support, or transport arms is protected. *Cf. Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsberg, J., with whom Rehnquist, C.J., and Justices Scalia and Souter joined, dissenting) (equating the term

---

[7] Eighteenth Century usage further undercuts the suggestion that "keep" simply melts into "bear arms." As Judge Kleinfeld noted, colonial statutes, among others, employed "keep" and "bear" together with separate meanings. Pet. App. 52 (Kleinfeld, J., dissenting from denial of rehearing *en banc*).

"carry" with the term "bear" as used in the Second Amendment).[8]

The collectivist interpretation of the Second Amendment is further undercut by the historical record. While "bear arms" has a military connotation, that has never been its only one. Contemporaneous state constitutions protected individuals' right to "bear arms" in "self-defense"; the Fifth Circuit cited no less than eleven such examples. *Emerson*, 270 F.3d at 230 n.29. The phrase was also used to refer to hunting activities. *See*, *e.g.*, 2 THE PAPERS OF THOMAS JEFFERSON 443-44 (J.P. Boyd ed., 1950) (in 1785 James Madison proposed to the Virginia Legislature a bill that would penalize any hunter who "shall bear a gun out of his inclosed ground, unless whilst performing military duty"). And, of course, "bear arms" may be limited to its military connotation only if the term "militia" in the prefatory clause requires the bearer to be in the military.[9]

---

[8] Some argue that "keep and bear arms," must be read as a unitary phrase, which in turn has a specialized military meaning. Pet. App. 105 (citing Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 CHI.-KENT L. REV. 291, 317 (2000)). But this reading fails the text for a number of reasons. First, "keep" has no military connotation. Second, the primary and secondary definitions of "bear" are nonmilitary. Third, even assuming *arguendo* that "bear arms" has a military connotation, the Second Amendment lacks the requisite textual evidence to constrain the phrase to that meaning. As discussed *infra*, the term "militia" does not limit the Amendment, and the term "keep" does not have a military connotation.

[9] Proponents of a more limited reading of the Second Amendment point to Madison's first draft, which included the clause "but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person." Here, they argue, "bearing arms" can have only a military connotation. But surely, one who is "religiously scrupulous of bearing arms" can have an equal aversion to the use of firearms in hunting or in self-defense as in military service. That the term "bearing arms" does not refer exclusively to military service is plain on the face of this draft, as Madison found it necessary next to refer specifically to "military service" as the thing from which one "religiously scrupulous" was to be excused. Were it otherwise, it would have sufficed to say that such a person should be excused from "bearing arms." As

(Continued on following page)

But, as discussed *infra*, "militia" referred to a much broader swath of the civilian population, regardless of actual military service. *Cf. Miller*, 307 U.S. at 179. Thus, the term "bear," as applied to arms, has its usual meaning – to carry, whether militarily or not. And that understanding in turn underscores the conclusion that the right is vested in the individual.[10]

2. Contrary to the Ninth Circuit's conclusion, this Court's decision in *Miller* does not establish that the Second Amendment protects only a communal right. If the Second Amendment vests no individual right, the Court need only have said so. Instead, the Court looked to the merits of the constitutional challenge as it applied to a sawed-off shotgun:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly, it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

307 U.S. at 178. To the extent that a case is made that a weapon falls within the "ordinary military equipment," *Miller* strongly suggests that the Amendment does have individual application.

---

different terms in close proximity are presumed to have different meanings, *United States v. Bean*, 123 S. Ct. 584, 587 n.4 (2002), the use of "military service" itself suggests that "bear arms" did *not* have a purely military meaning.

[10] Given its holding, the Ninth Circuit did not pass on the next logical question: what falls within the meaning of the term "arms" within the Second Amendment? *See*, *e.g.*, Lund, at 56-76. As the lower court did not address the question, it is not properly before this Court.

*Miller* lends further strong support to the view that the Second Amendment secures an individual right. Article I allows Congress to call the militia into federal service, but reserves the appointment of militia officers and training to the States. U.S. Const. art. I, § 8, cls. 15-16. The Court in *Miller* observed that "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of such forces" – *i.e.* to ensure that the militia was available for federal service, whether or not the States attended to it, "the declaration and guarantee of the Second Amendment were made." 307 U.S. at 178. The Second Amendment "must be interpreted and applied with that end in view." *Id.* As the Second Amendment was intended, in part, to secure the militia's effectiveness regardless of whether the States attended to it, it cannot be that the Second Amendment protects only States' right to organize a militia.

3.a.   In the face of the clear meaning of the Second Amendment's operational language, the Ninth Circuit attempted to justify its collectivist interpretation by seizing upon the Amendment's prefatory clause. While a preamble may inform, influence, or shape the operational clause, it cannot compel a result contrary to its meaning. *See* Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793, 807 (1998). The Second Amendment's preamble, however, is not inconsistent with the individual liberty mandated by the operational clause.

Certainly, the prefatory clause proffers a purpose for the right to "keep and bear arms." But nothing compels the conclusion that this is the only purpose. Earlier this Term in *Eldred v. Ashcroft*, 123 S. Ct. 769 (2003), the Court addressed a similar construction of the preambulatory language in the Copyright Clause, which reads "The Congress shall have the power . . . to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. art. I, § 8, cl. 8. The Court concluded that Congress's power to secure exclusive rights to authors and inventors is not limited by the prefatory purpose to "promote the progress of science

and useful arts." *Eldred*, 123 S. Ct. at 784. While promoting science and the arts may be the chief purpose of the copyright power, that is not the only purpose. *See*, *e.g.*, *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (advancing science and the useful arts is the "primary purpose" of the clause); *Mazer v. Stein*, 347 U.S. 201, 219 (1954) (rewarding inventors and authors is "a secondary consideration" of the clause).

The operational language of the Copyright Clause is expressly contingent on the prefatory language, as it is introduced with the words "by securing." The Second Amendment, by contrast, has no such limitation. If the prefatory language of the Copyright Clause cannot be read to state its sole justification, nor can that of the Second Amendment. Volokh, *The Commonplace Second Amendment*, at 807-13. Rather, the right to keep and bear arms must be understood in light of the many reasons that the founding generation of Americans valued that right, including hunting and self-defense. *See*, *e.g.*, *The Address & Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents*, Pennsylvania Packet (Dec. 18, 1787) (*reprinted in* 1 DEBATE ON THE CONSTITUTION 526, 532 (Lib. of Am. 1993)).

b. Even assuming *arguendo* that the prefatory clause places a limitation on the scope of the "right of the people to keep and bear arms," it cannot be properly understood to curtail the *individual* nature of the freedom to keep and bear arms.

*Militia.* The invocation of "the militia" as being "necessary to the security of a free state" supports the conclusion that the right to "keep and bear arms" is an individual one. As the Court in *Miller* acknowledged,

> the Militia comprised all males physically capable of acting in concert for the common defense. . . . [O]rdinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

*Miller*, 307 U.S. at 179 (emphases added). In reaching this conclusion, the *Miller* Court drew upon centuries of consistent understanding. The ratifying debates confirm the Court's understanding of the term "militia." Both the Virginia and North Carolina ratifying conventions spoke of "a well regulated militia composed of the body of the people." *Ratifications and Resolutions of Seven State Conventions* (Sept. 1788) (*reprinted in* 2 DEBATE ON THE CONSTITUTION 561, 568 (Lib. of Am. 1993)). And, as noted above, the Second Congress defined the militia to comprise "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years." Militia Act, 1 Stat. 271 (1792).[11] Nor can the text be confined to a statist reading. If "the militia" is read to refer to a standing fighting force, the Second Amendment would directly conflict with Article I, which expressly bans the States from maintaining troops. U.S. CONST. art. I, § 10, cl. 3.

*Well Regulated.* The modifier "well regulated" does not alter the Amendment's meaning. Some argue that "well regulated" constrains the militia to those enrolled, trained, and supplied by the State. Pet. App. 100. This cannot be the case for the same reasons why "militia" by itself cannot mean a specific military force. The historical record further refutes this contention. The Constitution preserved the appointment of officers for, and the training of, the militia to the States, but subject to "the discipline prescribed by Congress." U.S. CONST. art. I, § 8, cl. 16. Under the Militia Act of 1792, the well regulated militia hence meant one enrolled on the public lists, armed, decently equipped, and perhaps occasionally drilled. *Accord Emerson*, 270 F.3d at 234-35 & nn.33-34 (citing authorities). "Well regulated" emphatically did not mean a

---

[11] The views of early Congresses are strongly persuasive as to Constitutional meaning. *Eldred v. Ashcroft*, 123 S. Ct. at 779; *Printz*, 521 U.S. at 905.

militia armed by the Government, or a militia of trained soldiers.[12]

The term "militia" may be read to limit the right of "the people" only if the former term is held to mean the latter. Such a reading would be inconsistent with several canons of construction. It is presumed that different words used in proximity have different meanings. *See supra* note 9. The Framers employed the term "the people" elsewhere in the Bill of Rights and certainly did not confine it to the "militia." *See supra* at 11; *Verdugo-Urquidez*, 494 U.S. at 265. As Thomas Cooley concluded:

> The meaning of the provision undoubtedly is, that *the people, from whom the militia must be taken, shall have the right to keep and bear arms,* and they need no permission or regulation of law for the purpose.

THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES 281-82 (2d ed. 1891). That is why the right is secured to "the people," not to "the militia."

Finally, reading the prefatory clause so narrowly would be to depart from this Court's wealth of decisions affording broad construction to individual civil liberties. *See*, *e.g.*, *Byars v. United States*, 273 U.S. 28, 32 (1927) ("Constitutional provisions for the security of person and property are to be liberally construed, and 'it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'") (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)).

*Security Of A Free State.* If anything in the prefatory clause shapes the "right of the people to keep and bear

---

[12] Pet. App. 59-63 (Kleinfeld, J., dissenting from denial of petition for rehearing *en banc*); Lund, at 24-25 ("A well regulated militia is, among other things, one that is not overly regulated or inappropriately regulated. The Second Amendment simply forbids one form of inappropriate regulation: disarming the people from whom the militia must necessarily be drawn.").

arms," it is the focus on "the security of a free State." In the Framers' view, the Republic could be challenged either from without *or from within*. *See*, *e.g.*, *Nordyke v. King*, 319 F.3d at 1196 (Gould, J., specially concurring).

The Anti-Federalists had complained bitterly that the Federal government would abuse the militia, allow it to wither, and replace it with a potentially oppressive standing army. *See*, *e.g.*, *Patrick Henry's Objections to a National Army, Speech at the Virginia Ratifying Convention* (June 16, 1788) (*reprinted in* 2 DEBATE ON THE CONSTITUTION, 695-97 (Lib. of Am. 1993)); *Brutus IX*, NEW YORK JOURNAL (Jan. 17, 1788) (discoursing the dangers of standing armies); *Brutus X*, NEW YORK JOURNAL (Jan. 24, 1788) (same); *see also Emerson*, 270 F.3d at 237-39. Their concern ran not only to a professional federal army, but also to a standing, or "select" militia – one always formed, rather than civilian and waiting to be called up. *See Emerson*, 270 F.3d at 250 & n.58 (citing authorities).

The Second Amendment answered the perceived threat to freedom posed by these powers with the guarantee that individual citizens could not be disarmed. This lessened the need for a standing army by providing a ready fighting force if necessary, diminished the specter of a standing army, and thus minimized the potential for domestic despotism, whether state or federal. "[I]f in any blind pursuit of inordinate power, either [the Federal or a State Government] should attempt [to disarm the people], this amendment may be appealed to as a restraint on both." WILLIAM RAWLE, A VIEW OF THE CONSTITUTION (1829).

4. As demonstrated above, the historical circumstances surrounding the Amendment and its very purpose confirm that it secures an individual right. From the English Bill of Rights to the Militia Act of 1792 to the Freedmen Bureau's Bill of 1866, the history of this Nation demonstrates a profound respect for an individual's right

to possess firearms. The Second Amendment empowers individual citizens to defend themselves and their property against the acts of criminals, mob violence, and even state-sponsored oppression. Only individual possession of firearms allows for the effective exercise of self-defense against such threats. It does the rape victim no good to have armed police arrive at the scene after the crime has been committed. It does the shopkeeper no good to have national guardsmen restore order after a riot has destroyed his livelihood. And it would have done the Minutemen no good if the Crown alone had been in possession of guns in the colonies. The Founders understood all this, as reflected in the Second Amendment. As Justice Story observed, "The *right of the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary powers of rulers." JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1890 (1833) (emphasis added).

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

CHARLES J. COOPER
*Counsel of Record*
DAVID H. THOMPSON
GORDON D. TODD
ELISEBETH B. COLLINS
COOPER & KIRK, PLLC
1500 K Street, Ste. 200
Washington, D.C. 20005
(202) 220-9600