THE LAW OFFICES OF GARY W. GORSKI
Gary W. Gorski - SBN: 166526
1207 Front St., Suite 15
Sacramento, CA  95814
Tel. (916) 965-6800
Fax (916) 965-6801
usrugby@gmail.com

Attorney for Plaintiff

# THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESE MARIE PIZZO, <br><br> Plaintiff, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO MAYOR GAVIN NEWSOM, in both his individual and official capacities; FORMER SAN FRANCISCO POLICE DEPARTMENT; CHIEF OF POLICE HEATHER FONG, in both her individual and official capacities; SAN FRANCISCO POLICE DEPARTMENT CHIEF OF POLICE GEORGE GASCON, in his official capacity; SAN FRANCISCO SHERIFF MICHAEL HENNESSEY, in both his individual and official capacities; CITY AND COUNTY OF SAN FRANCISCO; and STATE OF CALIFORNIA ATTORNEY GENERAL EDMUND G. BROWN, in his official capacity, <br><br> Defendants. | Case No. 09-cv-04493-CW <br><br> PLAINTIFF'S SIMULTANEOUS EXPERT WITNESS DISCLOSURE PURSUANT TO THIS COURT'S SCHEDULING ORDER AND RULE 26 <br><br> Date of Disclosure Required: **Saturday, April 28, 2012** |

## PERCIPIENT EXPERTS

**Alexander Grinberg, M.D.**
**Psychiatrist**
**(Address subject to protective order)**

This expert is a licensed physician and psychiatrist.  This percipient expert will be offered to provide expert opinion testimony regarding knowledge of the CCW application process and criteria used to issue CCWs as he personally applied for a CCW, and was denied a permit without cause, especially when compared to retired law enforcement or those who worked for government, like attorneys Akins and Harrington, retired General Menist, and  judges who received CCWs.  He is

1   proffered to testify on his opinions that: 1) there is no "good cause" policy or criteria for issuance or

2   denial of a CCW application, and at a minimum, it is simply arbitrary with absolutely no objective

3   baseline criteria being used; 2) that both he and plaintiff were denied an equal and fair opportunity to

4   receive a CCW as compared to those who received CCWs, including retired law enforcement

5   officers; 3) rendering an opinion as to what the policy criteria seems to be for "good cause" issuance

6   of a CCW, and whether the "good cause" criteria was applied equally to all applicants, and if not

7   applied equally, why was it not applied equally; 4) opinions on human behavior, the false assumption

8   that police officers are more deserving of CCWs than himself, or any other citizen, and especially

9   medical doctors;  5) that a medical professional is just as qualified as a law enforcement officer in

10  the use of deadly force;  6) the danger to himself, personally, and to others similarly situated, and for

11  the need to be armed;  7) he himself, plaintiff, and others being improperly denied a CCW;  8)

12  testimony regarding the arbitrariness, capriciousness, and other inequities in the issuance of CCWs;

13  8) arbitrary discretion in the hands of a single elected official is, or will likely to be abused,

14  especially with the issuance of a CCW permit.  9) there is no objective criteria for the issuance of a

15  CCW.

16         He is also proffered to provide testimony that a California peace officer's psychological

17  profile will change at certain points during the course of their employment as a peace officer. A

18  California peace officer is more likely to commit suicide than a person who is not a California peace

19  officer.  An opinion on domestic violence by police officers and the profiled personalities of male

20  law enforcement personnel who battered their female domestic partners.  Issuing concealed weapons

21  permits to citizens who have never been peace officers has no measurable effect on the increase in

22  crime or gun violence.  There are no facts supporting any law that favors the issuance of CCWs to

23  honorably retired California peace officers as compared to the same laws also being applied equally

24  to honorably retired members of the United States Armed Forces.  The average psychological profile

25  of a law enforcement officer, as determined by the Minnesota Multiphasic Personality Inventory I

26  and II, is very similar to the average criminals psychological profile, and that those in law

27  enforcement officers are more likely than the general population are more aggressive and more likely

28  to be involved in deviant behavior, similar to what has been exposed in the initial disclosures (SF

Chronicle Articles) and most recently, by the United States Secret Service who are suppose to be the epitome of the individuals who should be permitted to carry a concealed weapon off duty or after retirement.

He may also be used as a rebuttal expert.

### Robert T. Grotz, M.D.
### (Address subject to protective order)

This expert is a licensed physician. This percipient expert will be offered to provide expert opinion testimony regarding knowledge of the CCW application process and criteria used to issue CCWs as he personally applied for a CCW, and was denied a permit without cause, especially when compared to retired law enforcement or those who worked for government, like attorneys Akins and Harrington, retired General Menist, and judges who received CCWs. He is proffered to testify on his opinions that: 1) there is no "good cause" policy or criteria for issuance or denial of a CCW application, and at a minimum, it is simply arbitrary with absolutely no objective baseline criteria being used; 2) that both he and plaintiff were denied an equal and fair opportunity to receive a CCW as compared to those who received CCWs, including retired law enforcement officers; 3) rendering an opinion as to what the policy criteria seems to be for "good cause" issuance of a CCW, and whether the "good cause" criteria was applied equally to all applicants, and if not applied equally, why was it not applied equally; 4) opinions on human behavior, the false assumption that police officers are more deserving of CCWs than himself, or any other citizen, and especially medical doctors; 5) that a medical professional is just as qualified as a law enforcement officer in the use of deadly force; 6) the danger to himself, personally, and to others similarly situated, and for the need to be armed; 7) he himself, plaintiff, and others being improperly denied a CCW; 8) testimony regarding the arbitrariness, capriciousness, and other inequities in the issuance of CCWs; 8) arbitrary discretion in the hands of a single elected official is, or will likely be abused, especially with the issuance of a CCW permit. 9) there is no objective criteria for the issuance of a CCW.

He is also proffered to provide testimony that a California peace officer's psychological profile will change at certain points during the course of their employment as a peace officer. A California peace officer is more likely to commit suicide than a person who is not a California peace

1  officer.  An opinion on domestic violence by police officers and the profiled personalities of male

2  law enforcement personnel who battered their female domestic partners.  Issuing concealed weapons

3  permits to citizens who have never been peace officers has no measurable effect on the increase in

4  crime or gun violence.  There are no facts supporting any law that favors the issuance of CCWs to

5  honorably retired California peace officers as compared to the same laws also being applied equally

6  to honorably retired members of the United States Armed Forces.  The average psychological profile

7  of a law enforcement officer, as determined by the Minnesota Multiphasic Personality Inventory I

8  and II, is very similar to the average criminals psychological profile, and that those in law

9  enforcement officers are more likely than the general population are more aggressive and more likely

10  to be involved in deviant behavior, similar to what has been exposed in the initial disclosures (SF

11  Chronicle Articles) and most recently, by the United States Secret Service who are suppose to be the

12  epitome of the individuals who should be permitted to carry a concealed weapon off duty or after

13  retirement.

14         He may also be used as a rebuttal expert.

15         **Jon Gray**
        **(Address subject to protective order)**

16
17         This expert will testify about the so called "good cause" criteria being arbitrary and

18  capricious, and that CCWs are issued to individuals, retired law enforcement, and Honorably Retired

19  California Peace Officers in an arbitrary manner.  He will testify about the issues raised in his CCW

20  application, and that even though he had established "good cause", his CCW application was denied

21  without a valid reason.  He will further testify that his denial was an arbitrary and capricious abuse of

22  discretion by the Sheriff.

23         **Jeffrey J. McInturff, MD**
        **Specialty: Emergency Medicine and U.S. Army Medical Doctor**
        **(Address subject to protective order - Address is Confidential – available upon**
24        **request)**

25         Dr. McInturff is a licensed California Physician for Kaiser Permante Medical Group and the

26  United States Army Reserves.  Medical school: Loyola University Chicago Stritch School of

27  Medicine, Maywood, IL.  Residency  Darnall Army Community Hospital, Fort Hood, TX.  Board

28  certification: Emergency Medicine, American Board of Emergency Medicine.  Professional Interests

1  and Affiliations: American College of Emergency Medicine.

2       He may provide testimony at the time of trial that the State of California and City and County

3  of San Francisco current gun laws, in general, are discriminatory, ineffective, and lack any factual

4  basis.  He will testify to the common types of accidents found in emergency rooms across America.

5       He is currently on deployment, and may provide a report upon his return within a reasonable

6  amount of time per the Uniformed Services Employment and Reemployment Rights Act

7  ("USERRA") and by similar provisions of California law. This expert is does not regularly testify as

8  an expert, and has unique expertise regarding the issues in this case.

9       This expert may be offered to provide expert opinions on the "Safe Storage" law,

10 "enhanced-lethality ammunition" law, and the arbitrary and capricious "good cause" and "good

11 moral character" requirements of the CCW laws and policies of Defendants, similar to those in the

12 attached Expert Witness Report of David Orsay.

13      He may also be offered as a rebuttal expert.

14                    **RETAINED EXPERT**

15      **David Orsay**
        **(Address is confidential – can be obtained through counsel)**

16

17      Mr. Orsay is a retained expert, and his report is attached.  He may also be offered as a rebuttal

18 expert.

19

20                              Respectfully submitted,
                                LAW OFFICES OF GARY W. GORSKI
21 Date:   April 27, 2012          /s/ Gary W. Gorski
                                GARY W. GORSKI
22                              Attorney for Plaintiff

23

24

25

26

27

28

- 5 -

1    CASE   :    **PIZZO v. SF**
     COURT  :    **IN THE UNITED STATES DISTRICT COURT**
2                **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                                    **PROOF OF SERVICE**
3
                    I, the undersigned, declare that:
4
                    I am a citizen of the United States, employed in the City of Sacramento, California.
5    My business address is LAW OFFICES OF GARY W. GORSKI,1207 Front St., Suite 22,
     Sacramento, CA  95814.  I am over the age of 18 years and not a party of the within-entitled cause.
6
                    I am readily familiar with GARY W. GORSKI's practice for collection and processing
7    of correspondence for mailing with the United States Postal Service the same day in the ordinary
     course of business.
8
                    On April 27, 2012, I served the attached on all parties in said action as addressed
9    below by causing a true copy thereof to be:

10   _____    express mailed:

11   _____    Telecopied by facsimile:

12      delivered by hand:

13   XXX  Electronic Communication (email)

14
     XXX  Placed in sealed envelope with postage thereon fully
15                        prepaid via **U.S. mail**

16
     **George Waters <George.Waters@doj.ca.gov>**
17   **Deputy Attorney General**
     **Government Law Section**
18   **1300 I Street**
     **Sacramento, CA 95814**
19   **Telephone:  916-324-5465**
     **Fax:   916-324-8835**
20   **Cell:  916-296-2472**

21   **Christine Van Aken <Christine.Van.Aken@sfgov.org>**
     **Deputy City Attorney**
22   **City Hall, Room 234**
     **1 Dr. Carlton B. Goodlett Place**
23   **San Francisco, CA 94102-4682**
     **(415) 554-4691 (direct)**
24   **(415) 554-4747 (fax)**

25           I declare under penalty of perjury that the foregoing is true and correct and that this
     declaration is executed April 27, 2012 at Sacramento, California.
26
         _____              _____
27        Gary W. Gorski                       /s/ Gary W. Gorski
         Name                                  Signature
28

                                    **- 6 -**
     _____
     **PLAINTIFF'S SIMULTANEOUS EXPERT WITNESS DISCLOSURE PURSUANT TO THIS COURT'S SCHEDULING ORDER AND**
                                    **RULE 26**

DAVID ORSAY
**Expert Witness Report**
*Pizzo v. City and County of San Francisco*

April 27, 2012

**1.      Statement of all opinions to
be expressed and the basis
and reasons for them.**

ISSUE 1:      Requirement that an operational firearm (i.e. handgun) be stored in a locked container or "disabled" with a trigger lock while the firearm is located in a person's residence.  These are commonly referred to as "safe storage" laws.

The following are my expert opinions, based upon my education, training and experience, and to a degree of reasonable certainty:

Essentially, City and County of San Francisco requires its residents to make an operable handgun, whether loaded or unloaded, inoperable and not immediately accessible by requiring the handgun to either be stored with a trigger lock or stored in a locked container.  My opinion, to a degree of reasonable certainty, is that the government's Safe Storage law completely negates the benefit of owning an immediately accessible, operable and loaded handgun in the home.  Additionally, these requirements actually increase the likelihood that the handgun will be discharged either involuntarily or voluntarily with the possible result of property damage, serious bodily injury, or death.   Any requirement that removes immediate access to a handgun in a person's home or place of business decreases the

1

time available to evaluate and de-escalate a situation, and increases the probability that the situation (hereafter to be referred generically as a 'Critical Incident') will escalate to the use of deadly force and/or accidental discharge.

My methodology for my opinion is that it is commonly understood by firearms instructors and entities who establish guidelines for the instruction of those who carry a handgun, or other firearm during the course of their duties (i.e. all law enforcement and military) that there is a tremendous amount of stress involved with a potentially deadly force encounter or critical incident.  It is well documented by experts in the field that many physiological symptoms can be expected to occur under such stress such as: auditory exclusion, loss of fine motor skills, and tunnel vision, to name a few.  These almost universally applicable symptoms render clear thinking difficult, and a great deal of training is dedicated to overcoming, or at least learning to recognize and work with this stress.  The ultimate goal of the training in every instance being that all options to deadly force are exhausted by following a "force continuum" or Rules of Engagement (ROE), and that deadly force is only utilized when absolutely necessary and justifiable.

These types of scenarios are exhaustively covered in the individual's initial training, and throughout their careers.  They are commonly referred to as "shoot/no shoot" scenarios and training; a term which unfortunately over-simplifies an incredibly complex process in one of the most significant events of two persons' lives.

In general, there is a period of time, or window of opportunity, available which begins at the moment a threat is perceived and continues to the moment that the situation is *resolved*.  It is during this window of opportunity when there may

be time to consider and decide upon an action *other* than the use of deadly force with a firearm.   The period may be miniscule or last many minutes (or longer) depending upon the situation.  No matter the length of time, to the best of one's ability he should attempt to Observe (everything that is occurring around him to understand its totality), Orient (determine possible courses of action; should he retreat, call for help, shout a warning, instruct his family to seek cover, call 911, attempt to de-escalate the situation, or shoot), Decide upon which course of action is best, and then Act upon that decision.  The ability to utilize, and even exploit, this window of opportunity for the purpose of possibly de-escalating a situation is extremely important.  (It is what characterizes members of SWAT teams, and military special operations teams from their counterparts; that is, their uncanny ability to "expand" this stressful chaotic period of time, and use what is commonly referred to as "discretionary force".)  However, for most people the aforementioned physiological symptoms of stress are already interfering with fine motor skills, perceptions, and interfering with clear thinking and judgment.  <u>Any other task within this window of opportunity that requires *time*, fine motor skills, or cognitive function can catastrophically *detract* from the all important "shoot/no shoot" decision making process; such as 'remember the combination', 'open the safe', 'remove the triggerlock', or 'load the gun'.</u>

Requiring a handgun to be anything other than *immediately* accessible diminishes the likelihood that the situation will be resolved as well as it might.  It renders the outcome less subject to good decisions making processes and more to blind luck.  Both trigger locks and lockboxes are intended by their manufacturers to render the handgun less than immediately accessible.  They almost always require: remembering a combination or where you've put a key, then using either that key or combination in

order to access the handgun.  Keying a combination, or using a key is absolutely a fine motor skill, and remembering numbers or where you've put a key requires some concentration.  Imagine doing these things when you believe that your life (and perhaps the lives of those you love) depends upon you getting this handgun into your hand in a state of readiness.

Importantly, remember that the period of time it has taken to remember the code/key location, and then utilize them has completely detracted from the time which could have been used to: 1. Identify/Observe the nature of the situation (a robber pounding on the door to break in vs. a drunken friend of your son's), 2. Orient (call 911, tell the family to stay in their rooms, shout a warning to the person at the door, make sure you have a flashlight to help with identification), 3. Decide (figure out which of those choices is best), 4. Act.  The door has been forced and whoever it is now inside of your house; you've not had time to call 911, shout a warning to the family, call out to whomever was at the door or even really listen to see if you recognize their voice.

The possibility that this situation might have been resolved without the use of deadly force has been seriously diminished.

Finally, not only does the window of opportunity close, but the likelihood of an accidental discharge while attempting to get the handgun loaded/call 911/ find the flashlight, etcetera, is increased.  An accidental discharge of a gun may be catastrophic.  The bullet is going to go somewhere until its energy has been expended.

Trigger locks have the extremely serious drawback of being inherently dangerous when they are being placed on the handgun.  You must violate some very basic gun handling rules

4

such as, "Treat all guns as if they are loaded", and "Never put your finger on the trigger or inside the triggerguard until your sights are on the target and you *intend* to press the trigger".  Violating these gun handling "laws" is how accidental discharges occur.

To give another example of the dangers inherent in violating these handling "laws", there are some law enforcement agencies who will not consider issuing a Glock pistol for the simple reason that it must be unloaded and then its trigger depressed in order for it to be disassembled and cleaned.  Poor training has resulted in individuals accidentally discharging their still loaded Glocks to the extent that these agency's law enforcement officers cannot be assumed to be able to 'safely' handle these particular handguns.

Safe Storage laws negate the possibility of an immediately accessible handgun. Thus the law violates any right to self-defense.

The law is not situational and deprives the homeowner of what is the best way to store a firearm.  In other words, an individual living alone is treated the same as a single parent with children in the house.  Each situation is uniquely different, but the law does not allow any discretion or choice.

In addition, the law is based upon some of the most unlikely scenarios for when a person is home with a handgun (i.e, that a secured handgun will prevent suicide, as noted in San Francisco Police Code Section 4511 findings).  It also assumes that predators (i.e. those with an intent to cause a person harm) prey on someone of equal or greater size and strength; and therefore, there are always less-than-lethal alternatives to a handgun.  It is laughable to posit that predators, given a choice, do not usually choose prey upon those they consider to be weaker.  In reality,

the person who needs the handgun the most may be the most likely victim of a predator (e.g. an elderly person living alone).  The handgun is an equalizer – it allows the weak victim of a strong predator to actually gain an advantage, to either deter the predator from causing harm or defend with deadly force.  This deterrent effect can preclude any harm to either the predator or the victim by immediately changing the scenario.

Safe Storage laws actually increase the risk of either accidental discharge and/or the used of deadly force.   The purpose of a handgun at home is for self defense.  The typical scenario is that a predator is "breaking" into a home while the victim is present, maybe asleep.  At the moment the victim realizes someone has entered the home, a sense of urgency forces mental computations (e.g. run, call the police, or defend).  All this information is processed simultaneously.  A handgun with a trigger lock, for example, creates more of urgency and panic, and therefore more danger in an accidental discharge of the firearm while trying to unlock.   There is a small window of time to react, evaluate the situation, consider alternatives, and warn or call for help, and the fact that the handgun is not accessible takes away the critical factor which will determine the outcome of the situation, which is time – time to think.

In other words, the more mental computations a person has to make in a split second decision to use deadly force, the greater the sense of panic and poorer the decision making process when the person is attempting to unlock the firearm.  It closes the window of opportunity during which the option of de-escalation via retreat, warnings, or calling for help, might have been made.

For example, if a predator breaks into a home, and the victim awakes from a deep sleep, assume they have 13 seconds

before the predator finds them (most young adults can cover 100 yards in 13-16 seconds).  If the victim's handgun is next to their bed, and is easily accessible, they can assume a defensive position and use escalating force (e.g. a shouted verbal warning for the predator to retreat).  The situation has now been reduced from the use of deadly force, to just the "threat" of use of deadly force.  However, had the handgun been in a locked container, most of that 13 seconds has been consumed with panic in getting the handgun unlocked or removed from the lock container.  Now, it has just become a rush with no time left to think – just shoot.

Because of the panic and increased mental computations a locked handgun creates, an individual actually loses the opportunity to make rationale decisions.

In sum, it is my expert opinion, based upon my education, training and experience, and to a degree of reasonable certainty, the government's Safe Storage law creates unnecessary danger and risk of harm to the People residing in the City and County of San Francisco; and increases the likelihood of accidental shootings and the actual use of deadly force because it reduces the time to allow for mental computations and increases panic.  Therefore, it fundamentally impedes an individual's right to self-defense and use of deadly force to deter and protect an individual and their family from an assailant while in their home.

ISSUE 2:      Banning the sale and/or use of so-called "enhanced-lethality ammunition".

The government has deprived its citizen's the use and/or access to "enhanced-lethality ammunition", which is apparently defined as ammunition which (1) Serves no sporting purpose; (2) Is designed to expand upon impact and utilize the jacket, shot or

materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target; or (3) Is designed to fragment upon impact.  Essentially, what is being banned is hollow point ammunition, and leaving only full metal jacketed (or semi-jacketed) ammunition for self defense purposes.

In other words, the government wants its citizens to use ammunition  that is more likely to ricochet and hit a bystander, pass through the intended target and hit a bystander, and require more shots to stop an assailant which thereby increases the probability of a bystander getting shot.  In other words, this law endangers everyone in the vicinity of a discharged firearm.

The purpose of this law is obvious; it is trying to take the lethal force option and make it less effective.  As all law enforcement officers are taught throughout their careers, the purpose of deadly force is to "stop" or "incapacitate" the person, not to "kill" the person.

Commonly carried handguns and their calibers are notoriously ineffective at even stopping or incapacitating an assailant.  It is conventional wisdom throughout law enforcement and the military that you don't bring a handgun to a gunfight. Handguns are only convenient and concealable; they are nowhere near long guns with regards to effectiveness.  Federal and state agencies have expended enormous resources of time and money in an effort to increase the effectiveness of handgun ammunition. Anything then, that renders handguns even less effective at stopping or incapacitating an assailant can be catastrophic to that person relying upon that handgun for protection.  There is a reason why law enforcement officers are typically not allowed to use full metal jacketed bullets; it is because they are extremely

ineffective at incapacitating a human or animal.

To take this one step further, law enforcement agencies are so convinced that handgun ammunition must be as effective as possible to ensure the "safety of their officers" that they not only require expanding ammunition/hollowpoints, but frequently the required ammunition for carry is a +P or +P+ cartridge. These cartridges are rendered more effective at "stopping" an assailant because they contain a more powerful powder charge and have increased velocities and energy upon impact.

The Fish and Game Departments of almost all States recognize the inadequacy of full metal jacketed bullets in their Hunting Regulations. Full metal jacketed bullets are, in fact, so inadequate that they are considered "inhumane" (causing superficial wounds to animals that immediately run away) and hunters cannot hunt with them. In fact, I am unaware of any state that allows a person to even hunt with a full metal jacket; because it is considered cruel.

Having only bullets which DO NOT FRAGMENT upon impac, available actually increases the likelihood of collateral damage due to their inadequacy. It is my opinion that discharging full metal jacketed bullets in the City and County of San Francisco puts the public at an increased risk of harm.

Law enforcement and military members are taught that once the decision has been made to shoot, that the shooter should continue to shoot until the target/assailant has stopped the action that precipitated the shooting. Because a hollowpoint is more effective at stopping an assailant, it would require that fewer bullets actually be fired. Fewer bullets being fired decreases the likelihood of collateral damage to innocents, and

may, in fact, increase the likelihood that the assailant himself survives the incident.

It is interesting to note that though the government posits that hollowpoint ammunition "serves no sporting purpose", a hunter is not allowed to hunt with anything but softpoint/hollowpoint/expanding bullets!  Therefore, the ordinance is in actual conflict with the hunting laws of the State of California definitely prohibits full metal jacketed ammunition (i.e. http://www.fgc.ca.gov/regulations big game as defined by Section 350, Title 14, CCR may only be taken by rifles using centerfire cartridges with "softnose" or "expanding" projectile.)  In addition, because a handgun is very weak, in relative terms, law enforcement typically uses +P+ ammunition.

Hollowpoint ammunition from a handgun is generally considered to dissipate energy much more quickly than full metal jacketed bullets.  This 'energy dump' and fragmentation within the body of an assailant is one of the factors that makes the hollowpoint ammunition more effective at stopping.  However, it also decreases the potential ricochet of bullets (a danger to both the person shooting and innocent bystanders) and danger of pass-through with regards to bodies or walls.  This is well understood in law enforcement with regulations dictating that on firing ranges using steel targets, only frangible or hollowpoint ammunition may be used within certain distances; if at all.

In this case, the government is actually reducing the effectiveness and purpose of a handgun as the final option for self-defense -- which is that if someone makes the decision that he must defend himself or someone else, the handgun stops the activity of an assailant immediately – not sometime in the future… or never.

In sum, it is my opinion that the ban on hollow-point ammunition actually increases the likelihood of: 1) ricochet and a danger to bystanders, 2) pass-through of the intended target and danger to a bystander, and 3) may require more shots to stop an assailant which thereby increases the probability of a bystander getting shot.  This law creates more danger to bystanders and innocent third parties, and decreases the probability that the use of a handgun against an assailant will actually "stop" the assailant.  In sum, the law deprives the People of the right to adequate and safe self-defense but trying to make a firearm "less than lethal", and therefore, less effective.

ISSUE 3:      Carry concealed weapon ("CCW") permit law and policy.

First, it would be my opinion, that law enforcement officers, as a whole, are better trained in the use of firearms than the general public and better "trained" on the use of deadly force.  With that said, it is my opinion that there is no remotely justifiable reason why any retired California Peace Officer should be issued a CCW without having to submit an application like all other citizens, whether former federal law enforcement or not.

I am extremely familiar with "good cause" and "good moral character" as those terms are used for the CCW application process, and aware of the unbridled discretion issuing authorities in California have regarding issuance of CCWs.

From all my education, training and experience, I am unaware of any *per se* definition as to what constitutes "good cause" or "good moral character" for the issuance of a CCW.  I base my opinion from a comparison study of hundreds of CCW

applications, and looked at which ones were approved, and which ones were denied.  I conducted this research with a Lt. Timothy G. Twomey (now deceased) of the Sacramento County Sheriff's Department.  The matrix attached hereto is my own work product based upon my review of hundreds of documents, and assisted Mr. Twomey in the preparation of his declaration, as he mentions in his declaration at paragraph 171.

I attach hereto, and incorporate herewith, the Declaration of Lt. Timothy G. Twomey in the case of *Mehl v. Blanas*, on appeal at the Ninth Circuit, and the exhibits in that case.  That was a case I personally worked on with Mr. Twomey, and assisted in the preparation of his declaration.  As noted at paragraph 171 of Mr. Twomey's declaration, I have reviewed hundreds of CCW applications from the Sacramento County Sheriff's Department, and have prepared a matrix regarding those applications.  The attached summary is of large volumes of data in *Mehl v. Blanas*, along with a copy of Mr. Twomey's declaration.  I incorporate those opinions and his methodology into this report as Mr. Twomey is now deceased, and I concur with the opinions expressed in that report. (a separate CD will contain the exhibits to the Twomey Declaration, which is an official court record)

In addition, I have reviewed the following files:

Robert T. Grotz, M.D., CCSF000508-CCSF000606
Alexander Grinberg, M.D., CCSF000449-CCSF000507
Jerry Akins, Police Chief's attorney, CCSF000001-CCSF000034, focusing on CCSF000011
James Harrigan, Sheriff's attorney, CCSF004501-CCSF004507, focusing on CCSF004507 (CCSF004656--CCSF004679)
Retired General Menist, CCSF000960-CCSF001018E Menist, Robert

12

Jon Gray, CCSF004680 TO CCSF004709

Judge Lucy Kelly McCabe, CCSF004508--CCSF004578

Roman Kaplan, CCSF004607--CCSF004630

Ms. Machaela Hoctor, former city prosecutor, CCSF004631--CCSF004655

Declaration of Expert Witness Lt. Timothy G. Twomey (Retired), Case 2:03-cv-02682-MCE-KJM Document 150 Filed 11/21/2007, and exhibits thereto.

I have reviewed the attached documents, including the new enacted CCW policies and ordinances.

For this report, I was also asked to assume the following facts:

- Plaintiff Pizzo submitted a CCW, that she was not contacted by an "investigator" to complete the application per the instructions, and had she been contacted, her good cause would have been that as a lesbian who has a domestic partner, she has been threatened on four separate occasions because of her sexual orientation and/or relationship.

- In the Durken Deposition at page 22, Harrigan had his CCW issued before the law enforcement officer had his CCW revoked, and that officer was never banned from owning a firearm.

- In the McEachern Depostion at page 160, there is no evidence that Menist had ever submitted a CCW application.

- In the McEachern Depostion at page 148 regarding Akins, especially at 151, there is no specific incident regarding an

individual officer threatening Akins.

What I find especially noteworthy is in Akins (attorney for the Police Department) CCW application, which specifically states: **"Some of them [San Francisco Police Officers] are or become unstable and all of them are armed.  This requires that I have a gun for self protection."**  There are several points to draw from this.  First, since Akins had his application approved, his good cause statement must be true.  The second point is that the head of the agency knew this to be true and approved the application.  Third, knowing this to be true shows that the police would rather issue a CCW to an employee of the department rather than disarm any officer who is deemed a deadly threat to the public's safety.

The case of Harrigan (Sheriff's attorney) involves more specificity, and if true, would seem to justify the issuance of a CCW to Harrigan.  The first issue of concern is if in fact this "armed deputy" was exhibiting "psychological instability" and made a threat, then why wasn't the deputy disarmed, psychologically evaluated, or charged with a crime.  The file is devoid of any substantive facts, other than Harrigan's own personal opinion.  It simply boggles the mind that given this threat, that we must assume the sheriff's department felt the threat was credible due to their issuance of a CCW, the sheriff's department would not go ahead and immediately disarm the threatening officer whom they had armed in the first place!

What is still more difficult to understand however is why these "unstable" police officers that Akins and Harrigan are referring to were allowed to remain armed with "enhanced-lethality ammunition" while the rest of the public is both prohibited from carrying a concealed weapon and deprived of the

14

use of "enhanced-lethality ammunition".  Why isn't the instability documented?

It is beyond reason why Robert T. Grotz, M.D.,' would not be issued a CCW.

Grotz' CV is impressive and lends itself to the same impressions of 'good character' recorded by Fairbain when recommending Menist as an upstanding citizen (paraphrasing CCSF000982).  CCSF000521 indicates that "several" other states have approved CCWs for Grotz.  CCSF000522 lists: Arkansas, Idaho, Indiana, Michigan, Montana, Oklahoma, South Carolina, Vermont, and Wyoming.

Threats are heavily documented with specificity and references to supporting documentation, enabling verification of the incidents (from CCSF000605 to CCSF000606).  This list of incidents (attempted home invasion, bullet holes, documented death threats, and the consistency of the vandalism) reasonably fits almost anyone's definition of "threatening".

At CCSF000566, Lieutenant Groshong responds to Grotz's entreaties with, "Physicians throughout San Francisco must experience the same problems you identify in your letter."  Why does he believe this?  There are not many citizens of San Francisco, or even the United States who would put up with the litany of incidents provided in Grotz's application.

Groshong then goes on to disingenuously tack on the same 'form letter' response that he provided to others whom have attempted to get the department to reconsider.  Elsewhere in Groshong's denial letters he uses similar boilerplate such as "There is no guarantee that your carrying a weapon would

mitigate or prevent the incidents you describe in your letter that ultimately led to your request."  Have all of those who have applied and received a CCW provided documentation that would "guarantee" that their carrying of a weapon would mitigate or prevent the incidents alluded to?  The ability to somehow articulate this "guarantee" to Groshong seems to be one of the requirements for a CCW, yet there is little commonality with regards to a "guarantee" in successful CCW applicants.

It is not possible to determine on what basis the decision to deny Grotz was made.  Groshong does not seem to have relied upon the cryptic notes from a police interview on November 4.  Based upon the documentation, Grotz was interviewed by an officer on November 4, 2004.  However, it is difficult to determine the purpose of the interview.  I base this opinion on the lack of any specificity or recommendations in the reports (CCSF000521).  The interviewing officer would be tasked with fully investigating the applicant and, presumably, making a recommendation with arguments supporting this recommendation.

Though Machaela Hoctor Hoctor's articulation of her reasoning for desiring a CCW (CCSF 004649) in November of 2006 is no different than a multitude of other applicants who were denied, it does seem to justify issuance of the permit.  What is absolutely mind boggling is that the CCW would be *revoked four months later due only to a change in "employment"*.

Hoctor's having her CCW revoked lends itself to the idea that there is little reasoning that goes into the issuance of CCWs.  In the letter revoking Hoctor's CCW, at CCSF004631 Sheriff Hennessey writes that the CCW was issued "in connection with [Hoctor's] *official duties* as an attorney…  Accordingly, I am revoking your concealed weapons permit."  Conspicuously absent

16

is the mention of any threat or change to the circumstances and reasoning involved in initially issuing the CCW.  Is Hoctor no longer in danger?  My opinion would be an adamant, "No."  One can only hope that the gang member/gang who had threatened her was informed of her change in employment and will respect this.

Of course, as is typical with all the applications, little or no reasoning is articulated by those making the determination.

Alexander Grinberg, M.D. was denied a CCW though he references the almost identical threats which Akins and Harrigan were issued CCWs.  In fact, unlike Akins, Harrigan, or Menist, Dr. Grinberg actually obtained a restraining against an individual indicating psychological instability.

Grinberg's request and documentation was certainly not "generalized", though once again, that is part of the reasoning provided by Groshong at CCSF000497.  The information regarding the threat to him was specific and well-documented.

Of course, Grinberg would have been unable to "guarantee" that carrying a weapon would mitigate or prevent the incidents he had described.  But Grinberg shares this failing with every other human being.  As expanded upon later, this standard that someone be able to "guarantee" that an action will absolutely prevent a situation from developing simply cannot be met.

I believe that it is for precisely the reason that the standard cannot be met, and that it is extremely ambiguous, that it is used again and again with regards to justification.  In this way, Groshong and/or whoever else is making the decisions can be as capricious as they wish while maintaining the illusion of equality in their decision-

17

making.

Robert MENIST, Maj.Gen. (ret.)

I have reviewed retired General Menist's CCW file which lacks a CCW application, and for the purposes of this report, I assume that he never submitted an application. It was represented to me Menist has stated in his deposition at page 21 that he said "I don't remember" when asked if he filled out a CCW application. The lack of an application on file and his "I don't remember" response, leads me to a reasonable conclusion that he never submitted an application and was issued a CCW without a formal application ever being submitted.

I am familiar with "good cause" and "good moral character" as those terms are used for the CCW application process, and aware of the unbridled discretion issuing authorities have regarding issuance of CCWs.

It is my opinion that no reasonable law enforcement investigator would find any credibility in retired General Menist's "good cause" statements. Moreover, Menist's own articulation of what he perceived as threats, coupled with his grandiose characterization of his job (again going to his poor perceptive), should have ensured that he be rejected as likely to use deadly force inappropriately.

The overall impression from reading the statements of Menist and the reports from the investigating officers is that Menist was greatly inflating his position, and importance, and attempting to befuddle local law enforcement investigators through the use of military jargon and buzzwords that were purposefully obscure. A Top Secret clearance is relatively

common on the spectrum of possible government clearances and is frequently granted to even low-level workers when required. There is only one clearance lower, but many levels higher.  The retired Menist self describes his civilian work as "providing counseling and fiduciary services.'" CCSF001003.  Yet, it also seems that he at least implied to Fairbain that he was still connected with military "special operations" (note the small 's' and small 'o' which render this statement vague enough to mean almost anything).  At CCSF000981, Fairbain states that Menist "continues on in special operations for the United States government."  This is non-specific and laughable.  In CCSF000982 Inspector Fairbain seems to say that because Menist is a nice guy and may be proficient enough with a handgun not to hurt himself or anyone else unnecessarily, he should be issued a CCW.

The self-described 'implied and direct threats' to Menist have to be read to be believed.  Based solely upon the fact that he dramatically couched the descriptions on CCSF0000974 as "threats", Menist should have been *denied* a CCW for lack of mental stability and sound judgment.

For instance, Menist uses the word "*accosted*" to describe the behavior of "a middle Eastern male who wanted to *discuss* the war in Iraq, and wanted to set up a meeting to give [Menist] a copy of the Koran".  Had this male been Caucasian, wanting to discuss the war in Iraq, and wanting to set up a meeting to give Menist a Bible, would that have made a difference?  Significantly, how does Menist, or the investigator Fairbain, or the San Francisco Police Department believe that this direct threat scenario/situation would have turned out better had Menist had a concealed handgun?!  Should Menist have shot the man?  Brandished the handgun in his face?  Made a citizen's arrest?

Based upon the lack of any further documentation regarding "threats", "special operations", the issuing agency for the security clearance, and whether it was still active, the entire investigation regarding any threats seems to have relied solely upon the assumption that Menist was telling the whole truth and nothing but the truth.

The implication of the reasoning set forth by Menist is that some unknown terrorist group in the area has specifically targeted him. Assuming the statements were true, the Chief of Police would have been personally advised of the threats, and would demand to know the nature of them. Additionally, for a person of Menist's rank, had any of Menist's higher-ups actually thought that the threat to him was real, he would have immediately been provided with a round-the-clock PSD (protective services detail) of armed bodyguards. The security level of the base would have been heightened. Next, there would have been an SVA (security vulnerability assessment) conducted to determine the exact nature of the threat and the danger to Menist and those around him. Ultimately a decision would be made with regards to the appropriate level of security necessary to keep Menist safe given the information know regarding the threat; if any. Interestingly, because the military has no authority outside of the base confines, the police department would have necessarily been informed of the results of these findings and also necessarily been incorporated into the protective security detail whenever it was outside of the base confines.

In my opinion, Menist received a CCW for one of two reasons: He was either able by virtue of his position of power to unduly influence the investigators, or he received preferential treatment. Ms. Pizzo had absolutely no chance for the level of review or consideration received by Menist, Akins, Harrigan, or

any other individual who was employed by government.

Considering the scope of CCW applications and documents related to them that I have reviewed, I have come to the opinion that there is absolutely no equality with regards to who is issued a CCW and who is denied.  The reasoning behind the denial is not explained because it cannot be explained in most instances.  It cannot be explained because there is no standard for determining who will be denied.  Because there is no standard, there is no equality.

It is obvious from Hoctor's easy issuance of a CCW and abrupt revocation several months later that issuance in many instances is linked directly to being a member of the city or county government.  Retiring policemen, demonstrating no imminent threat, or even a request for a CCW are issued one.  Thus, the government employees become a privileged group who are *more* "equal" than the common citizen. The police department would have us ignore that there is a separate criteria, yet believe that the criteria are equal.  Attempts at equality through "separate but equal" policies, procedures and systems met with failure during the civil rights era in America's history and required court intervention for correction.

The San Francisco Police Department's consistent reason for denying a CCW is exemplified by CCSF000497.   Without further explanation by the department, the following verbiage is used in almost every denial of the police department. Lieutenant Groshong states in part,

"There is no *guarantee* [my emphasis] that your carrying a weapon would mitigate or prevent the incidents you describe in your letter that ultimately led to your request."

21

Is articulating a "guarantee" that a CCW will prevent the incident one describes the standard?  This statement is so ridiculous that it brings another aphorism to mind.  At the risk of being trite, I will mangle it and say that the only guarantee in life is that you must pay taxes and someday die.  I feel very comfortable with opining that this "guarantee" standard cannot be met by anyone, anywhere, at any time.

Further, Groshong writes that, "A *generalized* [my emphasis] request based upon personal protection and self-defense does not establish good cause for the issuance…".  However, it is patently obvious that many of the requests are extremely timely, specific, and well documented.  I assume then that this statement means nothing, and the 'generalness' of the request has nothing to do with whether it is granted or not.

For the above stated reasons, it is my opinion there is no rationale basis for exempting retired law enforcement from the same standards and thresholds made applicable to the general public.  It is further my opinion that the "good cause" and "moral character" standard are arbitrary terms of art which are abused by governmental officials, some of whom are elected.

## 2.    The data and information considered in forming his opinions.

I have relied in all my education and training as stated herein.

Robert T. Grotz, M.D., CCSF000508-CCSF000606
Alexander Grinberg, M.D., CCSF000449-CCSF000507
Jerry Akins, attorney, CCSF000001-CCSF000034, focusing on

CCSF000011

James Harrigan, attorney, CCSF004501-CCSF004507, focusing on CCSF004507 (CCSF004656--CCSF004679)

Retired General Menist, CCSF000960-CCSF001018E Menist, Robert

Jon Gray, CCSF004680 TO CCSF004709

Judge Lucy Kelly McCabe, CCSF004508--CCSF004578

Roman Kaplan, CCSF004607--CCSF004630

Ms. Machaela Hoctor, former city prosecutor, CCSF004631--CCSF004655

Declaration of Expert Witness Lt. Timothy G. Twomey (Retired), Case 2:03-cv-02682-MCE-KJM Document 150 Filed 11/21/2007, and exhibits thereto.

I have also reviewed hundreds of CCW files and campaign records from the Sacramento County Sheriff's Department, and prepared a matrix regarding those documents.  That is being produced separately in CD.

I have reviewed and considered the open source information available to the general public at http://oag.ca.gov/crime.

I have also reviewed City and County of San Francisco CCW policy as attached hereto.

**3.      Summaries are attached.**

**4.      Qualifications.**

My recent experience includes: 2005 through 2012 deployment to the Middle East, Afghanistan, and Africa (for national security reasons, I cannot identify the name or nature of

23

this engagement) for an agency of the U.S. government.  I hold a
TS SCI w CI poly (Top Secret Sensitive Compartmented
Information with polygraph) security clearance requiring
extensive polygraph testing.  The initial qualifications to even
*apply* for vetting in this position is a minimum of eight years of
active duty in a SOF unit, combat experience, and hostage rescue.
The shooting standards for this unit are the highest in any federal
government agency.  Only 20 percent of those with the
aforementioned backgrounds and qualifications eventually finish
the training/vetting and are selected for the work.  Selection is an
ongoing process and all members are re-vetted and attend
additional training every two years.  Ongoing training involves
intelligence tradecraft, hand-to-hand combat (CQD), CQB,
communications, firearms, driving, and aerial platform work, to
name a few.

My education and training includes, but is not limited to
Federal Law Enforcement Academy (FLETC) Criminal Investigator
certification, "Outstanding Graduate" Basic U.S. Deputy Marshal
and several Advanced Deputy Marshal courses, among others.
Additionally, from July of 1980 to July of 1991, I was both a U.S.
Air Force Special Operations Pararescueman, and a U.S. Army
Special Forces Combat Engineer.  These courses included but are
not limited to: CQD, Use of Force training and instruction, and
several hundred hours of Close Quarters Battle (dynamic and
slow-and-deliberate), weapons, qualification in and use of stun
grenades (aka flash bangs), unarmed combatives,
control/restraining/submission techniques and holds, prisoner
search and restraint, defensive tactics, and prisoner handling.  As
Assistant Team Leader of the U.S. Marshals Service Eastern
District of California's Special Response Team (SRT), I received
approximately 400 additional hours in the aforementioned
areas.  I was frequently called upon to deal with the most

recalcitrant prisoners in order to avoid harm to the prisoner themselves and/or other law enforcement personnel.  Additionally, I provided instruction in these areas to my own team members and outside agencies.  In 1984, I was trained and certified as a Special Forces (aka "Green Berets") Instructor in the area of hand-to-hand combatives, among other areas.  I have been trained and certified on lethal and non-lethal methods of control and use of force including but not limited to the ASP Tactical (Expandable) Baton, OC ("Pepper") spray and stun grenades (aka flash bangs).

Additional areas of qualification include but are not limited to: FBI Basic SWAT training and certification, General Pistol Course, Awarded an Expert Rating at Jeff Cooper's American Pistol Institute, Gunsite Ranch, Prescott, Arizona; U.S. Army Special Forces Special Operations Engineer Sergeant Course, JFKSWC (John F. Kennedy Special Warfare Center) Fort Bragg, North Carolina.  USAF High Glide Ratio Parachute Military Freefall Course, Mather AFB, California. U.S. Army Special Forces Terrorism in Low Intensity Conflict Course, JFKSWC Fort Bragg, North Carolina.  USAF Pararescue Advanced Casualty Care Course, Kirtland AFB, New Mexico. U.S. Navy 9D 5 Submarine Escape and Diving Training, NAS Norva.  U.S. Army Special Forces Survival, Evasions, Resistance, and Escape (SERE) Instructor Qualification Course, JFKSWC Fort Bragg, North Carolina. USAF Arctic Survival Training Course, S V87 A, Eilson AFB, Alaska.  USAF Pararescue Recovery Specialist, PDS Code OOZ, Kirtland AFB, New Mexico.  USAF Basic Survival Training Course S V80 A, Fairchild AFB, Washington.  U.S. Army Airborne Course, Fort Benning, Georgia. U.S. Army Special Forces Underwater Operations Course, JFKSWC branch, Key West, Florida.  USAF Flight Physiological Training, Brooks AFB, TX.  Pararescue Indoctrination Course, Lackland AFB, TX.

While a Deputy U.S. Marshal, from 1991 to 2002, I served as Assistant Tactical Team Leader for the District's Special Response Team.  Additional duties included; Threat Analysis Coordinator for the District, Tactical instructor and firearms instructor.

I am a published author; "101 Passages in MCAT Verbal Reasoning", 461 pages, ISBN-13: 9781893858244 ISBN: 1893858243, 2002: a consistent bestseller in the MCAT (Medical College Admissions Testing) genre since its publication in 2001.

Before working for the United States Marshals Service, I was a decorated combat veteran with over ten years in the military serving in both Desert Shield and Desert Storm.  During the Gulf War, I was assigned to the 1723 Special Tactics Squadron, Special Operations Command (SOCOM) and was sent on missions deep inside of Iraq even prior to the ground war's beginning.  I served as one of 107 special operations raiders who seized Kuwait International Airport complex in a daring helicopter raid ahead of advancing Marines in the final few days of the war.  I also served in Special Operations as a U.S. Army Special Forces (Green Berets) demolitions expert assigned to an "A" Team.  As a pararescueman, I have received extensive training, first as a paramedic, and then in parachuting (static line, free fall HALO/HAHO, and jumpmastering), aircrew procedures, helicopter insertions and extractions (rappelling, fastrope, helocast, rope ladder, STABO, etc.), combat SCUBA diving (underwater navigation and demolitions, submarine lockouts, inflatable boat operations, underwater closed circuit/rebreathers, etc.), technical rock climbing, weaponry, explosives, radios, land navigation, patrolling, and survival, evasion, resistance, and escape.  Very early onward in my career, I was recognized for my training and abilities and consistently chosen to act as the Team Leader on

most operations, amassing a record of 27 individuals saves and 39 assisted rescue missions, and at the same time receiving numerous awards for Valor.  I was recognized throughout the Special Operations Command career field as one of the most proficient tactical Team Leaders and operators at the time.  Special Forces allowed me to consolidate this ability to instruct and teach all that I had learned and to hone my field skills.

As the engineer ("demolitions expert") on a Special Forces A Team, I was trained and qualified in, and can train others in the use and identification of: U.S. military/U.S. commercial/Warsaw Pact manufactured and field expedient explosives, ignition devices, firing systems (electrical and non electrical), anti handling devices, and their characteristics (up to and including man portable nuclear weapons such as SAATMs), and of course, small arms ammunition.  In a pre mission planning role as the Target Analyst it was my job to calculate the exact type, amount, and placement of demolition charges to be used for breaching charges, shaped charges, advanced steel cutting, cratering, and field expedient charges (such as dust initiators, fertilizer/paraffin compounds, expedient Claymore mines, etc.).  This is for any given structure/object from a door to a bridge.  Since these skills require an understanding of the different explosive characteristics (RE factors, standard block/sheet sizes, gas expansion, heat, etc.) and subsequent visual effects (cratering, spalling, and cracking) of each explosive material (black powder, TNT, Semtex, C 4, RDX, etc.), I have often been able to determine on a range precisely what type of charge was used and how.  My responsibilities also included extreme proficiency with, and knowledge of, handheld weapons and ammunition (foreign and domestic).

Medical training as a pararescueman has centered on

trauma; battlefield trauma similar to the blunt force or gunshot wounds one might encounter in law enforcement work.  This has qualified me to recognize and treat all manner of upper and lower airway emergencies, 'bleeders', dislocations, sprains, strains, and fractures; administer narcotics, start IVs, intibate, perform cricothyroidotomies, venous cutdowns, thoracostomies, tracheotomies, escharotomies, wound debridement, stitching, stabilization of wounds of any sort caused by gun shot wounds.

See attached for specific dates.

 I have not testified in the last 4 years.

 I charge $450.00 per hour for deposition/trial testimony. 6 hour minimum for deposition and trial.

David P. Orsay

Digitally signed by David P. Orsay DN: cn=David P. Orsay, o, ou, email=dporsay@ yahoo.com, c=US Date: 2012.04.28 00:09:37 -04'00'

/s/ David Orsay
David Orsay

1  LAW OFFICES OF GARY W. GORSKI
   8549 Nephi Way
2  Fair Oaks, CA  95628
   Telephone:     (916) 965-6800
3  Facsimile:     (916) 965-6801
   usrugby@pacbell.net
4  www.gwgorski.com
   GARY W. GORSKI - CBN:  166526
5  Attorney for Plaintiff

6  Co-Counsel
   DANIEL M. KARALASH - SBN: 176422
7  (916) 787-1234
   (916) 787-0267
8              THE UNITED STATES DISTRICT COURT

9          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

10  DAVID K. MEHL; LOK T. LAU;            )    CASE NO.: CIV S 03 2682 MCE/KJM
    FRANK FLORES                          )
11            Plaintiffs,                 )
                                          )    **DECLARATION OF EXPERT**
12  vs.                                   )    **WITNESS LT. TIMOTHY G.**
                                          )    **TWOMEY** (RETIRED)
13  LOU BLANAS, individually and in his   )
    official capacity as SHERIFF OF       )
14  COUNTY OF SACRAMENTO;                 )
    COUNTY OF SACRAMENTO,                 )
15  SHERIFF'S DEPARTMENT;                 )
    COUNTY OF SACRAMENTO; BILL            )
16  LOCKYER Attorney General, State of    )
    California; RANDI ROSSI, State        )
17  Firearms Director and Custodian of    )
    Records.                              )
18  _____Defendants_____    )

19
    I, Timothy G. Twomey, declare as follows:
20
          1. I am over the age of 18, and competent to testify as to the facts and opinions stated
21
    herein, and the information contained herein is of my own personal knowledge.
22
          2.  I received a Bachelors Degree in Psychology in 1972 from California State
23
    University, Sacramento.
24
          3. In late 1972 or early 1973, I was accepted into the Sacramento County Sheriff's
25
    Department's Reserve Academy.
26
          4.  In approximately September, 1974, I was hired as a full time Deputy Sheriff and was
27
    assigned to the Sacramento Law Enforcement Training Academy, graduating in or about January,
28
    1975; finishing some hundredths of a point behind the top academic recruit.

                                         1.

1      5.  In 1975 (+-), I became a Certified Departmental Weaponless Control Self Defense

2  (Koga) Instructor.

3      6.  In 1979, then-Captain George Lotz asked me to do an analysis of the Field Training

4  program.  He specifically wanted to know if the reason for the large number of failures in the

5  'retread' program (the number of deputies returning to the jail system during patrol for

6  retraining) had to do with the different academies the deputies attended.  He felt there were more

7  re-training  failures for those hired with just a Reserve Training experience.

8      7. This instance was the first of many times that I would be asked to conduct this type of

9  analysis.  I used my experience, training and education to determine the methodology to be

10  employed as there were no manuals on this type of study.  Therefore, the discretion was

11  completely mine as to how to perform this administrative investigation.

12      8.  I discovered that there was a 50% failure rate in the re-tread (re-training program).

13  That is, after passing the initial Field Training program, completing the jail time (up to 5 years)

14  50% of those retreaded back to the Field Training returned to Correctional Services regardless of

15  their academy background.

16      9.  After interviewing several retread failures, I discovered that the reasons varied for

17  each failure: some had established seniority in Correctional Services that enabled them to bid for

18  a day shift with weekends off.

19      10.  Some had pressure from family life to return to a day shift only.

20      11.  Some resented the necessary overtime Patrol Services required.

21      12.  Some resented being ordered around like rookies.

22      13.  But the fact remained that 50% of the deputies who underwent two training cycles

23  returned to the Correctional Services after an expensive redundant training program.

24      14.  In September of 1980, I was promoted to Sergeant, and was assigned to the Rio

25  Cosumnes Correctional Center (RCCC).  In March, 1983, I was assigned to the Sheriff's Staff as

26  the administrative assistant to Larry Stamm, Chief Deputy for Security and Correctional

27  Services.

28      15.  During my assignment as assistant to Chief Deputy Stamm, I reviewed every

2.

1  completed Internal Affairs Investigation (with the exception of one), including those alleging

2  excessive force and breach of Departmental policy, that came to Security and Correctional

3  Services and either passed them on to Chief Stamm, or wrote an administrative review for Chief

4  Stamm or returned them for further investigation.  I became familiar with the record keeping

5  methods in Internal Affairs, and their access to all levels in the department, crossing all lines of

6  authority. I became familiar with most, if not all, of the General Orders that govern the

7  department, writing several myself.  I became familiar with all of the operations that governed

8  each division within the Security and Corrections Service area, writing, modifying and/or, if

9  appropriate, deleting over 150 of them in the two year period.

10      16.  In 1983, while assigned to the old main jail, I chronicled the complete lack of

11  management control at all levels at the facility.  In particular, Deputy Kelley's Morning Watch

12  (the same Chief Deputy Kelley in many of the CCW applications) had amassed more complaints

13  of brutality in 30 days, then the entire patrol division had amassed over the entire year.

14      17.  This same Chief Kelly had a minimum of three IA/Divisional complaints for

15  excessive force (e.g. 94 IA 57, 93 DIV 58, and 91 DIV 31) from records I reviewed.

16      18.  In or around June, 1984, I was promoted to Lieutenant but remained assigned to the

17  Sheriff's staff as the assistant to Larry Stamm, Chief Deputy for Security and Correctional

18  Services.

19      19.  During this assignment, I was asked by Larry Stamm to become a legislative

20  advocate for Security and Correctional Services.

21      20.   Larry Stamm, at this time named  Chief Deputy of Security and Correctional

22  Services by newly elected Sheriff Robbie Waters, ordered me to author the Sheriff's Staff

23  Division budget for the 83/84 period.

24      21.   There was no mention of any monies allocated for the concealed weapons (CCWs)

25  permit process in the 82/83 budget which I utilized for the 83/84 budget as a bench mark.

26      22.  I was responsible for initiating legislative changes in PC§s 4007, 4021b, and 853.6(j)

27      23.  I also worked with Dwight "Spike" Helmick, legislative liaison for the California

28  Highway Patrol, and Al Cooper, legislative liaison for the California Chief's of Police and the

3.

1    California State Sheriff's Association in the development of PC§ 4030, the strip search

2    legislation.

3            24. In approximately January, 1985, I voluntarily transferred to South Patrol Division as

4    the co-watch commander of morning watch.

5            25.  Sometime in 1986, I was assigned as the South Patrol Division Executive Lieutenant,

6    and as the relief watch commander.

7            26.  In mid 1986, Chief Deputy Larry Stamm approached me and told me he had been

8    selected by newly elected Sheriff Glen Craig to be the new Undersheriff.  He asked me to

9    become his assistant, which I agreed to do.

10           27.  During the approximately 6 months prior to Sheriff Craig swearing in, I assisted the

11   future Undersheriff in formulating structural changes within the Sheriff's Department.

12           28.  We restructured the Field Training Program to allow newly hired deputies to

13   complete a formal State Board of Correction 80 hours Corrections Course, then be immediately

14   assigned to Correctional Services, instead of Patrol Training.

15           29.  Undersheriff Stamm, incorporating my findings from my 1979 Field Training

16   Program Study, decided that assigning deputies to Correctional Services instead of Patrol would:

17                   1.      Save the department a significant amount in training costs.

18                   2.      Eliminate the adrenalin rush experience that patrol training provides new

19                           deputies, only to have them face 4 to 5 to 6 years in the jail system as

20                           disgruntled "patrol" officers.

21                   3.      Save the department bodies.  Those deputies that were successful in the

22                           rigorous Jail Training Program, and were successful in the custody

23                           environment, after failing Patrol Training would still have a career within

24                           the Sacramento County Sheriff's Department as custody officers.

25                           (Currently under the Patrol First program, if a recruit fails Patrol Training

26                           after an extensive and expensive Academy, she/he is released from county

27                           services)

28           30.  In January of 1987, I was appointed the Assistant to Undersheriff Larry D. Stamm.  I

4.

was the first Lieutenant in the department to have held that assignment.

31. From 1989 through 1994, I was the Watch Commander for Evening Watch in South Patrol Division , commanding two watches, David and Edward.

32. For an approximate six month period, I was given the additional responsibility of commanding the Graveyard shift, Adam Watch; to my knowledge, the only Lieutenant in the history of the department to have such double watch responsibility.

33. During this period, I initiated several internal affairs investigations, oversaw dozens of Divisional Investigations, and conducted Watch Investigations as I deemed necessary.

34. During my ten year assignment as the Watch Commander at the Rio Cosumnes Correctional Center, I initiated about 10 internal affairs investigations, divisional investigations and watch investigations which resulted in discipline up to and including termination.

35. While I was assistant to Chief Deputy/Undersheriff Larry Stamm, I wrote, revised, or deleted if appropriate, 150 Operations Orders and Departmental General Orders.  While I was assistant to the Undersheriff, I attended the weekly Service Area meetings involving all of the managers in the division.

36. In or about January of 1988, at my request, **I was assigned as the Executive Lieutenant in the Special Investigations Bureau**, and coincidentally, the Commander of the Warrant/Fugitive Bureau, a bureau larger than any other in the Detective Division.

37. During the promotional process for Lieutenant in or around 1984, I not only read each and every Sheriff's Department General Order, but I made hundreds of flash cards with these orders written on them, and studied the growing stack several times each day.

38. I continuously reviewed and studied organizational structure and divisional resources throughout my career.

39. I was informed that I had captured 2nd place in the process for promotion to Lieutenant out of over 70 candidates.

40. There was no mention of the CCW process in the Sheriff's Staff Division Budget or the General Orders during the entire time I was a member of the Sacramento County Sheriff's management team.

41. In 1988, I was assigned as the Executive Lieutenant (currently called the Assistant Commander) of the Special Investigations Unit (SIU often frequently referred to as SID and/or SIIB, which refers to the Special Investigations/Intelligence Bureau).  I was also assigned at the same time, to serve as the commander of the Warrant Fugitive Bureau, a bureau under the umbrella of the Special Investigations Unit.

42. **Then-Captain Brian Collins tasked me to start and complete the Investigations Unit 88/89 budget when Sheriff Craig first took office.**

43. Again, since there were no manuals on how to go about this task, and the only examples were prior budgets, I used my experience, training and education to determine the methodology to be employed .  The discretion was completely mine to determine how to perform this administrative budget review.

44. When I completed this massive project, then Chief Deputy Valarien John Kobza, in the presence of Captain Collins, referred to my product as the best budget ever written.

45. **Following the example of the previous budget, which had been used as a template for the budget I had written, there was no mention in the SIU of any monies allocated to the CCW process.  I had been informed that the CCW process was a function of the SIU.**

46.  While serving as a member of the Sheriff's Staff Division, as assistant commander of the Special Investigation Unit, during my review of the Sheriff's Department General Order for promotion to Lieutenant, and while rigorously studying during at least three attempts to be promoted to Captain, I have never seen any orders, rules, or processes for the issuance of CCW permits.  Never seen these allegedly existing orders, rules, or processes, even  though I was very familiar with the CCW issuance law and aware that the Sheriff's Department issued CCWs.  I know this from my own personal experience in that I have seen the CCW applications used and the CCW permits actually issued during the course of my career, and these permits were signed by the Sheriff.

47. Similar to what I have done in this case, throughout my career, starting as a deputy, and retiring as a Lieutenant, I conducted hundreds of administrative investigations, which

1  involved analyzing and summarizing thousands of documents at a time, and then resulted in an

2  administrative determination of an issue had presented itself.

3      48. On numerous occasions, because many investigations involved unique situations, I

4  drew upon my education, training and experience to determine the best method for conducting

5  the administrative investigation.

6      49.  I relied upon this experience when reviewing the copious volumes of materials

7  provided by the defense in this CCW case with bate stamps commencing with the letter "D_" and

8  other available sources of information, as noted herein throughout.  My experience encompasses

9  a breadth of information and materials which I have reviewed, experienced, relied upon, and am

10  familiar include, but are not limited to, the following:  As a Deputy, I conducted a Line

11  inspection of the  Main Jail Prisoner property processes, and later while assigned to patrol and

12  Patrol re-tread training processes.  As a Sergeant/Lieutenant, I completed: a computerized

13  schedule for all services at the RCCC for all six or seven of its facilities, such as Staff hours at

14  the Main Jail, Staff hours at the  RCCC, Staff hours at the Courthouse, a computerized study of

15  the type of prisoners at Main Jail, sat on the Work Release Revenue Collection Committee, the

16  New Main Jail Architectural Committee, completed Internal Affairs reviews for Undersheriff,

17  wrote the General Order for Misdemeanor the warrant booking process, prepared a briefing

18  binder for Sheriff Robby Waters for his debate with Assembly Woman Maxine Waters on the

19  then pending  Strip Search legislation.  Conducted a three month computerized study involving

20  8000 records to compare the efficiency of one-person patrol units vs. two-person patrol units,

21  conducted a multi-agency staffing comparison to determine the relative staffing needs of officers

22  in patrol; proposed changes to PC §s 4030, 856.J, 4007, 4032B and VC § 40508.4, many

23  Divisional Investigations reviews, Inmate JT history at RCCC, and an Internal Affairs

24  Termination investigation during my last week on the job.

25      50. I am an expert on law enforcement management policy, procedures and in particular,

26  on conducting administrative investigations and administrative reviews.  Moreover, and

27  particularly pertinent to this case, the aforementioned expertise is very specific to the Sacramento

28  County Sheriff's department.  Most importantly, I am an expert in determining if the Sacramento

7.

1    County Sheriff's Department has a set policy or criteria as to what constitutes "good cause" or

2    lack thereof in determining who should or should not be issued a CCW.

3         51.  Further, I am an expert in evaluating and processing large amounts of Sacramento

4    County Sheriff's Department data, facts, and information, and rendering an opinion to a

5    reasonable degree of certainty as to what the evidence establishes regarding the existence or lack

6    thereof of a constituted departmental policy by custom or practice.  In this case, I am a qualified

7    expert on evaluating and processing large amounts of CCW data, facts, and information, and then

8    rendering an opinion to a degree of reasonable certainty as to: 1) what the policy criteria is for

9    both prima facie and non-prima facie "good cause" issuance of a CCW, and 2) whether the "good

10   cause" criteria was applied equally to all applicants, and 3) if not applied equally, why was it not

11   applied equally.

12        52. I am qualified to render an expert opinion as to the ultimate reason or reasons why

13   Plaintiffs Lau and Mehl were denied CCWs.

14                              **OPINION**

15        53. **DOCUMENTS AND EVIDENCE RELIED UPON IN PREPARING THIS**

16   **DECLARATION, ALL OF WHICH IS ON FILE WITH THE COURT:**  I base my opinions

17   to a degree of reasonable certainty due to my knowledge, skill, experience, training or education;

18   and as a former management employee of the County of Sacramento Sheriff's Department; and

19   upon the information I have personally reviewed as noted herein and with my own percipient

20   experience with the Department.  The documents I personally reviewed and read include the

21   following, and those produced as exhibits are the exclusive basis for my opinion, though other

22   documents not produced bolster my opinion, and do not detract from it.  However, these

23   documents which accompany the moving and opposition papers for summary judgment are a

24   superfluous amount needed to establish the opinions and analysis expressed herein.

25        54.  There is no doubt that the documents identified as business records of the Defendants

26   are in fact documents generated in the normal course of business.  In fact, I recognize the

27   handwriting on many of the Documents where it is either signed by Blanas, McGinniss and some

28   of the Chiefs.

                                    8.

(1) Documents produced in discovery, paying particular attention to all CCW documents and Campaign records, all of which were verified as true and correct business records by Defendant Blanas and the County.  In addition, CCW applications were verified by each applicant under the penalty of perjury, and Defendant Blanas verified his campaign records under the penalty of perjury.

(2) I read the depositions of Blanas, McAktee and Wong taken in this case.

(3) I have read the Declaration of Colanfrancesco.

(4) I reviewed the initial disclosures.

(5) I have reviewed the written CCW issuance policy and the state statute regarding issuance.

(6) I have also obtained and reviewed the expert opinion of Wendell Phillips, and his report signed August 31, 2007.  His opinion only confirms what my analysis has established, and is in no way a necessary factor in my opinions or conclusions.

(7) I have read each declaration filed in support of Defendants' Motion for Summary Judgment, which said documents were filed with this Court on October 15, 2007.

55.  Moreover, and in particular, I have read every page of the following documents as these are the type of document I would rely upon in rendering my expert opinions herein, and would reasonably be relied upon by other similarly situated experts in my fields of expertise for which my opinion herein is rendered:

56.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  2, Exhibit "A",  PDF scanned copy of the relevant portions of the Deposition of Defendant Blanas, and Exhibits 1, 1a, 2, and 3.

57.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  3, Exhibit "B",  PDF scanned copy of the relevant portions of Deposition of Amber Wong, and

1   Exhibits 5 and 6.

2       58.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 4, Exhibit

3   "C",  PDF scanned copy of the relevant portions of the Deposition of Aaron McAtee and Exhibit

4   4.

5       59.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 5, all of

6   the following bate stamped documents commencing with the letter "D" of the approximate 4000

7   pages of relevant documents that were produced by Defendant Blanas under the penalty of

8   perjury, per his discovery responses at Exhibits "G, H, J, K, L, N, R and S", and the County's

9   response at Exhibit "I".

10      60.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 6, Exhibit

11  "D",  PDF scanned copy of the relevant portions of the Dave Baker's application.

12      61.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  7,

13  Exhibit "E",  PDF scanned copy of the relevant portions of the Blanas letter to Gerber.

14      62.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 8, Exhibit

15  "F",  PDF scanned copy of  the relevant portions of the various blank CCW applications

16  produced.

17      63.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  9,

18  Exhibit "G",  PDF scanned copy of the relevant portions of the Blanas Supplemental RPD

19  response.

20      64.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 10,

21  Exhibit "H",  PDF scanned copy of the relevant portions of the Blanas Second Supplemental

22  RPD response.

23      65. The documents identified in the Declaration of Gary W. Gorski, Paragraph 11,

24  Exhibit "I",  PDF scanned copy of the relevant portions County Second Supplemental

25  Interrogatory Response.

26      66.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 12,

27  Exhibit "J",  PDF scanned copy of the relevant portions Defendant Blanas' supplemental to

28  documents.

67.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 13, Exhibit "K",  PDF scanned copy of the relevant portions of Blanas Supplemental Document Production.

68.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  14, Exhibit "L",  PDF scanned copy of the relevant portions Blanas Second Supplemental Document response.

69.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  15, Exhibit "M",  PDF from the County of Nevada Recorders Office, as part of public records.

70.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 16, Exhibit "N",  PDF scanned copy of the relevant portions of Blanas Third Supplemental Interrogatory Responses.

71.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 17, Exhibit "O",  PDF scanned copy of the relevant portions Defendant Blanas' campaign records.

72.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 18, Exhibit "P",  PDF scanned copy of the relevant portions Approved CCW applications produced by Defendants in response to the above discovery responses.

73.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  19, Exhibit "Q",  PDF scanned copy of the affidavit of James Colafrancesco.

74.  The documents identified in the Declaration of Gary W. Gorski, Paragraph 20, Exhibit "R",  PDF scanned copy of the September 7, 2006, cover letter and attached verifications for Defendant Lou Blanas' Responses to Plaintiffs' Request for Production of Documents, Defendant Lou Blanas' Responses to Special Interrogatories, and Defendant County of Sacramento's Responses to Special interrogatories.  These verifications were for Sets One of the propounded discovery noted in Exhibits "F", "G", "H", "K", "L", and "S".

75.  The documents identified in the Declaration of Gary W. Gorski, Paragraph  21, Exhibit "S",  PDF scanned copy of the May 3, 2006 service of Defendant Lou Blanas' Responses to Plaintiffs' Request for Production of Documents, Set One, Defendant Lou Blanas' Responses to Special Interrogatories, and Defendant County of Sacramento's Responses to Special

1  interrogatories.

2      76.  The declarations of Lau, Mehl, and Rothery filed concurrently with the Plaintiffs'

3  opposition papers and this declaration.

4      77.  With regard to the "some" of the following documents I reviewed, I am denoting

5  some of the key findings in each document as well, where a simple review of the document may

6  not present the significance or importance of the document, unless pointed out specifically.

7      78.  Attached hereto as **Twomey Exhibit "A"** is a true and correct PDF scanned copy of

8  Sacramento County Sheriffs Department, Concealed Weapons Permit Issuance Policy, and

9  Application Process.

10     79.  Attached hereto as **Twomey Exhibit "B"** is a true and correct PDF scanned copy of

11 the State of California, Department of Justice Standard Application for CCW License, effective

12 "6/99", obtained directly form the State of California.

13     80.  Attached hereto as **Twomey Exhibit "C"** is a true and correct PDF scanned copy of

14 Sheriff John McGinness' form letter handed out by the Sheriff's Department, dated September 8,

15 2006.

16     81.  Attached hereto as **Twomey Exhibit "D"** is a true and correct PDF scanned copy of

17 CCW applicants files, maintained as business records by the County of Sacramento Sheriff's

18 Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request

19 for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H,**

20 **J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

21     82.  **Twomey Exhibit "D"** consists of a sample of selected approved CCW applications

22 and associated records which accompanied the applications whereby these records could be

23 directly linked with the same person contributing money to former Sheriff Blanas, and some of

24 whom continued the contributions with Sheriff McGinniss' campaign as well.

25     83.  These applications show some of the minimum "baseline" justifications for issuance

26 of a CCW.

27     84.  Attached hereto as **Twomey Exhibit "E"** is a true and correct PDF scanned copy of

28 "denied" CCW applicants' files, maintained as business records by the County of Sacramento

Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

85. These applications are samples of some of the details provided by individuals who requested a CCW, and were denied.

86. Twomey's Exhibit "E" and "F" (inclusive of the Rothery Declaration) demonstrates that all these individuals provided equal or better justifications/reasons to the justifications/reasons provided in Twomey's Exhibits "D", "G", and "H", CCW applications which were approved.

87. Attached hereto as **Twomey Exhibit "F"** is a true and correct PDF scanned copy of JAMES ROTHERY's three CCW applications, inclusive of internal documents related to these three applications, which were "denied"; these records were maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

88. Attached hereto as **Twomey Exhibit "G"** is a true and correct PDF scanned copy of CCW approval forms consisting of internal documents related to CCW applications, which were "approved"; these records were maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

89. **Twomey Exhibit "G"**, Page 1, the application of John Kearns, a consultant, was approved by Sheriff Blanas directly March 30, 2006, with no purported committee review.

90. **Twomey Exhibit "G"**, Page 2, the application of Terry Burkes, a pharmacist, was approved by Undersheriff Blanas on 11/15/93, again by-passing the purported committee.

91. **Twomey Exhibit "G"**, Page 3, the application of Dave Finegold (occupation unknown) was approved by Undersheriff John McGinniss on 5/6/2003, by-passing the purported

1    committee altogether.

2        92.  **Twomey Exhibit "G"**, Page 6 (see also 4-5), the application of Roger Bennett, a tax

3    attorney, was approved by Undersheriff Henrikson, and then approved again on a renewal on

4    12/09/01 when Sheriff Blanas was in office without any approval signatures whatsoever. Page7.

5        93.  **Twomey Exhibit "G"**, Page 8, the application of Timothy Morgan (CYA) was

6    approved by Lou Blanas on 12/9/98.

7        94.  **Twomey Exhibit "G"**, Page 9, the application of Richard Zarzana, a security

8    consultant, was approved by Sheriff Blanas on 3/30/2006.

9        95.  **Twomey Exhibit "G"**, Page 10, the application of Carter Vanderford, a mill worker

10   for Setzer Forest Products, was approved by Undersheriff Blanas in 1998 though the CCW was

11   denied by Sacramento City Police Department.

12       96.  **Twomey Exhibit "G"**, Page 11, the application of Robert Thomas, a consultant, was

13   approved by Sheriff Blanas on 6/8/06, and again, no committee even reviewed the application.

14       97.  **Twomey Exhibit "G"**, Page 12, the application of Gary Stephenson of Ace Bail

15   Bonds was approved by Sheriff McGinniss personally, completely overruling his purported

16   committee AND Chief Kelly's denial on appeal.  This is a perfect example of selective approval

17   of CCW applications.  Keep in mind that the applicant's company has been a longtime

18   contributor to Sheriff Blanas.  See Twomey Exhibit "J", Page: 135 (Defendants' Bate D_02092,

19   see also Defendants'  Bate 1752 for $1000, 1887 for $500, 2092 for $1700, and 2242 for $1000.)

20       98.  **Twomey Exhibit "G"**, Page 13, the application of Gene W. Stinson, "business

21   owner/Dog Show Specialties" was approved for a CCW personally by Sheriff Blanas on 1/10/06,

22   completely overruling both the so-called committee and the appellate chief.  Again, another great

23   example that the so-called committee means nothing as far as approvals/denials are concerned.

24   Here, the committee points out purported policy of "immediate threat" being the determining

25   factor for approval, and that no such factor existed with regard to Stinson.  Therefore, one can

26   easily conclude, relying upon the evaluation of four peace officer managers that the applicant

27   failed to show immediacy; there was in fact no "immediate threat" to Stinson requiring a CCW.

28       99.  Since there is no procedure made available to the public regarding another level of

                                              14.

1  review to the Sheriff after a CCW applicant's appeal is denied, the question must be posed, "How

2  does one get the Sheriff to personally override the decisions of both the committee and the denial

3  on appeal of the single reviewing officer?"  If procedures are equally applied, then the only other

4  explanation is the inequitable access of some individuals to the Sheriff himself for the

5  furtherance of his position and their own self-aggrandizement.

6       100.  Attached hereto as **Twomey Exhibit "H"** is a true and correct PDF scanned copy

7  of the CCW application of a "Roland Lewis" which was produced as part of "approved" CCW

8  applications, but was missing committee notes; this application was maintained as business

9  records by the County of Sacramento Sheriff's Department, and produced as such in response to

10  Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part

11  and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's**

12  **response at Exhibit "I"**.

13       101.  Twomey Exhibit "J", the CCW application of Roland Lewis, is made as its own

14  separate exhibit because of its significance in that there is clearly no immediate threat mentioned,

15  nor is there any indication that music promoters are somehow more prone to violent crime.  The

16  fact that this application was approved with such minimal information exemplifies arbitrariness.

17       102.  Attached hereto as **Twomey Exhibit "I"** is a true and correct PDF scanned copy

18  of screen-shots of official government websites (except Pages 12 and 13) denoting the information

19  contained in each document, and each document denotes the government agency responsible for

20  maintaining said information, this also includes **Twomey Exhibit "N".**

21       103. With regard to  **Twomey Exhibit "I"** pages 12 and 13 pertaining to CCW permit

22  holder Halverstadt, this information was obtained from The Sullivan Group's official website, a

23  business entity well know to me because Sheriff McGinniss is a frequent guest speaker on Tom

24  Sullivan's talk show.

25       104.  **Twomey Exhibit "I"**  consists  of information any trained investigator would

26  utilize in confirming that given individuals are associated with certain businesses, and even the

27  nature of that association or relationship.  These are some examples of the information an

28  investigator can rely upon, but these examples are not meant to be exclusive or exhaustive.  In

1   attempting to confirm or deny these relationships, an investigator must know where to look for

2   information and must recognize the relative reliability of the information gleaned from his

3   sources.  Government websites which publish records on individuals and corporations are

4   generally deemed to be particularly reliable sources of information.

5        105. A good example of the relative reliability of a source of information is whether or

6   not an investigator could also rely upon this source as one of the bases for serving an arrest

7   warrant on an individual; in this case, Halverstadt.  In this hypothetical, simply reading **Twomey**

8   **Exhibit "I"** pages 12 and 13, the following could be gleaned to assist the officer in executing the

9   warrant: 1) known associates, 2) employment location, 3) that he lives somewhere in Granite

10  Bay, and that he was possibly a member of the U.S. Army Special Forces (Green Berets), making

11  him a possible dangerous arrestee.  The more reliable information that is available, the more it

12  can be cross-checked for accuracy.

13       106.  Attached hereto as **Twomey Exhibit "J"** is a true and correct PDF scanned copy of

14  Defendant Blanas' campaign records which were produced as public records having been

15  maintained as business records by the County of Sacramento, and produced as such in response

16  to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as

17  part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's**

18  **response at Exhibit "I"**.  Further, I recognize Defendant Blanas' signature under the penalty of

19  perjury authenticating the accuracy of the documents.  The Defendants bate stamps are in order,

20  but some pages were deliberately pulled out.  Since the pages contained only campaign

21  expenditure information there was no reason for these redactions and lack of production.  One

22  can reasonably conclude that there was apparently some concern on Defendant's part regarding

23  further revelations about who had made contributions to his campaign, and how much.

24       107.  Attached hereto as **Twomey Exhibit "K"** is a true and correct PDF scanned copy

25  of the Washoe County Assessor, State of Nevada screen-shot of an official government website

26  denoting the information contained in the document, and the document denotes the government

27  agency responsible for maintaining said information.  This is a public record of property

28  Defendant Blanas owns in Washoe County with CCW permit holder, Gerber.

1   108.  Attached hereto as **Twomey Exhibit "L"** and "M" are true and correct PDF

2   downloads from a State of California Department of Justice official government website denoting

3   the information contained in each document for the respective years of 2005 and 2006, and each

4   document provides the total number of CCWs issued per county in California for each calendar

5   year.

6   109.  The information contained in this exhibit conclusively demonstrates that preceding

7   each election year, there is a marked increase in the number of CCWs being issued in

8   Sacramento County.  However, particularly noticeable is that immediately before Defendant

9   Blanas' first run for Sheriff in 1998, there was approximately a three-fold increase in the number

10  of CCWs being issued.  Though it may be true, that at this time, other intra-county jurisdictions

11  could have been issuing CCWs, this marked increase during the election cycles every four years,

12  taken with all of the other factors, shows that there is a problem of CCWs being issued for

13  political gain.

14  110.  Attached hereto as **Twomey Exhibit "O"** is a true and correct PDF scanned copy

15  of Defendant County of Sacramento Sheriff's Department computerized CCW permit applicants'

16  information, including name, address, and date the applicant's permit was either issued or

17  denied.  These records are maintained as business records by the County of Sacramento, and

18  produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production

19  of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R**

20  **and S"**, and the **County's response at Exhibit "I"**.  Further, I recognize this type of document

21  as the type of information maintained by the Sheriff's Department.  The Defendants' bate stamps

22  are in order as they were served with their discovery responses.  This document supplements the

23  information contained in Gorski Declaration Exhibits 1, 2, and 3.

24  111.  The facts and data in this particular case upon which I base my opinions and

25  inference are those perceived and known to me before the preparation of this declaration, and are

26  the type of facts and data reasonably relied upon by experts in the field of law enforcement

27  management and investigations in forming opinions or inferences upon the subject for

28  determining policy, or lack of policy, and breaches thereof; in this particular case, assessing the

17.

CCW issuance policy, determining what that policy is, and whether the policy, if any, is equally applied.

112. The approximate 4000 pages of documents with Bate stamps produced under the penalty of perjury, and business information from the County of Sacramento Fictitious Business Names listings and the California Secretary of State Corporate Records search are facts and data in this particular case upon which I base my opinion and inferences perceived by me or made known to me before the preparation of this declaration, and are of the type reasonably relied upon by experts in the my particular field in forming opinions or inferences upon the subject.

113. As a trained investigator and Sacramento County Sheriff's Department manager charged with administrative reviews of policies and investigations, the documents specifically identified herein are documents I, and any other individual in my capacity, would rely upon in formulating the opinions expressed hereby as they are VERY reliable, in that all documents were produced under the penalty of perjury at multiple levels. For instance, most CCW applications are signed under the penalty of perjury (post June 1999). Likewise, campaign contribution reports are signed by Defendant Blanas himself under the penalty of perjury. Therefore, these documents are heavily relied upon for the purposes of my analysis and opinion.

114. After a chance to review the CCW applications that had been turned over, it was discovered that some CCW applications, portions of applications, and documents have been "purged", per for example, at memos at D_04065 and D_02788, a PDF scanned copy of which is attached hereto as Twomey Exhibit "D", Pages: 102, 125. There is no reason given for this, nor was there any evidence that it was approved by management.

## PRELIMINARY ANALYSIS

115. In California, a CCW (Carry-Concealed-Weapon) permit is issued by the local Sheriff or Police Chief in which the applicant resides. (PC §12050. (a) (1) (A) The sheriff of a county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying satisfies any one of the conditions specified in subparagraph (D); (D) For the purpose of subparagraph (A), the applicant shall satisfy any one of the following: (i) **Is a resident of the county or a city within the county**. (ii) **Spends a**

**substantial period of time in the applicant's principal place of employment or business in the county or a city within the county.** And, (ii) if the licensee's place of employment or business was the basis for issuance of the license pursuant to subparagraph (A) of paragraph (1), **the license is valid for any period of time not to exceed 90 days from the date of the license.** The license shall be valid only in the county in which the license was originally issued. The licensee shall give a copy of this license to the licensing authority of the city, county, or city and county in which he or she resides. **The licensing authority that originally issued the license shall inform the licensee verbally and in writing in at least 16-point type of this obligation to give a copy of the license to the licensing authority of the city, county, or city and county of residence**. **Any application to renew or extend the validity of, or reissue, the license may be granted only upon the concurrence of the licensing authority that originally issued the license and the licensing authority of the city, county, or city and county in which the licensee resides.**

116.  Defendants somehow attempt to equate this as giving them the authority to issue temporary 90 day licenses for "emergency" purposes.  The above section pertaining to the 90 day "provisional" license relates solely to the location of the applicant, and not the underlying facts for issuance.  In addition, the statute DOES NOT allow a license to be issued without all the applicable pre-requisites of CCW issuance being first met.  A good example of this abuse is noted below with regard to the CCW application and approval of Ed Gerber below.

117.  This section of the law is violated many times by the Sacramento County Sheriff's Department, in that CCWs were issued to out-of-county residents. (For example, at D-2520, 2594, 2671, 2826, 2485, 2854, and 2887.)  This fact is important regarding the blatant abuse of discretion in handing out CCWs, and indicative of the flagrantly subjective reasoning which was used to determine who was issued or denied CCWs in Sacramento County.  However, it was not necessary to rely upon this fact for the ultimate conclusions I render herein.  Again, it was just another red-flag for me that there is an obvious systemic problem.

118.  To obtain a CCW, one must pass a background check and pass the mandatory

training requirement.  However, approval of a CCW permit is left up to the discretion of the local Sheriff or Chief.  The facts overwhelmingly support that this discretion is abused in that campaign contributors (or those with access to the Sheriff) and those with linkage or ties to campaign contributors, invariably have a substantially increased likelihood of receiving a CCW, as compared to all other applicants.  This fact holding true even where the campaign-contributing applicant's justification for a CCW is inherently weak or non-existent when compared to those who did not make campaign contributions.  Hence, there is no "good cause" standard.

METHODOLOGY EMPLOYED

119.  All information, facts and evidence reviewed and relied upon was generated either before, during, or after each of the Plaintiffs applied for CCWs.  Information, facts and evidence generated after Plaintiffs were denied CCWs is highly probative in that it allows me to determine baseline standards for CCW issuance at different points in time.  And, in fact, there is a consistency to the issuance and denial process over time; with regular increases in issuance prior to elections.  The aforementioned proving that the "unwritten" CCW policy, as actually employed and practiced, constitutes a longstanding pattern, and that it constitutes the "normal operating procedure" of the County of Sacramento Sheriff's Department, and that it continues till this day.

120.  First, I reviewed the boilerplate written policy which identifies "good cause" as being the main thrust for issuance.  Attached hereto is a true and correct copy of the policy that was, and still is, in effect as Twomey Exhibit "A".

121. In 1999,  the Attorney General (AG) was mandated with creating a new state-standard CCW application form to replace local agency forms no-later-than July 1, 1999.  Use of any other forms once the new forms were distributed is banned by the same state law.

20.

1  The specific law is Penal Code 12051(a)(3)(A).

2       122.  Next, I reviewed the California Department of Justice, STANDARD

3  APPLICATION for LICENSE TO CARRY A CONCEALED WEAPON (CCW).  In that

4  application, the following is noted: "PC section 12051(a)(3)(A) requires the Attorney General to

5  prescribe a statewide standard application form for a CCW license."  "The licensing authority

6  specified in PC section 12050(a)(1) (a sheriff . . .) may issue a license to persons who are of

7  good moral character, who have completed a course of training, and where **good cause** exists for

8  issuance of the CCW license." " .. jurisdictions may require **psychological testing** on the initial

9  application .."  Attached hereto is a true and correct copy of the DOJ Statewide Standard CCW

10  application that was, and still is, in effect as Twomey Exhibit "B".

11       123.  "Sections 6, 7, and 8 **must** be completed in the **presence of an official** of the

12  licensing agency."  That Defendants were well aware of this instruction is supported by evidence

13  that Sheriff Blanas, at least at one point, informed "some" applicants of this mandate.  See

14  **Twomey Exhibit "E"**, Page: 30, form letter to applicants in 2005.

15       124.  Here, I note that Plaintiff Mehl in accordance with these instructions, did not fill

16  out Section 7 pertaining to the "investigators" interview, but waited for an official to contact

17  him.  However, though his application was twice denied, he was never contacted or instructed to

18  complete his application in the "presence of an official of the licensing agency."  Therefore, the

19  Defendants' policy was deficient from the start; as Amber Wong confirms, the *practiced (i.e.*

20  *actual)* policy was to *not* contact CCW applicants.  Pl. Exh. "B", Wong Depo . 17:12-19:11.

21  This failure to abide by even completely objective written instructions and guidance lends itself

22  to a conclusion that the entire CCW policy and practice was subject to the whims of the Sheriff

23  either directly or via his committee, and constitutes a clear failure and flaw in the CCW policy

24  from the start.  See **Twomey Exhibit "B", "E"**, Page: 30, form letter to applicants in 2005,

showing how the public was informed in writing how to fill out the applications. There is no evidence that any such letter was provided to Plaintiff Mehl.

125.  This Standard DOJ application is made available to the public from any law enforcement agency that issues CCWs, or the State DOJ.  A true and correct copy of this official state CCW application that was obtained from the State DOJ several years ago is attached hereto Twomey Exhibit "B", and is identical to the form still being used as it has not been revised since "6/99".  See lower left hand corner of first page of application denoting its publication date.

126.  The Sheriff's Department own written policy specifically states "Good cause exists for issuance of a concealed weapons permit as follows: General: The determination of good cause for the issuance of a concealed weapons permit is perhaps the most difficult aspect in this process. While every applicant may believe that he/she has good cause for a license, **the Sheriff's** determination is based on consideration of public good and safety. (Law)" Twomey Exhibit "A".

127.  This policy is broken down into two separate standards, known as "Prima Facie Good Cause" and "Non-Prima Facie Good Cause."  This has been the general policy for years. This document is attached as Twomey Exhibit "A".

**THE DEFENDANTS' CCW APPLICATION PROCEDURE AT THE TIME OF PLAINTIFF MEHL'S AND PLAINTIFF LAU'S DENIALS OF THEIR CCW APPLICATIONS**

128.  For my analysis, I first ascertained the purported or alleged procedure for reviewing, processing and approving/denying CCW applications, and any appeal thereafter.   For this determination, I relied upon the deposition of Amber Wong and Defendants' declarations in support of their motion for summary judgment.

129.  Defendants purport to have established a rigid procedure for reviewing CCW

applications consisting of a three panel review committee, and a right of appeal to a single

person who was not part of the original review process.

130.  However, I have uncovered numerous instances where the Sheriff or Undersheriff

personally got involved in the approval process.  In these instances the CCW applicant either

bypassed this purported procedure totally and went directly to the Sheriff/Undersheriff, or the

Sheriff/Undersheriff overruled the three member panel.  This issue is addressed below.

131.  However, my first order of business was to determine what constituted "good

cause", as that standard was enumerated in Twomey Exhibit "A" and allegedly applied in

denying and approving CCW applications.

## THE BASELINE FOR "GOOD CAUSE"

132.  In order to determine what constitutes "good cause", and in particular Non-Prima

Facie Good Cause, I reviewed those applications that were approved to establish what is

commonly referred to as a "**baseline**."

133.  I was at a disadvantage from the start because the "APPROVED FILES" which

were produced only consisted of two pages, neither of which was dated.  The Committee Finding

page was missing, and therefore I could not read the notes of the members.  In stark contrast, the

"DENIED FILES" were in most cases 13 pages long, and included the notes made by any

committee member.

134. From those applications that were approved, the following examples are provided as

applications I reviewed and relied upon to determine what facts and information are relied upon

by the Department to constitute Non-Prima Facie Good Cause for issuance of a CCW:

1.    "Self Defense of family, business 2 Private Property   Have had a ccw

since 1948.   The last to men that I apprehended, one was on parol the

other had a $1000 dollar warrant. since 1948 conditions have not

23.

improved." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02501. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

2. "Physician taking call.  Need to go out at all hours."  **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02589.  This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

3. I have had a permit for about 20 years while both employed and retired. Basically for self protection while doing vast amount of traveling in California.  This also included camping and fishing in remote areas." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02519. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

4. Jack Kimmel, of Kimmel Construction, Inc. "Self Defense" **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02653-02654. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

5. Roland Lewis, issued July 22, 1995, "Self Protection Bus. Related" **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02676; Twomey Exhibit "H".

6. David Mastagni, Lawyer, "course of business."  **Gorski Decl. Plaintiff's Exhibit "N", Bate #** 02693-02694.  This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

7.    John Valensin, "Self Protection overseeing trespass & game violations on large ranches.  Threatning [sic] calls from people whom Ive [sic] had arrested. & vandalizing large equipment on property.  **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D 02889.  This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

135.  Their dates of approval are contained on the document itself and/or Twomey Exhibit "O".

136.  These individuals had their CCW applications approved prior to Plaintiffs' applications, and these, according to Defendants' best records, are still active and valid.  Hence, I used these as the benchmark or "baseline" as to what constitutes "good cause."

137.  The next thing I looked at was the generic reason for denial for each and every application made available, including Plaintiffs.  It is clear that the same form letter was mailed out to almost every applicant whose request for a CCW was denied.  An example of a letter mailed out on these denials is located at **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_01066.  Pay particular attention to the reason for rejection in that: the applicant "did not provide **convincing evidence** that applicant or family members are in any **immediate danger** associated with everyday course of living as to justify the need to carry a concealed weapon."  "Applicant may have a weapon at **home** and in **business**."  "If your circumstances change and you wish to re-apply you may do so after one year from the date of denial."

138.  In addition, various notes are found in the applicants' files stating "insufficient good cause or reason provided.  These notes are consistent with the statement of fact in the rejection letters.

139.  Again, since the committee page was not provided with most of the approved

25.

1   applications, I cannot compare notes.

2       140.  Based solely upon this form denial letter, it is reasonable to conclude that "good

3   cause" is equated with "immediate" danger, and not some vague perception or remote possibility

4   of danger.  Thus, the public is informed that this is what constitutes "good cause" (i.e. immediate

5   threat).  This is consistent with what Mr. Lau described during his appeal when he was accused

6   of not documenting his danger with police reports.

7

8       141.  Several points must be made regarding these denial letters.  First, it correctly states

9   the law, in that a person may arm themselves in their place of business (i.e. owners of the

10  business or by permission of the owner) and they may have a loaded firearm in their home.

11      142.  Second, the rejection letter states "immediate danger" must be proven.

12

13      143.  Therefore, the denied applicants and general public are being informed and

14  instructed that the "official policy" as far as the general public is informed is to: 1) prove

15  "immediate danger" (i.e. exigent circumstances), and 2) that the CCW is NOT issued for defense

16  of home or business.

17      144.  There is also a third implied category, which is that an individual may NOT use

18  deadly force to protect property – though not stated, any self defense course would teach this.

19

20      145.  What was very obvious from reviewing the "approved" applications is that the

21  lowest threshold for "approved" status was everyday generic "self defense", and everyday

22  defense of "business".  Most troubling is that the Sheriff's Department has approved CCWs

23  wherein the applicant stated a need for a CCW for "defense of property" and even to stop

24  "vandalism" to property; though every peace officer, presumably including the CCW reviewers,

25  knows that deadly force shall never be used to defend property as we, as a society, place a higher

26  value on human life than property.  Ironically, many applicants, whose applications expressed

27  justification that impressed the reader with regards to real imminent danger, had their CCWs

28

denied with notations which cautioned that 'issuance could render a liability problem for the Sheriff's department". It is a truism that many applicants who are issued CCWs, by virtue of their requirement to have a permit, do not have a law enforcement or law background. Even more ironically, regarding the Sheriff's department apparent concern with liability, it could be argued that issuing a CCW to an applicant who uses the justification that he needs to protect his personal property is likely providing him with tacit approval/instruction that it is lawful and approved of to use deadly force in these instances.

146. Anticipating that Defendants will argue that I "cherry picked" the most extreme examples, I can show that these were exemplary applications and quite characteristic of the approved applications. More importantly however, where the justification was very 'weak' the applicant was invariably a campaign contributor or linked to a campaign contributor. To be fair, there were instances where approval was for much more compelling reasons. However, I focused my analysis on the minimum policy parameters for approval, and that is what is at issue. Because campaign contributions and access to the Sheriff are so important to obtaining a CCW, there are far, far more campaign contributors with approved applications based upon frivolous justifications than applications that are compelling.

147. For instance, many of the CCW applications were approved whereby the applicant's stated justification was "carries large sums of cash," or "self defense", or working in high crime areas, most notably the applications contained in Twomey Exhibit "D", for example:

| (a) | Edwin Gerber. Twomey Exhibit "D", Page 1, 7. |
| (b) | Ernest Martini. Twomey Exhibit "D", Page 11. |
| (c) | Ben Upton. Twomey Exhibit "D", Page 13. |
| (d) | Jack Kimmel. Twomey Exhibit "D", Page 19. |
| (e) | Roland Lewis. Twomey Exhibit "H". |

27.

(f)     And many others that I did not even include, but this is just

a note to me for future testimony: Roger Brown (D 2511);

Ronald Brusato (D 2514); Barry McClain (D 2701), etc.

148.  In contrast, a vast number of CCW applicants were denied after using a much more compelling justification, or the same, and admittedly weak verbiage in their justification; their common denominator being that they had *not* made campaign contributions, nor did they *know* or have *access* to the Sheriff.  It is also noted that among those denied, the reviewing panel sometimes required additional proof of a threat, or denied the applicant based upon the applicant's inability to articulate an immediate threat.  This reason, a lack of "immediacy" regarding danger written in various forms, in fact, being one of the most common reasons for denial.

149.  For instance, see the applications contained in Twomey Exhibits "E", "F", and the Declaration of Rothery, James.  A note to myself is that Razumolski, Sergy (D 1046 & 1054) also falls into this category as well.

150.  In sum, I have determined that the Sheriff's Department approves CCWs without any form of verbiage to this effect, much less proof regarding "immediate danger", when it suits their purposes to do so.

151.  After establishing the lack of a "baseline" criteria for issuance, I then reviewed denied applications to establish a basis for what the Department used in determining when applications were denied.

152.  When I compared the justification for the approved applications with those of the denied applications, I was astonished in that applications were denied for the same or similar reasons while others were approved.  There appeared to be no consistency regarding denial and approval.  A simple comparison between approved (Twomey Exhibit "D", "G", "H") and denied

applications (Twomey Exhibit "E", "F" and Lok Lau's) is all that is needed to support this conclusion.

153.  Based simply upon the applications, there was only one conclusion that can be drawn from this lack of consistency; I can state to a degree of reasonable certainty that there is no "good cause" policy or criteria for issuance or denial of a CCW application, and at a minimum, it is simply arbitrary and capricious with absolutely no sense objectivity or baseline criteria being used.

154.  From this determination, I then attempted to figure out why CCW applications were arbitrarily and capriciously being issued.

155.  I looked at the what was different between those applications that were approved as compared to those that were denied.

156.  There was a general commonality on certain parts of all but a very few of the CCW applications; that is most applications were identical in that they answered "no" to the prohibited categories, such as criminal convictions, mental incompetency, or any other disability that would affect the "character" of the applicant's ability to own, possess or use a firearm, whether concealed or otherwise.

157.  Ignoring the aforementioned areas of justification, after the routine screening of the applicant for "fitness" to own, carry, and possess a firearm, the remaining differences in each application were the person's name, address, job description, and employer as being information that would differentiate each application as being unique.

158.  Hypothesizing that some types of employment or businesses are more inclined to need a concealed weapon, such as private investigators, I looked at those applications next.  And I did, in fact, find that private investigators, were somewhat more likely to be approved, though this approval was more certain if they were affiliated with a well-known agency, and a campaign

contributor, and far less certain if they were self-admittedly "self employed" and not a campaign contributor.

159.  For instance, Approved: D 2474, 2487, 2500; Denied: D 928-926, 1057, 1151. Still, this did not resolve the arbitrariness and capriciousness for CCW approvals and denials, so I set this issue aside.

160.  When employer information was cross-referenced with employers who had made campaign contributions, the number of applicants who were employed by contributors and were approved was significant.  Thus, I focused my attention on this observable fact.

161.  Additionally, Sheriff's Department affiliations such as "SSD Aero Squadron" and "Sacramento Sheriff's Posse" seemed to be buzz words or alerts to those evaluating the applications.  This is discussed below.  Though in some cases there were applicants who entered this information in vain and were denied CCW permits, more often than not, these words seemed significant to a very weak application in alerting a reviewer that this was an applicant who might be more deserving of approval or further review.

162.  Therefore, it is my expert opinion, based upon a degree of reasonable certainty, that the County of Sacramento Sheriff's Department and then Sheriff Blanas, and now Sheriff McGinniss have absolutely no policy or criteria as to whom is issued a CCW for non-prima facie good cause applications.  At best, it is random and capricious with approval more likely to be given to well-known employers, campaign contributors, or those with Departmental affiliations.

163.  Therefore, I further examined the pattern that was now being established, and focused my attention on external factors that would affect the probability of an application being approved and those being denied.

164.  The next part of my analysis was to determine what was the single most important common denominator in a CCW application being either approved or denied.  To determine this,

I had to isolate a common denominator among the approved applications.

165.  I was retained by Mr. Gorski, Mr. Mehl, and Mr. Lau to determine if their postulation was correct (i.e. **that CCWs are issued at an inordinate rate to political supporters of the Sheriff, since it is the Sheriff himself who issues CCWs**.).

166.  Therefore, I started my analysis by first obtaining the facts, primarily a list of names of those who contributed to Defendant Blanas' political campaign.  For this, I reviewed Defendant Blanas' public record contribution records that were signed by him under the penalty of perjury.

167.  Therefore, my starting point was campaign contributors.

**THE COMMON DENOMINATOR AMONG APPROVED APPLICATIONS**

168.  Before I began my analysis, I first made a cursory review of CCW permit holders, and compared those names with those listed on campaign contributions.

169. According to Detective Mason's own notes to file, all CCW records prior to 2003 have been purged.  I have never heard of a law enforcement agency throwing away information unless ordered to do so.  Archived information regarding jail prisoners, jail visitor's information, and pawn shop information, as only a few examples, are all very important databases for law enforcement agencies.  This remarkable and questionable step of 'purging' information was taken with no apparent authorization from the Sheriff nor was it in compliance with any record retention policy.  See Twomey Exhibit "D", Pages: 102, 125.

170.  After reviewing the list, and comparing names and associated companies with campaign contribution records, I was able to isolate over 80 individuals who received CCWs and contributed to Sheriff Blanas' campaign.

171.  Thus, my next task was to take my preliminary notes and create a database of all known CCW applicants.  For this, I retained the services of David Orsay, a highly decorated

31.

Special Forces soldier, trained in and whose duties frequently require intelligence analysis work, and who holds a "Top Secret SCI with CI polygraph" security clearance.  This was necessary because Mr. Orsay was the only other person I knew with the expertise to crunch large amounts of data with me, and create a database of campaign contributors and CCW permit holders, those approved and denied, Sheriff departmental affiliation, addresses, cross-referenced with business and employer affiliations as obtained from campaign records and CCW applications, and all the while keep track of the Bate stamps from the source documents.

172.  Mr. Orsay, a published author and former Special Forces operative who worked on highly classified operations and materials, former Deputy U.S. Marshal, and most recently a contractor for the government in Iraq, has extensive experience in intelligence assessments, analysis, threat assessments, etc. – his expertise and opinions are the type of resources I would rely upon as both a trained investigator and a law enforcement manager.

173.  In addition, since time was of the essence, and my disability would prevent me from typing in much of the information, Mr. Orsay did most of the typing while I reviewed each application and campaign record, and collaborated with Mr. Orsay regarding what was to be added.  Between Mr. Orsay and myself, we (predominately Mr. Orsay) were able to construct a massive database of names (individuals and business), addresses both current and former, aliases (i.e. usually misspellings), CCWs issued and denied dates, whether the applicant contributed money, when, and whether such contributions were personal or linked with that applicant's own, or another company.

174.  Together, we were able to reconstruct and isolate the name of each business and its corporate tree (Organization, subsidiary, and company) linked to each individual CCW applicant based upon the information provided in the applications and/or campaign records and those made available through government databases.

175.  For the purposes of this opinion, however, I used this database only as a basis for more quickly querying relationships and determining where to probe more deeply into the volumes of documents provided to us by Defendant.  The database simply reduced labor.  For example, one can imagine *not* using a computer database, but instead organizing the information in carefully labeled piles according to dates, and names, with Post-It notes, highlighting, and notations to help with cross-referencing.  Our computerized database was a tool which added no new information to what we had received; it simply allowed me to more quickly analyze what we had received.

176.  After a careful analysis of the data, it was very evident that there was a very strong correlation in that campaign contributors and their relatives, family members, and business associates indeed have a definitive advantage in obtaining a CCW.  In fact, anyone who has contributed over several thousand dollars is virtually guaranteed a CCW, if they apply.  However, it is rare that even those making smaller contributions are turned down for a CCW.  When a contributor was denied, it was most likely other disqualifying extenuating circumstances, such as a lack of residence, criminal history, or a history of domestic violence which was the reason.  At the time I prepared my expert report, I did not have this database available, and now I realize there are a few very minor campaign contributors who had not received a CCW, though they had applied.  However, with this caveat, my opinion remains the same.

177.  Thus, the database was not used in any way as a basis for my opinion.  It was just a tool used to focus my attention on individual applications.  My opinion is based solely upon the CCW applications themselves, the CCW issued spreadsheets, and the campaign contributions, and then cross-referenced with government license databases.  I performed my analysis using my background, training, and experience using the same or similar type of methods that I have employed when conducting Department reviews and criminal investigations.

**OPINION ON THE EFFECT OF CAMPAIGN**

**CONTRIBUTIONS, CONNECTIONS TO ELECTED**

**SHERIFFS' AND MANAGEMENT, AND THE ISSUANCE**

**OF CCWS**

178.  First, the identification and confirmation of people's identities, backgrounds, and relationships to other people or business entities is a basic skill used daily by all law enforcement investigators.  In the course of criminal investigations while interviewing and researching, we are given or find a partial name, partial address, or pieces of information that must be cobbled together with other pieces of information and then confirmed.

179. This confirmation process has been rendered less difficult and more certain through the years, first through the advent of computers and databases, and second through internet information "open" sources such as official Federal, State and County licensing agencies (e.g. SEC, Secretary of State, and County Fictitious Business Names Records), most of which are all available online.  Even property records in some counties are online now, as will be shown below with the Gerber/Blanas connection.

180. The second aspect of my analysis wherein I describe placing myself in the CCW application reviewers' "shoes" also draws upon my background, training and experience with the Sheriff's department, and my familiarity with commonly accepted Sacramento Sheriff's department administrative policy and procedure.  Because I performed administrative reviews for the Sacramento County Sheriff's Department for years, I am aware that reviewing an applicant's fitness for a CCW is not a black-and-white process of simple denial or approval; but may require careful consideration of some subjective factors once the threat of danger to the applicant has been confirmed.

181. Often these practices are unwritten and I take this into account when conducting my

1   analysis.  In fact, without belaboring the point, I am particularly well suited to analyze these

2   reviews; I share many common denominators with those who actually conducted them; and

3   during my time with the Sheriff's department might have conducted the actual CCW reviews of

4   applications myself ,if asked to do so, without missing a beat.

5

6       182.  The methodology for connecting campaign contributors with CCW permits holders,

7   though somewhat tedious, is a relatively simple process of elimination.  In many cases this is not

8   necessary since the contributing company has specifically noted the individual 'behind' the

9   contribution on the document itself linking a name to a contributing company. That contributing

10  company may be the employer that the applicant then lists on his application, confirming the

11  relationship.  Or the address of the individual contributor is noted and matches the address on the

12  CCW application.

13

14      183. However, where the linkage is less certain, I use the following methodology to

15  confirm relationships and identities.  First, I compare the names on the list of permit holders

16  provided by Defendants under the penalty of perjury (See Gorski Decl., Exhibits "1-3", and

17  Twomey Exhibit "O") with public campaign contribution records signed by Defendant Blanas

18  under the penalty of perjury listed in Twomey Exhibit "J".  When I get a name match, I then

19  confirm that the same person is being identified in both documents by either comparing the

20  addresses provided or the name of the business as identified in both the CCW application and the

21  campaign contribution list.

22

23      184. So, for example, with Edwin Gerber, Twomey Exhibit "D", Page 6, Gerber lists

24  "Energetic" as the business name with an address on "Orange Grove".  I then locate Gerber's

25  name or business on the campaign records, and compare addresses.  Here, on Twomey Exhibit

26  "J", Page 171 I find "Energetic Painting and Drywall, Inc." with the same street name, but a

27  different number.  At this point, I confirmed the match even though the street numbers are not

28

35.

1    identical.  The probability is very low that there would be two businesses sharing the same rather

2    unique name but owned by different people on "Orange Grove" avenue.

3        185. In order to eliminate all doubt, I simply confirmed the address with the California

4    Secretary of State online "Business Portal" (See

5    http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C1137947 ).  On the State of

6    California's website, which is a very useful and common investigative tool in law enforcement

7    for quick verifications of corporate businesses, the State of California has a corporate record for

8    "Energetic Painting and Drywall, Inc.", establish on "4/1/1983" with a business address of 3030

9    "Orange Grove Ave, North Highlands, CA 95660".  For the Agent for Service of Process one "Ed

10   Gerber" is identified with the same address.

11       186. Therefore, I have now established that the "Ed Gerber" who had a CCW issued by

12   Defendant Blanas is the same Ed Gerber who owns and/or is affiliated with Energetic Painting

13   and Drywall that contributed the $3,600.00 to Defendant Blanas as noted at Twomey Exhibit "J",

14   Page 171.  My methodology has been verified as extremely accurate by Defendant Blanas

15   himself.  See Blanas Depo. 46:7-16, 47:9-48:25.  I employed this technique throughout.

16       187.  In addition, since many of Defendant Blanas' campaign contributors are contractors

17   or are involved in real estate, whenever it was appropriate, I also cross-referenced names with the

18   State of California Contractors State License Board, which allows consumers to verify whether a

19   person or company is a licensed contractor.  See

20   http://www2.cslb.ca.gov/General-Information/interactive-tools/check-a-license/License+Request.

21   asp and http://www2.dre.ca.gov/PublicASP/pplinfo.asp .

22       188. There, I searched for Gerber by name and the name of his company, and the search

23   function pulls up his contractors license, and all the names he has conducted business under,

24   again confirming his address.  Likewise, I also searched CCW permit holders names on the

Department of Real Estate (DRE) website for individuals even closely associated with real estate

sales or development at the State of California's website for consumers to verify real estate agents

and brokers licenses.  Again, another commonly used investigative tool in law enforcement. See

http://www2.dre.ca.gov/PublicASP/pplinfo.asp

189.  Using these and other similar methods, there are many ways to cross check names to

ensure that the same person is the one being identified in the County campaign records and the

County CCW permit records identified as Twomey Exhibit "O", D_01538-01641, a business

record or the Sheriff's Department listing CCW permit holder provided in discovery.

190.  Since many CCW applications were only partially produced, totally missing, or

heavily redacted, I could only review those applications and portions of the applications made

available by Defendant.  If I had been provided all complete CCW applications with no

redactions, I made the assumption that the pattern of approving and denying applications would

not be any different than the pattern I determined based upon what was produced.  In fact,

because Defendant may suffer should the CCW permit process be found unfair, it is more likely

than not that any materials purposely not produced by Defendant would provide even more

support for Plaintiff's arguments.

191.  First, a quick review of some of the key facts upon which my analysis is based.

These are only a few examples of the totality of evidence I reviewed and relied upon.  However,

these alone are sufficient to support my opinion.

192.  I read the declarations supporting summary judgment and the depositions.  It is clear

the initial three member panel that purportedly reviews applications does just that - 'reviews' only

the applications and the notes contained therein.  The only purportedly considered evidence

reviewed is what is in the actual application itself because the applicant, if contacted and

questioned at all, would not be present for questioning during the actual approval/denial process.

193.  Therefore, I am looking at the effect of the written applications on the key personnel reviewing the applications in determining why applications are approved or denied; I place myself in the reviewers' shoes by focusing on only the application, and determining why or why not an application could be approved.  In this regard, I'm reviewing these documents for the effect of the information on the reviewer, and I'm not offering the information for the truth of the matters asserted in the applications.  For the purposes of my analysis, it is irrelevant whether the information and statements in the applications are true.

194.  The sample of applications referred to hereafter are the more egregious representative applications of those who were campaign contributors or those whom were affiliated with campaign contributing companies.  Why did I choose these applications as examples?  After reviewing all of the materials produced I now know that CCW permit approval requires either: 1. affiliation with law enforcement, or 2. acquaintance with the Sheriff, or 3. a campaign contribution/campaign contributor affiliation.  Emphasis on any one of the three areas such as particularly large contributions, Reserve officer status, or being a close friend of the Sheriff go far in assuring approval of a CCW application.  A strong combination of two or more of the 'requirements' virtually assures approval.  Our sample provides applicants who were strong in one or more areas.

195.  A noticeable and glaring omission from this short list of requirements is the "immediate danger" category.  Unfortunately, example after example CCW application can be provided which refutes that "immediate danger" has anything to do with whether or not an applicant receives a CCW; applicants with chilling and compelling reasoning were denied, while those who wanted to deter vandals on their large properties were approved.  The applications referred to hereafter are a template for the CCW applicant who wants to be assured of having his application approved.  They are representative of those who in some fashion provided campaign

contributions to Defendant Blanas (and some to Sheriff McGinniss too), then applied for and received a CCW.

196.   Preliminarily, a CCW is good for only 2 years, and thus must be renewed. Therefore, the following CCW permit holders received a CCW during the period of time Defendant Blanas was in office because all records prior to 2003 have been destroyed, except for "current" permit holders.  Also, most of the same individuals that contributed to Defendant Blanas, contributed to Sheriff McGinniss when Sheriff McGinniss was Undersheriff.  For example, Twomey Exhibit "J-1", Page shows Capitol Steele (Abrate), D. Bruce Fite & Associates and Fite Properties, Inc. (Fite and Halimi), Energetic (Gerber), and Dettling.  Thus, there is a continuity in the pattern of contributions as will be demonstrated below.  Also, as will be shown, Fite's, Halimi's and Gerber's applications were all approved during the Blanas/McGinniss transition (Gerber by Blanas, and the others by McGinniss).  These three are contributors to both Blanas and McGinniss.

197.   Edwin Gerber owns what appears to be a million dollar vacation home in Reno with Defendant Blanas (See Twomey Exhibit "K"), and contributes to his campaign under Energetic Drywall (See Twomey Exhibit "J", Page: 171), which is reported in campaign disclosure records under the penalty of perjury.  Gerber's individual contributions were not reported as noted in the campaign records though Defendant Blanas testified that Gerber personally donated money (there is always the possibility that I missed it, but I did review all of Blanas' campaign records several times, and never once saw "Gerber's" name).  Defendant Blanas also personally approved Gerber's CCW application.

198.   Gerber stated in his justification that he carries large sums of cash and wears expensive jewelry.  More specifically, "Carry large sums cash $4000-$5000 wear $45,000 watch + rings - expensive jewelry".  Twomey Exhibit "D", Page: 7.  Defendant Blanas personally

"approved" this so-called "verbal" application on July 26, 2007, even though a "written" application was submitted on July 25, 2006.  Compare Twomey Exhibit "D", with the dates on pages 1, 2, 3, and 10; Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Pl. Exh. "1"; Pl. Exh. "B", Wong Depo . 87:6-22; 85:22 thru 86:20; 62:7-25 thru 63:1-10; see also Exhibit E; Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Pl. Exh. 5; Pl. Exh. "B", Wong Depo Wong Depo . 79:22-25 thru 80:1-20, 83:11 thru 85:7. 61; Twomey Exhibit "J", Page: 171 (Energetic Painting and Drywall, Inc.)

199.  It was not until this case that I had ever heard or read of the terms "verbal application" for a CCW and "emergency CCW."  See Twomey Exhibit "D", Page: 2.  I have never read or ever heard of this policy, nor am I aware of any statute providing for such.  To the contrary, everything I have heard, read, and studied regarding CCWs indicates that there must be a signed application AND review of the standard DOJ State Application, attached hereto as Twomey Exhibit "B".  At a minimum, this precludes those with mental problems and criminal histories from being authorized by the Sheriff to carry a concealed weapon.

200.  Ernest Martini a.k.a. Ernest Martini contributed to Defendant Blanas's campaign, and received a CCW for the following stated reason: "I routinely check on properties that are located in high-crime areas throughout California."  Pl. Exh. "A", Blanas Depo. 83:2-84:24, 88:2-20; Twomey Exhibit "J", Page: 108 [Martini Associates Property Management]; Twomey Exhibit "D", Page: 9-11; See Twomey Exhibit "I", Page: 5; see also Bate Stamp #D 01694, D 01725, D 02012.

201.  Ben Upton a.k.a. Benjamin Upton, a contractor (Valley Painting at Twomey Exhibit "J", Page: 82) in Elk Grove, contributed to Defendant Blanas's campaign and received a CCW. Twomey Exhibit "D", Page 12; Pl. Exh. 3, Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23, 91:22-25; Twomey Exhibit "J", Page: 34 (Valley Painting), 113.   As noted on Upton's CCW

application, his business name is "Valley Painting", at and page 13 he states that he "**[has] not**

**had a problem**", "**[has] never had any incidents**", and "**[has] never been threatened**", which

is all conclusive that there was no "immediate" threat or harm for the issuance of his CCW.

202.   Jim Anderson a.k.a. James Anderson owner of Pacific Coast Building Products,

Inc., is a major contributor to Defendant Blanas' campaign by the way of "forgiven loans" [D

01807, 01796, 01647], and received a CCW commencing in 1994; his CCW application is

missing.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:8-9, 83:2-84:24, **84:21-85:12**; Pl. Exh. 3;

Twomey Exhibit "J", Page: 19, 37, 180.  However, what is really important here is that a

"Michael Gilmore" (issued 2003) and "Richard Merri" (issued 1998) both have CCWs, and both

just happen to work for "Pacific Coast Building Products, Inc." which also just happens to be one

of the major campaign contributors to Defendant Blanas. Twomey Exhibit "D", Page: 15, 16.

203.   In particular, the only conclusion I can draw from why both of these individuals

were issued CCWs was because they were employed by Anderson's company since the name of

the company is the only common denominator, and no other information was provided.  Again,

here is a pattern of minimal information, no threat of immediate danger as required, and the only

common denominator is a business associated with a major campaign contributor.

204.   Jack Kimmel contributed to Defendant Blanas's campaign, and received a CCW

even though on his application it said "self defense" and "self defense" is NEVER justification for

issuance of a CCW based upon Defendants purported criteria (i.e. written policy).  Campaign

contributions were through Jack Kimmel Construction Company and "Sacramento Rendering."

Pl. Exh. "A", Blanas Depo. 50:7-12, 50:24-51:5, 70:17-71:5, 88:6-8.  Twomey Exhibit "J", Page:

11, 58, 129 (Sacramento Rendering); Twomey Exhibit "D", Page: 17-19.

205.   Likewise, Michael Koewler contributed to Defendant Blanas's campaign, and

received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:12-17, 88:6-9.  Twomey Exhibit

41.

"J", Page: 11, 107, 176  Like Jack Kimmel, he also is a business owner with Sacramento

Rendering, which contributes large amounts of money to Blanas (See Bate Stamps D02071,

01898, 01660, etc.).  Twomey Exhibit "D", Page: 20-21.  Significantly at page 20, the word

"other" is checked, in lieu of "threats", "money", "late hours", "types of work", "law

enforcement."  As this was a pre-1999 form, its format is much less sophisticated.

206.  However, what is important to note is the CCW was issued "**PER SHERIFF**

**CRAIG 06-10-97**".  Twomey Exhibit "D", Page: 20.  Then, somehow, at Twomey Exhibit "D",

Page: 21, the State wide CCW application was used, and all the other pages are missing, and by

comparing Defendants' bate stamp numbers, these documents were not even grouped together,

but just thrown into a random stack of thousands of other pages of other CCW applications.

Therefore, since documents must be produced in the order in which they are maintained, this

documents were pulled from separate locations.

207.  Next, a Kurt Halverstadt was issued a CCW on 6/13/2003; his application was

"**APPROVED FOR ISSUE UNDERSHERIFF JOHN MCGINNIS 6-13-03**", and as noted on

the same page "Lou Blanas" was "Sheriff."  Twomey Exhibit "D", Page: 22.  As noted at

Twomey Exhibit "D", Page: 30, Halverstadt's justification for a CCW was that he handles "assets

of significant value" and the "high visibility of being part of The Sullivan Group" and that it is "a

reasonable business precaution."  See also, Twomey Exhibit I, Pages: 12-13.  Again, no

immediacy, and no specific threats.

208.  If the standard for approval is "a reasonable business precaution", then most

business owners should be issued CCWs.  However, the law is clear: one may have a firearm in

their place of business, thus a CCW is not needed.  What was obvious to me immediately was that

Tom Sullivan of The Sullivan Group has a close line of communication with the Sheriff, and this

cannot be disputed for Sheriff McGinniss himself appeared frequently on Tom Sullivan's

program before Sullivan left for the national spotlight.  I have personal knowledge in that I know Sheriff McGinniss, I recognize his voice, and I listened to Sheriff McGinnis personally speak many times on Tom Sullivan's program.  The three panel committee was completely bypassed - again, similar to Gerber and Koewler.

209.  Then, after McGinniss becomes Sheriff, you see the same pattern – the Sheriff getting personally involved in the CCW approval process for select individuals.

210.  David Bruce Fite was issued a CCW on 1/23/2007.  Pete Halimi was issued a CCW on 1/2/2007.  Both are either employed by or had a business interest in D. Bruce Fite & Associates, Fite Construction & Development Co., and Fite Properties, all registered at 9857 Horn Road, Sacramento, CA 95827, at the time the CCW was issued, and campaign contributions under were made under various company names of D. Bruce Fite & Associates, Fite Construction & Development Co., and Fite Properties.  See, for example,  Twomey Exhibit "J", Page: 54, 145, 173; Twomey Exhibit "D", Page: 33.

211.  Twomey Exhibit "D", Pages 31-shows "John McGinniss" (Sheriff now) personally overruling the so-called three panel CCW committee by approving two almost identical applications principals (Fite and Halimi) of the business known as "Fite Development", "Fite Construction", or "Fite Properties, Inc." located on "Horn Road." Twomey Exhibit "J", Page: 54, 145, 173; Twomey Exhibit "D", Page: 33.  The first thing that really caught my attention, besides McGinniss himself personally overruling his own appointed committee and approving CCWs is that both of these individuals are identified as members of the "SSD AERO SQUAD" right on the CCW evaluation cover sheet.

212.  I know from my management experience that the County of Sacramento Sheriff's Department started the "Air Support Bureau" in the late 1970s or early 1980s.  The helicopters are referred to as STAR units (Sheriff's Tactical Air Resource).

213.  This is significant because I have been a member of the Sacramento Sheriff's Department (SSD) for 32 years, retiring in July of 2004, and I have never heard of or even seen any organizational chart for the SSD Aero Squad, short for the Sacramento Sheriff's Department Aero Squadron, though I note that the Sacramento County Sheriff's Aero Squadron is purportedly located at 711 G Street and donated to Defendant Blanas' campaign. Twomey Exhibit "J", Page: 14.

214.  The problem with this Aero Squad is that, in 1999, I was a manager with the Department and no such organization ever existed at 711 G Street, headquarters for my employer at the time. See Twomey Exhibit "J", Page: 14.  More importantly, had I known that a branch or department of government existed that donated money to a political campaign, I would have immediately commenced an IA investigation pursuant to the General Orders requiring me to report a suspected crime or violation of law.

215.  Next, what also really struck me as suspicious, and maybe why David Fite's application was originally denied was the fact that the evaluation form (Twomey Exhibit "D", Page: 31, see also 33) states that Fite is "Retired."  But then, under the penalty of perjury, Fite apparently states that "Applicant carries large amounts of cash from business to the bank for deposit."  I asked myself, "if he is retired, why is carrying cash from business to the bank?"  As a trained investigator, I would definitely question his application, and there should be notes explaining this very inconsistent statement.  Instead, the Sheriff just approves the CCW with no investigation from what I can determine from the Department's own business records.

216.  Halami's evaluation form has him listed as a "real estate developer".  Twomey Exhibit "D", Page: 37, 43; See Twomey Exhibit "I", Page: 7.  If it is true that the three panel committee reviews just what is in the application and the justification for issuance, then how is it that the "CCW BRIEFING SUMMARY" prepared by Amber Wong contains facts that are not in

44.

the application.  Pl. Exh. "B", Wong Depo . 31:17-41:13.  For example, here, Halami's actual

application provides the stated reason for a CCW is that he "**carries cash from business**."

Twomey Exhibit "D", Page: 45.  However, at Twomey Exhibit "D", Page: 39, Amber Wong

writes "Applicant carries large amounts of cash home from the business located in Rancho

Cordova.  He also works late hours and <u>feels vulnerable</u>." [emphasis added]   However, Halimi's

real estate license has his business located in Carmichael, CA, not Rancho Cordova.  See

Twomey Exhibit "I", Page: 7. Since there are no notes or other documents in Halimi's file, where

did this additional information come from?

217.  In 2002, Richard Hill a.k.a. Dick Hill had his application approved by Undersheriff

McGinniss after it was denied by the three member panel, and his Section 7 justification is blank.

Twomey Exhibit "D", Page: 47-49, 57.  However, someone else fills in that the "Applicant's

permit has expired and he failed to renew in a timely manner.  "Applicant makes bank deposits

for Lexus of Sacramento and responds to alarm calls for the business."  Twomey Exhibit "D",

Page: 50. Again, another person associated with the owner of a company that contributes and also

has a CCW.

218.  Bob Frink HEAVILY contributed by way of forgiven loans to Defendant Blanas's

campaign, and received a CCW, plus he is a "friend" of Defendant Blanas.  Pl. Exh. "A", Blanas

Depo. 83:2-84:24, 86:8-14; Twomey Exhibit "J", Page: 8, 19, 37, 96, 193 (RPM Management);

Pl. Exh. "3"; Twomey Exhibit "O", D_01593.  Robert Frink is also the owner of RPM

management, which also just happens to employ Richard Hill, and a Patrick Frink is also

affiliated with Bob Frink Imports, all at the same business address.  See Twomey Exhibit "I",

Page: 9, 10, 11 and compare with Twomey Exhibit "I", Page: 48, 49, 50, noting that RPM

Management and Lexus of Sacramento are operating all out of Robert Frink's Madison Avenue

address.

219.  Patrick R. Frink was issued a CCW on 2/24/2000, and Robert Frink was issued a CCW on 5/18/1995.  Both of these individuals were either employed by or had a business interest in Bob Frink Imports, Inc,  Bob Frink Management, Inc., RPM Management, all located at 5112 Madison Avenue, Suite 201, Sacramento, Ca 95841.  These various individuals and entities are identified in CCW records and on campaign contribution records. See Twomey Exhibit "I", pages 9-11, and Twomey Exhibit "O".

220.  Likewise, these records also identify a Richard Gord Hill that was issued a CCW on 9/6/2000, and that Richard Gord Hill was either employed by or had a business interest in Bob Frink Management, Inc. and RPM Management, 5112 Madison Avenue, Suite 201, Sacramento, CA 95841, at the time the CCW was issued.

221.  Ronald Yee, a dentist, contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 83:2-84:24, 92:3-6; Twomey Exhibit "J", Page: 14, 83, 114; Twomey Exhibit "D", Page: 59-60.  His stated reason is essentially that "there is a real possibility of encountering life threatening situations when out alone on the street or in my parking lot."  Clearly, there was no stated immediate threat.  Twomey Exhibit "D", Page: 60.

222.  Both John and Steve Raptakis have CCWs, and John Raptakis contributed to Defendant Blanas's campaign under J. R. Painting & Waterproofing at Vintage Park Drive.  See Twomey Exhibit "I", Page: 8; Twomey Exhibit "D", Page: 61, 62, 63, 64; Twomey Exhibit "J", Page: 39;  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:16-78:1, 91:2.  Again, the justification for issuance was essential self defense from garden variety working in "dangerous neighborhoods".

223.  Now, compare Raptakis' applications with Attorney Rothery's and Plaintiff Lau's, and it becomes that even a perceived threat by a campaign contributor is good enough reason to obtain a CCW, and others who have not contributed are denied even though they have more compelling so-called perceived "threats".

46.

224.  John Valensin contributed to Defendant Blanas's campaign, and received a CCW, and the reason for his application was defense of property from trespassers (it is illegal to use deadly force to protect property). Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9, 76:17-23; Pl. Exh. 2 and 3; Twomey Exhibit "D", Page: 65; Twomey Exhibit "J", Page: 36, 38, 113.

225.  Ron Sellers contributed to Defendant Blanas's campaign, and received a CCW for what would constitute everyday dangers, not unusual to the average employer.  Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9, 91:4-6; Twomey Exhibit "D", Page: 66-67; Twomey Exhibit "J", Page: 12, 38. 79.  Here, all of Sellers' concerns involve dangers at work and at his residence; places where he is already legally allowed to arm himself without a CCW; as stated in the form letter of rejection to other CCW applicants.  Likewise, Jack Sellers contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9.  Steve Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9.  Their applications, however, are missing, though they appear to be appointed Level III reserve deputies, which is just a political appointment since at the time they would not have to been POST certified.

226.  However, the application of Roman Thorntona is really interesting as he is the personal assistant for Ron Sellers. Twomey Exhibit "D", Page: 68.  Thorntona requested a CCW to guard Sellers, but Seller's can guard himself since he too has a CCW.  Again, not only does the proprietor of a business who contributes heavily to the Sheriff obtain a CCW upon application, but those closely associated with this contributor are approved as well (i.e. Halami with Fite; Hill with Frink; Gilmore and Merri with Anderson; Koewler with Kimmel; and now Thorntona with Sellers, not to mention the other two Sellers as well; then there are the two Raptakis; and Halverstadt with Sullivan/McGinniss).

227.  From there, it just goes on.  Dave Baker, carpet business, contributed to Defendant

47.

Blanas's campaign, and received a CCW, and his application was "approved Chief Dan Lewis",

and bypassing the so-called committee altogether with undocumented threats.  Twomey Exhibit

"D", Page: 76-78; Plaintiffs' Exhibit D.  Pl. Exh. "A", Blanas Depo. 23:20-25, 24:4-9, 26:19-20,

68:10-69:2, 69:10-13. Twomey Exhibit "J", Page: 138.

228.  Dr. Pasquale Montesano contributed to Defendant Blanas's campaign, and received

a CCW for responding to emergencies "at late hours".  Twomey Exhibit "D", Page: 79 [also, 83 is

part of 79, they are out of order]; Pl. Exh. "A", Blanas Depo. 83:2-84:24, 89:11-90:11; Twomey

Exhibit "J", Page: 61.

229.  Chris Hansen, of Chris Hansen Insurance in Elk Grove, contributed to Defendant

Blanas's campaign, and received a CCW in 1998, though the committee sheet says denied for "no

compelling reason" and it was then subsequently approved as a "renewal" in 1999 - the only

statement made being "personal safety due to my business" and he had a CCW in San Luis

Obispo, CA.  Twomey Exhibit "D", Page: 81, 82, 124.   Pl. Exh. "A", Blanas Depo. 68:10-69:2,

69:23-70:4, 83:2-84:24, 86:21-4; Twomey Exhibit "J", Page: 23, 71, 167, 168.

230.  John Christie employs Nanette Blanas (a woman whom I know to be Defendant

Blanas' wife), and both of these individuals also work in the same office as Angelo Tsakopoulos

(i.e. AKT Development) whose name and company contributes heavily to Defendant Blanas.  See

Twomey Exhibit "I", Page: 1-3.  For example Twomey Exhibit "J", Page: 17, $25,000.00

"forgiven loan" with the same business address, and this pattern is repeated throughout Defendant

Blanas' campaign records.  John Christie had his CCW approved in October of 1998, and the

$25,000.00 loan was forgiven by 1/11/99.  No other information is provided on Twomey Exhibit

"D", Page: 84.  However, at Twomey Exhibit "D", Page: 85, John Christie describes his place of

employment as "Sunrise Liquors" on Greenback Lane, but his real estate license has him listed at

7700 College Town Drive, Suite 101, the same identical address and suite as Angelo

1   Tsakopoulos.

2       231.  On the face of the application, and the only basis for approval is "carry large

3   amounts of cash to the bank three to four times a week.  Also work at the above business often

4   times late."  Twomey Exhibit "D", Page: 85.  It is also noted that 10 years prior, in "1988", he

5   was denied a CCW, which also happens to be 10 years after he incorporated "Sunrise Liquors,

6   Inc." on 4/7/1978.  Twomey Exhibit "N".  Likewise, John Christie's wife also applied for, and

7   received a CCW for the same purported reason.  Twomey Exhibit "D", Page: 88-89.

8

9       232.  Chris Lee, an "attorney/farmer" contributed to Defendant Blanas's campaign, and

10  received a CCW in 1996.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:7:12, 88:6-8; Twomey

11  Exhibit "D", Page: 92-93.  Not only does Lee's application establish no "documented" threats, it

12  is specifically stated in his application that he "lives in rural area of county - often confront

13  trespassers on my ranch."  Here, Lee's application makes clear that he wants to use deadly force

14  to protect property.  Twomey Exhibit "D", Page: 93.

15

16      233.  James Grey contributed to Defendant Blanas's campaign, and received a CCW.  Pl.

17  Exh. "A", Blanas Depo. 83:2-84:24, 87:19-23.  Twomey Exhibit "J", Page: 9, 26, 75, 93; See

18  Twomey Exhibit "I", Page: 6; Twomey Exhibit "D", Page: 94.  Again, no specific threats, just a

19  generalized feeling of vulnerability, but more importantly, it was emphasized that there was the

20  potential for bank managers to be kidnaped or extorted, with no specific threat towards him.

21

22      234.  Hatim Shariff contributed to Defendant Blanas's campaign, and received a CCW for

23  protection of business (i.e. Shariff Financial Corporation has three jewelry stores in Sacramento."

24  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:2-7, 91:1-3; Twomey Exhibit "D", Page: 96-97.

25      235.  Julie Rollofson contributed to Defendant Blanas's campaign, and received a CCW,

26  plus her father Dr. Rollofson also donated to Defendant Blanas's campaign [this was established

27  by Julie Rollofson listing her father as her employer on her CCW Application and Dr. Rollofson's

28

address matches on the campaign records.] Twomey Exhibit "O", D_01563;  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:13-78:1, 91:2; Pl. Exh. 2; Twomey Exhibit "D", Page: 98-99; Twomey Exhibit "J".  Most importantly, she was "denied" for "no compelling reason", but then it is written, "O.K. permit do amend review if status changes Chief B Roberts."  Again, the so-called committee is overruled by a higher authority.

236.  Alvin and Gary Ricci contributed to Defendant Blanas's campaign, and received a CCW, and the records were destroyed by SIB.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 75:1-2; Pl. Exh. 2; Twomey Exhibit "J", Page: 20, 68, 86; Twomey Exhibit "D", Page: 100-102.  The application merely mentions the name of Ricci's business, and that is it.

237.  Kermit Schayltz, owner of Lucky Derby Casino, was issued a CCW in 1996 for "course of business - to and from bank." with only two members present on the three member review panel.   Twomey Exhibit "J", Page: 28, 59, 76, 94, 151 (Point Walker, Inc. dba Lucky Derby Casino), 196; Twomey Exhibit "D", Page: 103-122.  Interestingly, a person who has had a CCW since 1996, is suddenly denied in 2007 by McGinniss, apparently because Schayltz did not contribute to McGinniss' campaign.

238.  The important point is that this individual has been operating the same business for years, and is eventually denied a CCW for the same reason one was approved.  At a minimum, this shows an arbitrary and capricious policy with absolutely no standard for the reviewing committee members to abide by.  Then, for Gerry Harris, he has a CCW and no application was provided, and he too is believed to be affiliated with Lucky Derby.  Twomey Exhibit "J", Page: 56, 194, 196 (Point Walker/Lucky Derby); Twomey Exhibit "O", D_01561.

239.  Bill Myers, "the Padillas" (i.e. Alejandro, Anselmo, Greg, Jess, Michael a.k.a. Padilla Bail Bonds) contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 74:21-25.  More importantly, here again, the "SSD Air Squadron"

is named as the only justification for issuance in 1997.  Twomey Exhibit "D", Page: 123, 133;

Twomey Exhibit "J", Page: 21, 78; Pl. Exh. 2 and 3.  One of the Padilla's states "self protection"

with no immediate threats.  Twomey Exhibit "D", Page: 133.

240.  Dave Mastagni contributed to Defendant Blanas's campaign, and received a CCW in

1989 for "course of business".  Twomey Exhibit "D", Page: 134; Pl. Exh. "A", Blanas Depo.

68:10-69:2, 72:16, 88:6-8; Twomey Exhibit "J", Page: 40, 60, 109.  I know David Mastagni

personally, been to his office, sought legal advice from him, and at no time did I ever perceive

that Mastagni was ever in any danger working in his law office, nor was his office ever located in

a high crime area.

241.  Bill Spurgin gave Defendant Blanas jewelry, donated to his campaign and received

a CCW, and his CCW is a non-law enforcement CCW issued in 1996 and is still current.  Pl. Exh.

"A", Blanas Depo. 68:10-69:2, 76:8-14.

242.  Joseph Mohamed, Asghar Mohamed, Ahmed, and John Mohamed were issued

CCWs in  2001, 2005 respectively, and their files were purged, and Joseph is a very heavy

contributor to Defendant Blanas.  Blanas Depo Exhibit 1, 2 and 3,  Twomey Exhibit "J", Page:

10, 12, 27; Twomey Exhibit "D", Page: 125-132.   Of particular interest is that he too is a real

estate broker and property manager, collecting rents.  The application states: "My concealed

weapon has provided me with a sense of security in these situations." (126)   It is noted that

basically no reason was provided for the others.

243.  Attorney John Virga contributed to Defendant Blanas's campaign, and received a

CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23; Twomey Exhibit "J", Page: 57; Pl. Exh.

2, Twomey Exhibit "O", D_01574.

244.  Margaret A. Abrate of Capitol Steel, Co.  contributed to Defendant Blanas's

campaign and received a CCW.  Twomey Exhibit "J", Page: 47, 70, 102, Twomey Exhibit "O",

51.

1   D_01609.

2       245.  John Morgan contributed to Defendant Blanas's campaign, and received a CCW.  Pl.

3   Exh. "A", Blanas Depo. 83:2-84:24, 89:1-6.  Twomey Exhibit "J", Page: 28, 78, 109, Twomey

4   Exhibit "O", D_01551.

5       246.  Jerry a.k.a. George Brannigan contributed to Defendant Blanas's campaign

6   commencing in 1995 or 1999, and received a CCW.  Pl. Exh. "A", Blanas Depo. 18:6-14;

7   21:2-15.  Twomey Exhibit "J", Page: 5, 19, 37, 95, Twomey Exhibit "O", D_01591.

8       247.  Jack Kearns a.k.a. John Kearns contributed to Defendant Blanas's campaign, and

9   received a Non-peace officer CCW.  Pl. Exh. "A", Blanas Depo. 67:9, 70:9-16, Twomey Exhibit

10  "O", D_01538.

11      248.  Bill Mosier contributed to Defendant Blanas's campaign, and received a CCW.  Pl.

12  Exh. "A", Blanas Depo. 25:17-25, 26:23-25; Twomey Exhibit "O", D_01596.

13      249.  A CCW was issued on 8/28/93 to Steve Beneto of Beneto Petroleum Products whom

14  also forgave a $15,000.00 loan to Defendant Blanas.  Twomey Exhibit "J", Page: 4, 19, 37, 95;

15  Twomey Exhibit "O", D_01636.

16      250.  On 8/12/1998, Spencer Bole was issued a CCW and contributed to Defendant

17  Blanas' campaign in 1999. Twomey Exhibit "J", Page: 5, 50, 87.  Twomey Exhibit "O",

18  D_01636.

19      251.  John Manikas was issued a CCW October 1994, and contributed to Blanas'

20  campaigns under Color Core Incorporated and Five Star in 1999.  Twomey Exhibit "J", Page: 6,

21  23, 88, 92 [$25,000], 96, 108.  Twomey Exhibit "O", D_01604.

22      252.  Dave Commons was issued a CCW in 1996, and contributed to Blanas' campaigns.

23  Twomey Exhibit "J", Page: 23; Twomey Exhibit "O", D_01577.

24      253.  David S. Smith, Eagle Ridge Construction was issued a CCW October 1994, and

52.

contributed to Blanas' campaigns.   Twomey Exhibit "J", Page: 24, 72, 104.   Twomey Exhibit "O".

254.   Ed Rincon was issued a CCW 1997, and contributed to Blanas' campaigns. Twomey Exhibit "J", Page: 25, 53, 73.  Twomey Exhibit "O", D_01573.

255.   Doug Barkdull was issued a CCW, and contributed to Blanas' campaigns.  Twomey Exhibit "J", Page: 49, 101; Twomey Exhibit "O", D_01609.

256.   Darrell Dettling was issued a CCW in 1994, and contributed to Blanas' campaign in 1999.  Twomey Exhibit "J", Page: 7, 24, 52, 72, 103, 170; Twomey Exhibit "O", D_01601.

257.   My attention was also directed to Defendant Blanas being deliberately evasive in responding to questions regarding who he issued a CCW and Honorary Badges to and who contributed to his campaigns, with coaching by his attorney.  Pl. Exh. "A", Blanas Depo. 23:15-25:24, 29:13-30:21,   In fact, at one point, Defendant Blanas deliberately lied about his ownership of a million dollar vacation home in Reno with CCW and campaign contributor Edwin Gerber, then he changed his mind on the subject.  Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:12.

258.   Moreover, take Twomey Exhibit "J", Page: 115, this is a list of outstanding loans to Defendant Blanas in the year 2001, and out of nine loans, two of which are by the same individual under different companies (i.e. Manikas with Color Core and Five Star Services), so there are only eight individuals.  Of these eight, five have CCWs (Beneto, Brannigan, Manikas, Cummings, and Frink), one indirectly employs Defendant Blanas' wife (Angelo Tsakoploulos through Christie), and one sold a house to Defendant Blanas and Gerber, who is a Co-owner and also just happens to have a CCW.  This is just an example of what the volumes of documents show.

259.   In fact, it is more likely than not that on every page one will find at least one CCW permit holder who has contributed to Defendant Blanas' campaign.  For instance, Twomey

Exhibit "J", Page: 119, 2 of 3 have CCWs (i.e. Beneto and Brannigan) and the third sold a house

to Defendant Blanas (i.e. Bardis) See Twomey Exhibit "K", Page: 1.  At Twomey Exhibit "J",

Page: 120, 4 of 5 have CCWs (Brannigan, Manikas under Color Core and Five Star, and Frink).

Then, at Twomey Exhibit "J", Page: 121, 3 of 5 have CCWs (Jack, Ron, and Steve Sellers).

There is also a Manolakas that has a CCW and it is more likely than not under a totality of

circumstance that this person is related.  Then, Twomey Exhibit "J", Page: 122, 1 of 2 individuals

has a CCW (Valensin), and the other (Tsakopoulos indirectly employs Defendant Blanas' wife).

260.  My analysis does not just stop there.  The application of Roland Lewis (Twomey

Exhibit "O", D_ 01561) is particularly puzzling because here is a man that has absolutely no

records connecting him to any company or individual, and he was issued a CCW for "Self

protection Bus related", a reason that is more cryptic than anything.  This is a very good example

of the capriciousness and arbitrariness that Plaintiffs, at a minimum, were subjected to.

261.  Next, I compared applications of those who were approved CCWs with those who

were denied, noting that most applications of "current" holders of CCWs were either not turned

over or are missing pages; those that were provided, most of the documents associated with the

application itself are missing, such as the "CONCEALED WEAPONS PERMIT EVALUATION"

(For an example of one provided in an denied application, see **Exhibit "8"** D_01067), the "CCW

BRIEFING SUMMARY" (See **Exhibit "8"** D_01068)

262.  Attached hereto as Twomey Exhibit "D", Page 2 (Plaintiffs' Exhibit "E"), is a letter

from Defendant himself to a Mr. Edwin Gerber, and man who Defendant Blanas not only owns a

vacation home with, but also has received campaign contributions from.  Mr. Blanas

acknowledges that a so-called "verbal" application for a CCW was made directly to himself, and

that he approved the CCW.  Blanas testifies in his deposition that he owns a house with Gerber,

that Gerber personally, and through his company contributed to his political campaign, and the

54.

attached Twomey Exhibit "K" and Exhibit "M", a true and correct copy of official assessor records of Nevada, showing the Gerber and Blanas ownership interest in the house.

263. Further, there is no objective criteria. As such, it is subject to abuse on its face.

264. In sum, this pattern is consistent throughout, just compare any name in Twomey Exhibit "J", Pages: 1-249 with the list of CCW permit holders markes as Plaintiffs' Exhibits 1, 2, and 3, and Twomey Exhibit "O", and it becomes obvious.

265. Therefore, based upon my education, training and experience, and to a degree of reasonable certainty, I can state that Defendants CCW permit process is wrought with capriciousness and arbitrariness, and continues till this day.

266. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that Plaintiffs were denied an equal and fair opportunity to receive a CCW as compared to those who received CCWs.

267. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that Plaintiffs were denied equal opportunity under the law to receive a CCW from Defendants.

268. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that selective issuance of CCWs to those with close affiliation to the Sheriff (i.e. elected official) is a systemic problem that is inherent in a system whereby money influences those with the "power" to issue CCWs, which in this case, is the Sheriff of Sacramento County.

269. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that what this evidence demonstrates is that those who have access to the Sheriff indeed have a very high probability of receiving a CCW, if they apply for one, as compared to a very low probability for those who do not have access to the Sheriff, nor

55.

1  contributed to his campaign, such Plaintiffs.

2  270. I further opine to a degree of reasonable certainty, that Plaintiffs Mehl and Lau did

3  not receive equal treatment for the review, if any, of their CCW applications since they did not

4  contribute or have any relationship to then Sheriff Blanas or then Undersheriff McGinniss.  I can

5  state to a degree of reasonable certainty that both Plaintiffs CCW applications were denied simply

6  because they were not known contributors to Sheriff Blanas' political campaigns for Sheriff, and

7  

8  his Undersheriff's quest to become sheriff.  This is what the evidence shows.

9  ACTIVE AND HONORABLY RETIRED MEMBERS OF THE CRIMINAL

10  JUSTICE SYSTEM

11  271. There is no supporting data as to why all active or honorably separated member of

12  

13  the criminal justice system directly responsible for the investigation, arrest, incarceration,

14  prosecution or imposition of sentence on criminal offenders are provided preferential treatment

15  for the issuance of a CCW.  See Twomey Exhibit "J", responses 17-27.  In fact, no research was

16  done determining what members of society were more inclined to be victims of crime (i.e.

17  geographic location, race, gender, etc.)  Therefore, the policy is flawed from the start since there

18  

19  was no effort to determine if certain demographics or variables are present in order that certain

20  citizens are more inclined to be the victims of crime, thus requiring a CCW more so than others.

21  272.  Also, the Defendants, when implementing the purported CCW written policy, relied

22  upon absolutely no data or facts as to what constitutes good cause.  See Exhibit "J", Defendants

23  responses to requests 17-27.   There is absolutely no evidence supporting a prima facie good

24  standard for issuance of a CCW to honorably retired peace officers of individuals who are or were

25  members of the criminal justice system.  In fact, I am unaware of any off-duty or retired officer

26  being subjected to crime at a greater rate than other members of society.

27  

28  273.  Based upon the totality of evidence, including the opined abuses noted above and

56.

Defendants admitted lack of research or evidence supporting the prima facie good cause policy, it is my opinion to a degree of reasonable certainty that the prima facie good cause standard lacks any merit or support, and creates a separate privileged class of citizens who are rewarded for their affiliation with law enforcement.

274.  I am not aware of any specialized training in the criminal justice system for determining what constitutes cause for issuance of a CCW.

275.  In fact, I have never even heard of any policy debates or issues regarding how, when and why CCWs should be issued.

276.  However, it is well known throughout the Sheriff's Department that CCW, Honorary Deputy Badges and IDs were given to Craig's and Blanas' campaign contributors.

277.  In sum, it is my opinion, based upon a degree of reasonable certainty, that the CCW policy of the Sacramento County Sheriff's Department, as both written and unwritten, is applied in a discriminatory, unfair, biased, prejudicial, and capricious manner, and that there is obviously extreme favoritism towards two distinct groups, to the exclusion of all other citizens of Sacramento County: 1) those with political influence and ties (e.g. campaign contributors and other who can contact the Sheriff directly and receive CCWs, Badges, and I.D.s.) and, 2) "active or honorably separated member of the criminal justice system directly responsible for the investigation, arrest, incarceration, prosecution or imposition of sentence on criminal offenders" are also provided preferential treatment (i.e. the prima facie good cause standard for issuance)

RESIDUAL OPINIONS

278.  It is my understanding that Plaintiff Lau is a former FBI Agent who was adjudicated with a PTSD work disability due to his long time undercover operations in hostile foreign Countries as a Counter-Intelligence FBI Agent, which included extensive polygraph exams to which no other CCW applicant/campaign contributor underwent in all likelihood.  This is

57.

undisputed. Mr. Lau in all likelihood possessed a security clearance that far exceeded any background investigation conducted on any CCW permit holders and Sacramento County employee, including myself.  There is no doubt of the danger to his life from hostile foreign Governments and local gangs and criminals, greater than any other person from any CCW application I reviewed.  Mr. Lau's application was rejected because, according to Defendants, he had not established "good cause" that there was a threat to his life – no other reason was provided to Mr. Lau (See Loch Lau's Declaration).

279.   I compared this with some of the other applicants who donated money or provided forgiven loans, and it was disturbing that these individuals were issued CCWs for such reasons as "Self Defense" (2465, 2471, 2482, 2500), carrying cash and wearing expensive jewelry (Gerber), and defending property (again, it is illegal to used deadly force to defend property).  Also, CCWs were issued for which no application exists.

280.   Plaintiff Mehl, a first class citizen with no prior contact with law enforcement, was not even contacted by the Defendants, though section 7 of the State DOJ form application required an "interview".  In sum, Mr. Mehl's application was completely ignored.

281.  Both Plaintiffs have never contributed money to any local sheriff's campaign.

282.  All things being equal, the proportion of rejections for campaign contributors would be about equivalent.  However, the only variable to change is that those who received a guaranteed  CCW were also campaign contributors.

DEFENDANTS DECLARATIONS AS EVIDENCE

283.   The Declarations submitted by campaign contributors and/or these within Blanas, inner circle further support my opinions expressed herein for the following reasons:

284.   Mr. Foondos states he received an Honorary Badge personally from then

58.

Sheriff Blanas, and that he was able to physically approach then Sheriff Blanas and ask for a CCW.  There is a Mr. Foondos on Defendant Blanas' campaign records.  Mr. Foondos deliberately avoids stating his relationship to Mr. Blanas.  Most importantly, he did NOT submit a CCW application.  Neither one of the Plaintiffs had this type of access to the then-Sheriff Blanas.

285.  Mr. Beutler states that he was able to physically approach then Under-Sheriff Blanas and ask for a CCW, and again as Sheriff.  He never submitted an application, though Sheriff Blanas has approved CCWs for so-called "emergencies." (e.g. Ed Gerber case in point.)  Campaign records clearly reveal that Mr. Beutler is a campaign contributor of Sheriff Blanas.  Again, this proves access.

286.  Mr. Dennis Treadaway received an honorary Deputy badge from Sheriff Blanas and claims to have asked Sheriff Blanas for a CCW, to which Sheriff Blanas replied "no", indicating direct access to him.

287.  Mr. Artemious Roussos asked Sheriff Blanas both by telephone and in person for a CCW, but was denied, but had direct access to Sheriff Blanas.

288.  Mr. Charles Mier, owner of Club 2me, a large contributor both in monies and in kind (co-chair,  Lou Blanas fund raiser) was upset when Sheriff Blanas told him in a phone conversation, "no" CCW.   Mr Mier started the application process but abandoned the idea.  Again, he at least had direct access to Sheriff Blanas.

289.  Mr. David Townsend, a well known political consultant, asked Sheriff Blanas for a CCW but he told him "he would absolutely not issue a CCW permit, and he would not approve a permit for me."  If Sheriff Blanas has nothing to do with the CCW process, how is it he can deny one?  He would/does not have any idea who applies and who does not apply.  Again a person of privilege and influence had direct access to Sheriff Blanas.

290.  Mr. John G. Manikas' permit expired in 1998.  He asked Sheriff Blanas about

renewing it.  Sheriff Blanas told him there was "no continuing justification for one and because business had contributed to his campaign, he would not authorize a renewal of my permit." Cryptically, Manikas never identifies the name of the business.

291.  This statement by Mr. Manikas flies in the face of statement made by Detective Fred Mason in his motion in support of DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT. Detective Mason states, "During both times I was assigned to SIIB, neither Sheriff Craig nor Sheriff Blanas ever requested any special review of an application, denial of an application, or the issuance of a permit to any individual.  Neither Sheriff attended the Evaluation Committee meetings where the applications were evaluated and decisions made as to whether or not a permit would be issued."

292.  If Sheriff Blanas is not involved in any way in the application process, how can he personally deny a permit to Mr. Foondos, Mr. Dennis Treadaway , Mr. Artemious Roussos, Mr. Charles Mier, Mr. David Townsend, and Mr. John G. Manikas?

293.  Again, if Sheriff Blanas was not involved in the CCW application whatsoever, how is it that he can deny an applicant verbally.  And what original justification evaporated and how did Sheriff Blanas know that?

294.  Ms. Nancy Dicenzo, a campaign contributor and personal friend of Sheriff Blanas, asked him for a CCW but was told "he would not personally issue one because of the scrutiny such an act would provoke."

295.  However, unlike the message given to Mr. Foondos, Mr. Dennis Treadaway,  Mr. Artemious Roussos, Mr. Charles Mier, Mr. David Townsend, and Mr. John G. Manikas, Sheriff Blanas encourages Ms. Dicenzo to apply through the application process, EVEN THOUGH SHE CONTRIBUTED TO HIS CAMPAIGN!!!

296.  Neither one of the Plaintiffs had this type of access to the then Sheriff

Blanas.  They are not in his circle of contributors, friends and associates.

297.  Therefore, Defendants' declarations actually prove my point: there are people who have access to the Sheriff to request simple favors, such as a CCW.  The facts clearly establish that those with access and money are granted CCWs.  There is no doubt in my mind.

298.  It is my opinion, to a degree of reasonable certainty, that the CCW approval process is not a process at all, but consists of a committee of political appointments who serve at the pleasure of the Sheriff.  It is reasonable to infer that these appointees are also in direct contact with the Sheriff's campaign contributors, or have knowledge of who they are.

299.   Further, I opine the following conclusions:  Defendant Blanas signed a declaration purportedly identifying 229 individuals who were granted permits under his administration who did not allegedly contribute to his campaign.

300.  However, he also failed to identify the other 80 (+/-) who either personally donated, or were affiliated with companies that donated to his campaign, and fails to produce a single application of a person who applied after contributing to his campaign and who was denied a CCW.

301.  Defendant Blanas also fails to explain how a campaign contributor can make an "oral application" for a CCW when there is no written or published policy for such a procedure.

302.   Defendant Blanas testified that; ( 1)  he personally issued a CCW to Mr. Gerber;  (2)  that both Mr. Gerber and his company Energetic Painting and Drywall, Inc. have contributed to his political campaigns for Sheriff of Sacramento County, and (3)  that they own a vacation home together in Reno, Nevada, and in fact Sheriff Blanas flies in Mr. Gerber's airplane. Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7.

303.  Further, after reviewing official campaign records produced by Defendant

Blanas, I note that Energetic has contributed, but I could not locate a single document showing

how, when, and how much  Mr. Gerber personally contributed, as testified to by Sheriff Blanas.

304.  Attached hereto as Twomey Exhibit "D", commencing at page 1 (and

Exhibit "5" as well) are the relevant portions of the CCW application and file of one Edward

Gerber, as testified to by Amber Wong and Defendant Blanas.

305.  On July 25, 2006, this CCW was approved personally by Blanas, though

Blanas has stated under the penalty of perjury that he does not get involved with the approval

process of CCWs.  Attached hereto as **Exhibit "K"** is a true and correct copy of Blanas's Tahoe-

Neveda property showing ownership. Gerber's application was approved personally by Blanas

because Gerber likes to carry a lot of cash and jewelry for his personal use.  See **Exhibit "5"**.

306.  Edwin Gerber owns a million dollar vacation home in Reno with Defendant

Blanas, and Gerber contributes to Blanas' campaign under Energetic Drywall, which is reported

in campaign disclosure records under the penalty of perjury, but his individual contributions were

not reported, though Defendant Blanas testified that Gerber personally donated money; Defendant

Blanas personally approved Gerber's CCW application with a stated justification by Gerber that

he carries large sums of cash and wears expensive jewelry.  Blanas Depo. 46:7-16, 47:9-48:25,

55:11-18, Blanas Depo. 63:14-67:7.  Energetic Painting and Drywall, Inc., 3030 Orange Grove

Ave, North Highlands, CA 95660, Number: C1137947  Date Filed: 4/1/1983.

307.   I am familiar with the Deputy Aaron McAfee incident through personal

conversations with Deputy McAfee, his watch commander at the time, and by reading a copy of

Deputy McAtee's arrest report which he gave me to read.

308. This is the now called "Colanfrancesco incident".

309. I have never read, been provided, nor relied upon any documents in any personal file,

nor any internal affairs investigation to form conclusions regarding the Colanfrancesco matter,

just the crime report and my conversation's with his watch commander regarding the report, and

deputy McAfee's work product.

310.  Hence, § 832.7 of the penal code is not involved.

311.  It was my conclusion at the time, and remains to this day that Deputy Aaron McAtee

was charged with and punished for conduct that any and all patrol deputies were required to do at

the time: show on the log sheet that a "report" was necessary, but complete the report in the next

few weeks without the use of overtime.

312.  I am convinced to this day that the false charge against Deputy McAtee resulted in

his failure to recognize that Colanfrancesco was immunized from suffering any action resulting

from criminal activity in Sacramento County.

313. These residual facts and opinions confirm my original opinions. In fact, Defendants'

evasive declarations completely confirm the truth of the matter, for Defendants had every

opportunity to present Declarations from their biggest, most influential campaign contributors,

and failed to do so.

314.  I have read and complied with the protective order issued in this case.

I declare that the information contained in this declaration is true and correct and made

under the penalty of perjury under the laws of the United States of America, signed in

Sacramento, CA on Wednesday, November 21, 2007.

///

///

///

63.

1    I declare under the penalty of perjury that the information contained herein is true and

2   correct, and are of my own personal knowledge.  Executed in the County of Sacramento, CA, on

3   November 21, 2007.

4

5

6

7

8   _/s/ Timothy G. Twomey (Original Signature on File with Attorney)_
    Lt. Timothy G. Twomey (Ret.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILE NO. 110901                    ORDINANCE NO. 206-11

1   [Police Code - Safe Storage and Enhanced-Lethality Ammunition Findings]

2

3   **Ordinance amending the San Francisco Police Code by adding Sections 4511 and**

4   **613.9.5 to add findings to ordinances: 1) requiring a handgun to be kept in a locked**

5   **container or disabled with a trigger lock; and 2) prohibiting the sale of enhanced-**

6   **lethality ammunition.**

7                    NOTE:        Additions are *single-underline italics Times New Roman*;
                                  deletions are *strike-through italics Times New Roman*.
8                                 Board amendment additions are double-underlined;
                                  Board amendment deletions are strikethrough normal.
9

10  Be it ordained by the People of the City and County of San Francisco:

11  Section 1. The San Francisco Police Code is hereby amended by adding Sections

12  4511 and 613.9.5, to read as follows:

13  *SECTION 4511. FINDINGS.*

14  *1.    Firearm injuries have a significant public health impact both nationally and locally.*

15  *a.    In the United States, firearm injuries accounted for 6.6 percent of premature*

16  *deaths from 1999-2007. Shootings are a leading cause of injury deaths in the nation, second only to*

17  *motor vehicle crashes. On average, there were 30,125 firearm deaths in the United States annually*

18  *between 2000 and 2007, inclusive. In 2007, 31,224 Americans died in firearm-related homicides,*

19  *suicides, and unintentional shootings – the equivalent of 85 deaths each day and more than three*

20  *deaths each hour.*

21  *b.    Nationally, more than two thirds of homicides and over half of all suicides are*

22  *committed with firearms.*

23  *c.    Unintentional shootings killed over 5,700 people in the U.S. between 2000 and*

24  *2007. In 2009, over 18,000 people were treated for unintentional gunshot wounds in the United States.*

25

d.     *The firearm-related homicide, suicide, and unintentional death rates for children 5-14 years old in the United States are significantly higher than those other industrialized nations.*

e.     *Over the last five years, firearm injuries have ranked third of all causes of injury death in San Francisco, after pedestrian fatalities and falls, respectively. Almost two thirds of these firearm deaths were homicides. In addition, gunshot wounds were the third most common reason for injury-related hospitalizations in San Francisco from 2005 to 2008 and fourth in 2009. Firearm-related suicides accounted for 16.2 percent of the suicide deaths in San Francisco in Fiscal Year 2009-2010.*

f.     *San Francisco General Hospital, as the only trauma center in San Francisco, treats approximately 98 percent of the city's shooting victims annually. Approximately 80 percent of the individuals treated for violent injuries at San Francisco General Hospital are uninsured.*

2.     *Having a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death.*

a.     *A firearm stored loaded or unlocked increases the risk of an accidental shooting.*

b.     *All U.S. case control studies (12 to date) have found that people who die by suicide are more likely to have lived in a home with a gun than similar people who did not die by suicide. Studies have also shown that the risk of suicide increases in homes where guns are kept loaded or unlocked.*

c.     *A 2007 study compared the 40 million people who live in the states with the lowest firearm prevalence (Hawaii, Massachusetts, Rhode Island, New Hampshire, Connecticut, and New York) to about the same number living in the states with the highest firearm prevalence (Wyoming, South Dakota, Alaska, West Virginia, Montana, Arkansas, Mississippi, Iowa, North Dakota, Alabama, Kentucky, Wisconsin, Louisiana, Tennessee, and Utah). Although non-firearm suicides were about equal in the two groups, total suicides were almost twice as high in the high-gun states.*

Supervisor Mirkarimi
**BOARD OF SUPERVISORS**     Page 2
8/2/2011
c:\documents and settings\gjohnson\application data\l5\temp\36953.doc

1              *d.      Keeping unsecured guns in the home increases the flow of illegal guns into the*

2  *community.  More than half a million firearms are stolen each year in the United States and many are*

3  *subsequently sold illegally.*

4        *3.     Children are particularly at risk of injury and death, or causing injury and death, when*

5  *they can access guns in their own homes or homes that they visit.*

6             *a.     The authors of a 2005 study found that an estimated 1.69 million children age 18*

7  *and under are living in households with loaded and unlocked firearms.  Many young children,*

8  *including children as young as three years old, are strong enough to fire handguns.*

9             *b.     A significant majority of the guns used in youth suicide attempts and*

10  *unintentional injuries were stored in the residence of the victim, a relative, or a friend.  Of youths under*

11  *18 who died by firearm suicide, the vast majority used a family member's gun, usually a parent's.  And*

12  *more than two thirds of school shooters obtained their gun(s) from their own home or that of a relative.*

13             *c.     Quick access to loaded firearms heightens the risk that a young person's*

14  *impulsive decision to commit suicide will be carried out without reflection or seeking help, and that the*

15  *impulsive attempt will be fatal.  One third of youths who died by suicide had faced a crisis within the*

16  *previous 24 hours.  Among people who nearly died in a suicide attempt, almost a quarter indicated that*

17  *fewer than five minutes had passed between deciding on suicide and making the attempt.  While fewer*

18  *than 10 percent of suicide attempts by other means are fatal, at least 85 percent of firearm suicide*

19  *attempts end in death.*

20        *4.     Guns kept in the home are most often used in suicides and against family and friends*

21  *rather than in self-defense.*

22             *a.     Guns kept in a home are more likely to be involved in an unintentional shooting,*

23  *criminal assault, or suicide attempt than to kill or injure in self-defense.*

24             *b.     Only one in ten firearm homicides in the shooter's home is considered justifiable,*

25  *meaning the shooter was not the assailant.  Of every ten firearm homicide victims killed at the shooter's*

Supervisor Mirkarimi
**BOARD OF SUPERVISORS**                                       Page 3
8/2/2011
c:\documents and settings\gjohnson\application data\l5\temp\36953.doc

1    *residence, six were intimate partners or family members of the shooter, three were friends or*

2    *acquaintances of the shooter, and only one was a stranger to the shooter.*

3    *5.      Applying trigger locks or using lock boxes when storing firearms in the home reduces*

4    *the risk of firearm injury and death.*

5    *a.      Keeping a firearm locked when it is not being carried ensures that it cannot be*

6    *accessed and used by others without the owner's knowledge or permission.  This simple measure*

7    *significantly decreases the risk that the gun will be used to commit suicide, homicide, or inflict injury,*

8    *whether intentionally or unintentionally.*

9    *b.      Safe storage measures have a demonstrated protective effect in homes with*

10   *children and teenagers where guns are stored.*

11   *6.      There is a wide consensus among medical professionals, police chiefs, gun control*

12   *advocates and gun rights groups that applying trigger locks or using lock boxes to store unsupervised*

13   *guns in the home promotes health and safety.*

14   *a.      The International Association of Chiefs of Police recommends that state and*

15   *local governments mandate safe storage of firearms.*

16   *b.      The American Academy of Pediatrics recommends that if families must have*

17   *firearms in their homes, the firearms should be stored locked, unloaded, and separate from locked*

18   *ammunition.*

19   *c.      Both gun control and gun rights advocates endorse the use of locking devices*

20   *when storing guns to ensure that unauthorized or untrained persons cannot use the gun to inflict injury*

21   *or death.  For example, the National Rifle Association's Home Firearm Safety Handbook, developed*

22   *and used as part of the National Rifle Association (NRA) Basic Firearm Training Program, emphasizes*

23   *that "there is one general rule that must be applied under all conditions: Store guns so they are not*

24   *accessible to untrained or unauthorized persons."  The NRA Guide To The Basics Of Personal*

25

1  *Protection In The Home* further explains that "all storage methods designed to prevent unauthorized

2  access utilize some sort of locking method."

3       7.    Requiring unsupervised firearms stored to be secured with trigger locks or in a locked

4  container does not substantially burden the right or ability to use firearms for self-defense in the home.

5          a.    The locking requirements apply only to handguns that are not being carried.

6  Gun owners and adults over 18 may carry loaded and unlocked handguns in the home at any time.  The

7  safe storage requirements also permit owners who wish to do so to store their handguns fully loaded.

8          b.    Gun security does not preclude quick access.  For example, affordable lockboxes

9  using Simplex-type locks, which pop open immediately when several keys or pushbuttons are touched in

10  a preset sequence, are widely available.  Users report that they can retrieve a loaded weapon in just

11  two to three seconds, and that the locks are also easy to open in the dark.  The NRA describes this type

12  of lockbox as providing "a good combination of security and quick access."  Some lockboxes also

13  feature biometric locks, which provide immediate access when they scan the owner's fingerprint.

14          c.    Portable lockboxes can store loaded weapons such that they are always within

15  easy reach on counters, tables or nightstands.  Such safely stored weapons are more quickly and easily

16  retrieved for use in self-defense than unlocked guns that have been hidden away in seldom-used

17  locations.

18  

19  **SECTION 613.9.5.  FINDINGS.**

20       1.    "Enhanced-lethality ammunition" means the ammunition that licensees may not sell,

21  lease or otherwise transfer under Police Code Sec. 613.10 (g).

22       2.    Enhanced-lethality ammunition is designed to tear larger wounds in the body by

23  flattening and increasing in diameter on impact and/or exploding and dispersing shrapnel throughout

24  the body.  These design features increase the likelihood that the bullet will hit a major artery or organ,

25  that it will take a more circuitous path through the body to create more widespread damage, and that it

Supervisor Mirkarimi
**BOARD OF SUPERVISORS**                          Page 5
8/2/2011
c:\documents and settings\gjohnson\application data\l5\temp\36953.doc

1    *will release all of its propulsive force inside the body to cause maximum injury. Accordingly,*

2    *enhanced-lethality ammunition is more likely to cause severe injury and death than is conventional*

3    *ammunition that does not flatten or fragment upon impact.*

4        *3.    Enhanced-lethality ammunition has been used in shooting massacres both in San*

5    *Francisco and abroad. On July 1, 1993, heavily armed gunman Gian Luigi Ferri shot and killed eight*

6    *people, then himself, in the 101 California Street high-rise in San Francisco using hollow-point bullets.*

7    *Most recently, on July 24, 2011, Anders Behring Breivik used lethality-enhanced bullets designed to*

8    *fragment inside the body and cause maximum internal damage to kill and grievously wound dozens of*

9    *children at a youth camp in Norway.*

10       *4.    Banning the sale of enhanced-lethality ammunition in San Francisco does not*

11    *substantially burden the right to self defense. The right to use firearms in self defense can be fully*

12    *exercised using conventional, non-collapsing, non-fragmenting ammunition. Enhanced-lethality*

13    *ammunition is not in general use, and this unusually injurious ammunition has been banned outside the*

14    *United States. For example, the Hague Convention of 1899, Declaration III, has for more than a*

15    *century prohibited the use in warfare of bullets that easily expand or flatten in the body.*

16      . *5.    Personal firearms kept in the home are more likely to be used against family and friends*

17    *than intruders. Home firearms may also be used in suicide attempts, accidental shootings and criminal*

18    *assaults.*

19       *6.    The City and County of San Francisco has a legitimate, important and compelling*

20    *governmental interest in reducing the likelihood that shooting victims in San Francisco will die of their*

21    *injuries by reducing the lethality of the ammunition sold and used in the City and County of San*

22    *Francisco.*

23

24

25

Supervisor Mirkarimi
**BOARD OF SUPERVISORS**                                     Page 6
8/2/2011
c:\documents and settings\gjohnson\application data\l5\temp\36953.doc

1         Section 2.  Effective Date.  This ordinance shall become effective 30 days from the

2    date of passage.

3

4    APPROVED AS TO FORM:
     DENNIS J. HERRERA, City Attorney

5

6    By: _____
         Cecilia T. Mangoba
         Deputy City Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Supervisor Mirkarimi
**BOARD OF SUPERVISORS**         Page 7
8/2/2011
n:\govlit\li2011\091333\00716316.doc



### City and County of San Francisco
### Tails
### Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

---

**File Number:**   110901                    **Date Passed:**   October 04, 2011

Ordinance amending the San Francisco Police Code by adding Sections 4511 and 613.9.5 to add findings to ordinances: 1) requiring a handgun to be kept in a locked container or disabled with a trigger lock; and 2) prohibiting the sale of enhanced-lethality ammunition.

September 15, 2011 Public Safety Committee - RECOMMENDED

September 27, 2011 Board of Supervisors - PASSED, ON FIRST READING
   Ayes: 11 - Avalos, Campos, Chiu, Chu, Cohen, Elsbernd, Farrell, Kim, Mar, Mirkarimi and Wiener

October 04, 2011 Board of Supervisors - FINALLY PASSED
   Ayes: 11 - Avalos, Campos, Chiu, Chu, Cohen, Elsbernd, Farrell, Kim, Mar, Mirkarimi and Wiener

File No. 110901

**I hereby certify that the foregoing Ordinance was FINALLY PASSED on 10/4/2011 by the Board of Supervisors of the City and County of San Francisco.**

_Angela Calvillo_
**Angela Calvillo**
**Clerk of the Board**

_Edwin Lee_                                        10/11/11
**Mayor Edwin Lee**                         **Date Approved**

---



| SAN FRANCISCO SHERIFF'S DEPARTMENT | Date Issued: **06/23/2011** | Policy #: **SFSD 01-15** |
| --- | --- | --- |
| | Last Revised: | |
| | Related Policies: | |
| **POLICY AND PROCEDURE** | Approved By:<br><br>**Michael Hennessey, Sheriff** | |
| Chapter: **01 Administration** | Title: **Carry Concealed Weapon** | |

**POLICY:** California Penal Code (PC) Sections 12050 through 12054 provide that a sheriff of a county may issue a license to carry a pistol, revolver or other firearm capable of being concealed upon a person. PC Section 12051(3) (A) requires the Attorney General to prescribe a statewide standard application form for a Carry Concealed Weapon license. The Sheriff of San Francisco is given statutory authority to issue a license to Carry a Concealed Weapon (CCW) to residents within the City and County of San Francisco.

**PURPOSE:** To establish a written uniform process for the issuance, denial, revocation and appeal of denied concealed weapon licenses.

I. **General:**

A. California Penal Code 12050 establishes four different categories for which the sheriff may issue a license to carry a concealed weapon.

1. *EMPLOYMENT*: These licenses may be issued to applicants who spend a substantial period of time in their principal place of employment or business in the county of issuance. These licenses are only valid in the county of issuance and for any period of time not to exceed ninety days from the date of issuance of the license.

2. *STANDARD*: These licenses may be issued to qualified residents who live within the City and County of San Francisco. Such CCW licenses are valid for a period of time not to exceed one year.

3. *JUDGES/COMMISSIONERS*: These licenses may be issued to California judges, full-time court commissioners and to federal judges and magistrates.

4. *RESERVE PEACE OFFICER/CUSTODIAL OFFICER*: A reserve peace officer / custodial officer must apply for this type of license through the agency which employs him / her.

B. IN ORDER TO APPLY FOR A CCW LICENSE, THE APPLICANT MUST MEET THE FOLLOWING STANDARD REQUIREMENTS:

Concealed Weapon License

1. *APPLICATION*: Complete an application that will include substantial personal information much of which may be subject to public access release under the Public Records Act.

2. *FEES*: Pay all associated application fees. Any fees paid will not be refunded if the application is denied. A list of fees will be provided to the applicant during the application process.

3. *RESIDENCE*: Primary residence must be in the city and county of San Francisco. Applicants are required to submit two "proofs" of residency to establish they live in San Francisco County. These shall be unpaid utility bills which are no more than 30 days old and include the applicant's residence address. Post Office boxes are not residence addresses and will not be accepted as permanent home addresses.

4. *EMPLOYMENT:* For these licenses, a city or county may be considered an applicant's "principal place of employment or business" only if the applicant is physically present in the jurisdiction during a substantial part of his / her working hours for purposes of that employment or business. Any application to renew an employment CCW license may be granted only upon the concurrence of the CCW licensing authority that originally issued the CCW license and the licensing authority of the city, county or city and county in which the licensee resides.

- **The Licensee shall give a copy of the San Francisco CCW license to the CCW licensing authority of the city and county in which he / she resides.**

5. *AGE REQUIREMENT*: Be at least 21 years of age at the time of application. This requirement is fulfilled by providing a California Driver's License or a California Identification card issued by the California Department of Motor Vehicles, or a valid United States Passport.

6. *UNITED STATES CITIZEN*: This requirement is fulfilled by providing a birth certificate, a valid Passport and / or other proof of citizenship.

7. *GOOD CAUSE*: Demonstrate that good cause exists for issuing a concealed weapon license. Good cause shall exist only if there is convincing evidence of a clear and present danger to life, or of great bodily harm to the applicant, his / her spouse, domestic partner or dependent children, which cannot be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed weapon. Applicants applying because of threats or personal protection needs must submit copies of police reports, restraining orders or other documentation substantiating their concerns and efforts they have made to address their concerns.

Concealed Weapon License

8. *WEAPON OWNERSHIP / REGISTRATION*: Provide proof of ownership and registration of any weapon to be licensed for concealment.

9. *CONVICTIONS*: Be free from criminal convictions that would disqualify the applicant from carrying a concealed weapon.

10. *GOOD MORAL CHARACTER*: Be of good moral character. Good moral character is verified by a background check based upon fingerprints and information submitted by the applicant. Personal reference letters, written by friends or acquaintances of the applicant, are requested for this purpose. Letters cannot be accepted if they are written by the applicant, or are form letters. References will be contacted by the Background Investigations Unit personnel so letters must be legibly signed, dated within 30 days of the application, include a daytime phone number and state that the writer is aware the applicant is requesting a permit to carry a concealed weapon. Past and current lawsuits will be reviewed.

11. *ADDITIONAL DOCUMENTS*: Proof of any other valid licenses, permits or certificates as may be required.

12. *PSYCHOLOGICAL*: Undergo a psychological examination administered by an approved San Francisco Sheriff's Department (SFSD) provider. The cost of this examination is at the expense of the applicant, but will not exceed $150.00.

13. *SUITABILITY*: Be free from any psychological conditions that might make the applicant unsuitable for carrying a concealed weapon.

14. *POST FIREARMS SAFETY/TRAINING: Per Penal Code 12050 (E) (i)*, For new licensee applicants, the course of training may be any course acceptable to the SFSD, not exceeding sixteen (16) hours of training and shall include instruction on at least firearm safety and the law regarding the permissible use of a firearm.

15. *RANGE QUALIFICATION*: The applicant must successfully complete an eight (8) hour range qualification class administered by SFSD. Applicants are required to purchase and qualify with only an authorized firearm designated by the SFSD. Applicants are also responsible for providing their own ammunition. All range qualification will occur at a designated location and time determined by the Sheriff or the Sheriff's designee.

16. *LIABILITY INSURANCE*: Provide proof of $1 million of personal liability insurance, holding harmless the city and county of San Francisco and its employees.

## II. Procedures:

A. APPLICATION PROCESS: Applications for CCW are processed in phases. Applicants must successfully complete each phase before proceeding to the next. The

Concealed Weapon License

Background Investigations Unit will notify the applicant if an application is rejected at any time during this process. Applications and applicant information packets may be obtained at the SFSD Background Investigations Unit located at 120-14th Street, SF, CA 94103, during normal business hours.

B. CCW APPLICANTS SHALL BE PROVIDED THE FOLLOWING DOCUMENTS:

    1.  CCW Initial Application Information Sheet;

    2.  California Department of Justice Standard Application;

    3.  Authorized Handgun list;

    4.  range requirements and procedure for CCW Applicants, and

    5.  list of fees

C. THE COMPLETED APPLICATION MUST BE RETURNED TO BACKGROUND INVESTIGATIONS UNIT ALONG WITH THE FOLLOWING:

    1.  a detailed letter of justification stating the reason(s) the applicant feels that good cause exists for a CCW License. Applicants applying because of threats or personal protection needs must submit copies of police reports, restraining orders or other documentation substantiating their concerns;

    2.  letter of support from an employer on company letterhead (if applicable); and

    3.  proof of any other valid licenses, permits or certificates as may be required.

D. APPEALS:

    1.  Applicants who are denied a CCW license will be advised of the reason for the denial. Appeals are forwarded to the Sheriff who will make the final decision.

E. RENEWAL APPLICATIONS: Renewals are granted only as authorized by law and if the conditions supporting the original license still exist and nothing has occurred involving the applicant that would prohibit the renewal of the license. To renew a CCW license the applicant must:

    1.  successfully pass a SFSD eight (8) hour firearm requalification course to be completed at least sixty (60) days prior to expiration of CCW license (applicants are responsible to provide their own ammunition);

    2.  provide an updated justification letter;

    3.  submit an application for renewal; and

    4.  submit renewal application fees.

    5.  The SFSD will not mail reminder letters.

F. CHANGE / AMENDMENT: A change and / or amendment to a CCW license does not extend the original expiration date of the license and the license shall be subject to renewal at the same time as if the license had not been amended.

G. CCW RESTRICTIONS: The CCW license may contain restrictions such as time, place or other specifics limiting the license holder. When carrying a concealed weapon the licensee shall not:

1. use a controlled substance;

2. be impaired by any medication or controlled substance, whether prescribed or not;

3. consume any alcoholic beverages;

4. unjustifiably brandish / display a concealed weapon or any other deadly weapon;

5. impede law enforcement officers in the performance of their duties;

6. be in a place having a primary purpose of dispensing alcoholic beverages for on-site consumption;

7. be in a place where children are in child care / school or any place where students attend school;

8. be on federal grounds, state capitol grounds, school grounds, sporting events or airports;

9. present himself / herself as a peace officer;

10. refuse to show the CCW license or surrender the concealed weapon to any peace officer upon demand;

11. carry a concealed weapon that is not listed on the license; and / or

12. carry a concealed weapon at times or circumstances other than those specified on the license.

H. CAUSE FOR REVOCATION OF CCW LICENSE: The Sheriff has the right to revoke any license issued during the period of the license. Revocations include, but are not limited to any of the following or failure of the licensee to report any of the following:

1. violation of any restrictions;

2. any falsified information on the application;

3. an arrest or criminal conviction (other than traffic citations);

4. any reported involvement in criminal activity;

5. a finding of not guilty for reason of insanity;

6. a commitment to a mental institution (includes holds for seventy-two (72) hour- evaluation);

7. a dishonorable discharge from military service;

8. renunciation of United States citizenship;

9. conduct reflecting negatively on the moral character or the license holder's ability to safely carry a concealed weapon;

Concealed Weapon License

    10.   conditions for issuance have changed or are no longer applicable;

    11.   the loss or theft of the firearm listed on the CCW; and / or

    12.   applicant falls into the prohibited class described in State of California Department of Justice Standard Application for CCW; California Prohibiting Categories for a CCW License; California Prohibiting Misdemeanors, and Federal Prohibiting Categories for Possessing Firearms.

I.   CHANGE OF ADDRESS: A CCW licensee is required to notify the Background Investigations Unit of any change in their primary residence within 10 calendar days and make arrangements to have their file and CCW permit updated. A license may not be revoked solely because the licensee changes his or her primary residence.

    1.   Upon the licensee changing his or her primary residence to another county, the CCW license shall expire ninety (90) days after they have moved. The licensee will need to contact the Sheriff or Chief of Police where the new residence is located to request a CCW license.

    2.   The Background Investigations Unit Commander or his / her designee will notify DOJ of any reported change of residence.

J.   CHANGE OF WEAPONS:

    1.   CCW License authorizes one weapon per license and one license per person. A licensee     may request a change of weapon to their CCW license through the Background Investigations Unit and Range Master by submitting a letter explaining the justification for change. The licensee will provide the units with the new weapon information (i.e. make, model, serial number, and caliber). Once a request is approved the Background Investigations Unit via the Range Master will schedule a firearms range qualification date.

    2.   If a licensee seeks to change a weapon, he / she must shoot and maintain a qualifying score of 80% or better with the new weapon on the SFSD firearms course.

    3.   The licensee will be required to pay the fees charged for CCW firearms qualification at the Background Investigations Unit, including any qualification requirements in order to make changes to the listed weapon on their CCW license.

    4.   When the Background Investigations Unit receives notice of a passing score at the firearms range qualification, an amended CCW license will be issued.

    5.   Licensees will be required to pay the current fees charged for issuance of an amended CCW license.

K.   LOST OR STOLEN FIREARM: In the event a licensee's registered firearm becomes lost or stolen, the licensee shall immediately contact the local law enforcement authority where the loss or theft occurred and file a police report.

    1.  The licensee shall contact the SFSD Background Investigations Unit on the first business day following the discovery of the loss or theft and submit a copy of the police report to a Background Investigator.

**III.  Forms:**

CCW Initial Application Information Sheet

California Department Of Justice Standard Application for License to Carry A Concealed Weapon (CCW)

Range Requirements and Procedure for CCW Applicants

List of Fees

License to Carry Concealed Pistol, Revolver, or Other Firearm within the state of California (DOJ FD 4501) 9932872

**IV.  Reference:**

California Penal Codes 12050, 12050.2, 12051, 12052, 12052.5, 12053 & 12054

California Department Of Justice Standard Application for License to Carry a Concealed Weapon (CCW)

# City and County of San Francisco

## OFFICE OF THE SHERIFF



**Michael Hennessey**
**SHERIFF**

(415) 554-7225

**Applicant's name:**

Subject: Initial Application Worksheet and Notice to Concealed Weapon License Applicants

Below is an explanation of what you can expect during the application process, which may take several months to complete.

**THE APPLICATION (Phase I):** In order for the Sheriff's Department to process your application for a license, please respond to the items below. Upon completion of items 1-4, the documents shall be hand-delivered to the Background Investigation Unit.

1. California Department of Justice *Standard Application for License to Carry a Concealed Weapon*. Read, fill out, and sign sections 1 through 5 only. You must complete sections 6, 7 and 8 in the presence of a Background Investigator.
2. Letter of Justification- You must submit a letter stating the reason(s) good cause exists for issuing a concealed weapon license along with supporting documentation.
3. A letter of support from an employer on company letterhead (if applicable).

The Licensee shall give a copy of the San Francisco CCW license to the CCW licensing authority of the city and county in which he/she resides.

4. Proof of U.S. citizenship.

These items shall be forwarded to the Sheriff for review and approval or denial. If denied, you will receive a letter of notification. If Phase I is approved, the applicant shall advance to Phase II.

NOTE: Much of the information in the application may be subject to public access under the Public Records Act.

**THE PROCESS (Phase II):** Following the approval of the Sheriff, an investigator will contact you to schedule an interview. You must provide proof of the following:

## THE PROCESS (Phase II) continued

- Registration for your firearm and the successful completion of a 24 hours firearms safety course certified by the Commission on Peace Officer Standards and Training (POST
- Proof of residency
- Proof of age requirement
- Personal reference letters to determine good moral character
- Proof of any other valid licenses or permits or certificates as necessary

A background check will be initiated, and you will be fingerprinted and photographed. If Phase II is successful, the applicant shall advance to Phase III. If not successful, the applicant will receive a letter of notification.

## REQUIREMENTS AND FEES (Phase III):

1. A list of fees is attached.
2. A psychological evaluation shall be required; conducted by a licensed psychologist approved by the Sheriff's Department; with a fee of $150.00.
3. You are required to carry and provide proof of a $1 million personal liability insurance policy
4. Pay a range fee and qualify with your weapon at a range facility designated by the Sheriff's Department, supply your own ammunition (no reloads- must use factory ammunition only) and "strong hand" shooting holster (shoulder and cross-draw holsters are not allowed on the range).

All application fees are set by statute, except for firearms training, testing and qualification. These fees will not be refunded in the event an application is denied.

**Final Authorization (Phase IIII):** Finally, all information will be reviewed by the Sheriff for a final decision on your CCW license request.

The San Francisco Sheriff's Department shall give you written notice indicating whether or not your application is approved or denied within 90 days of receipt of the initial application and supporting documentation as outlined in Phase I for a new license or a license renewal, or 30 days after receipt of your criminal background check from the Department of Justice, whichever is later.

If a CCW license is approved, the licensee must carry the DOJ license along with an SFSD CCW Permit Identification Card at all times while carrying the authorized firearm.

Submit to:

**San Francisco Sheriff's Department**
**ATTN: Background Investigations Unit**
**120 14th Street**
**San Francisco, CA 94103**

Sincerely,
MICHAEL HENNESSEY, Sheriff

**Acknowledgement of receipt**

_____
Senior Deputy D. Wilson #1414
Background Investigations

_____
Applicants full name

San Francisco Sheriff's Department
AUTHORIZED HANDGUN LIST
CCW Applicants
June 2011

## Semi-Automatic Pistols

- Beretta
- Glock
- H&K
- Kahr
- ParaOrdnance
- Ruger
- SigArms
- Smith & Weston
- Springfield
- Walther

## Chambered for:

- 9 x 19 or 9mm Parabellum
- 40 S&W
- 45 ACP

## Provided that:

- No single action semi-auto pistols of any kind (i.e. 1911 type)
- No locked-and-cocked carry
- Pistol must have a firing pin safety or block
- Each firearm must be qualified with in order to carry it - no blanket qualifications
- Glock pistols must be fitted with a standard 5 pound connector and a standard 5 pound spring

## Revolvers:

- Colt
- Ruger
- Smith & Wesson

## Chambered for:

- .38 Special

The rangemaster will inspect the firearm and ammunition prior to qualification.

# SAN FRANCISCO SHERIFF'S DEPARTMENT

## Concealed Carry Weapon Course of Fire

| | |
|---|---|
| Course #: | 35-2  - Concealed Carry Weapon |
| Designed For: | Handgun |
| Ammunition / Type: | Duty Type – Factory Brand |
| Number of Shots: | 50 |
| Target Type / Description: | SFPD-07CB |
| Scoring: | Grey area = 2 pts, must be 50% in on edge shoots to count |
| Possible Score: | 50 shots x 2 pts ea. = 100 |

**Course Description**:

The following is a handgun proficiency test designed to show proficiency in **markmanship** and **safe handling** of your handgun. The proficiency test is comprised of a total of 50 rounds fired at a silhouette target (SFPD-07CB) from various distances. The shooter must place 80% (40 out of 50) of the shots in the scoring area of the target in order to qualify. Drawing from a snapped/locked in holster using various times.

Distance:

**3 YDS**    Close Combat, *strong hand only*  /  Draw from the holster and Fire
2 rds in 4 sec / x 3 =   **6 rounds Total** –    **4 seconds**

**5 YDS**    Draw from holster and fire 3 rds – *Strong Hand Only*
3 rds in 5 sec = **3 rounds Total** -    **5 seconds**

**5 YDS**    Draw from holster and fire 3 rds  – *Support Hand Only*
3 rds in 6 sec =    **3 rounds Total** -    **6 seconds**

**5 YDS**    Draw from holster and fire 2 rds  - *Point Shoulder two handed grip*
2 rds in 5 sec / x 3 =   **6 rounds Total** -    **5 seconds**

**7 YDS**    Draw from holster and fire 2 rds  - *Using Sights two handed grip*
2 rds in 6 sec / x 3 =   **6 rounds Total** -    **6 seconds**

**7 YDS**    Draw from holster and fire 2 rds  - *Using Sights two handed grip*
3 rds in 7 sec / x 2 =   **6 rounds Total** -    **7 seconds**

**10 YDS**    Draw from holster and fire 2 rds  - *Using Sights two handed grip*
2 rds in 7 sec / x 4 =   **8 rounds Total** -    **7 seconds**

**15 YDS**    Draw from holster and fire 3 rds  - *Using Sights two handed grip*
2 rds in 10 sec / x 3 = **6 rounds Total**    **10 seconds**



| San Francisco Police Department |
| :---: |
| **San Francisco Police Department**<br>**CCW Licensing Policy** |

Pursuant to Penal Code section 26160, this policy is intended to provide the public with a summary of the criteria that the San Francisco Police Department (SFPD) considers when reviewing applications for a license to carry a concealed weapon (CCW license).

## Introduction

A CCW license authorizes the license holder to carry a pre-approved firearm concealed on their person in some situations outside their home or place of business. California Penal Code section 26155 vests the Chief of the San Francisco Police Department with the authority to approve or deny CCW licenses to applicants who reside within the City and County of San Francisco. A CCW license can be issued for up to two years, or three years if the licensee is a judge, court commissioner or magistrate. The Chief may impose further conditions or restrictions on a license as he or she deems warranted.

In California, the decision to issue a CCW license is discretionary. Penal Code section 26155 provides that the Chief "may" issue, but is not required to issue, a CCW license if certain minimum statutory criteria are satisfied. The Chief's decision to issue a CCW license will depend on the circumstances in each individual case, and there is no guarantee that an applicant will receive a CCW license even if he or she satisfies all of the criteria listed below. If the circumstances warrant, the Chief also has the discretion to waive some of the listed requirements.

## Basic Eligibility Requirements

To be eligible for a CCW license, the applicant must prove that he or she is --

1. A San Francisco resident;

2. A citizen or legal resident of the United States; and

3. At least 21 years of age at the time the application is submitted.

## Good Cause for Issuance

The applicant must establish that there is good cause for the Chief of Police to issue a CCW license. In light of the fact that San Francisco is the second most densely populated urban area in the country, and weighing the defensive benefit of carrying concealed firearms in public against the risk of surprise to law enforcement, the risk of avoidable and dangerous conflict escalation in a public setting, and the risk to general public safety that discharging firearms poses to law enforcement and bystanders alike, the Chief has determined on the basis of experience and judgment that good cause to issue a CCW license to San Francisco residents will generally only exist in conditions of necessity. Accordingly, applicants should be able to supply convincing evidence of the following:

1. There is a reported, documented, presently existing, and significant risk of danger to life or of great bodily injury to the applicant and/or his or her spouse, domestic partner or dependents;

2. The danger of harm is specific to the applicant or his or her immediate family and is not generally shared by other similarly situated members of the public;

3. Existing law enforcement resources cannot adequately address the danger of harm;

4. The danger of harm cannot reasonably be avoided by alternative measures; and

5. Licensing the applicant to carry a concealed weapon is significantly likely to reduce the danger of harm.

While each of the above factors is considered in the decision making process, the Chief makes a good cause determination based on the totality of the circumstances presented in each individual case.

## *Good Moral Character*

Once an eligible applicant makes a preliminary showing of good cause, the SFPD will conduct a background investigation to determine whether the applicant is of good moral character.  To demonstrate good moral character, the applicant must, at a minimum:

1.      Pass a background check performed by the California Department of Justice using the applicant's fingerprints and the information provided on the standard application form.

2.      Be and remain qualified under state and federal law to possess, receive, own, and/or purchase a firearm.

3.      Have no history of citations, arrests, convictions, civil lawsuits, employment discharges, license denials, license revocations or other actions indicating a possible propensity for violence, moral turpitude, drug and/or alcohol abuse, carelessness with weapons and/or dishonesty.

4.      Provide positive personal character references, preferably from members of the community who are not relatives and who are aware that the applicant seeks a license to carry a concealed weapon.

The Chief's moral character determination is discretionary and based on the totality of the circumstances presented in each individual case.

## *Personal Suitability*

The applicant must be free of any physical, psychiatric, and/or psychological conditions that might negatively impact his or her exercise of sound judgment and/or ability to handle a firearm safely.  The SFPD requires applicants to successfully complete a psychological examination.

## *Firearms Training and Range Qualification*

The applicant must establish legal ownership and registration of the weapon he or she seeks to carry concealed and successfully complete a course of firearms training of up to 16 hours, as determined by the SFPD.  In addition, the applicant must demonstrate proficiency and accuracy with the weapon to be licensed at the SFPD shooting range.

## *Application and Licensing Fees*

Application and fingerprinting fees must be paid when the application is submitted.  The cost of psychological testing and firearms training is the applicant's responsibility.  A licensing fee will apply when a license issues. Please consult the current fee schedule.

## *Further Information*

Application forms, detailed application instructions, and a current fee schedule are available from the SFPD Legal Division at 850 Bryant St., Suite 575, San Francisco, CA. 94103.  Applications must be submitted in person.  Questions about the application process and other CCW- related inquiries should be directed to the Officer-in-Charge, SFPD Legal Division, at (415) 553-1511.

20 YDS       Draw from holster and fire 2 rds  - _Using Sights two handed grip_
             3 rds in 15 sec / x 2 = **6 rounds Total**          1**0 seconds**

25 YDS       Draw from holster and fire 2 rds  - _Using Sights two handed grip_
             2 rds in 15 sec =        **2 rounds Total**         15 **seconds**



# SAN FRANCISCO SHERIFF'S DEPARTMENT

## CARRY CONCEALED WEAPON (CCW) FEES

1)  1) State of California Application Fee:     $100.00

     •   To be collected as follows:     $20.00 (at time of initial of filing)
                                                     $80.00 (at time of CCW license)

2)  Live Scan Fee:     $95.00 (at time of fingerprinting)

3)  Psychological Test:     $150.00 (paid to psychologist)

4)  Firearms Training Testing & Qualification:     $1722.00 (at time of scheduling of range qualification)

5)  License Renewal Fee:     $25.00 (at time of renewal)

6)  Firearms Requalification Fee:     $1,054.96 - P.C 12054 (a)
                                                     (at time of scheduling of range requalification)

7)  License Amendment Fee:     $10.00 (if necessary to change listed weapon on CCW)

## Non-Refundable Fees:

Most fees are set by federal statutory rates, except the hourly rate of pay of SFSD/SFPD firearms instructors for testing and qualifications. Fees will not be refunded if the application is denied at any point in the application process.  Fees are subject to change.



| Type | Begin | End | Course or Title | Category | Documentation | Notes | Timespan | Unit | City | Stat | Paygrad | Pertains to | | | | Pertains t... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Job | 15-Sep-2011 | ######## | International Security Specialist | Employer | | Independent Contractor | 4 Months | TAS-Corp | Alexandria | VA | | | | | | |
| Job | 10-Dec-2008 | 5-Sep-2011 | GRS Capo | Employer | | Independent Contractor | | SOC-SMG | | | | | | | | |
| Job Eval | | 6-Jun-2010 | CAPO | | Performance Evaluation | CAPO IC Performance Evaluation | | GRS | Kandahar | Afghanistan | Med, | | | | | |
| Job | 1-Mar-2008 | ######## | WPPS Instructor/Select Instructor | Employer | | Full-time | | Blackwater | | | | | | | | |
| Job | | 9-Dec-2009 | GRS Capo | Employer | | Independent Contractor | | Xe | | Afghanistan | | | | | | |
| Course, Cr | 1-Sep-2009 | 1-Oct-2009 | (TDC) Tactical Development Course (includes driving | Qualification, training | None known | Xe CAPO | 1 Month | GRS | Easton | MD | | | | | | |
| Course, Cr | 12-Sep-2009 | ######## | CQD Protective Operations Specialist Week 2 | Qualification, training | Via email from CQD only | Blackwater CAPO | | GRS | Easton | MD | | | | | | |
| Course, Cr | 31-Aug-2009 | 4-Sep-2009 | CQD Protective Operations Specialist Level 1 | Qualification, training | Via email from CQD only | Blackwater CAPO | | GRS | Easton | MD | | | | | | |
| Job Eval | | ######## | CAPO | | Performance Evaluation | CAPO IC Performance Evaluation | | GRS | He rat | Afghanistan | Med, GIS, | | | | | |
| Course, Cert | | ######## | Select Vetting | Qualification, training | None known | Blackwater CAPO | | GRS | Easton | MD | | | | | | |
| Course, Cert | | 1-May-2008 | CQD Protective Specialist Level 1 | Qualification, training | 14 Apr 2008, BW CQD Training Database | Blackwater CAPO | 5 days | GRS | Moyock | NC | | | PSD | | | |
| Job | | 1-May-2008 | Driving Instructor for Select | Employer | | | | | | | | | | | | |
| Job | 11-Nov-2007 | 1-Mar-2008 | WPPS Instructor | Employer | | Independent Contractor | | Blackwater | | | | | | | | |
| Job | 1-Jan-2006 | ######## | NSA Protective Officer | Employer | | | | MVM | | Iraq | | | | | | |
| Job | 1-Aug-2002 | ######## | Master Craftsman | Self-employed Woodworke | EN from Onay Furniture | | | | Glen Rock | nj | | | | | | |
| Job | 1-Aug-2002 | 1-Mar-2003 | Examkrackers in New Jersey | Instructor, Graphic artist | | | | | Glen Rock | nj | | | | | | |
| Job | 11-Jul-2002 | DUSM | | | SF-50 | Resignation from USMS | | | Sacrament | CA | GS-12, Step 5 | | | | | |
| Course | 12-Jun-2001 | ######## | Advanced U.S. Marshals Deputy Training Program | Qualification, training | Diploma, Adv. Deputy Training Program | Class #105 | 10 Days | FLETC | | | | PSD | | | | |
| Course | | ######## | Defensive/Anti-Terrorist Driving Training | Training | Part of Deputy U.S. Marshal Training | Part of Advanced Deputy Training Program | | FLETC | | | | PSD | | | | |
| Course | 12-May-1997 | ######## | Firearms Instructor School, Stockton | Qualification, training | Diploma, Firearm Instructors School | POST Cert. #2730-21641 week | | Stockton Police De | Stockton | CA | | PSD | | | | |
| Course | | 6-Jul-1996 | DUSM | Qualification, training | Diploma, Basic SWAT Training | | 1 week | U.S. Dept of Just...F | Susanville | CA | | PSD | | | | |
| Course | 2-Jul-1996 | 2-May-1996 | DUSM | Qualification, training | Diploma, Adv. Officer's SWAT Training | Lassen Community | 64 hours | Lassen Community | Susanville | CA | | PSD | | | | |
| Course | | 28-Jul-1995 | DUSM | Qualification, training | Diploma, LEO Spanish Training Program | Intensive Spanish Langu | 2 weeks | FLETC | Artesia | NM | | PSD | | | | |
| Job | | 28-Jul-1995 | USAFR Tech Sergent | Discharge diploma | DD From 256 AF (wallhanger) | | | | | | | | | | | |
| Course | | 7-Jun-1995 | DUSM | Qualification, training | Diploma, IXSN Narcotics Investigation | Western States Informat | 20 hours | | Sacramento | CA | | | | | | |
| Course | | ######## | DUSM | Qualification, training | Diploma, Street Survival '95 WIN Seminar | WIN Seminar | 8 hours | Calibre Press | Sacramento | CA | | | | | | |
| Course | 18-Apr-1995 | ######## | DUSM | Qualification, training | Diploma, Street Survival '95 Tactical Edge | Tactical Edge Seminar | 16 hours | Calibre Press | Sacramento | CA | | | | | | |
| Course | 12-Sep-1994 | ######## | Basic District Threat Coordinator Training | Qualification, training | Diploma, Basic District Threat Coordinator | Training | 1 week | FLETC | Glynco | CA | | PSD | | | | |
| Cert | | ######## | DUSM | Duty Designation | Threat Coordinator | | | E-CA | Sacrament | CA | | PSD | | | | |
| Course | | 29-Jul-1993 | DUSM | Qualification, training | Assistant Threat Analysis Coordinator | | | E-CA | Sacrament | CA | | PSD | | | | |
| Cert | | 29-Jul-1993 | DUSM | Qualification, training | Expandable Baton Training (ASP) | ASP Qualification | | | Sacrament | CA | | PSD | | | | |
| Course | | 29-Jul-1993 | DUSM | Duty Designation | Assistant Training Officer | | | E-CA | Sacrament | CA | | | PSD | | | |
| Award | | ######## | DUSM | Award | Special Act of Service Award | Diploma, Basic IDACS Terminal Operators | | U.S. Marshals Servi | Sacrament | CA | | | PSD | | | |
| Award | | ######## | DUSM | Award | Sustained Superior Performance | | | U.S. Marshals Service | | | | | | | | |
| Course | | 1-Oct-1991 | Defensive/Anti-Terrorist Driving Training | Training | Part of Basic Deputy U.S. Marshal Training | Part of Basic Deputy USMS course/LTP | | Glynco | Indianapolis | IN | | | | | | |
| Award | | ######## | DUSM | Award | Outstanding Graduate of U.S. Marshals | Cutter from the Director | | Glynco | GA | | | PSD | | | | |
| Cert | | ######## | Criminal Investigator Occ. Code 1811 | Certification | U.S. Marshal 1811 Federal criminal investig | Full-time | | FLETC | Glynco | CA | | | | | | |
| Course | 1-Aug-1991 | DUSM | Qualification, training | Basic Deputy Evaluation Form | State Department PSS Certificatio | FLETC | Glynco | CA | | | PSD | | | | | |
| Job | | ######## | ANG Pararescue Technician | DD-214 | Diploma | | 1 Year, 3 | 129 ARRS | Moffett Field | CA | E-6 | PSD | | | | |
| Job Eval | | 3-Mar-1991 | TSGT, Pararescueman | Performance Evaluation | CANG Performance Evaluation | CANG | | 129 ARRS | Moffett Field | ca | | PSD | | | | |
| Award | 19-Nov-1990 | 2-Mar-1991 | Pararescueman | Medal, Air Force Commendation Medal | Outstanding Achievement | Awarded 29 May 1992 for Desert St | 1723 Special Tactics | Squadron | | | | | | | |
| Job | 29-Jul-1989 | 1-Mar-1991 | Pararescueman | Record of Service | Report of Separation and Record of Service | | 1 year, 11 | 129th ARRS | Moffett Field | CA | | PSD | | | | |
| Course | | ######## | Pararescue | Release From SOCCENT | Letter | | Release from Combat Duty in Saudi, | Arabia | | | | | | | | |
| Award | 1-Dec-1990 | 24-Feb-1991 | USAF Pararescueman | Certificate of Achievement | Night Stalkers wallhanger | 160th SOAR during Desert Storm | | 3rd Batt., 160th SO | Kuwait | | | | | | | |
| Award | 10-Dec-1990 | ######## | Pararescueman | Award | Diploma, Desert Survival Familiarization | | 2 days | King Abdulaziz Air E | Saudi Arabia | | | | | | | |
| Award | | 27-Jul-1990 | Pararescue | Award | USMS Cert. of Appreciation for arrest of Ke | Ben Kler arrest | | | | | | | | | | |
| Course | | 18-Jul-1990 | Pararescue | Qualification, training | Letter from Gen. Thrasher re Kler arrest | Ben Kler arrest | | | | | | | | | | |
| Course | | 14-Jul-1990 | Pararescue | Qualification, training | Diploma, Gunsite Expert | Expert, general pistol | 6 days | American Pistol Inst | Paulden | AZ | | PSD | | | | |
| Award | | 29-Jun-1990 | Pararescue | Award | Letter of Appreciation | SOG operation in Denny | 13 days | US Marshals SOG | Denny | CA | | | | | | |
| Job Eval | | 1-Apr-1990 | SSGT, Pararescueman | Performance Evaluation | CANG Performance Evaluation | | | CANG | | | 129 ARRS | | Moffett Field | CA | | |
| Course | | ######## | PADI Rescue Diver | Qualification, training | PADI Validation card and training summary | Student #9002282886 R | 3 days | | | | | | | | | |
| Course | | ######## | Pararescue | Qualification, training | Diploma, Advanced Casualty Care | | 2 weeks | | Kirtland AFB | NM | | | | | | |
| Job | | 29-Jul-1989 | AGR Pararescue Technician | Special Pay | Special Order M-002 | authorization to receive HALD pay | 129 ARRS | Moffett Field | CA | E-5 | | PSD | | | | |
| Job | | 29-Jul-1989 | AGR Pararescue Technician | Special Pay | Special Order M-001 | authorization to receive dive pay | 129 ARRS | Moffett Field | CA | E-5 | | PSD | | | | |
| Job | | 8-Jul-1988 | U.S. Army National Guard | Discharge diploma | NGB form 55a | honorable dis Comp. C, 1st Batt. 1 | Wheaton | IL | | | | | | | | |
| Job | 25-Mar-1988 | 8-Jul-1988 | AFR | Reassignment | Report of Separation and Record of Service | | 3 months, | 305 ARRS | Selfridge | MI | | PSD | | | | |
| Job | | 6-Dec-1987 | USA Special Forces | Certificate of Achievement | Completion of the Selection | | | JFKSWC | Ft. Bragg | NC | | PSD | | | | |
| Job | 1-Jul-1987 | ######## | Pararescue Technician | DD-214 | DD-214 | "Completion of period of x4 months, 21 days | 75 ARS | Selfridge | MI | E-5 | | | | | | |
| Course | 1-Jul-1987 | ######## | USA JFKSWC Special Forces Qualification Course | Qualification, training | Diploma, SO Eng. Sgts. Course | Course #011-18C30 | 2 Months | JFKSWC | Ft. Bragg | NC | E-5 | PSD | | | | |
| Course | | ######## | SSgt, U.S. army, P18C20W9 | Qualification, training | Order 219-150 | SF MOS P18C20W9 | Co. A, 1st SFHAR | Ft. Bragg | NC | E-5 | | PSD | | | | |
| Award | | ######## | USA Special Forces | Award | Perm. Order 149-20, Special Forces Tab | Special Forces Tab | | JFKSWC | Ft. Bragg | NC | | PSD | | | | |
| Job | | 8-Aug-1986 | 7-Aug-1987 | ANG Pararescue Technician | Extension | | ADR extension | | 129 ARRS | | | | TSgt | | | |
| Job | 6-Apr-1985 | ######## | Pararescue | Diploma, Discharge | DD-214 (Very poor copy) | "Termination of AGR Mili 1 Year, 4 | 129 ARRS | Moffett Field | CA | | | | | | | |
| Course | | ######## | ANG Pararescue Technician | Qualification, training | AF Form 973 | Resignation from ANG | | | | | | PSD | | | | |
| Course | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Qualification, training | Diploma, HALO | MFF Course Max #11000-003 | | JFKSWC | Ft. Bragg | NC | | PSD | | | | |
| Course | | ######## | Pararescue | Qualification, training | Diploma, Terrorism in Low Intensity Conflict | 3A-F390H1-F20 | 6 days | JFKSWC | Ft. Bragg | NC | | PSD | | | | |
| Course | | ######## | Pararescue | Qualification, training | State of California Medical Certification | | | | | | | | | | | |
| Course | | ######## | Pararescue | Qualification, training | Diploma, Adv. Casualty Care | adv. Emergency Medical | 2 weeks | Kirtland AFB NM | | | | | | | | |
| Course | 8-Aug-1985 | ######## | Pararescue | Qualification, training | Diploma, Equipment Management, Block III | | | | | | | | | | | |
| Orders | | 23-Sep-1985 | Pararescue Technician | Discharge orders | NGB Form 133 | Full Time Training (ANG | | 129 ARRS | Moffett Field | CA | | | | | | |
| Orders | | 21-Aug-1985 | Reserve Paracuman | | Reserve Order CA-034608 | Honorable discharge from AFRES | | | | | | | | | | |
| Orders | | 12-Jul-1985 | Pararescue | | Reassignment orders | Transer from USAFR to ANGUS | | | | | | | | | | |
| Job | | 29-Jul-1985 | Reserve Pararescueman | | Reserve orders | | | 305 ARRS | Selfridge AF MI | | | | | | | |
| Job | 1-Jul-1985 | ######## | Pararescue Technician | DD-214 | DD-214 | "Completed extended enl 4 Years, 9 | 66 ARRS | Plattsburgh NY | E-4 | | | PSD | | | | |
| Award | 7-Dec-1984 | Pararescue | Medal, Combat Readiness | Combat Readiness Medal | | | | | | | | | | | | |
| Job Eval | | ######## | Pararescue | Performance Evaluation | Rescue of Col. Andie Smith on 24 Oct, 84 | Active Duty | Det 18 | Plattsburgh NY | | | Med, Instr, Leader, | | | | | |
| Award | | ######## | SSGT. Pararescueman | Letter of Appreciation | USAF Performance Report | | | Det 18 | Plattsburgh NY | | | PSD | | | | |
| Award | | 6-Sep-1984 | Pararescue | Letter of Appreciation | Air show | | | | Plattsburgh NY | | | PSD | | | | |
| Award | 29-Jan-1984 | ######## | JFKSWC SERE Instructor Qualification Course | Qualification, training | Diploma, SERE Instructor Qual Course | | 28 days | JFKSWC | Plattsburgh NY | | | PSD | | | | |
| Course | | ######## | SO-5 Underwater Egress Training | Qualification, training | NATOPS Flight Personnel Training | SO-5 Underwater Egress | 1 Days | Det 18, 40 ARS | Plattsburgh NY | | | | | | | |
| Course | | ######## | Pararescue | Letter of Recognition | U.S. Senator thanks or mission | | | | | | | | | | | |
| Course | 3-Feb-1984 | Pararescue | Qualification, training | Diploma, Supervisor's Course (PME II) | Supervisor's Course (PME II) | | | Plattsburgh NY | | | | | | | | |
| Job Eval | | ######## | Sgt. Pararescueman | Performance Evaluation | USAF Performance Report | Active Duty | | 71st Ars | Plattsburgh NY | | | Med, | | | | |
| Promotion | | 1-Jul-1983 | Pararescue | Promotion | Special Order PB 325 | Promotion to SSgt. | | | Ellendorf f AK | | | | | | | |
| Promotion | | 1-Apr-1983 | Pararescue | Promotion | Promotion to Sergeant | | | | Elmendorf f AK | | | | | | | |
| Job Eval | | ######## | SrA Pararescueman | Performance Evaluation | USAF Performance Report | Active Duty | | 71st Ars | Anchorage Ak | | | Med, | | | | |
| Award | 7-Jan-1983 | Pararescue | Award | Permanent Order 149-20, Senior Parachutist | Senior Parachutist Rating | | | Anchorage Ak | Elmendorf f AK | | | | | | | |
| Job Eval | | ######## | A1C Pararescueman | Performance Evaluation | USAF Performance Report | Active Duty | | | Leadership and May Elmendorf f AK | | | | | | | |
| Course | | ######## | Pararescue | Qualification, training | Diploma, Avalanche Hazard Evaluation | | 25 hours | Alaska Avalanche Warning Cent er | | | | | | | | |
| Course | | ######## | Pararescue | Qualification, training | Diploma, Arctic Survival Training | S-V87-A | 5 days | 3687, 3636°C Eiel | Eilelson AFB AK | | | | | | | |
| Course | | 4-Sep-1981 | EMT I Certification | Qualification, training | State of New Mexico Medical Certification | | | | | | | | | | | |
| Course | 4-Sep-1981 | USAF | Qualification, training | Diploma, Paramescue Recovery Specialist | | 18 weeks | Kirtland AFB NM | | | | PSD | | | | | |
| Course | | ######## | USAF | Qualification, training | Diploma, Basic Survival Training | Total field 47 hours | 3612th Combat Tra | Fairchild AF WA | | | | | | | |
| Course | | ######## | USAF | Qualification, training | Diploma, Airborne Course | Jump School | | | Ft. Benning GA | | | | | | | |
| Course | | 6-Mar-1981 | SF Underwater Ops | Qualification, training | Diploma, SF Underwater Ops | Combat Dive Qual | | JFKSWC | Key West FL | | | | | | | |
| Course | | 6-Nov-1980 | USAF Pararescue Trainee | Qualification, training | Diploma YMCA Advanced Scuba Diver | Civilian diploma from SCUBA school | | | Key West FL | | | | | | | |
| Course | | ######## | USAF Pararescue Trainee | Qualification, training | Diploma, PJ Indoctrination Course | | 157 days | | Lackland AFB TX | | | | | | | |
| Course | | ######## | USAF | Qualification, training | Diploma, Physiological Training | High altitude training | 1 week | | Brooks AFB | | | | | | | |
| Course | 1-Jul-1980 | ######## | USAF | Qualification, training | Diploma, Basic Military Training | | | | Lackland AFTX | | | | | | | |
| Course | | | Pararescue | | PADI Rescue Diver | | | | | | | PSD | | | | |
| Award | | | | | CA law enforcement award for risking life? | | | | | | | | | | | |
| Course | | | | | Select Deployments | | | | | | | | | | | |
| Course | | | | | Instructor Pararescueman | | | | | | | Med, | | | | |
| Job | | | | | Kabul Training and Operations | | | | | | | | | | | |
| Job | | | | | GIS | | | | | | | | | | | |
| Job | | | | | Onay Furniture | | | | | | | | | | | |
| Job | | | When was it published? | | Job description for Examkrackers? | | | Examkrackers | | | | | | | | |
| Job | | | | | "101 Passages" | | | Examkrackers | | | | | | | | |
| Job | | | | | Land and Ranch Real Estate | | | | | | | | | | | |
| Job | | | | | WPPS instructor (include subcategories) | | | | | | | PSD, Med, Navigation, Weapons | | | | |
| Job | | | | | Select Instructor | | | | | | | | | | | |
| Job | | | | | Select Program Manager | | | | | | | | | | | |
| Job | | | | | PSD, SVAs, Training officer | | Independent Contractor | 2 Months | TAS-Corp (Apache | Cairo | | | | | | | |
| Job | 16-Apr-2012 | | XPG Consultant (IC) | | | | | | | Egypt | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 9805 | Sub-qual/training | Prepare and conduct performance oriented training | | 12 Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 9845 | Sub-qual/training | Cross Cultural Communications | | 3 Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 00 | Sub-qual/training | Lab. Resistance to Interrogation and Indoctrination | | 100+ Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 00 | Sub-qual/training | Nine Steps for Survival in Captivity | | 2 Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 9846 | Sub-qual/training | Clandestine Communications | | 4 Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 3836 | Sub-qual/training | Hand-to-hand combat | | 29.5 Hrs | JFKSWC | | | | | | | | |
| | 29-Jul-1984 | ######## | JFKSWC Sere Instructor Block 00 | Sub-qual/training | Resistance to Indoctrination | | 4 Hrs | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Intro to Terrorism | 3A-F39/011-F20 | 2 Hrs. | JFKSWC | NC | | | PSD | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Terrorist Operations | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Terrorism and the Law | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Terrorism: Individual Protective Measures | | 3 Hrs | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Hostage Survival | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Resistance to Interrogation | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Clandestine Communications Techniques | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Terrorism in Low, Medium, and High Intensity Conflict | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Intelligence for Terrorism Countermeasures | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Terrorism Counteraction Planning | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Introduction to IDAD (Internal Defense and Development) | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Psychological Operations against Terrorism | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Populace and Resources Control | | Unk | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Dept. of State Regional Security Program | | 1 Hr | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | U.S. Country Team | | 2 Hrs | JFKSWC | | | | | | | | |
| | 3-Aug-1986 | 8-Aug-1986 | JFKSWC Terrorism in Low Intensity Conflict | Sub-qual/training | Overview of SOF | | Unk | JFKSWC | | | | | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Reconnaissance | Course #011-18C30 | 15 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Demolition Safety | Course #011-18C30 | 2 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Demolition Manual | Course #011-18C30 | 5 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Explosive firing systems | Course #011-18C30 | 14 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Calculation and Placement of Charges | Course #011-18C30 | 38 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Expedient charges | Course #011-18C30 | 9 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Demolition projects | Course #011-18C30 | 8 Hrs | JFKSWC | NC | | | PSD | | | | |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Phase I Land Navigation | Course #011-18C30 | 80 Hrs | JFKSWC | NC | | | PSD | | | | |

| Type | Begin | End | Course or Title | Category | Documentation | Notes | Timespa | Unit | City | Sta | Paygrade | Pertains to | | | | | Pertains t |
|------|-------|-----|-----------------|----------|---------------|-------|---------|------|------|-----|----------|-------------|--|--|--|--|------------|
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Phase II: Small Unit Tactics and SERE | Course #011-18C30 | 13 Wks | JFKSWC | Ft. Bragg | NC | | PSD | | | | | **PSD** |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Phase I: Cross Cultural Communication | Course #011-18C30 | 1 Wk | JFKSWC | Ft. Bragg | NC | | PSD | | | | | **PSD** |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | Phase I:  Methods of Instruction | Course #011-18C30 | 1.5 Wks | JFKSWC | Ft. Bragg | NC | | PSD | | | | | **PSD** |
| | 1-Jul-1987 | ######## | JFKSWC Special Forces Qualification Course Block | Sub-qual/training | | Course #011-18C30 | | JFKSWC | Ft. Bragg | NC | | PSD | | | | | **PSD** |
| Volunteer | 1-May-2005 | ######## | Instructor/Counselor at Youth Services International | | Don't know | | 2 Wks | | | | | | | | | | |