DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE SNODGRASS, State Bar #148137
CHRISTINE VAN AKEN, State Bar #241755
Deputy City Attorneys
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:     (415) 554-4633
Facsimile:      (415) 554-4699
E-Mail:          christine.van.aken@sfgov.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
and ITS OFFICIALS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESE MARIE PIZZO,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO MAYOR EDWIN LEE, in his official capacity; SAN FRANCISCO POLICE DEPARTMENT CHIEF OF POLICE GREG SUHR, in his official capacity; SAN FRANCISCO SHERIFF VICKI HENNESSEY, in her official capacity; CITY AND COUNTY OF SAN FRANCISCO; and STATE OF CALIFORNIA ATTORNEY GENERAL KAMALA D. HARRIS, in her official capacity,<br><br>Defendants. | Case No. C09-4493 CW<br><br>**MUNICIPAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:      July 26, 2012<br>Time:                    2:00 p.m.<br>Place:                   Courtroom 2, 4th Fl.<br>                            Oakland Courthouse |
| NATIONAL RIFLE ASSOCIATION, INC.,<br><br>Amicus Curiae. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION ............................................................................. 1

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 1

 I.  SAN FRANCISCO'S FIREARMS AND AMMUNITION LEGISLATION .......... 1

   A.  Storage Ordinance ................................................................................. 2

   B.  Ammunition Ordinance ......................................................................... 3

   C.  Discharge Ordinance ............................................................................. 4

 II.  SAN FRANCISCO'S ADMINISTRATION OF CONCEALED WEAPONS
    LICENSES ................................................................................................. 4

 III.  PLAINTIFF'S CCW LICENSE APPLICATION ................................................ 6

ARGUMENT ....................................................................................................................... 7

 I.  THE COURT SHOULD GRANT JUDGMENT TO SAN FRANCISCO ON
    PLAINTIFF'S STORAGE ORDINANCE CLAIMS. ........................................ 7

   A.  Plaintiff Lacks Standing To Challenge The Storage Ordinance. ............... 7

   B.  Alternatively, The Storage Ordinance Is Constitutional. ......................... 8

     1.  Standard Of Review For Second Amendment Claims. ................. 8

     2.  *Heller* Categorically Excludes Storage Measures From Second
       Amendment Scrutiny. ................................................................. 10

     3.  Alternatively, The Storage Ordinance Reasonably Advances San
       Francisco's Compelling Interest In Public Safety. ...................... 12

 II.  THE COURT SHOULD GRANT JUDGMENT TO SAN FRANCISCO ON
    PLAINTIFF'S AMMUNITION ORDINANCE CLAIMS. ................................ 13

   A.  Plaintiffs Lacks Standing To Challenge The Ammunition Ordinance. ..... 13

   B.  Plaintiff's Second Amendment Challenge To The Ammunition
     Ordinance Fails. .................................................................................... 14

     1.  The Ammunition Ordinance Does Not Burden Plaintiff's Second
       Amendment Rights. .................................................................... 14

     2.  Alternatively, The Ammunition Ordinance Reasonably Advances
       San Francisco's Legitimate Interest In Saving Lives By
       Mitigating Firearm Injuries. ....................................................... 16

   C.  The Ammunition Ordinance Is Not Unconstitutionally Vague. ............... 18

 III.  THE DISCHARGE ORDINANCE IS CONSTITUTIONAL. ............................ 19

 IV.  SAN FRANCISCO'S ORDINANCES DO NOT CONFLICT WITH THE
    CALIFORNIA CONSTITUTION OR CALIFORNIA STATUTES. .................. 20

V.     SAN FRANCISCO'S ADMINISTRATION OF CONCEALED WEAPONS
       LICENSES DID NOT AND DOES NOT VIOLATE PLAINTIFF'S RIGHTS. ..20

       A.     Plaintiff Lacks Standing To Challenge The Concealed Weapons Statutes
              Or San Francisco's Administration Of Concealed Weapons Licenses
              Because She Was Never Denied A CCW License. ...................................20

       B.     Plaintiff's CCW-Related Claims Fail On The Merits. ..............................21

              1.     Plaintiff Cannot Show That The City Denied Her Federal Rights
                     Pursuant To A Custom Or Policy. ..................................................21

              2.     Plaintiff Has No Second Amendment Right To A CCW License. 22

              3.     Plaintiff's Fourteenth Amendment Rights Were Not Violated. .....24

VI.    THE COURT SHOULD DISREGARD THE DECLARATION OF DAVID
       ORSAY. .........................................................................................................24

CONCLUSION...............................................................................................................25

1

## TABLE OF AUTHORITIES

**Federal Cases**

*Bateman v. Perdue*
   No. 10-CV-265-H (E.D.N.C.)............................................................23

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*
   492 U.S. 469 (1989)......................................................................13

*Bennett v. Yoshina*
   259 F.3d 1097 (9th Cir. 2001) ......................................................20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*
   473 U.S. 432 (1985)......................................................................24

*District of Columbia v. Heller*
   554 U.S. 570 (2008) .............................................................. *passim*

*Erdelyi v. O'Brien*
   680 F.2d 61 (9th Cir.1982) ...........................................................24

*Fla. Bar v. Went For It, Inc.*
   515 U.S. 618 (1995)......................................................................13

*Gun S., Inc. v. Brady*
   877 F.2d 858 (11th Cir. 1989) ......................................................19

*Hall v. Garcia*
   No. C 10-03799 RS, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011)............................9

*Heller v. v. Dist. of Columbia*
   670 F.3d 1244, 1252-53 (D.C. Cir. 2011)...............................9, 10, 24

*Kachalsky v. Cacace*
   817 F.Supp.2d 235 (S.D.N.Y. 2011) ..............................22, 23, 24

*Kowalski v. Tesmer*
   543 U.S. 125 (2004)......................................................................14

*Los Angeles County, Cal. v. Humphries*
   131 S.Ct. 447 (2010)....................................................................21

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992)..................................................................8, 20

*Madsen v. Women's Health Ctr., Inc.*
   512 U.S. 753 (1994)......................................................................13

*Monell v. Dept. of Social Servs. of N.Y.*
   438 U.S. 658 (1978)......................................................................21

*Moore v. Madigan*
    11-CV-03134, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012) ...........................23, 24

*Nordyke v. King*
    644 F.3d 776 (9th Cir. 2011) .......................................................................10

*Nordyke v. King*
    No. 07-15763, 2012 WL 1959239 (9th Cir. June 1, 2012)....................9, 10

*Parker v. Dist. of Columbia*
    478 F.3d 370 (D.C. Cir. 2007)......................................................................8

*Pembaur v. City of Cincinnati*
    475 U.S. 469 (1986)......................................................................................21

*Peruta v. County of San Diego*
    758 F.Supp.2d 1106 (S.D. Cal. 2010)....................................................23, 24

*Piszczatoski v. Filko*
    No. 10-6110, 2012 WL 104917 (D.N.J. Jan. 12, 2012)......................22, 23, 24

*San Diego Gun Rights Comm. v. Reno*
    98 F.3d 1121 (9th Cir. 1996) .........................................................................8

*Turf Ctr., Inc. v. United States*
    325 F.2d 793 (9th Cir. 1963) ........................................................................19

*United States v. Booker*
    644 F.3d 12 (1st Cir. 2011)
    *cert. denied*, 132 S. Ct. 1538 (U.S. 2012) ...............................................10

*United States v. Carter*
    669 F.3d 411 (4th Cir. 2012) .......................................................................13

*United States v. Chester*
    628 F.3d 673 (4th Cir. 2010) ..................................................................10, 13

*United States v. Decastro*
    10-3773, 2012 WL 1959072 (2d Cir. June 1, 2012)........................10, 12, 20

*United States v. Freeman*, 498 F.3d 893 (9th Cir. 2007)....................................25

*United States v. Greeno*
    No. 10-6279, 2012 WL 1813672 (6th Cir. May 21, 2012).............................9

*United States v. Hermanek*
    289 F.3d 1076 (9th Cir. 2002) .....................................................................25

*United States v. Marzzarella*
    614 F.3d 85 (3d Cir. 2010)
    *cert. denied*, 131 S. Ct. 958 (U.S. 2011)..............................................10, 12

*United States v. Masciandaro*
   638 F.3d 458 (4th Cir. 2011)
   *cert. denied*, 132 S. Ct. 756 (2011) ....................................................10, 13

*United States v. McDuffie*
   CR-08-0102-RHW, 2012 WL 1205785 (E.D. Wash. Apr. 11, 2012) ....................................25

*United States v. Petrillo*
   332 U.S. 1 (1947) ....................................................19

*United States v. Williams*
   553 U.S. 285 (2008) ....................................................19

*Williams v. State*
   417 Md. 479 (2011)
   *cert. denied*, 132 S. Ct. 93 (U.S. 2011) ....................................................21

*Woollard v. Sheridan*
   CIV. L-10-2068, 2012 WL 695674 (D. Md. Mar. 2, 2012) ....................................................23

**State Cases**
*In re Rameriz*
   226 P. 914 (Cal. 1924) ....................................................20

*Kasler v. Lockyer*
   23 Cal.4th 472 (2000) ....................................................20

*People v. Mimes*
   953 N.E.2d 55, 76 (Ill. App. Ct. 2011) ....................................................23

**Federal Rules, Statutes & Regulations**
18 U.S.C. § 921(4)(B) ....................................................19

18 U.S.C. § 921(a)(17)(B) ....................................................15

18 U.S.C. § 922(a)(8) ....................................................15, 16

18 U.S.C. § 922(l) ....................................................19

42 U.S.C. § 1983 ....................................................21

Fed. R. Civ. P. 26(c)(2) ....................................................25

Fed. R. Civ. P. 26(c)(4) ....................................................25

Fed. R. Civ. P. 56(a). ....................................................1

**State Constitution, Statutes & Codes**
Cal. Penal Code § 12026(b) ....................................................20

Cal. Penal Code § 25400 ....................................................4

Cal. Penal Code § 25450 ...................................................................................4

Cal. Penal Code § 25600 ...................................................................................4

Cal. Penal Code § 25655 ...................................................................................4

Cal. Penal Code § 25850 ...................................................................................5

Cal. Penal Code § 25900 ...................................................................................5

Cal. Penal Code § 25920 ...................................................................................5

Cal. Penal Code § 26010 ...................................................................................5

Cal. Penal Code § 26045 ...................................................................................5

Cal. Penal Code § 26150 ................................................................................4, 5

Cal. Penal Code § 26155 ...................................................................................5

Cal. Penal Code § 26175 ...................................................................................6

Cal. Penal Code § 26350(a) ...............................................................................5

Cal. Penal Code § 26362 ...................................................................................5

Cal. Penal Code § 30320 .................................................................................15

Cal. Penal Code § 32310 .................................................................................15

**State Statutes**
720 Ill. Comp. Stat. Ann. § 5/24-1(a)(11) .......................................................15

Act of April 13, 1782, ch. DCCCCLVIII, sec. XLII, Pennsylvania Statute.................11

Act of April 13, 1784, ch. 28, New York Statute .............................................11

Act of December 25, 1837, Georgia Statute .....................................................15

Act of February 20, 1901, South Carolina Statute ...........................................15

Act of March 1, 1783, ch. 24, Massachusetts Statute .......................................11

Act of March 14, 1879, ch. XCVI, § 1, Tennesee Statute ................................15

Ala. Code § 13A-11-60.....................................................................................15

An Act to Amend Chapter 44 (Relating to Firearms) of Title 18 etc.,
      Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986)........................................15

Fla. Stat. Ann. § 790.31 ...................................................................................15

Haw. Rev. Stat. § 134-8(a)....................................................................................15

Ind. Code Ann. § 35-47-5-11(d).............................................................................16

Iowa Code Ann. § 724.1(7)....................................................................................16

Iowa Code Ann. § 724.2(1)....................................................................................16

Iowa Code Ann. § 724.3........................................................................................16

La. Rev. Stat. Ann § 40:1812(1)...........................................................................16

N.C. Gen. Stat. Ann. § 14-34.3..............................................................................16

N.H. Rev. Stat. Ann. § 159:18...............................................................................16

N.J. Stat. Ann. § 2C:39-3(f)(1), (g)(2)...................................................................16

N.Y. Penal Law § 265.01(7)...................................................................................16

Statute of Northampton, 1328................................................................................22

Tenn. Code Ann. § 39-17-1304(b).........................................................................16

Utah Code Ann. § 65A-3-2(1)(d)...........................................................................16

**San Francisco Ordinances & Codes**

S.F. Police Code § 613...........................................................................................3

S.F. Police Code § 613.2........................................................................................3

S.F. Police Code § 613.9......................................................................................3, 4

S.F. Police Code § 613.10.......................................................................3, 13, 18, 19

S.F. Police Code § 613.14.......................................................................................3

S.F. Police Code § 613.13.......................................................................................3

S.F. Police Code § 4502..........................................................................................4

S.F. Police Code § 4506..........................................................................................4

S.F. Police Code § 4511..........................................................................................3

S.F. Police Code § 4512.......................................................................................3, 11

**Other References**

EpiCenter, California Injury Data Online, *Firearm Ownership & Storage* (2004),
    http://www.apps.cdph.ca.gov/epicdata/firearms/gunownstore.htm ............................................2

Lawrence Rosenthal & Joyce Lee Malcolm, *Mcdonald v. Chicago:*
    *Which Standard of Scrutiny Should Apply to Gun Control Laws?*,
    105 Nw. U. L. Rev. 437, 441 (2011) ...........................................................................23

Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and*
    *Historical Guideposts: A Short Reply to Lawrence Rosenthal*
    *and Joyce Lee Malcolm*, 105 Nw. U.L. Rev. Colloquy 227, 237 (2011) ..................................22

U.S. Dep't of Hlth. & Human Servs., Centers for Disease Control & Prevention,
    Nat'l Ctr. for Injury Prevention & Control, Web-Based Injury
    Statistics Query & Reporting System ("WISQARS"),
    *WISQARS Injury Mortality Reports 1999-2007* ........................................................2

*WISQARS Nonfatal Injury Reports 1999-2007*, at
    http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html ...........................................2

*WISQARS Unintentional Firearm Deaths & Rates Per 100,000*, at
    http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html .........................................2

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD: Defendants City and County of San Francisco and its Mayor, Chief of Police, and Sheriff, who are sued in their official capacities ("City" or "San Francisco"), hereby move this Court for an order granting summary judgment to the City and its officials pursuant to Federal Rule of Civil Procedure 56 on all claims brought by Plaintiff Therese Pizzo ("Plaintiff") against them.  The hearing on the motion will take place at 2:00 p.m. on Thursday, July 26, 2012, or as soon thereafter as may be heard, before the Honorable Claudia Wilken in Courtroom 2 on the 4th Floor of the United States District Court, Oakland Division, 1301 Clay Street, Oakland, California, 94612.  The City seeks an order granting judgment in favor of the City and its officials on all of Plaintiff's claims against them on the grounds that there is no genuine dispute as to any material fact and the City is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

**INTRODUCTION**

In response to the nation's epidemic of gun violence and accidents, San Francisco has taken modest and reasonable steps to promote gun safety, by requiring handgun owners to lock their handguns when they are not carrying their handguns; by prohibiting the sale of certain exceptionally lethal kinds of ammunition within the City; and by restricting issuance of licenses to carry loaded handguns in public to those who can show a specific need to carry their weapons in public for self-defense.  Plaintiff's claims arise from her view that her Second Amendment rights brook virtually no limits.  But because the Second Amendment right is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and because San Francisco's ordinances and conduct pass whatever standard of review this Court could plausibly apply to them, this Court should enter judgment in San Francisco's favor on all of Plaintiff's claims.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**I.    SAN FRANCISCO'S FIREARMS AND AMMUNITION LEGISLATION**

Firearm injuries have an enormous national and local public health impact.  S.F. Police Code § 4511(1) (Appendix ["App."] A-16).  From 2000 through 2007, there were an average of 30,000 firearms deaths every year.  *Id.* § 4511(1)(a); U.S. Dep't of Hlth. & Human Servs., Centers for Disease

Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, Web-Based Injury Statistics Query & Reporting System ("WISQARS"), *WISQARS Injury Mortality Reports 1999-2007*, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.  In 2007, there were the equivalent of 85 firearm-related deaths (whether suicides, homicides, or accidents) every day.  S.F. Police Code § 4511(1)(a); Van Aken Decl. Exh. A at CCSF002610.  More than two-thirds of all homicides and half of all suicides are committed with guns.  S.F. Police Code § 4511(1)(b); Van Aken Decl. Exh. A at CCSF002798.  Unintentional shootings are also significant:  There were 18,000 people treated for unintentional gun injuries in 2009, and 5700 people were killed in unintentional shootings in this country between 2005 and 2007.  S.F. Police Code § 4511(1)(c); *WISQARS Nonfatal Injury Reports 1999-2007*, at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html; *WISQARS Unintentional Firearm Deaths & Rates Per 100,000*, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.  Public health literature has consistently identified an association between accidental shootings and suicides and storing an unlocked firearm in the home.  S.F. Police Code § 4511(2) ; Van Aken Decl. Exh. A at CCSF002837, CCSF002542, CCSF002631.  And even where shootings in the home are intentional, they are rarely justified shootings where an assailant or intruder is the victim.  Instead, 90% of victims shot in the home are family members, friends, or acquaintances.  S.F. Police Code § 4511(2); Van Aken Decl. Exh. A at CCSF002614; EpiCenter, California Injury Data Online, *Firearm Ownership & Storage* (2004), http://www.apps.cdph.ca.gov/epicdata/firearms/gunownstore.htm. One tragic example is the experience of Griffin Dix, an East Bay parent whose 15-year-old son was killed in an accidental shooting at the home of a friend whose father kept a loaded gun unlocked in his bedroom.  The friend was showing off the gun and believed that he had unloaded the gun by removing the ammunition clip, not knowing that there was still a bullet in the chamber.  The friend pulled the trigger and fired the bullet, killing Kenzo Dix.  Dix Decl. ¶ 3.

### A.    Storage Ordinance

Public health research has found that laws promoting the locked storage of guns have been shown to protect children and teenagers from gun injuries.  S.F. Police Code § 4511(5)(b); Van Aken Decl. Exh. A at CCSF002534.  There is a wide consensus that using trigger locks or lockboxes to store

1    guns promotes safety:  The International Association of Chiefs of Police, the American Academy of

2    Pediatrics, and the National Rifle Association have all stated that locked storage can prevent

3    unauthorized access to guns.  S.F. Police Code § 4511(6); Van Aken Decl. Exh. A at CCSF002555,

4    CCSF002691.  Locking guns can also prevent gun thefts, which is a major source of guns used in

5    crime.  S.F. Police Code § 4511(2)(d); *see also* Chinn Decl. ¶ 15.  But locking a handgun when it is

6    not actively in use does not impair a gun owner's ability to use his or her weapon in an self-defense

7    emergency: modern gun lockboxes can be opened either immediately (if they are biometric) or in just

8    seconds by pressing buttons on a keypad, S.F. Police Code § 4511(7) ; Chinn Decl. ¶ 14.  Indeed,

9    portable lockboxes can store loaded weapons within easier reach than unlocked guns that are stored in

10   out of the way places.  S.F. Police Code § 4511(7)(c).

11        To prevent gun injuries, San Francisco enacted Police Code 4512 in 2007, requiring that any

12   handgun kept in a residence must be carried on the person of an adult or stored either in a locked

13   container or disabled with a trigger lock.  S.F. Police Code § 4512 (App. A-20) ("Storage Ordinance").

14   The Storage Ordinance does not require handguns to be carried or stored unloaded.  *Id.* § 4511(7)(a).

15   San Francisco adopted legislative findings in support of its Storage Ordinance in 2011, and these

16   findings are set out in Police Code § 4511.

17        **B.    Ammunition Ordinance**

18        San Francisco also comprehensively regulates the sale of firearms and ammunition by, among

19   other things, requiring dealers to be licensed, to undergo background checks, to store firearms under

20   lock and key, to submit to police inspections, and to carry liability insurance.  S.F. Police Code

21   §§ 613, 613.2, 613.9, 613.13, 613.14 (App. A-7 to A-13).  Dealers are also prohibited from selling

22   enhanced-lethality ammunition, which San Francisco defines as ammunition that

23        "(1) Serves no sporting purpose;

24        "(2) Is designed to expand upon impact and utilize the jacket, shot or materials
         embedded within the jacket or shot to project or disperse barbs or other objects
         that are intended to increase the damage to a human body or other target
25        (including, but not limited to . . . Hollow Point Ammunition[)]; or\

26        "(3) Is designed to fragment upon impact . . .."  S.F. Police Code § 613.10(g)
         (hereinafter "Ammunition Ordinance").

27

28   The Ammunition Ordinance applies only to licensed firearms and ammunition dealers within San

Francisco.  Notably, it does not preclude San Francisco residents from purchasing enhanced-lethality ammunition outside city limits and possessing or using that ammunition.

In 2011, San Francisco adopted findings in support of its Ammunition Ordinance.  S.F. Police Code § 613.9.5 (App. A-11).  The findings, noting that enhanced-lethality ammunition is more likely to seriously wound or kill a person who is hit by it than conventional ammunition, are supported by testimony from experts.  *Id.* § 613.9.5(2); Van Aken Decl. Exh. B at 19-21; Chinn Decl. ¶¶ 4, 6.  San Francisco has a compelling government interest in reducing the likelihood that shooting victims will die from their injuries, the findings noted.  Moreover, San Francisco found that its Ammunition Ordinance would not substantially burden any resident's ability to defend herself because conventional ammunition is sufficient for self-defense purposes.  S.F. Police Code § 613.9.5(4); Chinn Decl. ¶ 5.

## C.   Discharge Ordinance

At the time Plaintiff filed her complaint, San Francisco prohibited the discharge of firearms within city limits ("Discharge Ordinance").  S.F. Police Code § 4502 (App. A-14).  The City maintains that in 2009 the Discharge Ordinance implied an exception in case of a self-defense emergency but nonetheless clarified by 2011 amendment that the Discharge Ordinance does not apply when someone in lawful possession of a handgun discharges it "in necessary and lawful defense of self or others while in a personal residence" or where authorized by federal or state law.  *Id.* §§ 4506(a)(2), 4506(a)(3) (App. A-15).

## II.   SAN FRANCISCO'S ADMINISTRATION OF CONCEALED WEAPONS LICENSES

In addition to this legislation, San Francisco addresses the problem of gun injuries by restricting the issuance of licenses to carry loaded guns or unloaded handguns in public to those who have shown some specific threat that law enforcement and alternative measures cannot mitigate.

In public places in California, a person is generally not permitted to carry a firearm *concealed* on his or her person or vehicle.  Cal. Penal Code § 25400.  The statute has numerous exceptions, *id.* §§ 25450 *et seq.*, including an exception for when a person believes he or she is "in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person."  *Id.* § 25600.  The statute also excepts a person who has a valid license to carry concealed weapons ("CCW license").  *Id.* §§ 25655, 26150.  In public places in cities like San

Francisco, California also prohibits a person from openly carrying a loaded firearm or an unloaded handgun.  Cal. Penal Code §§ 25850; 26350(a).  These prohibitions have numerous exceptions, *e.g. id.* §§ 25900, 25920, 26350(a), 26361, 26363 *et seq.*, including an exception that allows a person to carry a loaded firearm where he or she "reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property."  *Id.* § 26045.  A person with a CCW license, however, may openly carry a loaded or unloaded gun.  *Id.* §§ 26010, 26362.

The State has delegated to Sheriffs and Chiefs of Police the authority to grant CCW licenses to applicants residing within their jurisdictions (and, for Sheriffs, to applicants working in their jurisdictions) who show that they are "of good moral character" and that "[g]ood cause exists for issuance of the license."  Penal Code §§ 26150, 26155.  Notably, Sheriffs and Chiefs of Police "may" grant CCW licenses to qualified applicants but there is no requirement that they do so.  *Id.*  In San Francisco, the Sheriff and the Chief of Police have adopted policies describing their views of what constitutes good cause for issuance of a CCW license.  McEachern Decl. Exh. 1.0; Johnson Decl. Exh. A.  The Chief's policy explains:

> "In light of the fact that San Francisco is the second most densely populated urban area in the country, and weighing the defensive benefit of carrying concealed firearms in public against the risk of surprise to law enforcement, the risk of avoidable and dangerous conflict escalation in a public setting, and the risk to general public safety that discharging firearms poses to law enforcement and bystanders alike, the Chief has determined on the basis of experience and judgment that good cause to issue a CCW license to San Francisco residents will generally only exist in conditions of necessity."  McEachern Decl. Exh. 1.0.

Consequently, the Chief only finds good cause based on the totality of the circumstances, including whether there is "a reported, documented, presently existing, and significant risk of danger to life or of great bodily injury" that "is not generally shared by other similarly situated members of the public" and cannot be addressed by "law enforcement resources" or "avoided by alternative measures."  *Id.* The Sheriff's policy employs very similar factors.  Johnson Decl. Exh. A at 2.  The Sheriff first issued a CCW policy in June 2011; it was updated in January 2012.  Johnson Decl. ¶¶ 4, 6.  The Chief originally issued a CCW policy in May 2000, and the current policy was promulgated in January 2012.  McEachern Decl. ¶¶ 4-5.  To determine whether a CCW license applicant has shown that he or she has

good cause for the license and has good moral character, both the Sheriff's Department and the San Francisco Police Department conduct background investigations concerning the applicant.  The investigator then reports information to the Sheriff or the Chief of Police, who ultimately must exercise her or his discretion in deciding whether the factors have been shown and the CCW license should issue.  McEachern Decl. ¶¶ 8-9, 12; Johnson Decl. ¶¶ 7, 13.

The Chief and the Sheriff have very rarely issued CCW licenses in the past decade.  The only current civilian holder of a CCW license in San Francisco is a retired general of the United States Army who continues to perform sensitive Army missions and has reported specific threats confirmed by Army officers.  Van Aken Decl. Exh. C at 10:24-12:23, 28:6-18; McEachern Decl. Exh. 5.0.  Each time this general has applied for a CCW license or renewal of that license, he has undergone what he describes as a thorough and time-consuming application and interview process.  Van Aken Decl. Exh. C at 15:16-17:24, 21:21-22:5.

## III.   PLAINTIFF'S CCW LICENSE APPLICATION

Plaintiff Therese Pizzo mailed and faxed a CCW application to the San Francisco Sheriff's Department (SFSD) and the San Francisco Police Department (SFPD) in June 2009.  Pizzo Decl. ¶¶ 56, 60.  The acts of mailing and faxing were carried out by Plaintiff's attorney, not Plaintiff herself.  Van Aken Decl. Exh. D at 89:2-19.  Pursuant to the instructions on the application, she did not fill out certain sections of the application that requested her contact information.  Pizzo Decl. ¶ 59.  The CCW application form and its instructions are prepared and promulgated by the California Department of Justice, not the Sheriff or the Chief of Police.  Cal. Penal Code § 26175.  But Plaintiff or her attorney did not accompany the mailed or faxed applications with contact information for Plaintiff or her attorney that would have enabled SFSD and SFPD to process her application and conduct the required background investigation.  McEachern Decl. ¶¶ 22-23; Johnson Decl. ¶¶ 14-15.  When Plaintiff's attorney wrote to SFPD and SFSD to inquire about CCW license policies, his letters contained his contact information, but he identified Plaintiff only as a "gay female" and did not provide her name, which would have enabled SFPD or SFSD to contact Plaintiff through her attorney.  Pizzo Decl. Exhs. 1 & 2.  In addition, Plaintiff admitted at her deposition that she never paid any application fee in connection with her CCW application.  Van Aken Decl. Exh. D at 89:20-90:2.  SFPD and SFSD thus

had no way to process Plaintiff's CCW application, and apparently they did not. Neither of the agencies found a record of Plaintiff's CCW application in the CCW files they maintain, and neither the Chief of Police nor the Sheriff ever made a determination to grant or deny a CCW license to Plaintiff. McEachern Decl. ¶¶ 18, 24-25; Johnson Decl. ¶ 16. The extensive CCW files maintained by SFPD and SFSD contain no other instances where SFPD or SFSD have received a CCW application but taken no action concerning it. McEachern Decl. ¶ 24; Johnson Decl. ¶ 16.

Both the Sheriff and the Chief of Police do not have a policy of denying all civilian CCW applications, or granting CCW applications only to government officials; instead, they evaluate each application on a case-by-case basis and make a discretionary determination whether to issue a CCW license. McEachern Decl. ¶ 12; Johnson Decl. ¶ 13.[1] Had Plaintiff provided enough information for the departments to process her application, the Sheriff and Chief of Police would have considered her application on its merits.

## ARGUMENT

### I. THE COURT SHOULD GRANT JUDGMENT TO SAN FRANCISCO ON PLAINTIFF'S STORAGE ORDINANCE CLAIMS.

#### A. Plaintiff Lacks Standing To Challenge The Storage Ordinance.

At her deposition, Plaintiff testified that she (erroneously) believes that the Storage Ordinance currently requires her to store her handguns disabled, locked, or inaccessible at all times. Van Aken Decl. Exh. D at 60:19-61:5. She admitted that she currently keeps her guns locked in a safe and that, because she is the mother of two small children, she would not store her guns unlocked "on a regular basis" but that she "*may*" want to keep her guns unlocked in the future "[i]f there were, say, riots outside my neighborhood or . . . some [imminent] threat." *Id.* at 57:25-58:13 (emphasis added); *see also id.* 50:16-51:8, 51:10-52:11 (Plaintiff changes her answer after conference with her attorney). These admissions demonstrate that Plaintiff lacks standing to bring her challenge.

Any plaintiff invoking the jurisdiction of the federal courts bears the burden of establishing the

---

[1] Plaintiff's declaration attaches a letter from James Harrigan dated May 29, 2009, in which Harrigan states that the Sheriff never issues CCW licenses to private citizens. Pizzo Decl. Exh. 4. This statement is incorrect; at the time he apparently wrote the letter, Harrigan and one other civilian possessed CCW licenses. Johnson Decl. ¶ 12. Harrigan is now retired from SFSD and has no responsibilities whatsoever in connection with processing CCW applications. *Id.* ¶ 13. The sheriff he worked for, Mike Hennessey, is no longer in office. *Id.* ¶ 5.

1   "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

2   (1992).  First, she must show "injury in fact" that is "concrete and particularized" and "actual or

3   imminent." *Id.* (quotation marks omitted).  Second, she must show that her injury is "fairly traceable

4   to the challenged action of the defendant." *Id.* (quotation marks, ellipsis, and brackets omitted).

5   Third, "it must be likely . . . that the injury will be redressed by a favorable decision." *Id.* at 561

6   (quotation marks omitted).  In an action challenging the constitutionality of a criminal law, the first

7   prong of the *Lujan* test—actual or imminent injury in fact—must be more than a hypothetical injury

8   from the very existence of the law and more than the mere desire to do what the law forbids (such as a

9   desire to store guns unlocked).  *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.

10  1996).  Instead, a plaintiff must show that she has violated or intends to violate the law and that she

11  has been prosecuted under the law, that she has been individually threatened with imminent

12  prosecution, or that there is a robust history of enforcement of the law.  *Id.* at 1126-27.  Plaintiff

13  cannot show an injury in fact:  she has not been prosecuted under the Storage Ordinance, and she

14  cannot carry her burden of showing either imminent prosecution or historic trends of prosecution.[2]  In

15  addition, her admissions defeat standing: if she wins this case, she "may" only keep her loaded

16  handgun unlocked based on speculative future events such as a riot, and maybe not even then.  She

17  suffers no actual or imminent injury today.  Independently, Plaintiff misunderstands the Storage

18  Ordinance, believing that it prohibits her from *carrying* her loaded weapons, or even loading her

19  weapons at all.  Exh. D at 60:19-61:5.  Plaintiff's misunderstanding of the Storage Ordinance, leading

20  her not to exercise her present ability to carry loaded weapons in her home as she pleases, is not

21  caused by San Francisco's Storage Ordinance.  Plaintiff does not meet the *Lujan* test.

**B.   Alternatively, The Storage Ordinance Is Constitutional.**

**1.   Standard Of Review For Second Amendment Claims.**

24      In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment

25  "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  554 U.S.

26  570, 592 (2008).  At the "core" of the individual right is "the inherent right of self-defense" which is

27      [2] Plaintiff may argue that *Heller* absolves her of the need to show prosecution.  But the D.C.

28  Circuit clarified that Dick Heller had standing only because he had applied for but been denied a
permit to own a handgun.  *Parker v. Dist. of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007).

"most acute" in the home.  *Id.* at 628.  Accordingly, the Court held that a District of Columbia ordinance that "totally bans handgun possession in the home" and requires "that firearms in the home be rendered and kept inoperable at all times," making it "impossible" to use them in self-defense emergencies, was barred by the Second Amendment.  *Id.* at 628-30.  The Court did not identify what level of scrutiny judges should use to test the constitutionality of gun control measures, *id.* at 628, 634, but it was careful to note that "the right secured by the Second Amendment is not unlimited."  *Id.* at 625; *see also McDonald v. City of Chicago*, 561 U.S. --, 130 S. Ct. 3020, 3047 (2010) (plurality). Indeed, *Heller* enumerated a number of gun regulations that were "presumptively lawful" or not otherwise called into doubt by its holding.  *Heller*, 554 U.S. at 626-27 & n.26, 632.  Among these permissible gun control measures are prohibitions on "dangerous and unusual weapons," *id.* at 627 (internal quotation marks omitted); "prohibitions on carrying concealed weapons," which were approved by the majority of 19th-century courts to consider them, *id.* at 626; prohibitions on possession by felons and the mentally ill, *id.*; and "laws regulating the storage of firearms," *id.* at 632.

After *Heller*, the Ninth Circuit has not yet decided what form of scrutiny courts should apply to gun control laws.  *See Nordyke v. King*, No. 07-15763, 2012 WL 1959239 (9th Cir. June 1, 2012) (*en banc*).  Many circuits have adopted a two-step approach.  "Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood."  *United States v. Greeno*, No. 10-6279, 2012 WL 1813672, at *7 (6th Cir. May 21, 2012) (Alarcón, J.).  "Where a challenged statute apparently falls into one of the categories signaled by the Supreme Court as constitutional, courts have relied on the 'presumptively lawful' language to uphold laws in relatively summary fashion."  *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) .  Even if the statute is not among the categories enumerated in *Heller*, courts still consider the history of gun controls to determine whether the regulation is supported by history and practice.  *See, e.g.*, *Heller v. v. Dist. of Columbia*, 670 F.3d 1244, 1252-53, 1255, 1257-58 (D.C. Cir. 2011) ("*Heller II*").  Where a regulatory measure is longstanding, it too is presumptively constitutional.  *Id.* at 1254.  But a regulation need not have a lengthy history to be lawful; the federal firearms law that prohibited all felons from possessing firearms, and is presumptively lawful, was not adopted until 1961 and "likely bears little resemblance

1   to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d

2   12, 23-24 (1st Cir. 2011) *cert. denied*, 132 S. Ct. 1538 (U.S. 2012).  Thus, "[firearms] exclusions need

3   not mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir.

4   2010) (*en banc*) *cert. denied,* 131 S. Ct. 1674 (U.S. 2011).

5         Under the second prong, if the court determines that the challenged regulation lacks historical

6   antecedents or is outside the categories signaled as constitutional by *Heller*, then the court applies

7   "some form of means-end scrutiny" to determine whether it is constitutional, with greater burdens on

8   the core of the right being subject to greater scrutiny.  *United States v. Marzzarella*, 614 F.3d 85, 89,

9   96 (3d Cir. 2010) *cert. denied,* 131 S. Ct. 958 (U.S. 2011); *see also Ezell v. City of Chicago*, 651 F.3d

10   684, 703 (7th Cir. 2011).  Notably, since *Heller* was decided, not a single federal appellate court has

11   applied strict scrutiny to a challenged gun control measure.  *See Heller II*, 670 F.3d at 1252-53, 1255,

12   1257-58 (applying intermediate scrutiny to onerous gun registration requirements); *Ezell*, 651 F.3d at

13   704-05, 708 (applying "not quite strict scrutiny" where Chicago required live-fire training to obtain

14   firearm licenses but prohibited public live-fire training ranges within city limits); *Booker*, 644 F.3d at

15   25 (applying intermediate scrutiny); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011)

16   (same); *United States v. Chester*, 628 F.3d 673, 680, 682-83 (4th Cir. 2010) (same); *Skoien*, 614 F.3d

17   at 641 (same); *Marzzarella*, 614 F.3d at 97 (same).  The Second Circuit recently adopted an even less

18   demanding standard, holding that even where there is a restriction of Second Amendment rights,

19   "heightened scrutiny is triggered only by those restrictions that . . . operate as a *substantial* burden" on

20   Second Amendment rights.  *United States v. DeCastro*, 10-3773, 2012 WL 1959072, at *5 (2d Cir.

21   June 1, 2012) (emphasis added).[3]

### 2.   *Heller* Categorically Excludes Storage Measures From Second Amendment Scrutiny.

24         Applying the tests established in other circuits for Second Amendment claims, the City's

25   Storage Ordinance is constitutional.  In *Heller*, the Supreme Court stated that its analysis did not

---

[3] In *Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011), a Ninth Circuit panel applied a test similar to the Second Circuit's "substantial burden" test.  This decision, however, was vacated when the Ninth Circuit ordered rehearing *en banc*.  664 F.3d 774.  The *en banc* opinion did not determine the standard of review.  2012 WL 1959239.

10

1    "suggest the invalidity of laws regulating the storage of firearms to prevent accidents."  554 U.S. at

2    632.  Under the first step of the two-pronged analysis, this Court must determine whether the Storage

3    Ordinance is the kind of storage measure that *Heller* excluded from Second Amendment challenge.

4          The Storage Ordinance requires only that, when a handgun is not carried on the person of an

5    adult or under the control of a peace officer, it must be stored either in a locked box or with a trigger

6    lock.  S.F. Police Code § 4512.  It imposes no limits at all on carrying a loaded handgun in the home

7    for purposes of armed self-defense.  It is a far cry from the District of Columbia ordinance that the

8    Supreme Court overturned in *Heller*, which made it unlawful to unlock or assemble a firearm even in

9    the face of mortal danger, 554 U.S. at 630, and was therefore a ban on the *use* of firearms,

10   masquerading as a storage ordinance.  San Francisco's Storage Ordinance also fits comfortably within

11   a tradition of safety laws that *Heller* acknowledged: at least three jurisdictions in the Framing era

12   regulated the storage of firearms or ammunition for safety reasons.[4]  These regulations demonstrate

13   that the historical understanding of the right to bear arms has never included immunity from

14   reasonable storage regulations to prevent accidents.

15         Plaintiff deals with this issue through *ipse dixit*: by proffering "expert" opinion that the Storage

16   Ordinance "completely negates the benefit of owning an immediately accessible, operable and loaded

17   handgun in the home."  Pltf. Br. at 14 (citing Orsay Decl.).  The Court should disregard David Orsay's

18   declaration because any testimony he might offer to the same effect is inadmissible, as discussed in

19

20   _____

          [4] These statutes, reproduced in the accompanying Appendix, are An Act In Addition to the
21   Several Acts Already Made for the Prudent Storage of Gun-Powder within the Town of Boston, Mar.
     1, 1783, in The Charter of the City Council of Boston etc. with Such Acts of the Legislature of
22   Massachusetts as Relate to the Government of Said City 18 (1827) (App. A-24) (making it unlawful to
     take a loaded firearm into any building in Boston, including a dwelling); An Act to Prevent the Danger
23   Arising From the Pernicious Practice of Lodging Gunpowder in Dwelling Houses, Stores, or Other
     Places Within Certain Parts of the City of New York, or on Board of Vessels Within the Harbour
24   Thereof, Apr. 13, 1784, ch. 28, 1784 Laws of the State of N.Y. 627-28 (App. A-27) (making it
     unlawful for "any … person … to have or keep any quantity of gun powder exceeding twenty-eight
25   pounds weight, in any one place, less than one mile to the northward of the city hall … and the said
     quantity of twenty-eight pounds weight … shall be separated into four stone jugs or tin cannisters,
26   which shall not contain more than seven pounds each"); An Act for Erecting the Town of Carlisle, in
     the County of Cumberland, into a borough; for Regulating the Buildings, Preventing Nuisances and
27   Encroachments on the Commons, Squares, Streets, Lanes and Alleys of the Same, and for Other
     Purposes Therein Mentioned, 1782, ch. DCCCCLVIII, sec. XLII, 1803 Laws of the Commonwealth of
28   Penn. 349-50 (App. A-31) (prohibiting storage of more than 25 pounds of gun powder in any shop or
     dwelling).

Section VI below, but even if the Court credits this testimony, it sweeps too broadly. There is no Second Amendment right to have "an immediately accessible, operable and loaded handgun" in the home. *Heller* indicates that storage ordinances are constitutional notwithstanding the fact that they may burden the right of self-defense to some extent:

> "Nothing about [historic] fire-safety laws [requiring storage of excess gunpowder] undermines our analysis; they do not remotely *burden the right of self-defense as much as* an absolute ban on handguns. Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents." 554 U.S. at 632 (emphasis added).

To overcome the Storage Ordinance's presumption of lawfulness, therefore, Plaintiff must offer some reason why it burdens the right of self-defense more than other storage laws. She offers no such reason. Nor does she offer any evidence to dispute San Francisco's factual findings that modern lockboxes can be opened in seconds, rendering any burden on the ability to use a handgun for self-defense less onerous than the one faced by Framing-era Bostonians, who had to load their weapons before use, or New Yorkers, who had to retrieve their gunpowder from stone jugs or tin cannisters to load their weapons.[5] Because the Second Amendment does not guarantee the right to a loaded handgun on every bedside table, the Court need go further than the first prong of Second Amendment analysis to find that San Francisco needs only a rational basis for enacting its Storage Ordinance.

### 3.    Alternatively, The Storage Ordinance Reasonably Advances San Francisco's Compelling Interest In Public Safety.

Even if the Court does not treat the Storage Ordinance as presumptively lawful, and instead holds that it impairs Plaintiff's Second Amendment rights, it should adopt the Second Circuit's test and hold that because it does not substantially burden those rights, it is not subject to any kind of heightened scrutiny. *DeCastro*, 2012 WL 1959072, at *5. Alternatively, the Court should go no further than the majority of circuits and apply only intermediate scrutiny to the Storage Ordinance, taking into account the minimal burden it imposes on the exercise of self-defense rights. Where a law "was neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise

---

[5] Plaintiff's own expert testified that he stores his personal assault rifles and other firearms unloaded in his bedroom closet and requires 20-25 seconds to load his handguns at night. Van Aken Decl. Exh. J at 55:1-21, 57:25-58:16.

their Second Amendment rights" and subject only to intermediate scrutiny.  *Marzzarella*, 614 F.3d at 97.  Under an intermediate scrutiny standard, "the government must demonstrate … that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective"  *Chester*, 628 F.3d at 683 (quoting *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question."  *Masciandaro*, 638 F.3d at 474.  Nor is San Francisco required to prove that its legislative judgments are empirically correct.  "Even when applying strict scrutiny—requiring a more taxing proof threshold than the one we apply here [in a Second Amendment case challenging conviction of a marijuana user in possession of a firearm]—the government may, in appropriate circumstances, carry its burden by relying 'solely on history, consensus, and simple common sense.'"  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (quoting *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 628 (1995); additional quotation marks omitted))

San Francisco has carried its burden.  Preserving public safety by preventing accidents, suicides, and gun thefts is undoubtedly a substantial government objective.  *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).  To serve this objective, San Francisco has relied on a series of studies in respected academic publications, along with public testimony and common sense, to determine that requiring guns to be locked can reduce the harms that come from unauthorized use of guns.  Van Aken Decl. Exh. A.  Because there is a reasonable fit between San Francisco's ends and the method it has chosen to accomplish its ends, the Storage Ordinance is constitutional.

**II.**   **THE COURT SHOULD GRANT JUDGMENT TO SAN FRANCISCO ON PLAINTIFF'S AMMUNITION ORDINANCE CLAIMS.**

   **A.**   **Plaintiffs Lacks Standing To Challenge The Ammunition Ordinance.**

Plaintiff mistakenly believes that the Ammunition Ordinance regulates the possession of ammunition.  Pizzo Decl. ¶ 26.  It does not, regulating only the ability of licensed ammunition dealers located in San Francisco to *sell* this ammunition and not the ability of residents to *possess* it.  S.F. Police Code § 613.10.  There is only one licensed ammunition dealer in San Francisco, High Bridge Arms, that is regulated by the Ammunition Ordinance.  Chin Decl. ¶ 11.  Plaintiff has never tried to

buy hollow-point bullets or other enhanced-lethality ammunition at High Bridge Arms, has not been to that store since the late 1980s, and until she was informed otherwise at her deposition, believed that it had closed.  Van Aken Decl. Exh. D at 41:9-42:20.  She has not used hollow-point ammunition since at least the early 1990s.  *Id.* at 69:24-70:23.  She apparently frequents a gun store in San Bruno, *id.* at 39:3-12, where she is free to buy any kind of ammunition she likes and carry it into San Francisco.  She believes that she is capable of defending herself and her family using conventional full-metal jacketed ammunition.  *Id.* at 71:12-18.

On these facts, Plaintiff has not met her burden of showing that she is injured by the Ammunition Ordinance.  In addition to lacking Article III injury, Plaintiff does not meet the prudential test for third-party standing to assert the rights of High Bridge Arms, the only entity regulated by the ordinance.  She alleges no special relationship between her and High Bridge Arms, or any hindrance to High Bridge Arms's ability to assert its own constitutional rights.  *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (noting rule against third-party standing and its limited exceptions).

**B.      Plaintiff's Second Amendment Challenge To The Ammunition Ordinance Fails.**

On the merits, Plaintiff's Second Amendment challenge fails.  The fundamental logic behind the City's prohibition on enhanced-lethality ammunition is that shootings should not necessarily be lethal or cause irreparable injury.  Because conventional ammunition is sufficient for self-defense in the home—a point conceded by Plaintiff at her deposition—and because there is a longstanding tradition of regulating particularly dangerous kinds of ammunition, the Court should subject the Ammunition Ordinance to no further constitutional scrutiny under the Second Amendment.  In the alternative, if the Court finds any burden on Plaintiff's Second Amendment rights, it should apply only intermediate scrutiny because of the minimal burden the ordinance exacts and because it is reasonably tailored to serving the City's compelling interest in minimizing gun-related deaths.

**1.      The Ammunition Ordinance Does Not Burden Plaintiff's Second Amendment Rights.**

The Supreme Court did not recognize in *Heller* any right to purchase or possess any particular kind of ammunition, and neither has the Ninth Circuit nor any other circuit of which San Francisco is aware.  But even if this Court assumed that the Second Amendment protects not only a right to keep

1    firearms for self-defense but also a particular kind of ammunition, it should nonetheless find that

2    enhanced-lethality ammunition does not fall within the scope of the Second Amendment right.

3         The Ammunition Ordinance falls within a longstanding tradition of regulating particularly

4    dangerous weapons and ammunition.  *Heller* recognized that prohibitions on "'dangerous and unusual

5    weapons'" are an "important limitation on the right to keep and carry arms" based on the history of

6    such prohibitions.  554 U.S. at 627 (quoting Blackstone, 4 Commentaries on the Laws of England 148-

7    149 (1769)).  *Heller* also recognizes that "nothing in our opinion should be taken to cast doubt on . . .

8    laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626-67.

9    Nineteenth- and early twentieth-century enactments show that bans on the sale of particular arms, even

10   those that may be popular or common, are part of our historic tradition of firearms regulation.[6]  The

11   tradition continues to this day: the federal government largely prohibits the sale of armor-piercing

12   ammunition, 18 U.S.C. §§ 921(a)(17)(B), 922(a)(8), and has since 1986.  *See* An Act to Amend

13   Chapter 44 (Relating to Firearms) of Title 18 etc., Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986).

14   Numerous states restrict the possession or sale of that and other particularly lethal kinds of

15   ammunition.  *See, e.g.,* Ala. Code § 13A-11-60 (prohibiting possession or sale of brass or steel teflon-

16   coated handgun ammunition); Cal. Penal Code § 30320 (prohibiting sale of "handgun ammunition

17   designed primarily to penetrate metal or armor"); *id.* § 32310 (prohibiting manufacture or sale of "any

18   large-capacity magazine"); Fla. Stat. Ann. § 790.31 (prohibiting possession and sale of various bullets

19   including "exploding bullets" including those that are "designed . . . so as to detonate or forcibly break

20   up through the use of an explosive or deflagrant"); Haw. Rev. Stat. § 134-8(a) (prohibiting

21   manufacture, sale, or possession of "any type of ammunition or any projectile component thereof

22   designed or intended to explode or segment upon impact with its target"); 720 Ill. Comp. Stat. Ann.

23

---

24   [6] Historic statutes prohibiting the sale of certain classes of weapons include An Act to Guard
     and Protect the Citizens of this State, against the Unwarrantable and Too Prevalent Use of Deadly
     Weapons, Dec. 25, 1837, ¶ 367, § 1, 1851 Statute Laws of the State of Ga. 848 (App. A-22) (making it
25   illegal "for any merchant . . . or any other person . . . to sell, or offer to sell . . . pistols"); An Act to
     Prevent the Sale of Pistols, Mar. 14, 1879, ch. XCVI, § 1, 1879 Act of the State of Tenn. 135-36 (App.
26   A-37) (banning the sale or disposal of "belt or pocket pistols, or revolvers, or any other kind of pistols,
     except army or navy pistol[s]"); An Act to Regulate the Carrying, Manufacture, and Sale of Pistols,
27   and to Make a Violation of the Same a Misdemeanor, Feb. 20, 1901, No. 435, § 1, 1902 Code of the
     Laws of S.C. 478-49 (App. A-35) (banning the sale of pistols less than 20 inches in length and 3
28   pounds in weight).

---

§ 5/24-1(a)(11) (prohibiting sale, manufacture, or purchase of "any explosive bullet"); Iowa Code Ann. §§ 724.1(7), 724.3 (prohibiting possession of "[a]ny bullet or projectile containing any explosive mixture or chemical compound capable of exploding or detonating prior to or upon impact"); N.H. Rev. Stat. Ann. § 159:18 (prohibiting use of "any teflon-coated or armor-piercing bullet or cartridge, or any bullet or cartridge which contains any explosive substance in the projectile and is designed to explode upon impact, in the course of committing any misdemeanor or felony"); N.J. Stat. Ann. § 2C:39-3(f)(1), (g)(2) (prohibiting possession of "hollow nose or dum-dum bullet" except in the home); N.C. Gen. Stat. Ann. § 14-34.3 (prohibiting sale or possession of "teflon-coated bullet"); N.Y. Penal Law § 265.01(7) (prohibiting possession of "a bullet containing an explosive substance designed to detonate upon impact"); Tenn. Code Ann. § 39-17-1304(b) (prohibiting sale or use of "any ammunition cartridge, metallic or otherwise, containing a bullet with a hollow-nose cavity that is filled with an explosive material and designed to detonate upon impact"); Utah Code Ann. § 65A-3-2(1)(d) (prohibiting firing of "tracer or incendiary ammunition").  Many of these statutes, like San Francisco's Ammunition Ordinance, exclude purchase of prohibited ammunition for law enforcement purposes. *See, e.g.*, 18 U.S.C. § 922(a)(8); Ind. Code Ann. § 35-47-5-11(d); Iowa Code Ann. § 724.2(1).  The Ammunition Ordinance fits comfortably within this tradition of restricting the sale of particularly dangerous kinds of ammunition and is therefore outside the scope of the Second Amendment.

San Francisco's Ammunition Ordinance is therefore subject only to rational basis scrutiny. Because there is a rational basis to believe that enhanced-lethality ammunition increases injuries from gunshot wounds, and that reducing the availability of this ammunition will reduce the likelihood of grave injury or death from gunshot wounds, the Ammunition Ordinance is constitutional.

### 2.  Alternatively, The Ammunition Ordinance Reasonably Advances San Francisco's Legitimate Interest In Saving Lives By Mitigating Firearm Injuries.

Even if the Ammunition Ordinance impairs Plaintiff's Second Amendment rights, it does not impose a substantial burden on those rights because of the range of ammunition options it leaves open. It should therefore be evaluated only under rational basis scrutiny under the Second Circuit's test.

The undisputed facts show that Plaintiff's inherent right of self-defense is only minimally burdened by the Ammunition Ordinance, if at all.  Plaintiff does not shop at the single gun store in San

1    Francisco regulated by the Ammunition Ordinance, and the gun store she frequents is not regulated by

2    the Ammunition Ordinance.  In any event, as discussed above, she has not used hollow-point

3    ammunition since the late 1990s, and she admits that she can defend herself and her family using

4    conventional full-metal jacket ammunition.  The Second Amendment protects not a right to own a

5    particular firearm or particular ammunition but instead to keep and bear guns in the home that are

6    useful for self-defense.  *Cf. Heller*, 554 U.S. at 626 ("the right was not a right to keep and carry any

7    weapon whatsoever").  If conventional ammunition is sufficient to vindicate the right of self-defense,

8    then San Francisco does not burden the right by prohibiting other, more lethal kinds of ammunition.

9    This is true even if, as Plaintiff contends and San Francisco agrees, the San Francisco Police

10   Department uses hollow-point ammunition.  *Heller* acknowledged that the Second Amendment,

11   notwithstanding its prefatory "militia" language, does not necessarily protect the kinds of weapons that

12   are the most useful in military service.  *Id.* at 627.  Since police forces also use sophisticated weapons

13   and gear that are not available to the public at large, *Heller*'s logic should apply equally to ammunition

14   selected by the police for needs particular to the police.

15         Nor do the opinions offered by David Orsay, assuming his testimony would be admissible,

16   alter the fact that Plaintiff's Second Amendment rights are at most minimally burdened by the

17   Ammunition Ordinance.  Orsay opines that conventional ammunition lacks the stopping power of

18   "expanding ammunition/hollowpoints" and that "a hollow-point or expanding bullet" is less likely to

19   ricochet or pass through walls and endanger bystanders.  Orsay Decl. ¶¶ 397-411 (quoted language at

20   ¶¶ 403, 409).  But even accepting this analysis as correct, it is also true that there are kinds of

21   *expanding* ammunition without the hollow-point or barb-dispersal characteristics of enhanced

22   lethality-ammunition.  Chinn Decl. ¶ 8.  Licensed firearms dealers in San Francisco are permitted to

23   sell these kinds of expanding ammunition.  *Id.*  Thus, the undisputed facts show that, at most, the

24   Ammunition Ordinance burdens only one of many options Plaintiff has to use expanding ammunition

25   for self-defense in the home.  And this burden is minimal, since the Ammunition Ordinance requires

26   her only to leave the City to get hollow-point ammunition (or order it by mail for home delivery).

27         Even if the Court evaluates the Ammunition Ordinance under some form of heightened

28   scrutiny, it should apply nothing more stringent than intermediate scrutiny in light of the minimal

1   burdens it imposes on Plaintiff's ability to defend herself in the home using her firearms.  The

2   Ammunition Ordinance passes intermediate scrutiny because it is substantially related to San

3   Francisco's interest in preserving public safety and reducing the number of fatalities arising from

4   accidental discharges and intentional shootings.  The Second Amendment "leaves [cities] a variety of

5   tools for combating" the danger of gun violence, *Heller*, 554 U.S. at 636, and allows for "state and

6   local experimentation with reasonable firearms regulation [to] continue," *McDonald*, 130 S. Ct. at

7   3046 (plurality).  The prohibition on the sale of enhanced-lethality ammunition is likely to decrease

8   the amount of enhanced-lethality ammunition within the City.  Those who still wish to purchase such

9   ammunition may go outside the City limits to do so, but those with no particular preference, but who

10  may have purchased such ammunition were it available at their local gun shop, will not, and thus the

11  overall amount of such ammunition in the City will decrease.  This decrease in use is substantially

12  related to the goal of reducing the number of fatalities resulting from accidental and illegal shootings.

13  Furthermore, decreasing the lethality of the ammunition used against police officers is another

14  important aspect of preserving public safety.  "Responding to a domestic disturbance call is among an

15  officer's most risky duties."  *Skoien*, 614 F.3d at 644.  And where such guns are brandished against

16  police officers, having a reduced amount of enhanced-lethality ammunition in these guns is an

17  important public safety measure.  In addition to domestic disturbances, it is also in the City's interest

18  that criminals not be equipped with enhanced-lethality ammunition.

19       If Plaintiff's arguments were credited, and San Francisco could not prohibit ammunition with

20  enhanced lethality characteristics because of Plaintiff's belief that it is the most effective at stopping an

21  intruder, then a host of the state statutes cited above would also be jeopardized.  It is likely that

22  explosive, hollow-point, and armor-piercing ammunition are all very effective at stopping assailants,

23  but the Second Amendment does not require states and local governments to tolerate them.  The Court

24  should enter judgment for San Francisco on this claim.

25       **C.    The Ammunition Ordinance Is Not Unconstitutionally Vague.**

26       Plaintiff complains that the Ammunition Ordinance's language, prohibiting the sale of

27  ammunition that "serves no sporting purpose," S.F. Police Code § 613.10(g)(1), is vague.  "A statute

28  meets the standard of certainly required by the Constitution if its language conveys sufficiently

1  definite warning as to the proscribed conduct when measured by common understanding and

2  practices." *Turf Ctr., Inc. v. United States*, 325 F.2d 793, 795 (9th Cir. 1963).  This term "serves no

3  sporting purpose" has been regularly employed by Congress for decades to refer to weapons and

4  ammunition that are considered suitable only for military use or that are typically used by criminals

5  rather than law-abiding members of the public.  *See*, *e.g.*, 18 U.S.C. § 921(4)(B) (defining "destructive

6  device" as "any type of weapon (other than a shotgun or a shotgun shell which the Attorney General

7  finds is generally recognized as particularly suitable for sporting purposes) . . . which will . . . expel a

8  projectile by the action of an explosive or other propellant. . .")； *Gun S., Inc. v. Brady*, 877 F.2d 858,

9  862 (11th Cir. 1989) (in discussing 18 U.S.C. § 922(l) concerning importation of firearms, stating "the

10  sponsor of the legislation, Senator Dodd, stated: . . . 'The entire intent of the importation section is to

11  get those kinds of weapons that are used by criminals and that have no sporting purpose.'") (citation to

12  Congressional Record omitted).

13      The Constitution does not demand "perfect clarity and precise guidance," *United States v.*

14  *Williams*, 553 U.S. 285, 304 (2008), but rather "an adequate warning" with "sufficiently distinct"

15  boundaries.  *United States v. Petrillo*, 332 U.S. 1, 7 (1947).  The use of the phrase "no sporting

16  purpose" across decades shows that the language of the Ammunition Ordinance meets these

17  constitutional standards.  Furthermore, when San Francisco's prohibition on ammunition that "serves

18  no sporting purpose" is treated as a definition and read together with other definitional elements of the

19  ordinance (ammunition that "[i]s designed to expand upon impact and utilize the jacket, shot or

20  materials embedded within the jacket or shot to project or disperse barbs or other objects that are

21  intended to increase the damage to a human body or other target," S.F. Police Code § 613.10(g)(2), or

22  that "[i]s designed to fragment upon impact," id. § 613.10(g)(3)) , the purpose of the language is clear.

23  Read together, the ordinance prohibits the sale of ammunition that either has no legitimate purposes or

24  that is intended to cause maximum harm to the human body.  Plaintiff's vagueness claim fails.

25  **III.    THE DISCHARGE ORDINANCE IS CONSTITUTIONAL.**

26      Plaintiff challenges Police Code § 1290, which at the time she brought her suit prohibited

27  discharging firearms within city limits and did not contain any express exception for self-defense

28  emergencies.  Notwithstanding San Francisco's belief that its Discharge Ordinance contained an

implied exception for such emergencies, San Francisco in an abundance of caution amended the

ordinance in 2011 to express that exception.  Plaintiff makes no argument that the current ordinance

violates her rights.[7]

## IV. SAN FRANCISCO'S ORDINANCES DO NOT CONFLICT WITH THE CALIFORNIA CONSTITUTION OR CALIFORNIA STATUTES.

Plaintiff's ninth cause of action contends that San Francisco's ordinance are overridden by the

California Constitution or Penal Code § 25605.  But there is no express right to keep or bear arms

under the California Constitution.  *Kasler v. Lockyer*, 23 Cal. 4th 472, 481 (2000); *In re Rameriz*, 226

P. 914 (Cal. 1924).  The California Supreme Court has rejected any argument that the California

Constitution's guarantee of the right to defend life and liberty impliedly protects a right to bear arms.

*Kasler*, 23 Cal. 4th at 481.  Nor do San Francisco's ordinances conflict with Penal Code § 25605

(which was codified at § 12026(b) at the time Plaintiff filed her complaint).  This section simply

allows that a person does not need a license or permit to "purchase, own, possess, keep, or carry" a gun

in his or her own residence.  None of the challenged ordinances require such a license.

## V. SAN FRANCISCO'S ADMINISTRATION OF CONCEALED WEAPONS LICENSES DID NOT AND DOES NOT VIOLATE PLAINTIFF'S RIGHTS.

### A. Plaintiff Lacks Standing To Challenge The Concealed Weapons Statutes Or San Francisco's Administration Of Concealed Weapons Licenses Because She Was Never Denied A CCW License.

As discussed in Section III of the Statement of Facts, Plaintiff never paid the application fee for

processing her CCW application, and she never provided her contact information to SFPD or SFSD so

that those departments could contact her to complete her application and conduct the background

investigations required by their policies.  Accordingly, neither SFPD nor SFSD ever considered or

denied her CCW license application.  The injury she claims in her CCW-related causes of action were

not caused by San Francisco but instead by Plaintiff's or her attorney's failure to provide the

information the City needed to complete the application process.  Since her injury is not fairly

traceable to San Francisco's conduct, she lacks Article III standing.  *Lujan*, 504 U.S. at 560.  Courts

---

[7] Plaintiff claims entitlement to attorneys' fees because of San Francisco's amendment.  This argument is premature at the summary judgment stage, but in any event is wrong.  *Bennett v. Yoshina*, 259 F.3d 1097, 1101 (9th Cir. 2001) (a legislative change that the "political branches were motivated to enact . . . solely by this litigation . . . lack[s] the necessary judicial *imprimatur*" to qualify a plaintiff as the prevailing party) (quotation marks omitted).

have reached the same result in analogous Second Amendment cases. *Decastro*, 2012 WL 1959072, at *3 ("[B]ecause Decastro failed to apply for a gun license in New York, he lacks standing to challenge the licensing laws of the state."); *Williams v. State*, 417 Md. 479, 488 n.7 (2011) *cert. denied*, 132 S. Ct. 93 (U.S. 2011) (defendant challenging constitutionality of handgun-carry licensing scheme "lack[ed] standing" because he "failed to file an application for a permit to carry a handgun").

### B.    Plaintiff's CCW-Related Claims Fail On The Merits.

#### 1.    Plaintiff Cannot Show That The City Denied Her Federal Rights Pursuant To A Custom Or Policy.

Under 42 U.S.C. § 1983, Plaintiff has a federal cause of action to sue the City (and its officials acting in their official capacities) for violations of federal rights—but the City is only liable for violations caused by the City's custom or policy, or by a decision made by an authorized decisionmaker. *Monell v. Dept. of Social Servs. of N.Y.*, 438 U.S. 658, 690-91 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). This requirement holds not only for damages lawsuits but also for lawsuits seeking declaratory and injunctive relief. *Los Angeles County, Cal. v. Humphries*, 131 S. Ct. 447, 451 (2010). Even assuming that Plaintiff's Second Amendment or Fourteenth Amendment rights were violated by the City when it did not to process her application, she has no evidence to show that the City did so pursuant to a custom or policy. Indeed, the available evidence shows the contrary: that the City's policy is to process the CCW applications that it receives.

Plaintiff also contends that the City either has a policy of denying all civilian CCW applications or a policy of granting CCW applications only to its own employees or to government employees. Neither contention is correct, as the undisputed facts show. Although James Harrigan's regrettable letter stated that then-Sheriff Hennessey did not grant civilian applications, this statement was untrue; two civilian CCW licenses issued by Sheriff Hennessey were then in effect. Nor is it the policy today: Interim Sheriff Vicki Hennessy (no relation to the former sheriff) and Chief of Police Greg Suhr evaluate each CCW application on its own merits. As for Plaintiff's contention that the City grants the CCW applications of current or former government employees but no one else, this contention too is wrong. The Army general who currently possesses a CCW license was never an employee of the City. The City has denied the CCW applications of other former federal employees.

1   Van Aken Decl. Exh. E at 63:3-17, 66:3-67:2; *Id.* Exhs. F-H.  The City has also denied the CCW

2   applications of a former City employee.  Van Aken Decl. Exh. I.  Thus, because City has no custom or

3   policy of granting only the CCW applications of current and former government workers, Plaintiff

4   cannot show that the City's custom or policy is the moving force behind her harm.[8]

5            **2.       Plaintiff Has No Second Amendment Right To A CCW License.**

6            Plaintiff treats it as self-evident that the Second Amendment protects her right to carry firearms

7   concealed or openly in dense urban environments like San Francisco.  But to establish a violation of

8   her Second Amendment right, it must be either that all residents of San Francisco have the right to

9   carry guns in public (or at least all residents without felony or domestic violence convictions), or that

10  Plaintiff met the City's good cause standard for issuing CCW licenses.  Neither proposition is correct.

11           *Heller* said nothing about whether the Second Amendment right to keep and bear arms extends

12  outside the home, as courts have confirmed.  *See Piszczatoski v. Filko*, No. 10-6110, 2012 WL

13  104917, *22 (D.N.J. Jan. 12, 2012) (*Heller* "does not recognize or even suggest a broad general right

14  to carry arms."); *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 264 (S.D.N.Y. 2011) (open carrying of

15  firearms is "outside the core Second Amendment concern articulated in *Heller*").  History

16  demonstrates that it did not: English law in 1328 prohibited carrying arms outside the home, providing

17  that no one may "'go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the

18  Justices or other Ministers nor in no Part elsewhere.'"  Patrick J. Charles, *Scribble Scrabble, the*

19  *Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee*

20  *Malcolm*, 105 Nw. U.L. Rev. Colloquy 227, 237 (2011) (quoting 1328 Statute of Northampton).

21  Consistent with this view, three states in the Framing era prohibited the public carrying of arms.  *Id.* at

22  237 & n.76 ("The Statute [of Northampton] remained in force in the states of Massachusetts, North

23  Carolina, and Virginia even after the adoption of the U.S. Constitution").  These restrictions

24  demonstrate that the Second Amendment does not apply beyond the core right identified in *Heller*.

25           Even if the Court finds, however, that there is a Second Amendment right to carry guns outside

26  the home in some instances, it should hold that California's gun laws, as applied by San Francisco

27

28           [8] Plaintiff has no remaining claims against individual-capacity defendants.  Dkt. 58.

1   officials, are constitutional because the restriction they impose—prohibiting carrying guns in cities

2   except upon a showing of good cause or in case of imminent danger—satisfies intermediate scrutiny.

3   As the Chief's CCW policy states and Plaintiff does not contest, the risks of public carrying of guns

4   include "the risk of avoidable and dangerous conflict escalation in a public setting, and the risk to

5   general public safety that discharging firearms poses."  McEachern Decl. Exh. 1.0.  Moreover, if

6   carrying guns in public is generally allowed, then police can no longer stop and question individuals

7   who display firearms in public—potentially compromising strategies of disrupting urban crime that

8   have proven very effective during the last 20 years.  Lawrence Rosenthal & Joyce Lee Malcolm,

9   *Mcdonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?*, 105 Nw. U.

10  L. Rev. 437, 441 (2011).  Restricting the public carrying of guns to those who have shown a

11  demonstrated lawful need for them, or who meet one of the exceptions set out in California's laws,

12  bears a reasonable relationship to these important public safety interests.

13          The majority of courts to consider open-carry permits issued only on a showing of good cause

14  have reached this conclusion.  *See Piszczatoski v. Filko*, Civ. No. 10-06110 (WHW), 2012 WL

15  104917, at *15-*22 (D.N.J. Jan. 12, 2012) (applying intermediate scrutiny to approve handgun

16  permitting regime with "justifiable need" standard); *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 240,

17  266-72 (S.D.N.Y. 2011) (applying intermediate scrutiny to statutory scheme allowing public carry

18  only on a showing of "proper cause"); *Moore v. Madigan*, 11-CV-03134, 2012 WL 344760 (C.D. Ill.

19  Feb. 3, 2012) (upholding Illinois's blanket prohibition on loaded carrying of firearms in public either

20  because the Second Amendment does not extend outside the home or because the ban passes

21  intermediate scrutiny); *cf. People v. Mimes*, 953 N.E.2d 55, 76 (Ill. App. Ct. 2011) (upholding Illinois

22  law prohibiting *all* loaded carrying of firearms in public); *Peruta v. County of San Diego*, 758 F. Supp.

23  2d 1106 (S.D. Cal. 2010) (upholding California's CCW license regime with respect to concealed

24  carrying).  *But see Woollard v. Sheridan*, CIV. L-10-2068, 2012 WL 695674 (D. Md. Mar. 2, 2012)

25  (applying intermediate scrutiny and striking Maryland's permit scheme requiring "good and substantial

26  reason" to carry handguns publicly); *Bateman v. Perdue*, No. 10-CV-265-H (E.D.N.C.) (Mar. 29, 2012

27  order) (striking down restriction on public carry during declared states of emergency under strict

28  scrutiny, in part because the law prohibited residents from buying firearms during such emergencies).

This Court should apply the same analysis as *Piszczatoski*, *Kachalsky*, and *Moore* and hold that California may properly restrict carrying handguns in public to those who demonstrate good cause or face an emergency.  If that is the case, then Plaintiff's Second Amendment rights were not violated here.  Her claim to "good cause" for a CCW license is based on four reprehensible but isolated threatening events, only one of which involved an overt threat of violence.  (Pizzo Decl. ¶¶ 14-17; Van Aken Decl. Exh. D at 17:12-23:18.)  These do not amount to good cause under the Sheriff's or Chief of Police's policies requiring a specific and imminent threat.

### 3.    Plaintiff's Fourteenth Amendment Rights Were Not Violated.

Plaintiff claims a Due Process Clause violation from San Francisco's denial of her CCW application.  Assuming her CCW application was indeed denied, this claim nonetheless fails.  Because the licensing authority has discretion whether to issue a CCW license, she has no property right in a CCW license and therefore no process is due to her.  *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir.1982) ("Erdelyi did not have a property or liberty interest in obtaining an initial license to carry a concealed weapon"); *Peruta*, 758 F. Supp. 2d at 1120 (following *Erdelyi* after *Heller*).  Plaintiff also shows no equal protection violation where her CCW license was denied but those of others were granted.  The Equal Protection Clause is "a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  But Plaintiff is not similarly situated to successful CCW applicants whose applications set out a specific, present threat of violence.  Nor is she similarly situated to current or retired peace officers, for the reasons that the Attorney General's brief sets out.  Because San Francisco is entitled to make classifications based on relevant differences, Plaintiff is not entitled to a CCW license under the Equal Protection Clause.

## VI.    THE COURT SHOULD DISREGARD THE DECLARATION OF DAVID ORSAY.

Plaintiff proffers opinion testimony through the declaration of David Orsay, a former Special Operations soldier and Deputy U.S. Marshal who became a private military contractor about a decade ago.  Orsay Decl. ¶ 1; Van Aken Decl. Exh. J at 37:8-23, 41:16-19.  He has no college or graduate degree.  *Id.* at 20:7-22:1.  He is a close personal friend of Plaintiff's lawyer and was represented by Plaintiff's lawyer in an employment dispute with the U.S. Marshals Service.  *Id.* at 83:12-20, 114:17-21.  He has performed expert witness work only once, in an excessive force case years ago when he

was hired by Plaintiff's lawyer. *Id.* at 8:3-24. In his declaration, he offers opinions about an immense range of topics, from the validity of the social-science sources San Francisco relied on in its legislative findings to the subjective motivations of various Sheriffs and Chiefs of Police in granting or denying CCW licenses. His declaration reveals no expertise that would qualify him to render opinions on these topics and does not describe any methodology whatsoever in arriving at his conclusions.[9]

Law enforcement officers may be qualified as experts to testify about matters within the particular scope of their experience as police officers. *See, e.g., United States v. McDuffie*, CR-08-0102-RHW, 2012 WL 1205785 (E.D. Wash. Apr. 11, 2012). But their testimony is not permitted where it strays to "matters far afield" of their expertise. *United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007). Particularly where a police expert does not explain his or her methodology, the testimony is not admissible. *United States v. Hermanek*, 289 F.3d 1076, 1093-94 (9th Cir. 2002). Because Orsay's declaration does not contain admissible opinions, the Court should disregard it. Fed. R. Civ. P. 26(c)(2), (4).[10]

## CONCLUSION

For the reasons offered above, the City and County of San Francisco and its officials respectfully submit that the Court should enter summary judgment in their favor.

Dated: June 28, 2012

DENNIS J. HERRERA

By: _s/Christine Van Aken_
CHRISTINE VAN AKEN
Attorneys for Defendants CITY AND COUNTY OF SAN FRANCISCO and ITS OFFICIALS

---

[9] For instance, he testified that his background in the relationship between firearm-storage laws and accidents and suicides comes from his experience as a father. *Id.* at 51:13-53:20.

[10] The only part of the Orsay Declaration that is plausibly admissible is his testimony about the characteristics and properties of hollow-point and expanding ammunition. But there is no dispute of *fact* between Chinn and Orsay that hollow-point ammunition generally has a greater power to incapacitate its victims than full-metal jacketed ammunition. Chinn Decl. ¶ 4.