1  C. D. Michel - S.B.N. 144258
   Clinton B. Monfort - S.B.N. 255609
2  Anna M. Barvir - S.B.N. 268728
   MICHEL & ASSOCIATES, PC
3  180 E. Ocean Boulevard, Suite 200
   Long Beach, CA 90802
4  Telephone: 562-216-4444
   Facsimile: 562-216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Amicus Curiae National Rifle Association, Inc.

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                        **OAKLAND DIVISION**

11 | THERESE MARIE PIZZO,                        | ) CASE NO. 09-CV-04493-CW
   |                                             | )
12 |              Plaintiffs                     | ) **BRIEF OF AMICUS CURIAE NATIONAL**
   |                                             | ) **RIFLE ASSOCIATION, INC. IN SUPPORT**
13 |              vs.                            | ) **OF NEITHER PARTY**
   |                                             | )
14 | CITY AND COUNTY OF SAN                      | ) **SFPC § 4512**
15 | FRANCISCO, EDWIN LEE, in both his           | ) **SFPC §613.10(g)**
   | official capacity; SAN FRANCISCO            | )
16 | POLICE DEPARTMENT CHIEF OF                  | )
   | POLICE GREG SUHR, in his official           | ) Hearing Date: August 30, 2012
17 | capacity; SAN FRANCISCO SHERIFF             | ) Time:        2:00 p.m.
   | VICKI HENNESSEY, in her official            | ) Place:       Courtroom 2, 4th Floor
18 | capacity; CITY AND COUNTY OF SAN            | )
   | FRANCISCO; and STATE OF                     | )
19 | CALIFORNIA ATTORNEY GENERAL                 | )
   | KAMALA HARRIS in her official capacity,     | )
20 |                                             | )
   |              Defendants.                    | )
21 |                                             | )
   |_____       | )
22 | NATIONAL RIFLE ASSOCIATION, INC.,           | )
   |                                             | )
23 |              Amicus Curiae.                 | )
   |_____       | )
24

25

26

27

28

1

## TABLE OF CONTENTS

2

**PAGE(S)**

3

INTEREST OF AMICUS CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

4

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

I.       PLAINTIFF DOES NOT HAVE STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7

       A.     The City Applies an Improper Standing Test That Directly
Contradicts the Court's Order Denying the City's Motion to
Dismiss in Jackson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8

       B.     Plaintiff Has Not Established Standing Because She Does
Not Presently Intend To Engage in Conduct Prohibited by
Sections 4512 and 613.10(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

9

II.     ALTERNATIVELY, SECTIONS 4512 AND 613.10(g) ARE
UNCONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10

       A.     Standard of Review for Second Amendment Challenges . . . . . . . . . . . . . 3

11

            1.     *Heller* and *McDonald* Endorse a Scope-Based Analysis, Not
a Means-End Approach That Necessarily Entails a Balancing
of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

12

            2.     Should the Court Adopt a Means-End Test for Second
Amendment Challenges, Strict Scrutiny Must Apply . . . . . . . . . . . . 6

13

       B.     Section 4512 Violates the Second Amendment . . . . . . . . . . . . . . . . . . . . 7

14

            1.     The City's Locked-Storage Law Restricts the Right
To Keep and Bear Arms for the "Core Lawful Purpose"
of Self-Defense in the Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15

            2.     The Storage Law Fails Under *Heller's* Scope-Based
Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16

            3.     The Locked-Storage Law Cannot Survive Any Heightened
Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17

       C.     Section 613.10(g) Violates the Second Amendment . . . . . . . . . . . . . . . 11

18

            1.     The Second Amendment Guarantees the Right To Acquire
Firearms and Ammunition in "Common Use" for Self-Defense . . . . . 11

19

            2.     The City's Ammunition Sales Ban Restricts Protected
Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS (CONT.)

2

**PAGE(S)**

3

4    **3.    Bans on the Sale of Arms in "Common Use" Are
          Unconstitutional in the Wake of *Heller* and *McDonald* –
          Under Any Standard of Review**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5

6             **a.    The City's Ban on the Sale of Expanding/Fragmenting
                      Ammunition Fails Under *Heller*'s Historical Approach**. . . . .  13

7             **b.    Alternatively, the City's Ban on the Sale of Expanding
                      Ammunition Fails Under Any Level of Heightened**

8                     **Scrutiny**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

9    **4.    The City's Ban on the Sale of "Ammunition That Does Not
          Serve a Sporting Purpose" Violates the Second Amendment,**

10            **Under Any Test**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

11   **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brief of Amicus Curiae The National Rifle Association, Inc.

1

# **TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

## **FEDERAL CASES**

4

5
*Andrews v. State*,
50 Tenn. 165 (1871).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6
*Bateman v. Perdue*,
No. 5:10-265 (E.D. N.C. Mar. 29, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7

8
*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9
*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10
*Brown v. Entm't Merchs. Ass'n*, __ U.S. __,
11
131 S. Ct. 2729 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

12
*Citizens United v. Fed. Election Comm'n*, __ U.S. __,
130 S. Ct. 876 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

13
*Clark v. Jeter*,
14
486 U.S. 456 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15
*Clingman v. Beaver*,
544 U.S. 581 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16

17
*Dearth v. Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18
*District of Columbia v. Heller*,
554 U.S. 570 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
19

20
*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 13

21
*Gowder v. City of Chicago*,
No. 11-1304, slip op. at 15 (N.D. Ill. June 19, 2012). . . . . . . . . . . . . . . . . . . . . . . . . 5

22

23
*Griswold v. Connecticut*,
381 U.S. 479 (1965).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

24
*Heller v. District of Columbia* (*Heller II*),
670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
25

26
*Jackson v. City and County of San Francisco*,
829 F. Supp. 867 (N. D. Cal. S.F. Div. Sept. 27, 2011).. . . . . . . . . . . . . . . . . . . . *passim*

27

28

1

**TABLE OF AUTHORITIES (CONT.)**

2

**PAGE(S)**

3

4

**FEDERAL CASES (CONT.)**

5

*Kwong v. Bloomberg,*
   No. 11-2356, 2012 WL 995290, at \*11 (S.D. N.Y. Mar. 26, 2012). . . . . . . . . . . . . . . . 7

6

*McDonald v.  City of Chicago,*
   130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

7

8

*Nordyke v. King,*
   664 F.3d 774 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10

*Peruta v. County of San Diego,*
   No. 10-56971 (9th Cir. appeal docketed Dec. 16, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . i

11

12

*Reno v. Flores,*
   507 U.S. 292 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13

*Richards v. Prieto,*
   No. 11-16255 (9th Cir. appeal docketed May 19, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . i

14

15

*Richmond Newspapers v. Virginia,*
   448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

16

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

17

18

*Tashjian v. Republican Party of Conn.,*
   479 U.S. 208 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19

*Timmons v. Twin Cities Area New Party,*
   520 U.S. 351(1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

20

21

*United States v. Booker,*
   644 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

23

24

*United States v. Marzarella,*
   614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

25

*United States v. Masciandaro,*
   638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

26

27

28

1

## TABLE OF AUTHORITIES (CONT.)

2

**PAGE(S)**

3

4

### FEDERAL CASES (CONT.)

5

*United States v. Playboy Entertainment Group, Inc.*,
6     529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Skoien*,
7     614 F.3d 638 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 *United States v. Weaver*,
     No. 09-00222, 2012 WL 727488, at *6 (S.D. W. Va. Mar. 6, 2012). . . . . . . . . . . . . . . . 7
9

*United States v. Williams*,
10     616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 *Ward v. Rock Against Racism*,
     491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12
### STATUTES, RULES AND REGULATIONS
13

14 California Penal Code § 16460. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15 California Penal Code § 18710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

16 California Penal Code § 18735. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17 California Penal Code § 25100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 California Penal Code § 25105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19 California Penal Code § 25200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20 California Penal Code § 25205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Florida  Statute § 790.174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
21

22 Hawaii Rev. Statute §§134-10.5, 707-714.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

23 720 Illinois. Comp. Statute 5/24-9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24 Iowa Code § 724.22(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

25 Maryland Code Ann., Crim. Law § 4-104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26 Minnesota Statute § 609.666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

27 New Hampshire Rev. Statute Ann. § 650-C:1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

New Jersey Statute Ann. § 2C:58-15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
28

1

### INTEREST OF AMICUS CURIAE

2          Amicus curiae, National Rifle Association ("NRA"), is a non-profit organization founded

3   in 1871. NRA represents hundreds of thousands individual members and approximately 850

4   affiliated associations in California. Among its other activities, NRA works to preserve and

5   protect the constitutional and statutory rights of gun owners, including the right to self-defense

6   and the Second Amendment right to keep and bear arms. As an amicus, NRA seeks to provide the

7   Court with necessary legal analysis regarding Plaintiff's challenges to San Francisco Police Code

8   sections 4512 and 613.10(g), the same claims brought by NRA in *Jackson v. City and County of*

9   *San Francisco*,[1] Case No. 09-2143. The Court granted NRA amicus status by order dated May 5,

10  2011 (Doc. No. 44).

11

12

13

14

15

16

17

18

19

20

21

22

23

24          [1] NRA did not seek amicus status to address Plaintiff's claims concerning the right to carry a
    firearm to prevent inundating the Court with paperwork, and because it appears Plaintiff does not
25  have standing.  Should the Court reach the merits of these claims, NRA respectfully suggests the
    Court stay these proceedings pending the resolution of *Peruta v. County of San Diego*, No. 10-
26  56971 (9th Cir. appeal docketed Dec. 16, 2010); and *Richards v. Prieto*, No. 11-16255 (9th Cir.
    appeal docketed May 19, 2011).These cases, to which NRA is also an amicus, raise similar claims
27  and are fully briefed and awaiting oral argument before the Ninth Circuit Court of Appeal.
    Alternatively, amicus suggests the Court review the briefing in these cases.

28

Brief of Amicus Curiae The National Rifle Association, Inc.

**INTRODUCTION**

This case was filed in the wake of NRA's challenge to sections 4512 and 613.10(g) in *Jackson v. City and County of San Francisco*, Case No. 09-2143. It included virtually identical challenges to those ordinances, as well as challenges to a host of other state laws and local policies. NRA subsequently petitioned the Court for amicus status to protect its members' interests with regard to the duplicative claims. In the interim, the City filed multiple motions to dismiss the *Jackson* plaintiffs' claims. The denial of the City's second motion to dismiss resulted in a published order from this Court that clarified the "standing" hurdle Second Amendment challengers must clear following the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Plaintiff Pizzo's moving and opposition papers nonetheless fail to cite the *Jackson* order (or any case law for that matter) to counter the City's assertion that Ms. Pizzo lacks standing.

This case presents issues of constitutional importance that, no matter how well-intentioned Plaintiff and her counsel might be, should not be left to such inadequate briefing. As these issues are being litigated in a case filed prior to this case, NRA respectfully suggests this Court stay Ms. Pizzo's challenges to sections 4512 and 613.10(g) pending resolution of *Jackson*.

Should the Court opt not to stay the proceedings, Plaintiff's claims should be dismissed for lack of standing. Alternatively, the City's locked-storage law and its ban on the sale of protected, common self-defense ammunition are unconstitutional because they impermissibly restrict the right to arms in one's home for the core lawful purpose of self-defense.

**ARGUMENT**

**I.     PLAINTIFF DOES NOT HAVE STANDING**

   **A.     The City Applies an Improper Standing Test That Directly Contradicts the Court's Order Denying the City's Motion to Dismiss in Jackson**

In its Cross-Motion for Summary Judgment, the municipal defendants ("the City") argue that Plaintiff does not have standing because she has not established an imminent prosecution or a long history of enforcement such that there is a credible threat of enforcement against Ms. Pizzo.

The City does so despite this Court's Order Denying Motion to Dismiss for Lack of Standing in *Jackson v. City and County of San Francisco*, wherein the City likewise asserted that

1

1    the *Jackson* plaintiffs did not have standing because they had not alleged a genuine likelihood of

2    enforcement. *Jackson v. City and County of San Francisco*, 829 F. Supp. 867, 869 (N. D. Cal.

3    S.F. Div. Sept. 27, 2011).

4         In its Order, the *Jackson* court made clear that, in the wake of *Heller*, Second Amendment

5    litigants need not allege or establish a likelihood of enforcement. Instead, the Court found the

6    *Jackson* plaintiffs had alleged standing because they had not merely described a wish to violate

7    the ordinances in some vague or unspecified way, but that they had alleged a present intention to

8    engage in prohibited conduct that they contend is constitutionally protected.

9         Plaintiffs allege they own guns now . . . they want to keep their guns unlocked *now* for
         potential use in self defense, and that they wish to acquire prohibited ammunition *now* for
10        the same purpose. While the time that they will actually *use* the guns in self defense is
         unknown . . . that does not undermine the immediacy and concreteness of the injury . . . .
11
     *Id*. at 872.
12
          Accordingly, the Court should determine standing according to Plaintiff's intentions to
13
     engage in the asserted protected conduct that is prohibited by the City's ordinances.
14
          **B.    Plaintiff Has Not Established Standing Because She Does Not Presently
15              Intend To Engage in Conduct Prohibited by Sections 4512 and 613.10(g)**

16        With respect to the locked storage ordinance, Plaintiff has not established that she would

17   presently keep her guns unloaded now, but for the existence of the law. Instead, Plaintiff has only

18   established a vague and speculative intention, at best, to store her firearms loaded and operable for

19   immediate self-defense.  Plaintiff testified that she may only keep her handgun unlocked in the

20   event of a riot or some other future event (other than the ordinance being struck down), and she

21   asserts that her storage method would be based upon the facts and situation *at the time*.

22        With respect to the City's ammunition sales ban, Plaintiff has similarly failed to establish a

23   present intention to engage in conduct prohibited by section 613.10(g). Plaintiff does not assert

24   that she intends to purchase the prohibited ammunition from the lone firearms and ammunition

25    retailer in San Francisco.  Rather, Plaintiff testified that she has not been to that store since the

26   late 1980s and she has not used hollow-point ammunition in over a decade.

27        Because Plaintiff has not established a present intention to engage in conduct prohibited

28   by the City's ordinances, Plaintiff's challenges to sections 4512 and 613.10 should be dismissed.

**II.    ALTERNATIVELY, SECTIONS 4512 AND 613.10(g) ARE UNCONSTITUTIONAL**

    **A.    Standard of Review for Second Amendment Challenges**

The Supreme Court, while not settling on a framework for all Second Amendment challenges, has left little doubt that courts are to assess gun laws based on history and tradition, and not by resorting to interest-balancing tests.  The *Heller* majority rejects the "severity of the burden" and "tiers-of-scrutiny" framework advanced by the City. *Heller*, 554 U.S. at 628 n.27, 634-35; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1271-74 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Alternatively, strict scrutiny must apply.

    **1.    *Heller* and *McDonald* Endorse a Scope-Based Analysis, Not a Means-End Approach That Necessarily Entails a Balancing of Interests**

*Heller* advances an analytical approach based on text and history that determines first whether the law restricts activity within the scope of the right as originally understood, and second whether the regulation is so commonplace in our history and traditions that the right to keep and bear arms must be understood in light of it. *See Heller*, 554 U.S. at 634-35; Oral Arg. at 44, *Heller*, 554 U.S. 570 (No. 07-290).

When *Heller* was argued before the Supreme Court, the Solicitor General urged the Court to employ "intermediate scrutiny" in reviewing the District's handgun ban and locked-storage law, believing if that standard were employed, the laws would be upheld. *See* Oral Arg. at 44-45, *Heller*, 554 U.S. 570 (No. 07-290). Chief Justice Roberts rejected this attempt to "articulate an all-encompassing standard" applicable to every Second Amendment case, asking:

> Isn't it enough to determine the scope of the existing right that the amendment refers to, look at the various regulations that were available at the time, including you can't take the gun to the marketplace and all that, and determine how . . . this restriction and the scope of this right looks in relation to those? . . . I'm not sure why we have to articulate some very intricate standard. I mean, these standards in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up. But I don't know why when we are starting afresh, we would try to articulate a whole standard that would apply in every case?

*Id*.

Chief Justice Roberts was suggesting that courts simply ask whether the law restricts activity falling within the scope of the right as originally understood.  If it does, the law is *presumed* invalid unless the *government* can show its regulation is so commonplace in our history

1   and traditions that the scope of the fundamental right to keep and bear arms must be understood in

2   light of it.[2]  But there would be no "balancing test" or weighing of burdens and benefits. *Id.*

3          When *Heller* was decided, this scope-based approach was, in large part, the approach

4   taken by the majority, after it expressly rejected Justice Breyer's subjective, interest-balancing

5   test. 554 U.S. at 634-35. Notably absent from *Heller's* analysis was any discussion of "compelling

6   interests," "narrowly tailored" laws, or any other standard of review jargon. Nor were there

7   discussions of the District's "legislative findings" purporting to justify the restrictions.

8          Instead, *Heller* focused on whether the challenged laws restricted the right to keep and

9   bear arms as that right was understood by those who drafted and enacted both the Second and

10  Fourteenth Amendments. *Id.* at 626-34. The Court gleaned that understanding from an extensive

11  examination of the textual and historical narrative surrounding the pre-existing right to arms, to

12  define, at least in broad terms, the scope of the rights that the Second Amendment guarantees. *Id.*

13  at 605-19. In doing so, the Court emphasized that "[c]onstitutional rights are enshrined with the

14  scope they were understood to have when the people adopted them, whether or not future

15  legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

16         The *Heller* Court ultimately found that handguns are arms protected by the Second

17  Amendment, *id.* at 629, and that keeping handguns in one's home for self-defense purposes is

18  core conduct protected by the same, *id.* at 635. Because the District's handgun ban and locked-

19  storage requirement directly conflicted with protected conduct, and because there was no

20  historical record of such restrictions, the laws were unconstitutional. *Id.* at 628-30.

21         The Court's later decision in *McDonald* further underscored the notion that history and

22  tradition, rather than burdens and benefits, should guide analyses of Second Amendment

23  challenges. Like *Heller*, *McDonald* did not use balancing tests and expressly rejected judicial

24  assessment of "the costs and benefits of firearms restrictions," stating that courts should not make

25

26         [2] *Heller* suggests that as to law-abiding citizens in a home setting – where the need for the right
    to arms is "most acute," 554 U.S. at 628 – the analysis stops there. Other courts, in different
27  circumstances, have added a means-end analysis to *Heller's* scope-based approach. *See, e.g.*,
    *Ezell*, 651 F.3d at 701-04; *United States v. Marzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United*
28  *States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

1   "difficult empirical judgments" about the efficacy of particular gun regulations.  *McDonald v.*

2   *City of Chicago*, 130 S. Ct. 3020, 3050 (2010). This language is compelling. Means-end tests, like

3   strict or intermediate scrutiny, necessarily require the assessment of the "costs and benefits" of

4   government regulations, as well as "difficult empirical judgments" about their effectiveness.[3]

5        The City's moving and opposition papers wholly ignore this framework. Instead, the City

6   advances a two-step approach that "asks whether the challenged law burdens conduct that falls

7   within the scope of the Second Amendment right, as historically understood" and, if it does,

8   applies a means-end test based on the severity of the burden on the right to keep and bear arms.

9   Under the City's framework, history and tradition serve only as a threshold to determine whether

10  the challenged law implicates the individual right. *Id*. But, as explained above, *Heller* and

11  *McDonald* set forth a test based *wholly* on text, history, and tradition.

12       The few courts that have adopted a means-end analysis based on the "severity of the

13  burden" have done so in error. Neither *Heller* nor *McDonald* support adoption of this approach.

14  Doing so required those courts to ignore the many passages from *Heller* and *McDonald* that rely

15  on history and tradition and discredit the use of interest-balancing tests.  The Ninth Circuit seems

16  to understand the folly of adopting this analysis, having vacated the opinion of a three-judge

17  appellate panel engaging in a similar discussion. *Nordyke v. King*, 664 F.3d 774 (9th Cir. 2011).

18  This Court now has the chance to adopt an approach consistent with *Heller* and *McDonald*.[4]

19

20

---

21   [3]  The City's reliance on "studies" to justify the challenged ordinances' restriction on core
22   conduct "creates exactly the type of problem identified by Justice Scalia in *Heller I*, since, for
     every study, there can be a credible or convincing rebuttal study." *See Gowder v. City of Chicago*,
23   No. 11-1304, slip op. at 15 (N.D. Ill. June 19, 2012).

24   [4]  Any reliance by the City on election law cases like *Clingman v. Beaver*, 544 U.S. 581 (2005)
     to bolster its "severity of the burden" approach is misplaced. Unlike restrictions on the Second
25   Amendment, the Constitution explicitly grants states the broad authority to prescribe regulations
     to govern the electoral process. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217
26   (1986). As such, "States may, and inevitably must, enact reasonable regulations of parties,
     elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities*
27   *Area New Party*, 520 U.S. 351, 358 (1997). While the City may cite *Clingman* for the premise that
     not all laws regulating core fundamental rights must survive the most exacting scrutiny, it cannot
28   ignore the constitutional authority justifying the "severity of the burden" approach in that context.

### 2. Should the Court Adopt a Means-End Test for Second Amendment Challenges, Strict Scrutiny Must Apply

Should the Court hold that restrictions on the core right of law-abiding citizens to self-defense in the home are subject to means-end review, strict scrutiny must be the test. The City claims that intermediate scrutiny (or less) is appropriate for all but the most severe of Second Amendment deprivations.[5] But this argument conflicts with protections courts afford core areas of other fundamental, enumerated rights. And it rests on cases involving factors not present in *Heller* (e.g., prohibited person, sensitive place, unprotected arms). Here, no such factors are in play.

Just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). Courts routinely apply strict scrutiny when restrictions on *core* First Amendment conduct is concerned, including regulations on the content of speech, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000), political expenditures, *Citizens United v. Fed. Election Comm'n*, __ U.S. __, 130 S. Ct. 876, 898 (2010), and expressive association, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). In these contexts, courts consider the severity of the burden a regulation places on core protected conduct *only* in weighing whether the regulation survives strict scrutiny – *not in determining* the applicable standard of review. *See Citizens United*, 130 S. Ct. at 898-99; *Playboy Entm't Grp., Inc.*, 529 U.S. at 812-13; *Boy Scouts of America v. Dale*, 530 U.S. 640, 658-59 (2000); *Roberts*, 468 U.S. at 658-59. Here too, where the laws restrict the *core* Second Amendment right to self-defense in the home by law-abiding adults, strict scrutiny must apply regardless of the severity of the burden imposed.

The City nonetheless argues that Plaintiffs' challenge is at most entitled to intermediate scrutiny because the degree of burden on Plaintiffs' rights is minimal. Defs.' Opp'n 15:3-16, 20:1-16. This approach derives no support from *Heller* or *McDonald*, and it stands in direct opposition to the protection courts afford to core areas of enumerated, fundamental rights. Further, those courts that have applied intermediate scrutiny have done so in cases presenting vastly different

---

[5] Laws restricting Second Amendment conduct demand more than rational basis review. Whatever else *Heller* left for future courts to decide, it is clear on this point. 554 U.S. at 628 n.27.

1   questions than those presented here. Almost without exception, these cases do not involve the

2   right to armed self-defense by law-abiding citizens within the home.[6]  In fact, most involve

3   conduct decidedly *outside* the core Second Amendment right, including possession by violent

4   criminals, *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), *United States v. Chester*, 628

5   F.3d 673, 680, 682-83 (4th Cir. 2010), *United States v. Williams*, 616 F.3d 685, 692 (7th Cir.

6   2010), *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010), possession in places the court

7   determined to be "sensitive," *United States v. Masciandaro*, 638 F. 3d 458, 471 (4th Cir. 2011),

8   and possession of arms the court determined are not in "common use" for lawful purposes, *United*

9   *States v. Marzarella*, 614 F.3d 85 (3d Cir. 2010).

10      The clear implication is that these courts would have applied a more stringent standard of

11   review if those regulations had reached core conduct.  And contrary to the City's carefully-worded

12   assertion that "since *Heller* was decided, not a single federal appellate court has applied strict

13   scrutiny to a challenged gun control measure" – several Courts have expressly stated that they

14   *would have applied strict scrutiny* had core conduct been implicated at all, and they would have

15   done so regardless of the "severity" of the burden. *See Masciandaro*, 638 F.3d at 470 (noting that

16   just as "any law regulating the content of speech is subject to strict scrutiny, . . . __any law that__

17   *would burden* the 'fundamental,' core right of self-defense in the home by a law-abiding citizen

18   would be subject to strict scrutiny") (emphasis added); *United States v. Weaver*, No. 09-00222,

19   2012 WL 727488, at *6 (S.D. W. Va. Mar. 6, 2012) (citing *Masciandaro* with approval); *Chester*,

20   628 F.3d at 680, 682-83 (applying intermediate scrutiny because firearm possession by domestic

21   violence misdemeanant is not within the core right of the law-abiding citizen to possess a firearm

22   for self-defense).

23      Should the Court adopt a means-end approach, precedent commands strict scrutiny.

24   **B.    Section 4512 Violates the Second Amendment**

25   **1.    The City's Locked-Storage Law Restricts the Right To Keep and Bear Arms for the "Core Lawful Purpose" of Self-Defense in the Home**

26

27      [6] The only cases relating to possession in the home dealt with challenges to simple permitting or registration laws. Those laws do not directly conflict with core conduct in the manner that City's laws do. *Heller II*, 670 F.3d at 1254; *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011);

28   *Kwong v. Bloomberg*, No. 11-2356, 2012 WL 995290, at *11 (S.D. N.Y. Mar. 26, 2012).

1    It is in the dead of night, when robberies of occupied dwellings are most prevalent, that the

2    City's locked-storage requirement presents the most obvious restriction. The law requires

3    residents, under threat of criminal penalty, to choose between locking up their handguns through

4    the night when they are at highest risk for attack,[7] or sleep with their loaded guns strapped to their

5    bodies.  The "choice" is as false as it is absurd.

6    Chief Justice Roberts and Justice Scalia illuminated the burden imposed by a requirement

7    to keep guns locked away at night during oral argument in *Heller* when counsel for the District

8    suggested the locked-storage law had an implied self-defense exception and that, because of that

9    exception, the ordinance did not restrict one's right to armed self-defense. The Chief Justice and

10   Justice Scalia disagreed – finding the contention implausible as they briefly imagined the steps

11   needed to render a locked handgun operable to defend against a sudden late-night attack:

12       JUSTICE SCALIA:    You turn on, you turn on the lamp next to your bed so you can – you
         can turn the knob at 3-22-95, and so somebody –
13       MR. DELLINGER:    Well –
         CHIEF JUSTICE ROBERTS: Is it like that? Is it a numerical code?
14       MR. DELLINGER:    Yes, you can have one with a numerical code.
         CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up your
15       reading glasses –
         (laughter)
16
     Oral Arg. at 83-84, *Heller*, 554 U.S. 570 (No. 07-290).
17
18       While the Court found humor in counsel's suggestion that the locked-storage law (even

19   assuming a self-defense exception) would impose only a minimal burden on the right to arms in a

20   self-defense emergency, the point is a serious one that translates well to the present case. In

21   comparison to the storage law struck down in *Heller*, we have simply gone from a law making it

22   "legally impossible" to engage in emergency self-defense conduct to one that makes it "practically

23   impossible" to be armed and ready for a self-defense emergency during the night when residents

24   are at the greatest risk. That is a distinction without a difference when facing a sudden attack.

25

26
     _____

27   [7] At night, the need to have access to an operable firearm is most acute. From 2003 to 2007, an
     estimated 61.3% of robberies of occupied dwellings occurred between 6 p.m. and 6 a.m. Bureau
28   of Justice Statistics, U.S. Dep't of Justice, National Crime Victimization Survey 6 tbl.9 (2010),
     *available at* http://www.bjs.gov/content/pub/pdf/vdhb.pdf.

1    In short, the locked-storage law – even with a self-defense exception – restricts the right to

2    arms. The Supreme Court found arguments to the contrary unpersuasive, even humorous.  The

3    City has failed to meet its burden to explain otherwise.

4    It is irrelevant that the City has determined that some lockboxes provide ready access to a

5    stored gun. How quickly one's firearm might be *rendered* operable (with the right technology) has

6    no bearing on whether the City's requirement infringes the core right to keep arms operable for

7    self-defense. To be sure, physical impossibility to engage in self-defense is not the test for

8    whether a restriction is valid. But, as *Heller* found, the District could not save its law just because

9    exercise of the right remained "possible" with long guns. 554 U.S. at 629. Similarly, the City's

10   law is not valid because it *might* be possible to render a firearm operable in time to save one's life.

11   Further, *Heller* does *not* suggest that locked-storage laws like the City's are "categorically

12   valid." The Court's statement that its "analysis does [not] suggest the invalidity of laws regulating

13   the storage of firearms to prevent accidents[,]" merely reassures governments that storage

14   ordinances are not *necessarily* invalidated by its holding. Such language certainly does not

15   insulate from meaningful judicial review one of the most extreme storage laws in the country –

16   especially considering that *Heller* itself invalidated the only locked-storage law it had before it.

17   Finally, the City's claim that there is no Second Amendment right to have an immediately

18   accessible, operable handgun in the home contravenes *Heller*'s express guidance.  In *Heller*, the

19   Court was careful to note that the Second Amendment protects the right to "possess and carry"

20   weapons and to be "armed and ready" for self-defense "in case of confrontation" –  not merely the

21   right to be armed and ready for self-defense once one is being attacked. 554 U.S. at 584, 592.

22                    **2.    The Storage Law Fails Under *Heller's* Scope-Based Approach**

23   The City has not met its burden to establish that laws requiring people to keep their

24   handguns locked up when in their own homes regardless of the circumstances were part of the

25   historical narrative surrounding the Second Amendment when it was drafted.

26    Those laws referenced by the City fail to establish a history and tradition of laws that

27   mandate locked storage of firearms in the home regardless of the circumstances. Notably, two of

28   the ordinances regulated only the storage of large quantities of gunpowder and did not require

1    residents to keep their firearms locked away and inoperable.  Further, these ordinances were

2    motivated by an expressed desire to prevent widespread fires. *Heller*, 554 U.S. at 631. And the

3    only ordinance that did prohibit the taking of loaded firearms into buildings was similarly aimed

4    at reducing the risk of fire. *Id.* In any event, the City cannot justify its extreme locked-storage

5    requirement on a single Framing-era ordinance. *Id.* at 632. This is especially clear considering that

6    the gun storage provisions of nearly every other jurisdiction come no where close to the restriction

7    the City imposes in requiring locked storage at all times.[8]  Such laws, which are commonplace

8    throughout the United States, instead permit gun owners to keep their firearms operable for self-

9    defense within the sanctity of their own homes, but absolve them of liability if an unauthorized

10   person gains access to and misuses their firearms if their firearms were locked away.

11         **3.**      **The Locked-Storage Law Cannot Survive Any Heightened Scrutiny**

12         Under strict scrutiny, the City must show that its locked-storage law is "narrowly tailored

13   to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). Even assuming

14   the government has a "compelling interest" in the manner that law-abiding citizens store their

15   firearms in their homes, the City's broad and burdensome law is simply not "narrowly tailored."

16         To pass muster under even intermediate scrutiny, which is not appropriate in this case, the

17   City must show that its locked-storage law is "*substantially* related to an important governmental

18   objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (emphasis added). That is, the City must

19   establish a tight fit "that employs not necessarily the least restrictive means but . . . a means

20   *narrowly tailored* to achieve the desired objective." *Bd. of Trustees of State Univ. of N.Y. v. Fox*,

21   492 U.S. 469, 480 (1989) (emphasis added). "The requirement of narrow tailoring is satisfied so

22   long as the regulation promotes a substantial governmental interest that would be achieved less

23   effectively absent the regulation, and the means chosen are not substantially broader than

24   necessary to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989).

25

26

27       [8] Massachusetts is an outlier, but even that state's extreme restriction on the right to keep
     operable arms in the home provides an exception for the residents to keep unlocked, operable

28   firearms if they are under the control of the owner. *See* Mass. Gen. Laws ch. 140, § 131L.

1    The City cannot defend its infringement by claiming the law is intended to protect children

2  or others from accidental injury or to keep handguns out of the hands of unauthorized persons,

3  with any attendant restriction on the right being incidental and necessary. There is simply no

4  logical fit between such an interest and a law requiring that *all* residents, including competent,

5  law-abiding adults, keep their handguns locked up at *all times* – regardless of whether minors or

6  felons or anyone else is present. Here, examples abound of narrowly tailored laws[9] that promote

7  the same interests, while allowing citizens to keep their firearms operable for immediate self-

8  defense.  The City's law is not so tailored.  And nothing in the City's papers or "fact" finding

9  legislation suggests those more narrowly tailored laws would less effectively achieve its interests.

10    As it cannot survive even intermediate scrutiny, section 4512 is unconstitutional on its face.

11  **C.    Section 613.10(g) Violates the Second Amendment**

12    **1.    The Second Amendment Guarantees the Right To Acquire Firearms and Ammunition in "Common Use" for Self-Defense**

13    The Supreme Court recently confirmed that the Second Amendment secures a fundamental

14  right to possess functional firearms for self-defense. *Heller*, 554 U.S. at 635; *McDonald*, 130 S.

15  Ct. at 3042. That right necessarily includes the right to acquire firearms *and* ammunition.

16  "[C]ertain unarticulated rights are implicit in enumerated guarantees. . . . [F]undamental rights,

17  even though not expressly guaranteed, have been recognized by the Court as indispensable to the

18  enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80

19  (1980). "The right to keep arms, necessarily involves the right to purchase them, to keep them in a

20  state of efficiency for use, and *to purchase and provide ammunition suitable for such arms*. . . ."

21  *Andrews v. State*, 50 Tenn. 165, 178 (1871) (emphasis added). Banning commerce in arms

22  violates the Second Amendment at its core. *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d

23  Cir. 2010).  The government can no more ban the sale of protected ammunition than it can ban the

24  sale of protected books, contraceptives, or even violent video games. *See Griswold v. Connecticut*,

25  381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2738

26

27    [9] *See* Cal. Penal Code §§ 25100, 25105, 25200, 25205; Fla. Stat. § 790.174; Haw. Rev. Stat. §§134-10.5, 707-714.5; 720 Ill. Comp. Stat. 5/24-9(a); Iowa Code § 724.22(7); Md. Code Ann.,

28  Crim. Law § 4-104; Minn. Stat. § 609.666; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. § 2C:58-15.

1   (2011). And so, laws that prohibit citizens from purchasing protected arms are at odds with the

2   Second Amendment, regardless of whether they directly restrict possession of such arms. *See*

3   Order at 10, *Bateman v. Perdue*, No. 5:10-265 (E.D. N.C. Mar. 29, 2012).

4        Additionally, the Supreme Court has clarified that the Second Amendment protects those

5   arms that are "typically possessed by law-abiding citizens for lawful purposes" or those "in

6   common use" *Heller*, 554 U.S. at 624-25. Because the Second Amendment protects the purchase

7   and possession of ammunition necessary to meaningfully exercise the right to keep and bear arms,

8   *Andrews*, 50 Tenn. at 178; *see also Richmond Newspapers*, 448 U.S. at 579, it follows that the

9   acquisition of ammunition in "common use" for lawful purposes is protected.

10       **2.    The City's Ammunition Sales Ban Restricts Protected Conduct**

11       Here, section 613.10(g)(2)-(3) bans the sale of ammunition "designed to expand or

12   fragment upon impact." Like the class of arms in *Heller*, i.e. handguns, this class of ammunition is

13   in "common use" and the City's ammunition ordinance thus restricts protected conduct.

14       The City's contention that other types of ammunition are available is irrelevant. *Heller* is

15   clear that just because some other arm may "suffice" for self-defense – that does not save a ban on

16   arms in "common use." "It is no answer to say, as petitioners do, that it is permissible to ban the

17   possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."

18   *Heller*, 554 U.S. at 629. The court of appeal in *Heller* made a nearly identical ruling:

19       The District contends that since it only bans one type of firearm, "residents still have
20       access to hundreds more," and thus its prohibition does not implicate the Second
         Amendment because it does not threaten total disarmament. *We think that argument*
21       *frivolous*. It could be similarly contended that all firearms may be banned so long as sabers
         were permitted.

22   *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (emphasis added).

23       In *Heller*, the Court found that a ban on handguns was invalid because they are commonly

24   used for a lawful purpose (i.e., self-defense), noting that "the American people have considered

25   the handgun to be the quintessential self-defense weapon." 554 U.S. at 629.

26       Here, it is beyond dispute that the expanding/fragmenting or hollow-point ammunition is

27   in common use.  In fact, it is widely available in every state, there being no statewide ban on its

28

---

12

1    sale or possession.[10] And it is no secret that those who own firearms for self-defense regularly

2    purchase such ammunition for use in self-defense, but use less expensive fully-jacketed

3    ammunition for target shooting. It is indeed the "quintessential" self-defense ammunition.

4          Finally, government bans on the sale of protected ammunition *cannot* be saved by the

5    premise that individuals might purchase the prohibited ammunition in other jurisdictions. *See*

6    *Ezell*, 651 F.3d at 697-700. Just as a local government may not "prohibit the exercise of a free-

7    speech or religious-liberty within its borders on the rationale that those rights may be freely

8    enjoyed in suburbs," it is likewise precluded from banning the sale of protected firearms and

9    ammunition.  *Id.* at 697.

10                    **3.      Bans on the Sale of Arms in "Common Use" Are Unconstitutional in
                             the Wake of *Heller* and *McDonald* – Under Any Standard of Review**

11         Contrary to the City's assertions, section 613.10(g) does not regulate ammunition – it

12   flatly prohibits the sale of protected ammunition. It cannot be argued that, after *Heller*, the

13   government can ban the sale of the very arms that the Second Amendment protects.

14                    **a.      The City's Ban on the Sale of Expanding/Fragmenting
                             Ammunition Fails Under *Heller*'s Historical Approach**

15         Generally, laws that prohibit access to fundamental rights are unconstitutional. *See*

16   *Brown*, 131 S. Ct. at 2736 (access to violent video games protected by the First Amendment);

17   *Griswold*, 381 U.S. at 485-86 (access to contraceptives). In *Heller*, the Supreme Court made clear

18   that bans on protected arms cannot stand – without resorting to means end scrutiny. 554 U.S. at

19   636. Nothing in our nation's history suggests tolerance for laws that flatly ban the sale of arms

20   that are in common use. The City nonetheless attempts to justify its ammunition ban by pointing

21   prior bans on the sale of common arms. But these statutes, enacted well after the adoption of the

22   Second Amendment, are insufficient to establish that the enumerated right should be understood

23   in light of those restrictions.  *See id.* at 632. It strains all sense of reason to suggest, as the City

24   does, that these statutes could survive a constitutional challenge in light of *Heller*. To be sure,

25   each of the statutes relied on by the City proscribed the sale of handguns – the very type of firearm

26   *Heller* expressly held to be in "common use" for lawful purposes and protected by the Second

27

28   _____

     [10]  New Jersey remains an outlier by regulating the carry of hollow nose bullets. N.J. Stat. Ann.
     § 2C:39-3(f),(g). But that statute does *not* ban the sale or private possession of such ammunition.

1   Amendment. *Id.* at 628. It is untenable to conclude that, after *Heller*, bans on the sale of protected

2   arms that are in "common use" would survive a constitutional challenge. Although the City argues

3   that ammunition with a history of prohibition under state and federal law (e.g., incendiary

4   ammunition, armor-piercing ammunition, or ammunition greater than .60 caliber)[11] is *not* in

5   "common use," the same simply is not true of the ammunition the City prohibits. Section 613.10

6   goes far beyond those restrictions and bans the sale of a broad class of ammunition in "common

7   use" by law-abiding citizens for self-defense in the home.

8       Because the City has failed to meet its burden to provide a historical record in support of

9   its ammunition restrictions, the City's expanding and/or fragmenting ammunition ban is invalid.

10              **b.    Alternatively, the City's Ban on the Sale of Expanding
                        Ammunition Fails Under Any Level of Heightened Scrutiny**

11       The City advances no legitimate reason why the government may ban the sale of protected

12   arms despite being precluded from banning the possession of those same protected arms.

13       Government interests in banning handguns are virtually identical to the City's interests in

14   banning hollow-point ammunition – to decrease violent injuries, whether through criminal misuse

15   or accidents through decreased availability of prohibited arms.[12] Despite these interests, the

16   Supreme Court found the Districts' handgun ban unconstitutional in *Heller* – making clear that

17   even if the Court *had* adopted a means-end standard of review, the City's handgun ban would be

18   unconstitutional. 554 U.S. at 628-29. The City's ammunition ban is similarly invalid.

19       Moreover, the City has failed to establish the required "fit" between the ban and its stated

20   public safety concerns.  The City's ban promotes the sale of ammunition that is *more* dangerous to

21   the public and prohibits the purchase of ammunition that is most effective and commonly used for

22   self-defense – outcomes that run directly counter to any interest the City might have in promoting

23   public safety. And in no circumstance is the City's ban narrowly tailored achieve those ends.

24

25   [11] *See, e.g.*, Cal. Penal Code §§ 16460, 18710, 18735, 30315; 18 U.S.C. §§ 921(a)(17),
     922(a)(8).  The ammunition restricted by these laws is widely prohibited and not in common use.
26   Thus, the City's warning that these statutes would also be jeopardized is wholly unfounded.

27   [12] The District of Columbia advanced these interests in support of its handgun ban in *Heller*,
     554 U.S. at 634, and the City itself advanced similar interests when it instituted its own handgun
28   ban. Proposition H, as approved by voters, Gen. Elec. (November 8, 2005) §§ 1-3.

1    In any event, because the government cannot ban the sale of protected firearms and

2    ammunition in "common use" for lawful purposes, the City's ammunition ban is unconstitutional.

3    **4.    The City's Ban on the Sale of "Ammunition That Does Not Serve a Sporting Purpose" Violates the Second Amendment, Under Any Test**

4    The City's "sporting purposes" ammunition ban directly contravenes the central

5    component of the Second Amendment – individual self-defense. *McDonald*, 130 S. Ct. at 3036.

6    The City's opposition ignores the Supreme Court's instruction that individuals have a

7    fundamental right to arms for the core purpose of *self-defense*, regardless of whether such arms

8    are used for *sporting purposes*. The City, as it did in *Jackson*, may attempt to give its ordinance

9    meaning by looking to federal statutes prohibiting the importation of "non-sporting" arms. But

10   even if federal laws were appropriately examined to determine the meaning of section 613.10(g),

11   such statutes, unlike City's ammunition ban, restrict the *importation* of firearms and ammunition,

12   but do not restrict the purchase of firearms and ammunition by law-abiding citizens, and thus do

13   not provide the required commonplace historical basis for City's restrictions.[13]

14   The City also attempts to characterize its law as a ban on arms that serve no "legitimate

15   purpose." Defs.' Opp'n, 19:23. But the City's ordinance plainly bans ammunition that "does not

16   serve a *sporting* purpose," regardless of its suitability for self-defense. If the City wishes to craft

17   an ordinance to prohibit ammunition that serves no legitimate purpose, whether that purpose be

18   self-defense, hunting, or sporting events – that is what it should do. But the City's current ban is

19   invalid under any standard due to its direct conflict with the core right to arms for self-defense.

20   **CONCLUSION**

21   Plaintiff's challenges to sections 4512 and 613.10(g) should be stayed or dismissed with

22   prejudice. Alternatively, these sections are invalid and their enforcement should be enjoined.

23   Date: July 18, 2012                    **MICHEL & ASSOCIATES, PC**

24                                          /S/ C. D. Michel
                                           C. D. Michel
25                                          Attorney for Plaintiffs

26

27   [13] Although 18 U.S.C. § 922(a)(9) restricts the purchase, as opposed to the importation, of non-sporting firearms, this provision was enacted pre-*Heller* and  has since been challenged. *Dearth v.*

28   *Holder*, 641 F.3d 499 (D.C. Cir. 2011), *remanded to* No. 09-00587 (D.D.C. 2009).

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| THERESE MARIE PIZZO, | ) **CASE NO.: CV-09-2143-RS** |
| | ) |
| Plaintiffs | ) **CERTIFICATE OF SERVICE** |
| | ) |
| vs. | ) |
| | ) |
| CITY AND COUNTY OF SAN | ) |
| FRANCISCO, EDWIN LEE, in both his | ) |
| official capacity; SAN FRANCISCO | ) |
| POLICE DEPARTMENT CHIEF OF | ) |
| POLICE GREG SUHR, in his official | ) |
| capacity; SAN FRANCISCO SHERIFF | ) |
| VICKI  HENNESSEY, in her official | ) |
| capacity; CITY AND COUNTY OF SAN | ) |
| FRANCISCO; and STATE OF | ) |
| CALIFORNIA ATTORNEY GENERAL | ) |
| KAMALA HARRIS in her official capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |
| | ) |
| NATIONAL RIFLE ASSOCIATION, INC., | ) |
| | ) |
| Amicus Curiae. | ) |
| | ) |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of:

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION, INC IN SUPPORT OF NEITHER PARTY**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

**"SEE ATTACHED SERVICE LIST"**

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 18, 2012.

/S/ C. D. Michel
_____
C. D. Michel
Attorney for Amicus

16

1

**"SERVICE LIST"**

2

3   Gary William Gorski
    Law Offices of Gary W. Gorski
    8549 Nephi Way
4   Fair Oaks, CA 95628
    (916)965-6800
5   (916)065-6801 (fax)
    usrugby@gmail.com
6

7   Geoffrey Lloyd Graybill
    California Attorney General's Office
8   1300 I Street
    P.O. Box 944255
9   Sacramento, CA 94244-2550
    (916) 324-5465
10  (916) 324-8835 (fax)
    geoffrey.graybill@doj.ca.gov
11

12  Christine Van Aken
    Office of the City Attorney
13  City & County of San Francisco
    #1 Dr. Carlton B. Goodlett Place
14  City Hall, Room 234
    San Francisco, CA 94102-4682
15  (415) 554-4691
    (415) 554-4747 (fax)
16  Christine.Van Aken@sfgov.org

17

18  Daniel Michael Karalash
    Law Ofc Daniel M Karalash
19  1207 Front St Ste 15
    Sacramento, CA 95814
20  916-787-1234
    916-787-0267 (fax)
    dankaralash@gmail.com
21

22  Craig Cox Weaver
    CC WEAVER & ASSOCIATES
23  P.O. Box 2275
    Folsom, CA 95763
24  916-941-5184
    916-404-4867 (fax)
25  craigcweaver@ccweaver.com

26

27

28

17