IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESE MARIE PIZZO,                    No. C 09-4493 CW

          Plaintiff,                    ORDER DENYING
                                        PLAINTIFF'S MOTION
     v.                                 FOR SUMMARY
                                        JUDGMENT (Docket
CITY & COUNTY OF SAN FRANCISCO;         No. 60) AND
KAMALA HARRIS, in her official          GRANTING
capacity as California Attorney         DEFENDANTS' CROSS-
General; EDWIN LEE, in his              MOTIONS FOR
official capacity as Mayor of the       SUMMARY JUDGMENT
City & County of San Francisco;         (Docket Nos. 71
GREG SUHR, in his official              and 90)
capacity as San Francisco Police
Chief; and ROSS MIRKARIMI, in his
official capacity as the Sheriff
of San Francisco,

          Defendants.

_____/

     Plaintiff Therese Marie Pizzo moves for summary judgment on

her claims against Defendants Edwin Lee in his official capacity

as the Mayor of the City and County of San Francisco, Greg Suhr in

his official capacity as the San Francisco Police Chief, Ross

Mirkarimi in his official capacity as the San Francisco Sheriff

(collectively, the City) and Kamala Harris in her official

capacity as California Attorney General.[1]  Defendants oppose

Plaintiff's motion and have filed cross-motions for summary

judgment, which Plaintiff has opposed.  Amicus Legal Community

Against Violence (LCAV) has filed a brief in support of

Defendants' cross-motions.  Amicus National Rifle Association,

_____

     [1] Pursuant to Federal Rule of Civil Procedure 25(d), the
Court SUBSTITUTES Sheriff Mirkarimi in place of former Acting
Sheriff Vicki Hennessy.

United States District Court
For the Northern District of California

Inc. (NRA) has filed a brief supporting none of the parties.
Having considered the papers filed by the parties and the amici,
and their arguments at the hearing on these motions, the Court
GRANTS Defendants' motions and DENIES Plaintiff's motion.

BACKGROUND

I.   Regulation of firearms and ammunition in San Francisco

The carrying of weapons, including firearms, in California is
governed by the Deadly Weapons Recodification Act of 2010.  Cal.
Penal Code § 16000, et seq.  This law, along with several other
state statutes, prohibit certain categories of people from
possessing firearms, including people convicted of certain crimes,
people subject to a temporary restraining order and people
receiving inpatient mental health treatment and determined to be a
danger to themselves or others.  See, e.g., Cal. Penal Code
§§ 29800(a) (persons convicted of certain felonies or addicted to
narcotic drugs), 29825 (persons subject to a protective order or
temporary restraining order); Cal. Wel. & Inst. Code § 8100(a)
(certain patients receiving mental health treatment).  For people
who do not fall into these excluded categories, state law
provides,

> No permit or license to purchase, own, possess, keep, or
> carry, either openly or concealed, shall be required of
> any citizen of the United States or legal resident over
> the age of 18 years who resides or is temporarily within
> this state, . . . to purchase, own, possess, keep, or
> carry, either openly or concealed, a handgun within the
> citizen's or legal resident's place of residence, place
> of business, or on private property owned or lawfully
> possessed by the citizen or legal resident.

Cal. Penal Code § 25605(b).

Although state law does not restrict the open or concealed
possession of a firearm on private property, various state laws

United States District Court
For the Northern District of California

restrict the carrying of firearms in public.  State law generally prohibits carrying a concealed weapon in public without a license.  Cal. Penal Code §§ 25400, 25655.  State law also generally prohibits carrying a loaded firearm in public.  Cal. Penal Code § 25850.  There are a number of exceptions to this prohibition of possession of a loaded firearm.  For example, it does not prohibit "any person from having a loaded weapon, if it is otherwise lawful, at the person's place of residence, including any temporary residence or campsite."  Cal. Penal Code § 26055.  It also does not apply to, among others,  individuals with a license to carry a concealed weapon or people who reasonably believe that either they or their property are in immediate, grave danger and that carrying a weapon is necessary for the preservation of their person or property.  See Cal. Penal Code §§ 26010, 26045.  State law also generally restricts the open carrying of an unloaded firearm in public.  Cal. Penal Code § 26350(a).  This prohibition also has exceptions, including for holders of a license to carry concealed weapons and for individuals in a residence or place of business or on private property, if done with the permission of the owner or lawful possessor.  Cal. Penal Code §§ 26362, 26383.

    The City and County of San Francisco also has ordinances that regulate the sale, possession and use of firearms and ammunition within its boundaries.

    At the time that Plaintiff filed her complaint, San Francisco had two ordinances related to the discharge of firearms.  The first, Police Code section 1290, provided in relevant part, "No person or persons, firm, company, corporation or association shall fire or discharge any firearms or fireworks of any kind or

3

**United States District Court**
For the Northern District of California

description within the limits of the City and County of San Francisco." S.F. Police Code § 1290 (2009).  The second ordinance provided that, "It shall be unlawful for any person to at any time fire or discharge, or cause to be fired or discharged, any firearm or any projectile weapon on or into any street, highway or other public place within the City and County of San Francisco."  S.F. Police Code § 4502 (2009).  At the time, the latter ordinance had an exception, stating that the "provisions of Section 4502 shall not apply . . . to persons using said firearms or projectile weapons in necessary self defense."  S.F. Police Code § 4506(a) (2009).

In 2011, these ordinances were amended.  Section 1290 was amended to remove any reference to firearms.  S.F. Police Code § 1290 (2011).  By its terms, it now prohibits only fireworks. Id.  Section 4502 was amended to note that it was "[s]ubject to the exceptions in Section 4506."  S.F. Police Code § 4502 (2011). Section 4506 was amended to provide that the

provisions of Section 4502 shall not apply to or affect:

. . .

(2) Persons in lawful possession of a handgun who discharge said handgun in necessary and lawful defense of self or others while in a personal residence; or

(3) Persons in lawful possession of a firearm or projectile weapon who are expressly and specifically authorized by federal or state law to discharge said firearm or projectile weapon under the circumstances present at the time of discharge.

App. A-15, S.F. Police Code § 4506(a) (2011).

In 2007, San Francisco enacted Police Code section 4512 (the storage ordinance) mandating, "No person shall keep a handgun within a residence owned or controlled by that person unless the

4

handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice."  App. A-2-6, A20-21.  This section includes an exception stating that it does not apply if the "handgun is carried on the person of an individual over the age of 18."  S.F. Police Code § 4512(c)(1).  In 2011, San Francisco adopted legislative findings in support of its storage ordinance, which are set forth in Police Code section 4511.  See App. A-16-19.  The legislative findings provide in part that "[h]aving a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death," guns kept in the home are most often used in suicides, against family and friends and in an unintentional shootings, rather than in self-defense, and that using "trigger locks or using lock boxes when storing firearms in the home reduces the risk of firearm injury and death."  S.F. Police Code § 4511.

San Francisco regulates the sale of firearms and ammunitions and requires that any person selling firearms or ammunitions be licensed and adhere to certain restrictions.  See, e.g., App. A-7-10, S.F. Police Code §§ 613, 613.2, 613.9.  Among these restrictions on licensees is a prohibition on the sale, lease or transfer of ammunition that

(1) Serves no sporting purpose;

(2) Is designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target (including, but not limited to, Winchester Black Talon, Speer Gold Dot, Federal Hydra-Shok, Homady XTP, Eldorado Starfire, Hollow Point Ammunition and Remington Golden Sabre ammunition[]); or

United States District Court
For the Northern District of California

        (3) Is designed to fragment upon impact (including, but
        not limited to, Black Rhino bullets and Glaser Safety
        Slugs).

        This subsection does not apply to conventional hollow-
        point ammunition with a solid lead core when the
        purchase is made for official law enforcement purposes
        and the purchaser is authorized to make such a purchase
        by the director of a public law enforcement agency such
        as the Chief of the San Francisco Police Department or
        the Sheriff of the City and County of San Francisco.

S.F. Police Code § 613.10(g) (the ammunition ordinance).  In 2011,

San Francisco adopted legislative findings in support of its

ammunitions ordinance, which are set forth in Police Code section

613.9.5.  App. A-11.  The legislative findings explain in part

that "enhanced-lethality ammunition is more likely to cause severe

injury and death than is conventional ammunition that does not

flatten or fragment upon impact" and that the City has an interest

"in reducing the likelihood that shooting victims in San Francisco

will die of their injuries by reducing the lethality of the

ammunition sold and used in the City and County of San Francisco."

S.F. Police Code § 613.9.5(2),(6).  The findings also state that

the City believes that banning such sales "does not substantially

burden the right of self defense" because the "right to use

firearms in self defense can be fully exercised using

conventional, non-collapsing, non-fragmenting ammunition."  S.F.

Police Code § 613.9.5(4).

        State law provides that only a police chief or county sheriff

"may" issue a license to carry a concealed weapon (a CCW license),

but does not require that they do so.  Cal. Penal Code §§ 26150,

26155.  A police chief or county sheriff may issue a CCW license

to a person only upon a showing that the applicant is of good

moral character, good cause exists for the issuance of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

license, the applicant resides in the jurisdiction of the police chief or county sheriff and the applicant has completed a firearm safety course.  Cal. Penal Code §§ 26150(a), 26155(a), 26165.  Each police chief or county sheriff is required to publish and make available a written policy summarizing these requirements.  Cal. Penal Code § 26160.

State law sets forth various procedural requirements for applications for CCW licenses.  An applicant for a CCW license must have his or her fingerprints taken and sent to the California Department of Justice.  Cal. Penal Code § 26185(a)(1).  After receiving the fingerprints, the California Department of Justice is required to provide the relevant police chief or county sheriff with a report of the person's record, including whether the applicant is prohibited by state or federal law from possessing a firearm.  Cal. Penal Code § 26185(a)(2).  A police chief or county sheriff must receive this report from the California Department of Justice before he or she is allowed to issue a CCW permit.  Cal. Penal Code § 26185(a)(3).  Applicants must submit a filing fee established by the California Department of Justice when applying for a CCW permit, to cover the costs of furnishing this report.  Cal. Penal Code § 26190(a)(1).  If a police chief or county sheriff requires psychological testing for someone who is applying for a CCW license, the testing must be done by the same licensed psychologist used by the police chief or county sheriff for the psychological testing of his or her own employees.  Cal. Penal Code § 26190(f)(1).

Active duty and honorably retired peace officers are generally exempt from the state law prohibitions on carrying

United States District Court
For the Northern District of California

concealed and loaded weapons in public.  <u>See</u> Cal. Penal Code §§ 25450, 25900, 26300.  At the time of retirement, honorably retiring peace officers are issued an identification certificate by the agency that employed them, stamped with an endorsement stating that the issuing agency approves of their carrying a concealed firearm.  <u>See</u> Cal. Penal Code §§ 25455, 25460, 25905. Officers who retire due to a psychological disability are not eligible for such an endorsement.  Cal. Penal Code § 26305(a). The issuing agency may, at initial retirement or any time thereafter, revoke for good cause a retired peace officer's privilege to carry a concealed firearm.  Cal. Penal Code §§ 25470, 25920.  A retired officer must qualify with the firearm annually. Cal. Penal Code § 25475(a).

In conjunction with a committee of representatives from the California State Sheriffs' Association, the California Police Chiefs Association and the Department of Justice, the California Attorney General is responsible for creating and revising a standard form for CCW license applications, which must be used uniformly throughout the state.  Cal. Penal Code § 26175.  The California Attorney General has created such a form.  <u>See</u> McEachern Decl. ¶ 6, Ex. 3.0.[2]  The form directs applicants to "[f]ill out, read, and sign Section 1 through 5, as directed," but

_____

[2] Defendants object to certain evidence presented by Plaintiff and Plaintiff objects to certain evidence presented by Defendants. The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually.  To the extent that the Court relies on evidence to which the parties object, such evidence has been found admissible and the objections are overruled.

United States District Court
For the Northern District of California

states that "Sections 6, 7, and 8 must be completed in the presence of an official of the licensing agency." Id. at 2. Section 1 asks for the applicants' names, but does not ask for contact information. Id. at 3. Section 7, which is titled "Investigator's Interview Notes," contains spaces for other information for the applicants, including their address and telephone number. Id. at 11. This contact information is not requested anywhere else on the form.

In San Francisco, both the Sheriff and the Police Chief have adopted policies setting forth the criteria they consider when deciding when to issue a CCW license. The Police Chief first issued a CCW license policy in May 2000 and the current policy was issued on January 12, 2012. McEachern Decl. ¶¶ 4-5. As to the good cause requirement, the Police Chief's current policy states,

> In light of the fact that San Francisco is the second most densely populated urban area in the country, and weighing the defensive benefit of carrying concealed firearms in public against the risk of surprise to law enforcement, the risk of avoidable and dangerous conflict escalation in a public setting, and the risk to general public safety that discharging firearms poses to law enforcement and bystanders alike, the Chief has determined on the basis of experience and judgment that good cause to issue a CCW license to San Francisco residents will generally only exist in conditions of necessity. Accordingly, applicants should be able to supply convincing evidence of the following:
>
> 1. There is a reported, documented, presently existing, and significant risk of danger to life or of great bodily injury to the applicant and/or his or her spouse, domestic partner or dependents;
>
> 2. The danger of harm is specific to the applicant or his or her immediate family and is not generally shared by other similarly situated members of the public;
>
> 3. Existing law enforcement resources cannot adequately address the danger of harm;

4.   The danger of harm cannot reasonably be avoided by alternative measures; and

5.   Licensing the applicant to carry a concealed weapon is significantly likely to reduce the danger of harm.

While each of the above factors is considered in the decision making process, the Chief makes a good cause determination based on the totality of the circumstances presented in each individual case.

McEachern Decl. ¶ 4, Ex. 1.0, CCSF001971.   The Police Chief's policy goes on to state, "Once an eligible applicant makes a preliminary showing of good cause, the SFPD will conduct a background investigation to determine whether the applicant is of good moral character." Id. at CCSF001972.   The Police Chief's policy is currently published on the SFPD's website, along with the application form; however, it may not have been published there prior to January 2012.   McEachern Decl. ¶¶ 7, 11, Ex. 4.0.

Then-Sheriff Michael Hennessy first issued a CCW license policy in June 2011, after this case had been initiated.   Johnson Decl. ¶ 6.   Prior to that time, the Sheriff did not have a written policy.   Id.   Sheriff Hennessy held his position for over thirty years.   Id.   After Ross Mirkarimi became Sheriff, he updated the policy in January 2012.   Id. at ¶ 4.   While acting Sheriff Vicki Hennessy was in office, she did not issue a new CCW policy and instead implemented the policy issued by Sheriff Mirkarimi.   Id. at ¶ 5.

The Sheriff's current policy states, "Good cause to issue a CCW license generally exists in the conditions of necessity," and sets forth five factors relevant to the good cause determination that are similar to the Police Chief's policy.   Id. at ¶ 4, Ex. A, CCSF004499.   Like the Police Chief's policy, the Sheriff's policy states, "If good cause is demonstrated, the SFSD shall conduct a

United States District Court
For the Northern District of California

background investigation in order to determine whether the
applicant is of good moral character." <u>Id.</u>  The Sheriff also
requires applicants to "provide a letter explaining the good cause
the applicant believes justifies issuance of the CCW license."
<u>Id.</u> at ¶ 7.  However, the letter requirement is not stated in the
Sheriff's written policy.  <u>See</u> <u>id.</u> at ¶ 4, Ex. A.

At the hearing, the City represented that the Police Chief
and Sheriff both now require applicants to submit in person
applications for CCW permits and that their contact information is
obtained at the time of submission.  <u>See also</u> Johnson Decl. ¶ 11.

II.  Facts relevant to the named Plaintiff

Plaintiff is a lesbian woman who lives in San Francisco with
her same-sex registered domestic partner and two children, who are
two and six years old.  Pizzo Decl. ¶ 3.  She owns handguns for
"personal self-defense." <u>Id.</u> at ¶ 11.

Plaintiff has been the victim of repeated harassment and
threats in the past due to her sexual orientation.  <u>Id.</u> at ¶ 12.
In the 1980s, she was pushed down a flight of stairs by a man who
called her a "dyke." <u>Id.</u> at ¶ 13.  In 1999, when she was kissing
her partner in San Francisco, a man screamed obscenities at her
and threw gum and garbage at her.  <u>Id.</u> at ¶ 14.  Sometime later,
when she and her partner travelling through Arizona, a man
approached them and tried to "push his body up against me," while
making harassing comments about their sexual orientation.  <u>Id.</u> at
¶ 15.  At another unspecified time, in Los Alamos, California,
when she and her partner were in a restroom at a bar, another
couple pounded on the door, yelled obscenities and threats at them
based on their sexual orientation and made them fear that they

would be hurt or killed.  Id. at ¶ 16.  On another occasion, while she was crossing a street in San Francisco, a man in a truck yelled obscenities having to do with her sexual orientation and revved his engine.  Id. at ¶ 17.

In Plaintiff's declaration in support of her motion for summary judgment, she attests, "In San Francisco, I can usually be more open and act freely," but "when I leave San Francisco, and especially when I leave California, I have to change the way I act and dress, otherwise I am targeted."  Id. at ¶ 18.  She especially fears threats and assaults in "more rural areas of California and in rural areas out-of-state."  Id. at ¶ 32.  She has "no way to adequately defend or protect myself from the numerous threats and assaults" that she has received because of the laws described and complying with the laws "place[s] my family at unnecessary risk." Id. at ¶¶ 35, 37.  She intends to have a "readily accessible operable handgun ready for immediate use, loaded with proper ammunition, within my home for self-defense, on my person, and in my vehicle," but can do so only if she is "issued a valid CCW permit."  Id. at ¶¶ 36, 38.  She also declares, "I will no longer go camping.  I will no longer visit Texas unless I am issued a CCW permit."  Id. at ¶ 19.  Plaintiff further attests that she does not keep ammunition in her house because she believes that to do so would subject her to prosecution for "possession of 'enhanced lethality ammunition,'" because she believes all ammunition is lethal.  Id. at ¶ 26.  She wants to "use semi-jacketed hollow point ammunition that expands and fragments upon impact," because she believes that it is better than "full metal jacket" ammunition, which she believes "increases the risk of innocent

United States District Court
For the Northern District of California

people getting shot if someone discharges a firearm due to ricochet and pass-through of walls and the assailant."  Id. at ¶ 29.

At Plaintiff's earlier deposition, when asked if she would have a loaded weapon in her home outside of a gun safe or without any sort of locking mechanism on it if she were permitted to do so by law, she at first answered, "I don't know," and that she would be concerned about her children being around a loaded weapon. Pizzo Depo. 50:16-51:4.  She said she could imagine leaving a loaded weapon outside of the gun safe, but locked.  Id. at 51:5-8. After a sidebar with her attorney, she stated,

> With my children present in the home, it would depend on the circumstance.  If they were--if it were in my room and they didn't have access to it, for instance, if I were to go to bed at night and I wanted to have a loaded weapon in the room with me with the door locked, the kids in bed, I could see an instance like that.

Id. at 51:10-52:11.  She then stated that, if the ordinances were struck down, she would not start storing a loaded handgun outside of her gun safe and lock the bedroom door between her and her children "on a regular basis" but

> there may be times where I feel the need to do something like that if--if the--as long as I felt as though it was a reasonable thing to do at the time.  If there were say, riots outside my neighborhood or there was some-- some eminent threat, then I--I may do that.

Id. at 57:25-58:13.

Plaintiff also testified that she believed that she could defend herself in her home using traditional full metal jacket ammunition, but that she did not believe that it was the best ammunition to use.  Id. at 71:12-18.  She stated that she believed that all gun shops had left San Francisco and did not know that

United States District Court
For the Northern District of California

there was still one gun shop open within the city, High Bridge
Arms.  Id. at 41:9-21; Chin Decl. ¶ 11.  She further testified
that she had never tried to buy hollow-point bullets at any gun
shop in San Francisco and that when she had last purchased bullets
at High Bridge Arms in the late 1980s, she was able to purchase
what she was seeking at the time, lead bullets.  Pizzo Depo.
41:23-42:20.[3]

    Plaintiff searched online on the websites of the San
Francisco Police Department and the San Francisco Sheriff's
Department for information on how to obtain a CCW permit.  Pizzo
Decl. ¶ 43.  Finding no information, she turned to her attorney,
Gary W. Gorski.  Id.

    Plaintiff attaches to her declaration a letter that she
states Gorski sent on her behalf to the San Francisco Police
Department and the San Francisco Sheriff's Department by regular
mail, fax and email on May 26, 2009.  Pizzo Decl. ¶ 44, Exs. 1, 2.
In this letter, Mr. Gorski wrote,

> I have been retained by a gay female who has been
> attempting to apply for a CCW . . . To date, her
> attempts have been futile as there is no published
> policy on either website about the CCW application
> process and your employees have been obstructive to say
> the least.
>
> When my client attempted to apply by contacting your
> departments, she was given the run-around in that 1)
> employees had no knowledge of any CCW policy, 2) had no
> knowledge about how to apply, and 3) they stated that
> your department does not process CCW applications.

---

[3] The City contends that Pizzo said that she has not used
hollow-point ammunition since at least the early 1990s and that
she frequents a gun store in San Bruno, but they have not filed
the cited pages of her deposition transcript.  See City's Mot. for
Summ. J. at 14 (citing Pizzo Depo. 39, 69-70); Docket No. 76-10
(omitting these pages).

United States District Court
For the Northern District of California

> This letter constitutes a formal request of the
> following, pursuant to the Public Records Act:
>
> Please provide a DOJ CCW application.
>
> Please provide a list of all current and past CCW permit
> holders since your tenure in office, inclusive of all
> good cause data relied upon for issuance.
>
> Please provide a copy of your written CCW issuance
> policy.
>
> If your department defers to the other for the
> processing of CCWs, please provide that policy or letter
> of understanding.
>
> In addition to this request, please provide a date and
> time that my client can meet with an "investigator" of
> your department to complete section 7 of the
> application, and have the application "witnessed" by the
> investigator and "signed."

Id. Mr. Gorski provided his full contact information, but did not include Plaintiff's name or contact information. Id. The Police Department attests that it could not locate these letters in its files. McEachern Decl. ¶ 19. The Sheriff's Department generally attests that it could not find any material related to any CCW application by Plaintiff. Johnson Decl. ¶ 11.

Plaintiff states that her attorney received responses from the San Francisco Police Department and San Francisco Sheriff's Department on May 28, 2009 and May 29, 2009, respectively. Pizzo Decl. ¶¶ 45, 51, Exs. 3, 4. Mr. Gorski has not attested to this fact personally. Both departments declare that they could not locate a responsive letter in their files. McEachern Decl. ¶ 19; Johnson Decl. ¶ 11. In the instant motions, the City has not challenged that these letters were sent by individuals at the Police Department or the Sheriff's Department.

The letter from the San Francisco Police Department was signed by Lieutenant Daniel J. Mahoney, who identifies himself as

Commanding Officer of the Legal Division.  Pizzo Decl. ¶ 45, Ex.

3.  In the letter, he states

> In response to item number 1 of your request, please be
> advised that the California Department of Justice is the
> custodian of the Application for License to Carry a
> Concealed Weapon.  As a courtesy, I am enclosing a copy
> of the Application.
>
> In response to item number 2, please be advised that the
> SFPD does not maintain a list of all current and past
> CCW permit holders.  I can tell you that we have one
> active concealed weapon permit at this time.  That
> permit was issued to Mr. Robert Menist on 7/1/07 and
> expires on 6/30/10.
>
> In response to item number 3 and 4, we do not have
> responsive documents.
>
> With regards to your request for a date and time that
> your client can meet with an "investigator", please be
> advised that only if it becomes necessary to complete
> section 7 of the application, an investigator will
> contact your client.  We do not schedule appointments
> for this process of the application.

Id.  Although Lieutenant Mahoney stated that there were no

responsive documents to the request for Mr. Gorski's request for

the written CCW issuance policy, there was such a policy in effect

at that time, as described above.  Lieutenant Mahoney attached a

blank copy of the application form and copy of the fee structure

for the application.  Id.  At present, Retired Army General Robert

Menist continues to be the sole current holder of a CCW license

issued by the San Francisco Police Department.  McEachern Decl.

¶ 13.

    The responsive letter from the San Francisco Sheriff's

Department was signed by James F. Harrigan, who identified himself

as Legal Counsel to the Sheriff.  Pizzo Decl. ¶ 51, Ex. 4.  In the

letter, Mr. Harrigan stated in full,

16

I write to respond to your confusing and inflammatory letter of May 26, 2009.  Please place yourself in my shoes for a moment and <u>read</u> your letter, attached.

First, and foremost, you never identify your client which, of course, prevents us from researching any correspondence that may have been received from her. Secondly, you identify her as a "gay female" as if that actually matters.  I presume you have permission to express such personal information but you might be surprised to learn that we don't maintain carry concealed weapons (CCW) applicant files by sexual preference, or even by gender.

Third, you ascribe obstructionist behavior to Sheriff's employees without any facts, who they might have said their name was, or even when such event(s) occurred.

It isn't often that I get such a poorly crafted letter and it is not ameliorated by your ending paragraph, which attempts to be solicitous <u>after</u> making such unsupported accusations.

Perhaps I can clarify the Sheriff's position for your consideration.  Mr. Hennessey is obligated to issue CCWs to retired law enforcement personnel in limited circumstances under state law.  There are a host of conditional factors which apply.  He is not obligated to issue a CCW to any private citizen although he has the authority to do so.  He has never issued a CCW to such an applicant and has no intention of doing so.

Should you wish to file an application you may write a letter to me or the Sheriff which will be replied to with a denial.  It is a useless exercise but please do so if you with [sic] to.  Obviously, that letter must identify the applicant and reason(s) for the request.

No meeting with an "investigator" will be scheduled because his decision is as it has been for twenty-nine (29) years, a denial.  Such is his right and his practice.

<u>Id.</u>

Although Mr. Harrigan stated that the Sheriff's Department had never issued CCW licenses to private citizens, the then-Sheriff had issued at least two to individuals who were not retired law enforcement officers.  At the time of Mr. Harrigan's letter, he himself held a CCW license issued by the Sheriff on October 3, 2008, while he was a civilian employee of the Sheriff's

United States District Court
For the Northern District of California

Department.  Johnson Decl. ¶ 9.  Mr. Harrigan's license expired on October 3, 2010 and was not renewed.  Id.  Mr. Harrigan has since retired from the Sheriff's Department.  Id.  On or about November 17, 2006, Sheriff Hennessey also issued a CCW license to a Deputy City Attorney in the San Francisco City Attorney's Office who was responsible for civil gang injunction prosecutions and reported receiving threats in connection with those prosecutions.  Id. at ¶ 10.  On March 5, 2007, Sheriff Hennessey notified the Deputy City Attorney that, because she was leaving employment with the City Attorney's Office, the CCW license that he had issued to her in connection with her duties would be revoked effective May 1, 2007.  Id.; Johnson Decl. ¶ 10, Ex. C.

On June 4, 2009, Plaintiff filled out and signed the DOJ standard application form.  Pizzo Decl. ¶ 56.  She completed sections one through five of the application but did not complete or sign sections 6 through 8 because the form's instructions directed her not to.  Id. at ¶¶ 57, 59.  Thus, her filled-in application included her name and date of birth, but did not contain her address, telephone number or any other contact information.  Pizzo Decl. ¶ 56, Ex. 5.  It also did not contain Mr. Gorski's name or contact information.  Id.

Plaintiff gave the application to her attorney to send; she did not personally send it to the Sheriff's Department or the Police Department.  Pizzo Decl. ¶ 56; Pizzo Depo. 89:7-19. Plaintiff states that Mr. Gorski mailed it and faxed it to the Sheriff's Department or the Police Department, but does not offer testimony or evidence from him stating that he did so.  Pizzo Decl. ¶¶ 56-60.  Plaintiff did not write a check to send with her

**United States District Court**
For the Northern District of California

application.  Pizzo Depo. 89:25-90:2.  Plaintiff includes with her declaration two fax confirmation pages that show that, on June 29, 2009, Mr. Gorski faxed a twenty page document to the Sheriff's Department and the Police Department, the first page of which was the cover page of the standard DOJ application form.  Pizzo Decl. ¶ 60, Ex. 6; see also Johnson Decl. ¶ 15; McEachern Decl. ¶ 23. Plaintiff does not provide evidence that Mr. Gorski included with the application a cover letter or any information that would have associated it with him or his earlier letter or that would have provided the Sheriff's Department and the Police Department with contact information for Plaintiff or himself.

To date, Plaintiff has not received a response to her application from either department.  Pizzo Decl. ¶ 8.  Neither the Sheriff's Department nor the Police Department could locate any record of having received her application.  McEachern Decl. ¶¶ 24-25; Johnson Decl. ¶ 14.  Neither department processed her application or made a determination of whether to grant or deny it.  McEachern Decl. ¶ 25; Johnson Decl. ¶ 14.  For every other CCW application file that each department could locate, it has records that show that action was taken on the application. McEachern Decl. ¶ 24; Johnson Decl. ¶ 16.

On September 23, 2009, Plaintiff filed the instant suit.  In her complaint, she brings claims against the City and County of San Francisco and the San Francisco Mayor, the San Francisco Sheriff, the San Francisco Police Chief and the Attorney General

of California in their official capacities only.[4]   She asserts the following ten claims against all Defendants in her complaint:

(1)   S.F. Police Code section 4512 (the storage ordinance) violates the Second Amendment;

(2)   S.F. Police Code section 1290, addressing the discharge of firearms within San Francisco, violates the Second Amendment;

(3)   Cal. Penal Code section 26150, et seq., regarding the issuance of CCW permits, violates the Second Amendment;

(4)   Cal. Penal Code section 26150, et seq., regarding the issuance of CCW permits, and the policies of the San Francisco Sheriff and Police Chief, violate the Equal Protection Clause of the Fourteenth Amendment;

(5)   the sections of the California Penal Code that create an exception to concealed and loaded carry laws for honorably retired police officers with CCW permits violate the Equal Protection Clause of the Fourteenth Amendment;

(6)   the Federal Law Enforcement Officers Safety Act, 18 U.S.C. §§ 926B, 926C regarding CCW permits for qualified retired law enforcement officers violates the Equal Protection Clause of the Fourteenth Amendment;

(7)   S.F. Police Code section 613.10(g) (the ammunition ordinance) violates the Second Amendment;

---

[4] Plaintiff also brought claims against former San Francisco Mayor Gavin Newsom, former San Francisco Chief of Police Heather Fong, and former San Francisco Sheriff Michael Hennessey in their individual capacities.  She subsequently dismissed her claims against them in their individual capacities by stipulation. Docket No. 58.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    (8)  S.F. Police Code section 613.10(g) (the ammunition

2    ordinance) is unconstitutionally vague under the Fifth Amendment's

3    due process clause;

4    (9)  S.F. Police Code sections 4512, 1290, 613.10(g) and Cal.

5    Penal Code section 26150, <u>et seq.</u>, violate the constitution and

6    laws of the state of California; and

7    (10) S.F. Police Code sections 4512, 1290, 613.10(g) and Cal.

8    Penal Code section 26150, <u>et seq.</u>, violate the Due Process Clause

9    of the Fourteenth Amendment.[5]

10   As relief, Plaintiff seeks a declaration that the complained-

11   of laws, and Defendants' application and enforcement thereof, are

12   unconstitutional, and an injunction enjoining them from

13   enforcement.

14   In her reply in support of her motion for summary judgment

15   and opposition to Defendants' motions for summary judgment,

16   Plaintiff withdraws her ninth cause of action as to all Defendants

17   and her fourth cause of action as to the Attorney General only.

18   Docket No. 104, 21, 25.

19                           LEGAL STANDARD

20   Summary judgment is properly granted when no genuine and

21   disputed issues of material fact remain, and when, viewing the

22   evidence most favorably to the non-moving party, the movant is

23   clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

24

25   _____

26   [5] A separate suit against the City and County of San
     Francisco and its Mayor and Police Chief, challenging the validity
27   of S.F. Police Code sections 613.10(g), 1290 and 4512 under the
     Second, Fifth and Fourteenth Amendments, remains pending in this
     district.  <u>See Jackson v. City and Cnty. of San Francisco</u>, Case
28   No. 09-2143 (N.D. Cal.), Docket No. 18.

56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

DISCUSSION

I.   Standing

Defendants contend that Plaintiff does not have standing to pursue her challenges to the storage and ammunition ordinances or to the CCW license statutes and policies. Amicus NRA also argues that she does not have standing to challenge the storage and ammunition ordinances, but disputes the legal standard that Defendants seek to apply to the standing issue. Plaintiff responds that she does have standing to pursue these issues.

A. Challenges to the storage ordinance

To establish standing, a plaintiff must show: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1225 (9th Cir. 2008). "Because plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury." Bras v. California Public Utilities Com'n, 59 F.3d 869, 873 (9th Cir. 1995).

The City contends, based on San Diego Gun Rights Comm. v. Reno, 98 F.3d 1121 (9th Cir. 1996), that to satisfy the injury-in-fact requirement, "a plaintiff must show that she has violated or intends to violate the law and that she has been prosecuted under the law, that she has been individually threatened with imminent prosecution, or that there is a robust history of enforcement of the law." City's Cross-Mot. for Summ. J. at 8. The NRA argues that she need not show a likelihood of enforcement, relying largely on Jackson v. City & County of San Francisco, 829 F. Supp. 2d 867, 872 (N.D. Cal. 2011), in which the court considered the continuing vitality of San Diego Gun Rights Committee in light of the Supreme Court's recent decision in District of Columbia v. Heller, 554 U.S. 570 (2008).

A concrete injury is one that is "'distinct and palpable . . . as opposed to merely abstract.'" Schmier v. U.S. Court of Appeals for 9th Circuit, 279 F.3d 817, 821 (9th Cir. 2002)

United States District Court
For the Northern District of California

1  (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)).

2  However, when "contesting the constitutionality of a criminal

3  statute, 'it is not necessary that [the plaintiff] first expose

4  himself to actual arrest or prosecution to be entitled to

5  challenge [the] statute that he claims deters the exercise of his

6  constitutional rights.'"  <u>Babbitt v. UFW Nat'l Union</u>, 442 U.S.

7  289, 298 (1979) (quoting <u>Steffel v. Thompson</u>, 415 U.S. 452, 459

8  (1974)) (formatting in original).  The Supreme Court has

9  explained, "When the plaintiff has alleged an intention to engage

10  in a course of conduct arguably affected with a constitutional

11  interest, but proscribed by a statute, and there exists a credible

12  threat of prosecution thereunder, he should not be required to

13  await and undergo a criminal prosecution as the sole means of

14  seeking relief."  <u>Id.</u>  See also <u>MedImmune, Inc. v. Genentech,</u>

15  <u>Inc.</u>, 549 U.S. 118 (2007) (a "plaintiff's own action (or inaction)

16  in failing to violate the law eliminates the imminent threat of

17  prosecution, but nonetheless does not eliminate Article III

18  jurisdiction").  "But 'persons having no fears of state

19  prosecution except those that are imaginary or speculative, are

20  not to be accepted as appropriate plaintiffs.'"  <u>Babbitt</u>, 442 U.S.

21  at 298 (quoting <u>Younger v. Harris</u>, 401 U.S. 37, 42 (1971); <u>Golden</u>

22  <u>v. Zwickler</u>, 394 U.S. 103 (1969)).  "When plaintiffs 'do not claim

23  that they have ever been threatened with prosecution, that a

24  prosecution is likely, or even that a prosecution is remotely

25  possible,' they do not allege a dispute susceptible to resolution

26  by a federal court."  <u>Id.</u> at 298-99 (quoting <u>Younger</u>, 401 U.S. at

27  42).  Further, "a vague and unspecified" intention to engage in

28  the proscribed conduct "at some unknown point in the future" is

not enough to support standing.  <u>Jackson</u>, 829 F. Supp. 2d at 872.

<u>See also</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 564 (1992)

("Such 'some day' intentions -- without any description of

concrete plans, or indeed even any specification of when the some

day will be -- do not support a finding of the 'actual or

imminent' injury that our cases require.").

Regardless of whether or not Plaintiff can establish that

prosecution is even remotely possible, she has not alleged a

sufficient intention to engage in conduct proscribed by the

storage ordinance to support Article III jurisdiction.  As

explained above, in her declaration, Plaintiff states that she

intends to possess a "readily accessible operable handgun ready

for immediate use, loaded with proper ammunition, within my home

for self-defense, on my person, and in my vehicle."  <u>Id.</u> at ¶¶ 36,

38.  However, the storage ordinance does not prohibit her from

having such a handgun in her vehicle or on her person in her home.

<u>See</u> S.F. Police Code § 4512(a), (c)(1) (prohibiting people from

keeping a handgun within their residence unless it is stored in a

locked container or disabled with a trigger lock, but creating an

exception if the "handgun is carried on the person of an

individual over the age of 18").[6]

To the extent that Plaintiff may have intended this statement

to mean that she would like to have an operable handgun within

reach but not on her person, her only intentions of doing so are

speculative and based on potential future events that are not

---

[6] Residence is defined to include "vehicles where human habitation occurs," S.F. Police Code § 4512(b)(1), but Plaintiff has not offered any evidence that she lives in her vehicle.

connected to whether the ordinance is still in effect.  She
testified that she may only keep her handgun unlocked at some
unspecified future point if she were to feel unsafe based on
events that may or may not happen, such as a riot, and then only
if she also locked her children out of her room or otherwise kept
her children away from the loaded weapon.  Cf. Jackson, 829 F.
Supp. 2d at 872 (finding standing based on allegations "that based
on their personal views of how it would enhance their personal
safety, they want to keep their guns unlocked now for potential
use in self defense") (emphasis added).

     At the hearing, Plaintiff clarified that she asserts that she
has standing because the ordinance currently prevents her from
making her own decision as to whether or not to store her operable
gun outside of her gun locker, even if she ultimately may decide
not to do so.  Plaintiff offers no authority to support her
argument that this deprivation can support standing, where she has
expressed no intention to actually engage in any conduct that may
be prohibited by the statute.  Under these circumstances, the
Court concludes that there is no material dispute of fact that
Plaintiff does not have an intention to engage in a course of
conduct prohibited by the statute that is not "vague and
unspecified."

1    Accordingly, the Court GRANTS the City's motion for summary

2    judgment on Plaintiff's claims that seek to challenge the storage

3    ordinance.[7]

4        B. Challenges to the ammunition ordinance

5        The City contends that Plaintiff does not have standing to

6    challenge the ammunition ordinance, because the law acts to

7    restrict the sales made by licensed gun dealers within city limits

8    but does not prohibit individuals from possessing any type of

9    ammunition inside city limits, and Plaintiff is not a licensed gun

10   dealer.  Thus, by the City's reasoning, the ordinance does not

11   restrict her behavior.  However, even if the restriction is aimed

12   at limiting the conduct of gun dealers, such a restriction may

13   still impose a burden on a gun user's ability to obtain the

14   relevant types of ammunition.  See Jackson, 829 F. Supp. 2d at 872

15   n.3 ("While it may be that plaintiffs will be unable, as a factual

16   matter, to establish that a ban on sales within the City and

17   County of San Francisco actually presents a significant burden on

18   their ability to obtain such ammunition, that would only undermine

19   the merits of the claim, not plaintiffs' standing to bring it.").

20       Plaintiff contends that she has standing because the City has

21   made obtaining ammunition so burdensome that it amounts to a

22   constructive ban.  However, Plaintiff has not offered evidence

23   that she intends to purchase the prohibited ammunition anywhere,

24   _____

25       [7] Plaintiff does not respond to the Attorney General's
     argument that she is not a proper Defendant for the claims
26   challenging the City's storage, ammunition and discharge
     ordinances.  Plaintiff also has moved for summary judgment on
27   those claims against only the City.  Accordingly, the Court GRANTS
     the Attorney General summary judgment on the claims that challenge
28   the City ordinances.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

including within San Francisco, and thus has not established that the ordinance has caused her an injury-in-fact.  In her declaration, Plaintiff states, "I want to use semi-jacket hollow point ammunition that expands and fragments upon impact," which she believes is better than full metal jacket ammunition for self-defense.  Pizzo Decl. ¶ 29.  However, she does not express an intention to purchase such ammunition from a gun shop located in San Francisco or anywhere else if the ordinance were struck down or offer evidence that she has been burdened by having to purchase ammunition outside of San Francisco.  In fact, she testified that she believed that there were no gun shops within San Francisco itself at which she could make purchases if the ordinance were invalidated, although this belief has since proven to be untrue. She further stated that she had last shopped at a particular gun shop in San Francisco more than twenty years ago and did not express any plans to shop there again in the future, although this gun shop is in fact still open.  Thus, Plaintiff has not expressed a present intention to engage in conduct prohibited by the ordinance and her argument that the ordinance burdens her ability to purchase or keep the ammunition is speculative.

Accordingly, the Court finds that Plaintiff lacks standing to challenge the ammunition ordinance and GRANTS the City's motion for summary judgment on these claims.

C. Challenges to the CCW licensing scheme

The City, joined by the Attorney General, contends that Plaintiff lacks standing to challenge the CCW permit process because she did not submit proper applications to the Police Chief or to the Sheriff.

"It is a long-established rule 'that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit.'" <u>Friery v. L.A. Unified Sch. Dist.</u>, 448 F.3d 1146 (9th Cir. 2006) (quoting <u>Madsen v. Boise State Univ.</u>, 976 F.2d 1219, 1220-1221 (9th Cir. 1992) (per curiam)). In <u>Madsen</u>, the plaintiff sued a university "claiming handicap discrimination based on the fact that the University did not offer free handicap parking permits on campus." 976 F.2d at 1220. Prior to filing suit, he called various offices at the university asking about "free handicap parking permits" and was told that none were available. <u>Id.</u> He did not apply for a permit, seek a waiver or pay the fee and ask for a refund. <u>Id.</u> Instead, he filed a complaint with the Department of Education, Office of Civil Rights. <u>Id.</u> The Ninth Circuit concluded that he did not have standing to bring suit. <u>Id.</u> at 1222. In ruling, the court stated, "Requiring a party to have actually confronted the policy he now challenges in court has several prudential and practical advantages." <u>Id.</u> at 1221. The court noted that one of these advantages is "that only those individuals who cannot resolve their disputes without judicial intervention wind up in court." <u>Id.</u> Further, "requiring a formal application as the normal prerequisite for bringing a case to court limits those who can claim injury from a policy which may not have harmed them at all, or that they may not have even known about." <u>Id.</u> at 1222.

Plaintiff responds that she "submitted her two applications; not once, but twice to each department." Am. Pl.'s Reply and Opp. Re: Summ. J. 26. Plaintiff cites her attorney's letter to the

departments; however, this was not an application.  It was a
request for information about the application process.  Plaintiff
also cites the applications that she represents her attorney faxed
and mailed to the departments.  Although she filled in the
applications according to their terms and she complains that the
"City refused to appoint an investigator so that plaintiff could
complete the application process," id. at 26, Plaintiff did not
provide the City with any information that would have allowed
either department to contact her in order to process these
applications.  Further, Plaintiff never submitted payment of the
relevant application processing fee to the City.  Accordingly,
Plaintiff did not properly avail herself of the application
process.

Such a conclusion furthers the practical advantages discussed
by the Ninth Circuit in Madsen as well.  By not submitting an
application that would have allowed the City to provide her with a
response, Plaintiff did not allow either department the
opportunity to resolve the dispute without judicial intervention.

Plaintiff further argues that this requirement should be
excused because it would have been futile for her to apply.  In
Madsen, the Ninth Circuit stated, "To begin with, it is unclear
whether futility can, by itself, establish standing where it does
not otherwise exist.  It may well be that futility excuses some
aspects of proving injury-in-fact while standing, a constitutional
requirement, may not be so easily finessed."  976 F.2d at 1220.
The court declined to resolve this issue because it found the
plaintiff had not alleged enough facts to establish futility.  Id.
However, in a later case, the Ninth Circuit stated, "We have

United States District Court
For the Northern District of California

consistently held that standing does not require exercises in futility." Taniguchi v. Schultz, 303 F.3d 950, 957 (9th Cir. 2002). Thus, in cases where the challenged policy or ordinance unambiguously rendered an application futile, courts have not required plaintiffs to submit a formal application to establish standing. See, e.g., id. at 950 ("the [challenged] statute unambiguously precludes Taniguchi, as [a lawful permanent resident] convicted of an aggravated felony, from the discretionary waiver. To apply for the waiver would have been futile on Taniguchi's part and, therefore, does not result in a lack of standing."); Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d 814 (9th Cir. 1996) ("Applying for a permit would have been futile because: (1) the City brought state court actions against [the plaintiffs] to compel them to remove their signs; and (2) the ordinance flatly prohibited [the plaintiffs'] off-site signs[.]"); see also Dragovich v. United States Dep't of the Treasury, 764 F. Supp. 2d 1178, 1185 (N.D. Cal. 2011) (same sex couples was not required to submit an application for state-maintained long-term care insurance plan in order to establish standing where the government agency made abundantly clear in written and oral communications that their applications would be rejected and the relevant laws "plainly result" in the exclusion of same sex couples).

In Friery, the Ninth Circuit considered a case in which a plaintiff attempted to establish standing through the futility exception. 448 F.3d at 1149-50. The plaintiff, a teacher at a high school in Los Angeles Unified School District (LAUSD), had approached the principal at a school at which he taught and asked

**United States District Court**
For the Northern District of California

about the possibility of transferring to a vacant position at
another school.  Id. at 1147-48.  The school district had in place
a policy which "bars intra-district faculty transfers that would
move the destination school's ratio of white faculty to nonwhite
faculty too far from LAUSD's overall ratio."  Id. at 1147.  The
principal told him that "he would not be eligible for the transfer
because he was . . . of 'the wrong ethnic origin.'"  Id. at 1148.
The teacher did not file a formal transfer application in light of
this representation.  Id.  The Ninth Circuit found that the record
was not sufficiently developed for it to determine whether he had
standing and remanded for further fact-finding by the district
court.  Id. at 1150.  In doing so, the court noted, "If [the
principal] correctly interpreted the Transfer Policy, if [the
principal] had the authority to deny [the teacher] the ability to
transfer, and if any exceptions in the Transfer Policy did not
apply to [the teacher], then [the principal]'s assurances to him
might make Friery's application futile."  Id. at 1149-50.

     Here, Plaintiff's primary basis for arguing that her
application would have been futile is the letter sent by Mr.
Harrigan, the then-Sheriff's legal counsel, in which he stated
that any application from a private citizen would be rejected.
Plaintiff, however, has offered no evidence that this was actually
the policy of the former Sheriff or that Mr. Harrigan had the
authority to deny an application or to set policy.  There is
evidence in the record that the Sheriff has issued CCW permits to
unsworn individuals and that the Sheriff has denied such permits
to former federal or local employees.  Further, even if it would
have been futile for Plaintiff to apply for a permit from the

**United States District Court**
For the Northern District of California

Sheriff, there were two licensing authorities in San Francisco and this letter did not make it appear that it would have been futile for Plaintiff to submit an application to the Police Chief. Finally, Plaintiff's own actions belie this argument.  After receiving this letter from Mr. Harrigan, Plaintiff attempted to submit a CCW license application to the Sheriff's Department. Although she did not complete it properly, this demonstrates that she herself did not believe that it was futile to apply.

Accordingly, the Court finds that Plaintiff lacks standing to challenge the CCW permit process and GRANTS Defendants' motions for summary judgment on these claims.[8]

II.   Challenges to the discharge ordinance

Plaintiff states that Police Code section 1290 "prohibits the 'discharge [of] any firearms' within the City and County of San Francisco, and provides no exception for discharges related to in-home self-defense."  Pl.'s Mot. for Summ. J. 15.  On this basis, Plaintiff argues that the ordinance is unconstitutional and requests that the Court enjoin enforcement of it.  Id.  However, in 2011, Police Code section 1290 was changed and no longer applies to firearms at all.  It was replaced with the amendments to sections 4502 and 4506 that contain the specific exceptions

_____

[8] Plaintiff also has not responded to Defendants' arguments that she has not named any proper federal defendant for her sixth cause of action, which challenges the provisions of Federal Law Enforcement Officers Safety Act, 18 U.S.C. §§ 926B, 926C, that allow qualified retired law enforcement officers to obtain CCW permits, and that the named Defendants, who are all state and city officials, are required by the Supremacy Clause to give these statutes effect.  In fact, in her motion and opposition papers, Plaintiff does not make a single reference to these statutes. Accordingly, the Court GRANTS Defendants summary judgment on the sixth cause of action.

that Plaintiff complained section 1290 had lacked.  Plaintiff also raises no argument that sections 4502 and 4506 are unconstitutional and does not seek to enjoin enforcement of these sections.  Because the complained-of section has been repealed, Plaintiff's request to enjoin its enforcement is moot.

Plaintiff contends that, although her request for relief is moot, she should be able to obtain an award of attorneys' fees that she incurred during the pendency of this action.  Plaintiff argues, "To the extent the law was changed after plaintiff filed her action," she is entitled to "an adjudication that plaintiff is deemed a prevailing party for an award of attorney fees pursuant to 42 U.S.C. Section 1988," because a "[p]ost hoc legislative change altered the legal relationship between the parties and constituted a direct benefit to plaintiff."  Id.

Title 42 U.S.C. § 1988 provides in relevant part that, in any action or proceeding to enforce various civil rights statutes, including 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).

A "plaintiff who does not secure a judgment on the merits 'but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct' is not a 'prevailing party' for purposes of awarding attorney's fees."  Benton v. Or. Student Assistance Comm'n, 421 F.3d 901, 906-907 (9th Cir. 2005) (quoting Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Res., 532 U.S. 598, 600 (2001)).  Following the Supreme Court's decision in

United States District Court
For the Northern District of California

Buckhannon, the Ninth Circuit held that "to qualify as a 'prevailing party' under 42 U.S.C. § 1988 a party must obtain a 'judicially sanctioned change in the legal relationship of the parties.'" Bennett v. Yoshina, 259 F.3d 1097, 1101 (9th Cir. 2001) (quoting Buckhannon, 532 U.S. at 1840 and holding that, "even if" the "political branches were motivated to enact" a legislative change "solely by this litigation, this result 'lacked the necessary judicial imprimatur' to qualify plaintiffs as prevailing parties") (emphasis in original).

Accordingly, even if the City changed the ordinance in reaction to this lawsuit, and not, for example, in reaction to the Supreme Court's decisions in Heller and McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), the City's voluntary change does not qualify Plaintiff as a prevailing party for the purposes of obtaining attorneys' fees.

CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's motion for summary judgment (Docket No. 60) and GRANTS Defendants' cross-motions for summary judgment (Docket Nos. 71 and 91).

The Clerk shall enter judgment.  Defendants shall recover their costs from Plaintiff.

IT IS SO ORDERED.

Dated: 12/5/2012

CLAUDIA WILKEN
United States District Judge